UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 16-cv-_____

FREDERICK SIEGMUND, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

XUELIAN BIAN, WEI GUAN,
SIDLEY AUSTIN LLP,
SHANGHAI YINLING ASSET
MANAGEMENT CO., LTD.
LEADING FIRST CAPITAL LIMITED and
LEADING WORLD CORPORATION,

Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiff Frederick Siegmund ("Plaintiff"), by his counsel, alleges upon personal

knowledge as to his own acts, and as to all other matters based upon the investigation conducted

by himself and his counsel, which includes the review of filings with the Securities and

Exchange Commission ("SEC"), discovery had in this action to date and other publicly available

information, as follows:

**I.**     **INTRODUCTION**

1.      Plaintiff, individually and on behalf of all similarly situated public shareholders of

Linkwell Corporation ("Linkwell" or the "Company"), asserts claims for federal securities

violations and state law breaches of fiduciary duty, aiding and abetting breaches of fiduciary

duty and civil conspiracy against defendants Xuelian Bian ("Xuelian"), Wei Guan ("Wei"),

Sidley Austin LLP ("Sidley"), Shanghai Yinling Asset Management Co., Ltd. ("Yinling"),

Leading First Capital Limited ("Leading First" or "Parent") and Leading World Corporation ("Leading World" or "Merger Sub") (Yinling, Leading First and Leading World are collectively referred to as "Yinling"), for their misconduct in connection with the design, implementation and consummation of a covert go-private merger transaction (the "Acquisition").

2.      The Acquisition was undertaken on behalf of and for the benefit of Xuelian and Wei to: (a) extinguish the valuable claims asserted against them in a previously filed derivative action (*Siegmund v. Bian, et al*., No. 12-cv-62539 (S.D. Fla.) (the "Derivative Action"); and (b) directly acquire for Xuelian, Wei and their affiliates total control of the Company's disinfectant business in China.

3.      The Acquisition was consummated without providing statutory notice to Plaintiff (and other similarly situated shareholders) of the go-private merger transaction, giving the shareholders the opportunity to vote thereon or his right to an appraisal of his shares of Linkwell stock under Florida law, and resulted in the unilateral sale of Plaintiff's shares of Linkwell stock at an unfair price.

4.      In the Derivative Action, Plaintiff asserted claims on behalf of nominal defendant Linkwell and against the members of the Company's Board of Directors (the "Board") and certain other related and/or affiliated third parties for their misconduct and self-dealing in connection with a prior unfair, wrongfully accomplished reverse merger transaction (the "Transaction").

5.      The Derivative Action sought to recover damages and other relief for claims for state law breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, constructive fraud, civil conspiracy, unjust enrichment, imposition of a constructive trust and statutory attorneys' fees and expenses against Xuelian, Wei, Song Qiang Chen ("Song"), Ling Li

("Ling"), Metamining, Inc. ("Metamining"), Metamining Nevada, Inc. ("Metamining Nevada"), CD International Enterprises, Inc. ("CD Int'l"), China Direct Investments, Inc. ("China Direct"), Capital Resource Management Co., Ltd., f/k/a Capital One Resource Co., Ltd. ("Capital Resource") and Ecolab Inc. ("Ecolab").

6.     The Transaction was designed to conceal its principals' self-dealing with respect to the Company's assets and operations, to the detriment and expense of Linkwell.  Pursuant to the publicly disclosed terms of the Transaction, Linkwell issued 94% of its equity to Metamining and China Direct to acquire 100% of the equity of Metamining Nevada, a wholly owned subsidiary of Metamining with no assets, operations or employees.  Linkwell's public filings with the SEC, however, did not disclose that the Transaction also involved the spin-off of the Company's disinfectant business.  Discovery obtained in the Derivative Action revealed that as part of the agreement to transfer control of Linkwell to Song and Ling, Linkwell would spin off its 90% equity ownership interest in Linkwell Tech Group, Inc. ("Linkwell Tech") (and Linkwell Tech's 100% equity ownership interest in Shanghai Likang Disinfectant High-Tech Co., Ltd. ("Likang Disinfectant") and Shanghai Likang Biological High-Tech Co., Ltd. ("Likang Biological")) to Xuelian and Wei in exchange for the return or cancellation of their shares of Linkwell stock.  Linkwell, however, did not receive any consideration for the spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei, or for the transfer of substantially all of its equity to Song, Ling, CD Int'l, China Direct and Capital Resource.

7.     After Plaintiff uncovered that the Transaction was a sham and moved for partial summary judgment, the Transaction was unwound.  The stock certificates for the shares of Linkwell stock issued to Song and Ling (and members of their respective families) were

subsequently returned to the Company.  The shares of stock issued to China Direct and Capital Resource were also returned.  Plaintiff, however, was unable to obtain any confirmation that the stock certificates representing the Company's 90% equity ownership of Linkwell Tech and Linkwell Tech's 100% equity ownership of Likang Disinfectant and Likang Biological were returned to Linkwell.

8.      On January 16, 2014, the Court in the Derivative Action entered Orders compelling Linkwell, Song, Ling, Metamining, Metamining Nevada and CD Int'l, China Direct and Capital Resource to respond to Plaintiff's discovery concerning, among other things, the location of the stock certificates for Linkwell Tech, Likang Disinfectant and Likang Biological, by January 31, 2014.

9.      Xuelian and Wei, however, prevented Linkwell from obeying the January 16, 2014 Omnibus Order (ECF No. 116) ("Omnibus Order") and failed to take appropriate action within their power as members of the Board to cause the Company to comply with discovery. Xuelian and Wei retained legal counsel to assist them with, among other things, avoiding the obligation to comply with the Omnibus Order and the disclosure of facts establishing their misconduct and self-dealing.

10.      On or about March 28, 2014, Sidley presented a proposal to Xuelian, Wei and Liyong Sui ("Liyong") (a representative of the yet to be formed Yinling) to take Linkwell private in a one-step merger, and subsequent post-merger restructuring for an IPO outside of the U.S.

11.      On April 4, 2014, Likang Disinfectant retained Sidley as legal counsel to provide advice and assistance in all aspects of the Acquisition.  The April 4, 2012 legal counsel engagement letter ("Likang Engagement Letter") was signed by Xuelian for Likang Disinfectant and Joseph Chan, a partner in Sidley's Singapore office.  Pursuant to the Likang Engagement

Letter, Sidley agreed to assist in the preparation and filing of documents whereby Linkwell would "go dark" with the SEC, deregister its securities and cease filing financial statements or periodic reports.  Sidley also agreed to assist Linkwell with any regulatory inquiry from the Financial Industry Regulatory Authority ("FINRA").

12.     By going dark, Xuelian and Wei sought to avoid future public disclosures regarding the Acquisition, as well as any regulatory scrutiny of the same.

13.     Pursuant to the Likang Engagement Letter, Sidley additionally agreed to assist in: (a) the organization of an acquisition vehicle (Leading World); (b) the structuring and execution of a going private proposal and the necessary legal documentation to facilitate the same; and (c) liaising with the transfer, depository and paying agents.

14.     On April 11, 2014, Linkwell filed a Certificate and Notice of Termination of Registration on Form 15 ("Notice of Termination") with the SEC.

15.     On April 15, 2014, counsel for Plaintiff sent an email to counsel for CD Defendants, whose client China Direct served as the registered agent for Linkwell, regarding the Company's non-compliance with the Omnibus Order and the recent filing of the Notice of Termination.  The email advised that Plaintiff intended to move for an Order of Contempt and requested a meet and confer on April 16, 2014 with a representative of Linkwell to discuss the Company's immediate efforts to comply with discovery.  That communication was forwarded to Linkwell on April 17, 2014.

16.     On April 22, 2014, Likang Disinfectant, and Sidley executed a supplement to the Likang Engagement Letter ("Supplement").  Pursuant to the Supplement, Likang Disinfectant retained Sidley as legal counsel for Linkwell, Xuelian and Wei in connection with the Derivative Action (which asserted claims on behalf of Linkwell and against Xuelian and Wei).  Like the

Likang Engagement Letter, the Supplement was signed by Xuelian for Likang Disinfectant and Sidley partner Joseph Chan.

17.     Sidley undertook the retention despite clear conflicts of interest posed by the representation of Linkwell, the Nominal Defendant in the Derivative Action, and Xuelian and Wei, individuals alleged to have, among other things, caused substantial harm to Linkwell. Sidley obtained no waiver of conflicts from Linkwell and no consent from the Company's public shareholders with respect to the representation of Xuelian and Wei.

18.     On July 9, 2014, Yinling retained Sidley in connection with the Acquisition.  The July 9, 2014 legal counsel engagement letter ("Yinling Engagement Letter") was signed by Liyong for Yinling and Sidley partner Joseph Chan.

19.     Likang and Yinling each subsequently executed waiver letters which: (a) acknowledged the disclosure by Sidley that its representation of both Likang and Yinling in connection with the Acquisition is an actual or potential conflict of interest; and (b) consented to Sidley's representation.

20.     On July 15, 2014, Xuelian and Wei were served with process in this action.  Three days later, Xuelian and Wei purportedly resigned their positions as directors and officers of Linkwell.  Xuelian and Wei did not disclose their resignations until November 2014, after they were confronted with a motion for an Order of Contempt relating to the Company's failure to comply with the Omnibus Order.

21.     On August 12, 2014, Linkwell entered an agreement and plan of merger (the "Merger Agreement") with Leading First and its wholly owned subsidiary Leading World, pursuant to which Leading First would acquire all of the equity of Linkwell at $0.88 per share.

22.     Sidley served as the sole counsel for the acquirer *and* target in the Acquisition, attended all meetings involving the Board and Yinling, and participated in all discussions of the material terms to the Merger Agreement, including the $0.88 per share merger consideration. Sidley formed and incorporated Leading First and Leading World for purposes of entering into and consummating the Acquisition.  Sidley was responsible for the preparation and drafting of all transaction documents relevant to the Acquisition, including the Merger Agreement which contained provisions to ensure that any costs or expenses incurred in connection with this action by, among others, Xuelian and Wei, as well as any costs or expenses incurred in connection with the Acquisition, would be borne by Linkwell.  Sidley also drafted the proxy statement ("Proxy Statement") and was responsible for ensuring that the mailing of the Proxy Statement and related materials to the Company's shareholders was timely and complied with Florida law.

23.     Sidley additionally served as counsel for Xuelian and Wei in connection with the Derivative Action, yet failed to disclose any information about the Acquisition or the September 19, 2014 special meeting of Linkwell shareholders in Shanghai, China ("Special Meeting") to approve the same to the Court or Plaintiff.

24.     Xuelian, Wei and Sidley determined not to provide Plaintiff (or any other U.S. public shareholders of Linkwell that held their stock in street name) with notice of the Acquisition, Special Meeting or their appraisal rights, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes, in order to prevent Plaintiff (and other similarly situated shareholders of Linkwell) from moving to enjoin the Acquisition or exercising appraisal rights.

25.     After the Merger Agreement was approved at the Special Meeting, Sidley caused amended and restated articles of incorporation ("Amended Articles of Incorporation") to be filed on behalf of Linkwell with the Florida Department of State.  Pursuant to the Amended Articles

of Incorporation, Linkwell, for the first time, agreed to authorize the indemnification of its current and former officers and directors to the fullest extent provided by applicable law and including the advancement of legal expenses for all matters pending, existing or occurring at or prior to the approval of the Merger Agreement.

26.    Sidley also caused articles of merger for Linkwell ("Articles of Merger"), which attached a plan of merger ("Plan of Merger") and amended Bylaws, to be filed with the Florida Department of State, which set forth, among other things, that the Acquisition became effective on September 19, 2014, after the Plan of Merger and Merger Agreement were adopted by the Linkwell shareholders at the Special Meeting.

27.    Upon information and belief, neither the Amended Articles of Incorporation nor the Articles of Merger were publicly available until October 26, 2014.

28.    As a result of the failure by Xuelian, Wei and Sidley to comply with Florida's statutory notice requirements, Plaintiff did not discover the Acquisition until after its consummation.  The failure to provide Plaintiff with statutory notice unlawfully and unfairly deprived Plaintiff of the opportunity to: (a) evaluate whether the $0.88 per share merger consideration was fair; (b) vote to approve the Merger Agreement; (c) exercise appraisal rights; or (d) move to enjoin the Acquisition.  Plaintiff would have moved to enjoin the Acquisition in this action if the legally required notice had been provided.  The failure to provide such notice rendered the approval of the Merger Agreement and consummation of the Acquisition a *fait accompli*.

29.    Documents produced in discovery after the Acquisition was consummated demonstrate that the Company's disclosures concerning the Acquisition are manifestly incomplete insofar as they omit material information.  For example, the Proxy Statement (which

Plaintiff obtained through discovery in the Derivative Action) contains no current financial statements, either audited or unaudited, for Linkwell, or even a fairness opinion from a financial advisor to allow Linkwell shareholders to evaluate the $0.88 per share merger consideration. The Proxy Statement did not disclose the pendency of the Derivative Action, the nature of the claims asserted against Xuelian and Wei, amongst others, for self-dealing and other breaches of fiduciary duty in connection with the Transaction; nor does it contain a valuation of those claims to the Company.

30.     The Merger Agreement appended to the Proxy Statement is also incomplete.  It is not executed by the parties.  It lacks the requisite schedules, including the Company Disclosure Schedules referenced therein which are described to contain "a correct and complete list of all of the Company's subsidiaries, ownership interest of the Company in each Company Subsidiary, and the ownership interest of each Person or Persons in each Company Subsidiary."

31.     As a result of Defendants' misconduct, Plaintiff and the other public shareholders of Linkwell suffered substantial damages as they did not receive fair value for their Linkwell stock in connection with the Acquisition.

32.     In 2008, Ecolab paid $2 million to acquire 10% of the equity of Linkwell Tech from Linkwell.  In 2013, Ecolab purportedly sold the 10% equity interest to Linkwell Tech (and not Linkwell) for $2.4 million.

33.     In connection with the Acquisition, Yinling purportedly paid only $483,120.00 ($0.88 x 549,000 outstanding shares of Linkwell stock) to obtain 100% of the equity of Linkwell. Excluding the shares of Linkwell stock owned by Xuelian, Wei and parties that they control or with whom they are affiliated, the cost to squeeze out the public shareholders of Linkwell was a mere $176,960.66 ($0.88 x 201,092 outstanding shares of Linkwell stock).

34.     Corporate filings with the Shanghai Administration of Industry and Commerce ("SAIC") indicate that Likang Disinfectant had: RMB 254,020,000 million (U.S. $40,926,924) (based on December 31, 2014 conversion rate of 0.1611169372) in total assets and RMB 28,920,000 (U.S. $4,659,502) in total liabilities for year-end 2014; RMB 189,710,000 (U.S. $31,336,466) (based on December 31, 2013 conversion rate of 0.1651808859) in total assets and RMB 22,177,000 (U.S. $3,663,217) in total liabilities for year-end 2013; and RMB 170,684,480 (U.S. $27,391,515) (based on December 31, 2012 conversion rate of 0.1604804074) in total assets and RMB 23,062,248 (U.S. $3,701,039) in total liabilities for year-end 2012.

35.     Likang Disinfectant recorded net profits of RMB 15,613,894 (U.S. $2,505,724), 20,180,000 (U.S. $3,333,350) and 6,050,000 (U.S. $974,757) for the years 2012, 2013 and 2014, respectively.

36.     The merger consideration paid to Linkwell's public shareholders of $0.88 per share is less than 1% of the net asset value of Linkwell subsidiary Likang Disinfectant that was reported to SAIC for 2014.

37.     The 2012, 2013 and 2014 financial information for Likang Disinfectant furnished to SAIC was *not* provided to the public shareholders of Linkwell in the Proxy Statement.

38.     Despite having been purportedly cashed out of Linkwell as a result of the consummation of the Acquisition, Xuelian is presently the controlling shareholder of Likang Disinfectant which, according to the Company's SEC filings, was responsible for 99% of the revenues and earnings of Linkwell from its disinfectant business in China.  Pursuant to corporate filings with SAIC, Xuelian is the majority shareholder of Shanghai Zhongyou Pharmaceutical High-Tech Co., Ltd. ("Zhongyou Pharmaceutical"), and owns in excess of 51% of that company. Yinling is now one of Zhongyou Pharmaceutical's *minority* shareholders.  As of December 9,

2014, Zhongyou Pharmaceutical owned over 83% of the equity of Likang Disinfectant.  The remainder of the equity of Likang Disinfectant is owned by Linkwell Tech.

## II.      JURISDICTION AND VENUE

39.     The Court has subject matter jurisdiction over the claims asserted herein pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a), as those claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. §78j, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

40.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. 1391(b) because many of the acts and omissions charged herein occurred in this District.

## III.      THE PARTIES

### A.      Plaintiff

41.     Plaintiff was a Linkwell stockholder throughout the time the misconduct complained of herein occurred.  On November 6, 2014, Plaintiff's shares of Linkwell stock were unilaterally cancelled from his brokerage account in connection with the Acquisition.  Neither Plaintiff, nor his broker, were provided with any information concerning the Acquisition and were not furnished with a copy of the Merger Agreement, Proxy Statement or notice of the Special Meeting.  Plaintiff was not notified of his statutory appraisal or other rights in connection with the Acquisition.  Plaintiff is a citizen of the State of New York.

### B.   Defendants

42.     Defendant Xuelian, at all relevant times, was a controlling shareholder of Linkwell.  Xuelian has served as the Board Chairman, Chief Executive Officer and President of Linkwell since May 2005.  Xuelian has simultaneously served as Chief Executive Officer, President and a director of Linkwell Tech since its inception in June 2004, and as General Manager of Likang Disinfectant since 1993.  Xuelian is the Executive Director and controlling shareholder of Zhongyou Pharmaceutical.  Xuelian is also a co-owner of Linkwell Int'l and owns 30% of the equity of Zhongyou (Shanghai) Technology Development Co. Ltd. ("Zhongyou Technology").  Upon information and belief, Xuelian is a citizen of China.

43.     Defendant Wei, at all relevant times, was a controlling shareholder of Linkwell. Wei has served as a member of the Board and Vice President of the Company since May 2005. Wei has also served as the Vice President of Linkwell Tech since its inception in June 2004, and as Vice General Manager of Likang Disinfectant since 2002.  Wei is a co-owner of Linkwell Int'l with Xuelian.  Wei owns 35% of the equity of Zhongyou Technology and serves as a supervisor for that company.  Upon information and belief, Wei is a citizen of China.

44.     Defendant Sidley is an international law firm with its headquarters in Chicago, Illinois.

45.     Defendant Yinling is a Chinese limited liability company with a principal business in Shanghai, China.  Yinling was formed on April 18, 2014.  Yinling is the sole shareholder of Leading First.   Yinling is also a minority shareholder of Zhongyou Pharmaceutical.

46.     Defendant Leading First is a British Virgin Islands company with a business address in Shanghai, China.  Sidley formed Leading First on or about June 25, 2014 for the purpose of entering into and consummating transactions contemplated by the Merger Agreement.

47.     Defendant Leading World is a Florida corporation with a business address in Shanghai, China, and a wholly owned subsidiary of Leading First.  Sidley formed Leading World on or about August 5, 2014 for the purpose of entering into and consummating transactions contemplated by the Merger Agreement.

## IV.     <u>RELEVANT NON-PARTIES</u>

48.     Relevant Non-Party Linkwell is a Florida corporation with a principal place of business in Shanghai, China.  Prior to the commencement of the Derivative Action, Linkwell operated as public holding company for its direct operating subsidiaries Linkwell Tech, Likang Disinfectant, Likang Biological and other affiliated entities.  Linkwell shares the same registered business address and office space as Likang Disinfectant.

49.     Relevant Non-Party Liyong is a Vice President of Yinling and the sole director of Leading First and Leading World.  Liyong is a chartered accountant in China.

50.     Relevant Non-Party Song served as a member of the Board from March 30, 2012 to mid-2014.  Song also served as the Chairman of Metamining and Metamining Nevada since co-founding those companies in 2008 and 2011, respectively.

51.     Relevant Non-Party Ling served as a member of the Board from March 30, 2012 to mid-2014.  Ling, also a co-founder of Metamining and Metamining Nevada, served as the President and a director of those companies since 2008 and 2011, respectively.

52.     Relevant Non-Party Metamining is a California corporation with a principal place of business in Foster City, California.  Metamining is a privately held mining development company that manages mines in the United States and develops a portfolio of mineral assets, including metallurgical coal, iron ore, copper and manganese ore.

53.     Relevant Non-Party Metamining Nevada is a Nevada corporation.  Prior to the Transaction, Metamining Nevada was a wholly owned subsidiary of Metamining.  Metamining

Nevada was formed by Metamining on March 30, 2011 in connection with the entry of certain purchase and sale agreements in connection with the Nevada Properties (defined below).

54.     Relevant Non-Party CD Int'l is a Florida corporation with its principal place of business in Deerfield Beach, Florida.  CD Int'l produces and distributes industrial commodities in China and the Americas.

55.     Relevant Non-Party China Direct is a Florida corporation and a wholly owned subsidiary of CD Int'l.  China Direct provides specialized business consulting services primarily to Chinese companies seeking access to the U.S. capital markets.  China Direct shares an interlocking management structure with CD Int'l.  It also shares the same office space with CD Int'l in Deerfield Beach, Florida.

56.     Relevant Non-Party Capital Resource is a Brunei company with a principal place of business in China, and a wholly owned subsidiary of CD Int'l.  Capital Resource provides specialized business consulting services primarily to Chinese companies seeking access to the U.S. capital markets.

57.     Relevant Non-Party James Wang ("Wang") is the Chairman and Chief Executive Officer of CD Int'l and China Direct.  Wang has served as Chairman and Chief Executive Officer of CD Int'l since August 2006.  He co-founded China Direct and has served as its Chairman and Chief Executive Officer since January 2005.  In his capacity as Chief Executive Officer of CD Int'l, Wang exercised voting and dispositive control over the shares of Linkwell stock held by China Direct and Capital Resource.

58.     Relevant Non-Party Ecolab is a Delaware corporation with headquarters located in St. Paul, Minnesota.  Ecolab develops and markets products and services for the hospitality, foodservice, healthcare and industrial markets.

14

## V.    DUTIES OF DIRECTOR DEFENDANTS

59.    As directors of Linkwell, Xuelian and Wei each owed the Company and its shareholders the fiduciary duties loyalty, good faith, due care and disclosure.  The misconduct complained of herein involves culpable violations by the Company's directors of their fiduciary obligations.

60.    By reason of their positions as directors and fiduciaries of Linkwell, and because of their ability to control the business and corporate affairs of the Company and its subsidiaries, Xuelian and Wei each owed Linkwell and its public shareholders fiduciary duties and were required to use their ability to control and manage Linkwell in a fair, just, honorable and equitable manner, to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their own personal interests or benefits.  Furthermore, as officers, directors and fiduciaries of a publicly held company, Xuelian and Wei each had a duty to refrain from utilizing their control over Linkwell to secretly divert assets to themselves or their designee(s).

61.    Each director of Linkwell named herein owed the Company and its public shareholders the fiduciary obligation to act in good faith, with due care, loyalty and diligence in the management and administration of the Company's affairs, as well as in the use and preservation of its property and assets, and the highest obligations of fair dealing.

62.    By reason of their positions at Linkwell, Xuelian and Wei each had the power and authority to control the contents of the Company's public statements to the financial marketplace, including the Company's Form 10-Qs, press releases, proxy statements and information statements (collectively, "public filings") discussed herein.

63.    Because of their positions at Linkwell, Xuelian and Wei were each aware of the wrongful conduct complained of herein, had access to adverse non-public information and were

required to disclose such facts promptly and accurately to the Company's shareholders and the financial markets.

64.     Xuelian and Wei, because of their advisory, executive, managerial and directorial positions with Linkwell, each had access to adverse, non-public information about the financial condition and operations of Linkwell, access to internal corporate documents, reports and other information, including adverse, non-public information about the business, financial condition and future prospects, and attended management and/or board of director meetings.  Xuelian and Wei were each responsible for the truthfulness and accuracy of the Company's public filings.

65.     Xuelian and Wei directly participated in the management, administration and/or oversight of Linkwell and were privy to confidential, proprietary information about its business operations and accounting practices.

66.     To discharge their duties, Xuelian and Wei were each required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company.  By virtue of such duties, Xuelian and Wei were obligated to, among other things:

        a.      Manage, conduct, supervise and direct the business affairs of Linkwell in accordance with all applicable laws (including federal and state laws, government rules and regulations);

        b.      Neither engage in self-dealing, nor knowingly permit any officer, director or employee of Linkwell to engage in self-dealing;

        c.      Neither violate, nor knowingly permit any officer director or employee of Linkwell to violate, applicable laws, rules and regulations;

      d.      Prudently protect the Company's assets, and to ensure that the Company is paid an appropriate price for the disposition of its material assets and/or operations;

      e.      Exercise control and supervision over the public statements to the securities markets trading in Linkwell stock by the officers and employees of the Company; and

      f.      Supervise the preparation and filing of all financial reports or other information required by law from Linkwell, examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning each of the subjects and duties set forth above.

67.      In connection with the Acquisition, Xuelian and Wei each stood in a fiduciary relationship with Linkwell, Plaintiff and the Company's other public shareholders and owed them the highest fiduciary obligations of loyalty, good faith, fair dealing, due care and full and candid disclosure.

68.      To diligently comply with their fiduciary obligations, Xuelian and Wei were duty bound not take any action that:

      a.      Adversely affects the value provided to Linkwell or its stockholders;

      b.      Favor themselves;

      c.      Adversely affects their duty to search for and secure the best value available under the circumstances for Linkwell and its stockholders; and/or

      d.      Provide them with preferential treatment at the expense of Linkwell or its public shareholders.

69.      Xuelian and Wei, separately and together, knowingly or recklessly violated their fiduciary duties as directors, officers and controlling shareholders of Linkwell, including their

duties of loyalty, good faith, due care and disclosure owed to Linkwell, Plaintiff and the other shareholders of Linkwell.  Xuelian and Wei undertook and approved the Acquisition as a means to terminate the Derivative Action, avoid significant personal liability for their misconduct and, thus, deprive the Company of compensation for the damage they caused.  Xuelian and Wei stood on both sides of the Acquisition, engaged in self-dealing and obtained for themselves financial benefits not equally shared by Plaintiff and the public shareholders of Linkwell.  Xuelian, Wei and their legal counsel Sidley did not provide statutory notice of the Acquisition and shareholder appraisal rights to *all* of the Company's shareholders, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes, so as to prevent Plaintiff from moving in the Derivative Action to enjoin the Acquisition or exercise appraisal rights.

70.    Other reasons exist that challenge the fairness and propriety of the Acquisition. For example, Sidley, counsel for Linkwell, Xuelian and Wei in connection with the Derivative Action, also served as counsel for Likang and Yinling in the Acquisition.  The Proxy Statement does not disclose this conflict of interest.   After the Acquisition was consummated, Xuelian continued to control Linkwell through his position of management at and as controlling shareholder of Likang Disinfectant.  The Proxy Statement does not disclose whether Xuelian or Wei would have any post-merger management role or equity interest in Linkwell, Linkwell Tech or Likang Disinfectant.

71.    As a result of the self-dealing and divided loyalties of Xuelian and Wei, Linkwell did not obtain value for its assets.  Moreover, Plaintiff and the public shareholders of Linkwell Company (unaffiliated with Xuelian and Wei) did not receive fair value for their shares of Linkwell stock.

72.     Because Xuelian and Wei knowingly or recklessly breached their fiduciary duties of loyalty, good faith, due care and disclosure in connection with the Acquisition, the burden of proving entire fairness, including all aspects of its negotiation, structure, price, terms and provision of statutory notice, is placed upon them as a matter of law.

## VI.     ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.     Background

#### 1.     Linkwell

73.     At all relevant times, Linkwell, through its direct subsidiaries Linkwell Tech, Likang Disinfectant and Likang Biological, and certain other affiliated entities, engaged in the development, manufacture, sale and distribution of disinfectant health care products in China.

74.     Likang Disinfectant's products are sold on a wholesale and retail basis to the health care community in China.  It has 66 marketed products, 46 of which are certified by one or more of the following Chinese government authorities: the Chinese Ministry of Health, the State Food and Drug Administration and the Ministry of Agriculture.  The Ministry of Health, the authority which approves products that require the highest level of licensing, granted Likang Disinfectant 31 hygiene licenses.

75.     Products manufactured by Likang Disinfectant accounted for more than 99% of the Company's total net revenues for fiscal year ended December 31, 2011.

76.     According to the Company's Annual Return on Form 10-K for fiscal year ended December 31, 2011 ("2011 Form 10-K"), Linkwell, through Likang Disinfectant, has more than 6,000 active and recurring customers in China, including hospitals, clinics, health centers, medical suppliers and distribution companies.

77. Linkwell's total net sales for fiscal year ended December 31, 2011 were almost $17 million, more than a 25% increase over its prior year's performance. Gross profits were $7,428,520 and net income was approximately $1.88 million, a 101.2% increase over 2010.

78. As of December 31, 2011, the Company had cash and cash equivalents of $2,919,670, accounts receivable of $12,651,347, total assets of $27,446,588, total liabilities of $10,012,087, total stockholders' equity of $17,434,501, and working capital of $1,997,311 with no material commitments for capital expenditures.

### a) Legal Counsel Agreement

79. Linkwell's strong financial performance and future prospects, however, were not reflected in its share price. In the 2011 Form 10-K, Linkwell acknowledged that its common stock did not have an established trading market in the U.S. and, as such, was traded on the OTCBB and the Pink Sheets. Trading on these platforms made it more difficult for Linkwell to raise additional capital in the U.S. public markets.

80. Sometime in 2011, after discussions with the Company business consultant Wang, Xuelian and Wei determined to spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological from Linkwell.

81. On January 1, 2012, Linkwell, Linkwell Tech and Likang Disinfectant executed a legal counsel agreement ("Legal Counsel Agreement") with Shanghai Haimai Legal Firm ("Haimai Legal"), pursuant to which Haimai Legal agreed to provide certain legal services to Linkwell, Linkwell Tech and Likang Disinfectant in exchange for 6 million shares of Linkwell common stock.

82. As set forth in the Legal Counsel Agreement, Linkwell, Linkwell Tech and Likang Disinfectant engaged Haimai Legal as counsel in anticipation of certain planned transactions with third parties for the sale of equity in Linkwell, Linkwell Tech and Likang

Disinfectant. The Legal Counsel Agreement sets forth, among other things, that "Party A [(Linkwell, Linkwell Tech and Likang Disinfectant)] planned to conduct private equity financing and carry out merger & acquisition (we called 'capital operation' as follows); meanwhile Ecolab, Inc. and another American company planned to acquire shares of Party A (we called 'acquisitions of equity')."

### 2. Ecolab

83. On February 15, 2008, Linkwell, Linkwell Tech and Ecolab entered into a stock purchase agreement ("Stock Purchase Agreement") whereby Ecolab agreed to purchase 10% of the issued and outstanding shares of Linkwell Tech (888,889 shares) from Linkwell for $2 million.

84. On May 30, 2008, Linkwell, Linkwell Tech and Ecolab entered into a stockholders agreement ("Stockholders Agreement") whereby Linkwell and Ecolab agreed to be subject to certain pre-emptive rights, transfer restrictions and take along rights related to the shares of Linkwell Tech each entity held.

85. The Stockholders Agreement provided Ecolab with a call right exercisable upon the entry of any change of control transaction by Linkwell. The call right required the Company to sell Ecolab all of its equity interest in Linkwell Tech, and any of the affiliates owned by Linkwell, without a control premium.

86. The Stockholders Agreement also provided Ecolab with an option to require Linkwell to buy back the 10% equity interest that Ecolab acquired for $2.4 million ("Put Option"). Pursuant to its the terms, the right to exercise the Put Option would terminate in the event that Ecolab acquired all of the outstanding equity of Linkwell Tech. The Stockholders Agreement further provided that it could be terminated by written agreement of the parties.

87.     The Stock Purchase Agreement and Stockholders Agreement provided no terms for Ecolab to acquire any additional equity of Linkwell Tech.  Thus, the acquisition by Ecolab of Linkwell Tech equity in excess of the 10% equity interest Ecolab already owned would have to be governed by a separate agreement.

88.     Ecolab did not identify Linkwell Tech as a subsidiary company in its Annual Return on Form 10-K filings with the SEC for fiscal years ended December 31, 2008, December 31, 2009, December 31, 2010 and December 31, 2011.  Ecolab only included significant majority-owned subsidiaries in its consolidated financial statements.  During 2008 through 2011, the exhibit attached to Ecolab's Form 10-K filings identifying its subsidiary companies also listed the percentage of ownership.

89.     In late 2011 and early to mid-2012, Ecolab, Linkwell and others were engaged in negotiations regarding the acquisition by Ecolab of a controlling equity interest in Linkwell Tech, Likang Disinfectant and Likang Biological.

90.     During the negotiations, Xuelian, Wei and/or the Company's counsel at Haimai Legal disclosed the material terms of the Transaction to Ecolab, including the spin-off of Linkwell Tech from Linkwell.

### 3.     Metamining and Metamining Nevada

#### a)     The Purchase and Sale Agreements

91.     On April 15, 2011, Metamining entered into purchase and sale agreements (the "Purchase and Sale Agreements") with Little Valley Group, LLC, Greater Nevada Ranches, LLC and Western Resources Group, LLC (the "Sellers") to acquire rights to mining claims on approximately 4,500 acres in northern Nevada (the "Nevada Properties") during a two-year period, for an aggregate purchase price of $14.25 million (the "Purchase Price").

92.     The Nevada Properties are also referred to in the Company's SEC filings as the "Iron Horse Project in Nevada," the "Iron Horse Project – Dodge Mine" and the "Iron Horse Project."

93.     Under the Purchase and Sale Agreements, the Purchase Price was payable in 3 installments payments.  The first installment payment included an initial down payment in the approximate amount of $3,000,003 payable in 3 partial payments.

94.     The Sellers acknowledged in the Purchase and Sale Agreements that they received a "review" payment in the amount of $234,567.53 on December 28, 2010.  A pre-payment in the amount of $500,000 was to be made to the Sellers within 10 days after execution of the Purchase and Sale Agreements, and the balance of the down payment ($2,265,435.60) was due 45 days after the pre-payment.  The second installment payment in the amount of $5.625 million was due on April 15, 2012.  The third installment in the amount of $5.625 million was due on April 23, 2013.

95.     Pursuant to the Purchase and Sale Agreements, the Sellers financed the payment of the Purchase Price by Metamining by carrying two of the $5.625 million notes payable on April 15, 2012 and April 15, 2013 (in the aggregate $11.25 million), free of interest.

96.     By March 2012, however, Metamining had not even completed payment on the first installment of the Purchase Price.

### b)     The Letters of Authorization

97.     On March 5 and 6, 2012, Metamining and Metamining Nevada executed letters of authorization ("Letters of Authorization") with China Direct and Capital Resource.  Both Letters of Authorization were executed by Song on behalf of Metamining and Metamining Nevada, and by Wang on behalf of both China Direct and Capital Resource.

98.     Pursuant to the Letter of Authorization, Metamining and Metamining Nevada authorized China Direct and Capital Resource to act on its behalf in connection with accessing the U.S. capital markets in order to provide financing, among other things, to fund the Purchase Price and development of the Nevada Properties.

c)      **The Reverse Merger Consulting Agreement**

99.     On March 6, 2012, Metamining Nevada executed a reverse merger consulting agreement ("Reverse Merger Consulting Agreement") with China Direct and Capital Resource. The Reverse Merger Consulting Agreement was executed by Song on behalf of Metamining Nevada, and by Wang on behalf of both China Direct and Capital Resource.

100.    Pursuant to the Reverse Merger Consulting Agreement, Metamining Nevada engaged China Direct and Capital Resource to help it raise capital and list on a U.S. stock market.  It sets forth that, through a reverse merger transaction, Metamining Nevada will become a wholly owned subsidiary of a U.S. public company and the shareholders of Metamining Nevada – Song and Ling – will become the controlling shareholders of the public company.

101.    The Reverse Merger Consulting Agreement describes the process by which Metamining Nevada will become a wholly owned subsidiary of a U.S. public company and raise capital as follows:

a.      China Direct and Capital Resource shall provide a clean shell company for Metamining Nevada to merge into.

b.      The shell company shall not have any debts or liabilities.

c.      The total number of outstanding shares of the shell company shall be 10 million.

       d.      After listing on the OTCBB, Metamining Nevada will raise $15 million through a private placement and simultaneously issue 3 million shares of common stock to PIPE investors, which will increase the outstanding common stock to 13 million shares.

       e.      China Direct and Capital Resource will be paid a fee (referred to in a prior draft of the Reverse Merger Consulting Agreement obtained in discovery as a commission) of 8% of the amount raised through the private placement for providing consulting services to Metamining Nevada.

       f.      China Direct and Capital Resource will advance the legal expenses incurred on behalf of Metamining Nevada in connection with the listing on the OTCBB and the raising of capital, and the amounts advanced will be deducted from the sum raised through the private placement.

102.    The Reverse Merger Consulting Agreement sets forth that, after completion of the reverse merger transaction, the shareholders of Metamining Nevada will own 9 million shares and 90% of all equity and assets of the shell company, and China Direct and the "retailing [sic] shareholders of [the] shell company" owning 1 million shares.  In order for this to occur, Linkwell "shall issue 9,581,973 shares of preferred stock at the reverse merger.  Among, which, 9 million shares shall be issued to shareholders of Metamining [Nevada], and the other 581,973 shares shall be issued to [China Direct and Capital Resource]."

103.    The Reverse Merger Consulting Agreement provides that after it takes effect, "all of the verified assets and business of [Metamining Nevada] shall be acquired by the public company."  The Reverse Merger Consulting Agreement took effect on March 6, 2012.

104.    The Reverse Merger Consulting Agreement further sets forth that, after completion of the reverse merger transaction, China Direct and Capital Resource will provide

Metamining Nevada with "comprehensive consulting services for One year (April 1, 2012 to March 31, 2013), including preparation of 10Q/10K financial reports, periodic SEC filings, U.S. legal consultation, investor relations, website design and promotion, and press release."

105.    Finally, in a chart captioned "Current Outstanding Shares," the Reverse Merger Consulting Agreement specifically sets forth that Xuelian and Wei would cancel their 36 million shares of Linkwell stock to reduce the total number of outstanding shares of Linkwell stock from 119,605,475 to 83,605,475.

106.    After a reverse stock split at 200:1 ratio, Song and Ling would control 90% of the equity of the "new" public company, and Wang (on behalf of CD Defendants) would control 5.82% of the equity.

### 4.    CD Int'l, China Direct and Capital Resource

107.    At all relevant times, Wang, CD Int'l, China Direct and Capital Resource served as consultants in connection with the Transaction and the sale or spin-off of Linkwell Tech.

108.    At or about the same time that China Direct and Capital Resource executed the Letters Authorization and Reverse Merger Consulting Agreement with Metamining and Metamining Nevada, they also executed a service agreement ("Service Agreement") and a consultant service agreement ("Consultant Service Agreement") with Linkwell, as well as reviewed an agreement prepared by Ecolab which provided for the elimination of the Put Option under the Stockholders Agreement ("Amendment to Stockholders Agreement").

### a)    The Service Agreement

109.    On March 13, 2012 Capital Resource executed the Service Agreement with Linkwell.   The Service Agreement was signed by Xiaowen Zhuang (Wang's brother) ("Xiaowen") on behalf of Capital Resource, and Xuelian on behalf of Linkwell.   Pursuant to the Service Agreement, Capital Resource agreed, in exchange for 5 million shares of Linkwell

common restricted stock, to provide certain services for Linkwell, including, but not limited to, maintaining the Company's U.S. representative offices, providing financial management and investor relation service, managing investor road show and investment conferences, coordinating the preparation of and filing of all public disclosures with the SEC and providing written instruction for future merger and consolidation.

110.    The Service Agreement also lists the Company's "Work Items."   Among other things, the Work Items require Linkwell to provide Capital Resource with the "background information of three companies for intended acquisition."   As described below, the three companies for intended acquisition referenced in the Service Agreement were Linkwell Tech, Likang Disinfectant and Likang Biological.

### b)    The Amendment to Stockholders Agreement

111.    On or about March 18, 2012, CD Int'l reviewed the Amendment to Stockholders Agreement on behalf of its client Linkwell.   As set forth in the Amendment to Stockholders Agreement, Linkwell, Linkwell Tech and Ecolab desired to terminate Ecolab's right to exercise the Put Option.   Pursuant to its terms, the Amendment to Stockholders Agreement terminated Section 4.1 of the Stockholders Agreement.

112.    Upon information and belief, the Amendment to Stockholders Agreement was sent to Linkwell, Linkwell Tech and Ecolab and subsequently executed by the parties.

113.    The Put Option was cancelled by its holder (Ecolab) in March 2012.

### c)    The Consultant Service Agreement

114.    On March 31, 2012 Capital Resource executed the Consultant Service Agreement with Linkwell.   The Consultant Service Agreement was signed by Xiaowen on behalf of Capital Resource, and Xuelian on behalf of Linkwell.

115.    Pursuant to the Consultant Service Agreement, Capital Resource agreed, in exchange for 5 million shares of Linkwell common stock, to strip Linkwell of its 90% equity interest in Linkwell Tech and provide related consulting services to Linkwell.

116.    According to the Consultant Service Agreement, Capital Resource was to complete the divestiture of Linkwell Tech from Linkwell before June 30, 2012.  Among other things, the Consultant Service Agreement acknowledged the terms of the Transaction between Linkwell and Metamining and that, as a result, the Board would be reorganized.  As set forth in the document:

> On March 30, 2012, [Capital Resource] shall complete Linkwell Corporation's reverse merger with the U.S. company Metamining Nevada, Inc.
>
> On April 1, 2012, [Linkwell]'s current board of directors shall be reorganized.  New shareholders shall designate the board chairperson, CEO, and chairperson's secretary; and Linkwell Tech Group, Inc. shall designate one director, with his/her term up till [sic] June 30, 2012.  During this period, the company name and stock symbol of Linkwell Corporation shall be changed, while the two parties work to separate the 90% equity of Linkwell Tech Group, Inc. from Linkwell Corporation, namely, the 36 million shares under the name of Linkwell International Capital Ltd. shall be returned to Linkwell Corporation in exchange for the 90% equity of Linkwell Tech Group, Inc.

117.    The Consultant Service Agreement also sets forth additional rights and obligations of the parties.  For example, Linkwell agreed that the Linkwell Tech designated director of the reorganized board "shall cooperate with Linkwell Corporation's new board of directors in signing and issuing corresponding board of director documents."

118.    The Consultant Service Agreement further provided that Capital Resource is responsible for, among other things:

a.    All legal, business and financial auditing documents related to the Transaction and separation/divestiture of Linkwell Tech;

       b.      Introducing Metamining Nevada, Inc. and the extra costs of completing the quarterly report Form 10-Qs, annual report Form 10-K, major event Form 8-K and other disclosures required by the SEC starting from the fiscal quarter of April 1, 2012 to June 30, 2012; and

       c.      Press releases, investor relations, road shows, audit coordination, legal consultation, translation, company registration, tax returns, documents management and other regular corporate matters of the public company after the divestiture of Linkwell Tech from Linkwell.

119.    Other materials contemporaneously prepared by CD Int'l and Metamining for potential investors in a reorganized Linkwell similarly describe the Transaction and the anticipated spin-off of Linkwell Tech from Linkwell as follows:

> Linkwell … is a U.S. company, who operates under a holding company structure and currently has one direct operating subsidiary, Linkwell Tech … of which we own 90%. On February 15, 2008, Linkwell Tech sold 10% of its issued and outstanding capital stock to Ecolab Inc., a Delaware corporation …. Linkwell Tech owns 100% of … LiKang [sic] Disinfectant …. LiKang [sic] Disinfectant's business is hospital disinfectant products which is our primary business. LiKang [sic] Disinfectant acquired 100% of LiKang [sic] Biological on March 5, 2009.
>
> The chart below shows the current structure of the company:



…

In March 2012, the shareholders of Metamining Nevada, Inc. developed a plan to expand and obtain the benefits of a U.S. public company (the "Reorganization"). A key element of the Reorganization was to enter into a transaction with a public shell company in the United States by which we, the public shell company would acquire operations based in the state of Nevada.

To accomplish this plan, in [sic] March 6th 2012, Metamining Nevada … entered an agreement with China Direct … and Capital [Resource] … in which [China Direct] and Capital [Resource] are both engaged to coordinate the capital raise and list in the U.S. stock market for Metamining Nevada, Inc. through a reverse merger transaction. [China Direct] will provide Linkwell … as the clean shell company, after the reverse merger, Metamining Nevada … will become a wholly owned subsidiary of [Linkwell], while the founding shareholders of Metamining Nevada … will become the controlling shareholders of the reorganized public company.

In addition, Linkwell … entered a consulting agreement with Capital [Resource], in which Capital [Resource] is engaged to spin off [Linkwell]'s 90% owned subsidiary, Linkwell Tech … by selling 90% equity interest in Linkwell Tech … in exchange for the return and cancelation of a total of 36 million shares of [Linkwell] common stock held by Linkwell International ….

After the reorganization [sic], the structure of the Company will be as the following chart:



**B.     The Transaction**

120.    On April 2, 2012, Linkwell announced in a press release filed in a Form 8-K with the SEC that the Company had entered into a definitive share exchange agreement (the "Share Exchange Agreement") with the Metamining to acquire Metamining Nevada as a wholly owned subsidiary, in exchange for 9 million shares of newly issued Series C convertible preferred stock and 3 million warrants to purchase common stock.

121.    The press release set forth that after the effective date there would be a reverse stock split of all of the outstanding shares of the Company's common stock at a 200:1 ratio so that the Series C preferred is convertible into 9 million shares of common stock would give Metamining approximately 90% of the equity.

122.    Comments attributed to Xuelian in connection with the acquisition of Metamining Nevada were as follows:  "We are extremely pleased to have entered into this agreement to acquire Metamining Nevada and enter into a new era for our company.  We are confident that this acquisition will become a tremendous long term growth opportunity for our company and we intend to work diligently to unlock the vast potential of these mining properties for our shareholders."

123.    The announcement was greeted by shock and surprise by Plaintiff, one of the Company's public shareholders, for a number of reasons.

124.    First, Linkwell had not previously disclosed to its public shareholders that the Company was contemplating a business combination, let alone one with a start-up company in an entirely dissimilar line of business – the exploration, mining and trading of iron ore in the United States.   There was no apparent business purpose to support the merging of the two companies.

125.    Second, the determination by the Board (then comprised of Xuelian and Wei) to acquire Metamining Nevada was entirely inconsistent with the disclosures made by Linkwell to its shareholders less than a month before.   On March 9, 2012, Linkwell had informed shareholders in a Definitive Information Statement on Schedule 14C that it would effect a reverse stock split of its common stock at a 30:1 ratio.   According to the Information Statement, on February 13, 2012, the Board adopted and approved the reverse stock split in an amendment (the "Charter Amendment") to the Company's Articles of Incorporation, having determined this action to be in the Company's best interest because it believed that the common stock was undervalued and the reverse split would allow the common stock to trade in a "more realistic price range."

126.    Xuelian and Wei knew or should have known that the acquisition of Metamining Nevada in exchange for almost all of the equity of Linkwell would have a negative effect on the Company's stock price.   The Transaction did in fact have a negative impact on the Company's stock price.

127.    Third, Linkwell did not obtain a fairness opinion in connection with the Transaction, so that shareholders could evaluate whether the purported acquisition of 100% of the equity of Metamining Nevada constituted adequate consideration for substantially all of the Company's equity.

128.    Fourth, the issuance of new equity in connection with the Transaction also affected Xuelian and Wei who, at the time, purported to beneficially own 39,023,470 shares of Linkwell common stock, or almost 40% of the Company's equity.   Under the terms of the Transaction, the number of shares of common stock Xuelian and Wei beneficially own would be reduced to less than 3% of the Company's equity.   It made no business sense that Xuelian and Wei, who collectively devoted more than 57 years to building Linkwell into a profitable business, would consent to such a substantial reduction in equity for essentially nothing in return.

129.    The only plausible explanation was that Xuelian and Wei obtained something of value in exchange for their agreement to execute the Share Exchange Agreement and substantially reduce or cancel their equity interest in Linkwell that did not devolve to the Company.   The benefit that Xuelian and Wei received, namely, the Company's 90% equity interest in Linkwell Tech and, as consequence, Linkwell Tech's 100% equity interest in Likang Disinfectant and Likang Biological, was not disclosed in any of the Company's public filings.

### 1.       The Terms of the Transaction

130.    On April 4, 2012, Linkwell announced in a Form 8-K filing with the SEC that it acquired Metamining Nevada from Metamining on March 30, 2012.   According to the filing, Linkwell acquired Metamining Nevada to exploit certain mining and real property rights on the Nevada Properties.

131.    Pursuant to the terms of the Share Exchange Agreement, Linkwell acquired 100% of the capital stock of Metamining Nevada in exchange for 9 million shares of the Company's Series C convertible preferred stock and 3 million Series C common stock purchase warrants issued to Metamining.   Linkwell was also required, among other things, to: (a) appoint 2 directors designated by Metamining; and (b) issue certificates representing 581,973 convertible preferred shares to China Direct.

33

132.   Metamining was limited to appointing only 2 new directors because CD Int'l recommended during pre-closing negotiations that an entirely new slate of members not be immediately appointed to the Board in order to avoid unwanted scrutiny of the Transaction by the SEC and other regulatory agencies.   CD Int'l explained that the appointment of 2 Metamining directors to the Board was just the first stage of a phase-by-phase appointment process, and that by June 30 the Board would contain only Metamining appointees.

133.   As set forth in March 27, 2012 email from individuals at CD Int'l to Metamining:

> To save at least two-week[s] work related to the SEC disclosure and potential comments on the transaction, our attorney suggests that the current board remain [in] control for the following 15 days after acquisition closing date (March 30).  *In this way, the public company remains an operating company in the deal rather than a shell company, which will avoid many potential questions related to a typical reverse merger with a shell.*

> 15 days later, one of the two current directors will resign so that the board will be controlled by MetaMining [sic] since then. MetaMining [sic] can appoint other directors on that day.

> Another current director will remain on board until June 30, 2012 to ensure smooth transition of the board.  That director will resign on June 30, 2012.  Thus, from June 30, the whole board of the public company will all be from MetaMining [sic].

> In all, *we are* not limiting the number of directors from MetaMining [sic], but *suggesting a phase-by-phase appointment process to save potential questioning from SEC and other regulatory agencies*.  (Emphasis added.)

134.   On March 29, 2012, the Company filed Articles of Amendment to its Articles of Incorporation wherein the Board (composed of Xuelian and Wei), by unanimous written consent, adopted a resolution providing for the issuance of 9,581,973 shares of Series C convertible preferred stock.

135.   On March 30, 2012, Song and Ling were appointed to the Board.  On the same date, Linkwell issued 581,973 shares of Series C convertible preferred stock to China Direct for services rendered on behalf of Metamining in connection with the Transaction.

### 2.   The Grossly Inadequate Consideration for the Transaction

136.   On May 11, 2012, Linkwell filed an amendment to its April 4, 2012 Form 8-K filing.  The amended filing provided the following financial statements and other information: (a) the audited financial statements of Metamining Nevada as of December 31, 2011 (the "Audited Financial Statements"); and (b) pro forma financial information for Linkwell for the fiscal year ended December 31, 2011.

137.   The Audited Financial Statements of Linkwell reflect an absence of assets on the balance sheet of Metamining Nevada and no revenues on the statement of income.

138.   Note 1 in the Audited Financial Statements nevertheless described Metamining Nevada as an active business operation, which currently owns mining rights on the Nevada Properties, and that the Nevada Properties hold promising future prospects.

139.   Metamining Nevada, however, did not purchase any real property or mining rights on the Nevada Properties.  It was not even a signatory to any of the Purchase and Sale Agreements.   Before the Purchase and Sale Agreements were executed, Metamining was required to form a Nevada incorporated operating company (Metamining Nevada) to receive title of the mineral and mining rights so as to secure the Sellers control over the transfer of the Nevada Properties until the full payment of the Purchase Price.

140.   Moreover, after this action was commenced, Song admitted in a declaration dated July 20, 2013, and filed with the United States District Court, Northern District of California, in *Zhenhua Logistics (Hong Kong) Co., Ltd. v. Metamining, Inc., et al.,* No. 13-cv-2658 (N.D. Cal.)

("Zhenhua Action"), that "Metamining holds a 100% ownership interest in the Iron Horse Project …."

141.    On May 15, 2012, Linkwell filed its quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC which failed to report any results from the operations of its subsidiary disinfectant business.

142.    In the notes to consolidated financial statements of the same Form 10-Q, Linkwell disclosed the elimination of the $2.4 million put option liability to Ecolab under the Stockholders Agreement – which was cancelled by Ecolab in March 2012.

143.    Materials contemporaneously prepared by CD Defendants (reproduced below) confirm the secret agreement to spin-off Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei for no consideration to the Company:

The 3 Steps to Consummate the LWLL – Metamining (Meta) Reverse Acquisition (With 3 million Warrants)

Required Disclosure

**Step 1. LWLL acquires Meta with preferred stock (PS) for Meta**

The exchange

After the exchange

Other Shareholders (including Bian and Guan 1.8%)

8.9%

100%

Meta Inc. (CA)

91.1%

Meta (NV)

LWLL (FL)

90%

Linkwell Tech (FL)

100%

Likang Disinfectant (PRC)

100%

Likang Bio (PRC)

Meta Inc. (CA)

100%

Meta (NV)

10%

9 mm preferred stock and 3.3 million warrants

100% equity interest

Eco Lab (DE)

10%

LWLL (FL)

90%

Linkwell Tech (FL)

100%

Likang Disinfectant (PRC)

100%

Likang Bio (PRC)

8K, 4 business days after merger.

8K-A, 71 days after 8K.

Legal acquirer (accounting acquirer) = LWLL

Legal acquiree (accounting acquirer) = Meta

**Step 2. Meta to control the Board of Directors and execute reverse split of shares, conversion of preferred stock and name change**

**Step 3. LWLL spins off Linkwell Tech**

The spin off

After spin-off

Other Shareholders

7.7%

Meta Inc. (CA)

92.3%

LWLL (FL)

100%

Meta (NV)

Proxy

Proxy

Other Shareholders

8.9%

Meta Inc. (CA)

91.1%

LWLL (FL)

100%

Meta (NV)

Eco Lab (DE)

10%

Cancel 180,000 shares

90%

Bian and Guan (1.4% ownership)

90% equity interest

Linkwell Tech (FL)

100%

Likang Disinfectant (PRC)

100%

Likang Bio (PRC)

Proxy Issues

1. Reverse Split

2. Conversion of preferred into common @ 1:1

3. Spin-off of Linkwell Tech

4. Name change

Note: The 4 issues could be done in one proxy.

**Ownership With 3 Million Warrants**

| Pre-merger and Pre-reverse-split Common Stock Ownership | | |
|---|---|---|
| CDII | 10,000,000 | 8.36% |
| Likang former owners (Bian and Guan) | 36,000,000 | 30.10% |
| Other LWLL Shareholders | 73,605,475 | 61.54% |
| LWLL Shares Outstanding as of 3/29/2012 | 119,605,475 | 100.00% |

| After Issuance of Shares of Preferred Stock on the Merger | | |
|---|---|---|
| CDII | 581,973 | 4.42% |
| Metamining Shareholders (with 3 million warrants) | 12,000,000 | 91.05% |
| After Reverse Stock Split (200:1) | | |
| CDII | 50,000 | 0.38% |
| Likang former owners (Bian and Guan) | 180,000 | 1.37% |
| Other LWLL Shareholders | 368,027 | 2.79% |
| LWLL Shareholders Subtotal | 598,027 | 4.54% |
| Total shares after the merger and reverse split | 13,180,000 | 100.00% |

| After Spin-off of Linkwell Tech | | |
|---|---|---|
| Cancellation of shares (Bian and Guan) | (180,000) | |
| CDII | 631,973 | 4.86% |
| LWLL shareholders | 368,027 | 2.83% |
| Metamining Shareholders (with 3 million warrants) | 12,000,000 | 92.31% |
| Total shares of after the merger, reverse split and spin-off | 13,000,000 | 100.00% |

| Breakout of Ownership Excluding Metaming | | |
|---|---|---|
| CDII | 631,973 | 4.79% |
| Likang former owners (Bian and Guan) | 180,000 | 1.37% |
| Other LWLL Shareholders | 368,027 | 2.79% |
| Total ownership excluding Metamining | 1,180,000 | 8.95% |

The 3 Steps to Consummate the LWLL – Metamining (Meta) Reverse Acquisition (Without Warrants)

| | Required Disclosure |
|---|---|

**Step 1. LWLL acquires Meta with preferred stock (PS) for Meta**

The exchange

After the exchange

Other Shareholders (including Bian and Guan 1.8%)

Meta Inc. (CA)   88.4%

11.6%

LWLL (FL)   100%

Meta (NV)

90%

Linkwell Tech (FL)   100%

Likang Disinfectant (PRC)   100%

Likang Bio (PRC)

Meta Inc. (CA)   100%

Meta (NV)

9 mm preferred stock

100% equity interest

LWLL (FL)   90%

Linkwell Tech (FL)   100%

Likang Disinfectant (PRC)   100%

Likang Bio (PRC)

Eco Lab (DE)   10%

8K, 4 business days after merger.

8K-A, 71 days after 8K.

Legal acquirer (accounting acquiree) = LWLL.

Legal acquiree (accounting acquirer) = Meta

**Step 2. Meta to control the Board of Directors and execute reverse split of shares, conversion of preferred stock and name change**

Proxy

**Step 3. LWLL spins off Linkwell Tech**

The spin off

After spin-off

Other Shareholders   9.8%

100%

Meta (NV)

Meta Inc. (CA)   88.4%

LWLL (FL)   90%

Eco Lab (DE)   10%

Linkwell Tech (FL)   100%

Likang Disinfectant   100%

Likang Bio (PRC)

Bian and Guan (1.8% ownership)

Cancel 180,000 shares

90% equity interest

Other Shareholders   10%

Meta Inc. (CA)   90%

LWLL (FL)   100%

Meta (NV)

Proxy

Proxy Issues

1. Reverse Split

2. Conversion of preferred into common @ 1:1

3. Spin-off of Linkwell Tech

4. Name change

Note: The 4 issues could be done in one proxy.

39

**Without Warrants**

| Pre-merger and Pre-reverse-split Common Stock Ownership | | |
|---|---:|---:|
| CDII | 10,000,000 | 8.36% |
| Likang former owners (Bian and Guan) | 36,000,000 | 30.10% |
| Other LWLL Shareholders | 73,605,475 | 61.54% |
| LWLL Shares Outstanding as of 3/29/2012 | 119,605,475 | 100.00% |

| After Issuance of Shares of Preferred Stock on the Merger | | |
|---|---:|---:|
| CDII | 581,973 | 5.72% |
| Metamining Shareholders | 9,000,000 | 88.41% |
| **After Reverse Stock Split (200:1)** | | |
| CDII | 50,000 | 0.49% |
| Likang former owners (Bian and Guan) | 180,000 | 1.77% |
| Other LWLL Shareholders | 368,027 | 3.62% |
| LWLL Shareholders Subtotal | 598,027 | 5.87% |
| Total shares after the merger and reverse split | 10,180,000 | 100.00% |

| After Spin-off of Linkwell Tech | | |
|---|---:|---:|
| Cancellation of shares (Bian and Guan) | (180,000) | |
| CDII | 631,973 | 6.32% |
| LWLL shareholders | 368,027 | 3.68% |
| Metamining Shareholders | 9,000,000 | 90.00% |
| Total shares of after the merger, reverse split and spin-off | 10,000,000 | 100.00% |

144.   On May 29, 2012, Linkwell filed a Preliminary Information Statement on Schedule 14C which disclosed that, on May 24, 2012, the Board, comprised of Xuelian, Wei, Song and Ling, adopted and approved the Articles of Amendment: (a) to effect a reverse stock split at a 200:1 ratio rather than the previously disclosed 30:1 ratio; and (b) to change the corporate name of the Company to Sun Sage Resources, Inc.

145.    This Information Statement set forth that the Company's principal shareholders, holding "60.1% of our outstanding voting securities have approved these actions on June [7], 2012, by written consent in lieu of a special meeting of shareholders in accordance with the relevant provisions of the Florida Business Corporations Act."

146.    As of May 24, 2012, according to its Information Statement, Linkwell had 119,605,475 shares of common stock and 9,581,973 shares of Series C convertible preferred stock outstanding.  The Articles of Amendment were approved by the holders of 67,373,443 shares of the Company's common stock and 9,581,973 shares of the Series C convertible preferred stock.  The holders of the voting securities that were stated to have approved these actions by written consent in lieu of a special meeting include Xuelian, Wei, Metamining, CD Defendants and Haimai Legal.

147.    According to the Information Statement:

a.    Xuelian exercised voting and investment power over 30,420,919 shares of Linkwell common stock, 20,420,919 shares of which as a co-owner of Linkwell International Capital Ltd. ("Linkwell Int'l");

b.    Wei exercised voting and investment power over 15,602,551 shares of Linkwell common stock, 13,602,551 shares of which as a co-owner of Linkwell Int'l;

c.    Song exercised voting and investment power over 9 million shares of Linkwell Series C convertible preferred stock owned by Metamining, and 3 million shares of Linkwell common stock issuable upon the exercise of outstanding Series C common stock purchase warrants exercisable anytime following the reverse stock split;

d.    Shengayo Wu ("Shengayo") exercised voting and investment power over 8.35 million shares of Linkwell common stock owned by Haimai Legal; and

e.   Wang exercised voting and investment power over 581,973 shares of Linkwell Series C convertible preferred stock beneficially owned by CD Int'l through China Direct and 10 million shares of Linkwell common stock beneficially owned by CD Int'l through Capital Resource.

148.   On July 26, 2012, Linkwell filed an amendment to its quarterly report for the period ended March 31, 2012 on Form 10-Q/A with the SEC.  The amendment was filed in response to comments for the staff of the SEC and intended to address, among other things, certain risks faced by the Company as a result of the Transaction.

149.   The amended risk factors disclosed that the Metamining *never* commissioned or received feasibility studies or obtained operating permits to either explore or mine the mineral rights on the Nevada Properties.   Moreover, substantial feasibility work and capital were required just to demonstrate economic viability.   Even further, the filing disclosed that the Company may not be able to establish sufficient mineral reserves to ever justify commercial operations on the Nevada Properties.

150.   On the same day, Linkwell also filed a Form 8-K/A (amendment no. 2) amending the May 11, 2012 Form 8-K/A to provide a revised disclosure in Note 1 of the previously submitted Audited Financial Statements.   These curative disclosures confirmed that the representations Linkwell made about Metamining Nevada and its business in prior disclosures filed with the SEC were materially misleading.

151.   On August 20, 2012, Linkwell filed a quarterly report for the period ended June 30, 2012 on Form 10-Q with the SEC which contained the results of operations from the Company's subsidiary disinfectant business and reported revenue, profit and income for the 3 and 6 months ended June 30, 2012 in its consolidated statements of operations.  The Form 10-Q

filing disclosed that Metamining Nevada had no operations during the 6 months ended June 30, 2012.

152.    On September 11, 2012, Linkwell filed a Form 8-K/A (amendment no. 2) amending the May 11, 2012 Form 8-K/A to provide a revised disclosure in Note 1 of the previously submitted Audited Financial Statements.  These curative disclosures again confirmed that the representations Linkwell made about Metamining Nevada and its business in prior disclosures filed with the SEC were materially misleading.

153.    On October 25, 2012, Linkwell filed a Definitive Information Statement on Schedule 14C announcing the adoption and approval by the Board of the Articles of Amendment.  The Articles of Amendment, which are annexed to the Information Statement, set forth that the effective date for the reverse stock split is November 16, 2012.

154.    The Information Statement represented that "the holders of 60.1% of our outstanding voting securities have approved these actions on October 10, 2012, by written consent in lieu of a special meeting of shareholders in accordance with the relevant provisions of the Florida Business Corporations Act."  The holders of the voting securities that were stated to have approved these actions by written consent in lieu of a special meeting were Xuelian, Wei, Song, Metamining, CD Int'l. China Direct, Capital Resource and Haimai Legal.

155.    On November 15, 2012, Linkwell filed its quarterly report for the period ended September 30, 2012 on Form 10-Q with the SEC.  The Form 10-Q filing disclosed that Metamining Nevada still had no operations during the 9 months ended September 30, 2012.

156.    As a result of the business conducted by its operating subsidiaries in China, Linkwell had, as of December 31, 2011, cash and cash equivalents of $2,919,670, accounts receivable of $12,651,347, total assets of $27,446,588, total liabilities of $10,012,087, total

stockholders' equity of $17,434,501, and working capital of $1,997,311 with no material commitments for capital expenditures.

157.    As of the date of its last Form 10-Q filed with the SEC on November 15, 2012, none of the Company's liquidity or capital resources were utilized to make any of the payments due under the Purchase and Sale Agreements.

### C.    Ecolab Acquires Linkwell Tech, Likang Disinfectant and Likang Biological

158.    Ecolab identified Linkwell Tech, Likang Disinfectant and Likang Biological as corporate subsidiaries in its Annual Return on Form 10-K for fiscal year ended December 31, 2012 (filed with the SEC on February 26, 2013).  The "List of Subsidiaries," which is included as an exhibit to the Form 10-K filing, set forth the disclaimer that "[c]ertain additional subsidiaries, which are not significant in the aggregate, are not shown."

159.    Ecolab did not identify Linkwell Tech as a subsidiary in the 2008 Annual Return on Form 10-K that it filed with the SEC after the acquisition of 10% of the equity of the company in 2008.  In fact, Ecolab's historical practice has been to list as subsidiaries only those companies in which it maintains at least a majority ownership interest.  The List of Subsidiaries exhibit to Ecolab's 2011 Annual Return on Form 10-K defines subsidiaries as only those companies where Ecolab has equity interests of 50.1% and above.

160.    The disclosures in the 2012 Annual Return on Form 10-K represented that Linkwell Tech, Likang Disinfectant and Likang Biological are significant majority-owned subsidiary companies of Ecolab and that "[a]ll significant majority-owned subsidiaries are included in the filed consolidated financial statements."  Thus, the assets, liabilities and results of operations of Linkwell Tech, Likang Disinfectant and Likang Biological were included in Ecolab's consolidated financial statements for 2012.

161.    Linkwell did not file an Annual Return on Form 10-K for fiscal year ended December 31, 2012 with the SEC.  Linkwell did not file an annual or quarterly financial report with the SEC after Plaintiff commenced this action.  Upon information and belief, Linkwell did not file any financial reports with the SEC after the quarter ended September 30, 2012 to avoid having to disclose, among other things: (a) how Ecolab came to acquire Linkwell Tech, Likang Disinfectant and Likang Biological as significant majority-owned subsidiaries; (b) what consideration, if any, Linkwell was paid for these assets and operations; and (c) if not, to whom such consideration was paid.

162.    At all relevant times, Ecolab knew that Linkwell, as a publicly traded company, would be required to disclose to the SEC and its shareholders any material agreement to acquire all or substantially all of the Company's assets and operations.

### D.    Ecolab Discovers this Action and Distances Itself from Linkwell

163.    Plaintiff commenced the Derivative Action on December 26, 2012.[1]

164.    Upon information and belief, sometime prior to April 22, 2013, Ecolab obtained notice of the Complaint which identified it as a relevant non-party.  The basis for that belief is that on April 22, 2013, Linkwell, Linkwell Tech and Ecolab executed a redemption agreement ("Redemption Agreement") whereby: (a) Linkwell Tech agreed to repurchase the 10% equity interest expressly obtained by Ecolab pursuant to the Stock Purchase Agreement in 2008; and (b) the parties terminated *in their entirety* the agreements between and amongst themselves, including the Stock Purchase Agreement and the Stockholders Agreement.

---

[1] Plaintiff filed a Verified Shareholders Derivative Complaint ("Complaint") after serving the Board with a books and records demand and litigation demand.

165.    Under the terms of the Redemption Agreement, Linkwell Tech purchased the 888,889 shares of its stock that Ecolab had acquired from Linkwell for $2.4 million – the same price that would have been paid by Linkwell under the Put Option in the Stockholders Agreement had it not been terminated by Ecolab in March 2012.

166.    Ecolab returned the share certificate representing the 888,889 shares of Linkwell Tech stock to Linkwell Tech, not Linkwell.  According to the Company's Form 10-Q filing for the quarterly period ended September 30, 2012 (filed November 15, 2012), Linkwell Tech was a 90% owned subsidiary of Linkwell.

167.    Upon information and belief, Ecolab returned the shares to Linkwell Tech because Linkwell no longer possessed an equity interest in the subsidiary company.

### E.    The Transaction is Unwound

168.    On October 17, 2013, Plaintiff moved for an Order granting partial summary judgment on the claim in the Complaint for unjust enrichment against Song, Ling, Metamining, Metamining Nevada, CD Int'l and China Direct.  Plaintiff asserted in the motion that, because of Song's admissions in the Zhenhua Action that Linkwell received no value in exchange for approximately 94% of its equity, there was no genuine issue of material fact that Song, Ling, Metamining, Metamining Nevada, CD Int'l and China Direct had been unjustly enriched.

169.    Song submitted two declarations under the penalties of perjury in the Zhenhua Action stating that Metamining was the present owner of the Nevada Properties (or the Iron Horse Project), *not* Linkwell or Metamining Nevada.

170.    On June 26, 2013, Song filed a declaration (ECF No. 85-16) opposing plaintiff's ex parte application for a writ of attachment, temporary restraining order and preliminary injunctive relief.  The declaration set forth that:  "*Metamining presently holds assets with significant value*.  These assets are *in the form of real property, mining rights and infrastructure,*

*and equipment* of three mining operations: the Coal Creek (Spiro) Mine in Oklahoma, *the Iron Horse Project in Nevada*, and Barnett Energy LLC, which holds mining rights in Virginia." (Emphasis added.)

171.    On July 2, 2013, Song filed a supplemental declaration (ECF No. 106-2) which stated that "*Metamining holds a 100% ownership interest in the Iron Horse Project* …." (Emphasis added.)

172.    During his deposition in the Derivative Action, Song confirmed that the statements made in his July 2, 2013 declaration are true and accurate.  His testimony objectively contradicts the November 12, 2013 declaration Song submitted in the Derivative Action (ECF No. 101-1) in which he states under the penalty of perjury that "Metamining indirectly owns 88% of the Iron Horse Project" and that "Metamining claims no direct ownership of the Iron Horse Project."

173.    In response to Plaintiff's motion, Xuelian, Wei, Song, Ling and Wang determined to unwind that portion of the Transaction whereby Linkwell acquired 100% of the equity in Metamining Nevada in exchange for the delivery of approximately 94% of the Company's equity to Song, Ling, Metamining, Metamining Nevada, CD Int'l, China Direct and Capital Resource.

174.    Linkwell disclosed in a Form 8-K filing with the SEC on November 26, 2013 that it sold 100% of its "interest" in Metamining Nevada back to Metamining pursuant to an equity transfer agreement.  The filing further disclosed that, under the terms of said agreement, Metamining cancelled the Linkwell shares and stock warrants it owned.

175.    Documents produced in discovery indicate that CD Int'l, China Direct and Capital Resource returned the Linkwell stock obtained from the Company in connection with the Transaction.

176.    The prosecution of the Derivative Action by Plaintiff was the main reason for the unwinding of that portion of the Transaction in which Song, Ling, CD Int'l, China Direct and Capital Resource acquired substantially all of the Company's equity and Xuelian and Wei sought to spin-off Linkwell Tech, Likang Disinfectant and Likang Biological to themselves and/or to Ecolab for their own self benefit.  Song confirmed as much at his July 20, 2015 deposition:

> Q.    You mentioned that part of the reason that the transaction was unwound was because the capital that was sought was not able to be raised; is that correct?
>
> A.    No, it's not entirely so.  The main reason I would say is because of the litigation.  We were sued.
>
> Q.    And when you say "the litigation," do you mean this lawsuit filed by Frederick Siegmund?
>
> A.    Yes.
>
> Q.    Ultimately we saw in the documents that the reverse merger was unwound, Linkwell returned to the position it was premerger; is that correct?
>
> A.    Yes.

Song Tr. (July 20, 2015) at 294:19 - 295:10.

**F.    The Acquisition**

177.    At the time the Acquisition was undertaken, Plaintiff's claims in the Derivative Action had already survived a motion to dismiss.  On May 21, 2013, the Court issued an Order (ECF No. 41) denying the motions of Song. Ling, Metamining, Metamining Nevada, CD Int'l, China Direct and Capital Resource to dismiss.  On January 8, 2014, the Court issued an Order

(ECF No. 113) denying the motion of CD Int'l, China Direct and Capital Resource for reconsideration of the Order denying their motion to dismiss.

178.    On January 16, 2014, the Court entered Discovery Orders (ECF Nos. 116-18) that directed Linkwell, Song, Ling, Metamining, Metamining Nevada, CD Int'l, China Direct and Capital Resource to respond to Plaintiff's outstanding discovery requests.

179.    Xuelian and Wei, in their capacity as directors and officers of Linkwell, prevented the Company from complying with the Omnibus Order – which directed Linkwell to answer interrogatories and produce documents by January 31, 2014 – and/or failed to take action to cause the Company to comply.

180.    Xuelian and Wei then retained Sidley to structure a transaction to divest Plaintiff of his shares of Linkwell stock and standing to maintain the Derivative Action.  Sidley developed a scheme whereby Xuelian, Wei, Yinling and their affiliates would acquire Linkwell and the revenue generating assets and operations of its subsidiary companies at a fraction of their fair value.   Given the pendency of the Derivative Action, however, the scheme could be accomplished only by withholding notice of such transaction from Plaintiff until after it was consummated.

181.    On March 28, 2014, Sidley prepared a proposed transaction structure and fee proposal for Likang Disinfectant ("Proposal") based on prior discussions conducted with Xuelian and Liyong.  According to documents produced in discovery, Sidley began working on the Proposal on March 7, 2014.

182.    Pursuant to the Proposal, Sidley would represent Likang Disinfectant in connection with the deregistration of Linkwell's securities with the SEC, followed by a one step merger between Linkwell and Yinling, and then a post-merger restructuring of the private

company in preparation for a subsequent public offering in China for a fee of RMB 950,000.  In relevant part, the Proposal described the proposed transaction structure as follows:

  a. Linkwell will 'go dark" and terminate its filing obligations with the SEC by filing a Form 15;

  b. Liyong's organization (Yinling) establishes two vehicles, a parent company in an offshore jurisdiction and a merger subsidiary in Florida;

  c. Yinling serves a merger proposal on the Board;

  d. The Board evaluates the terms of the merger proposal;

  e. "[Yinling] serves a first draft of the agreement and plan of merger on the [B]oard and the [B]oard, (if necessary, consider to engage its separate counsel), evaluates said agreement;"

  f. Yinling, the Board and their counsel negotiate the agreement and plan of merger;

  g. The Board accepts the agreement and plan of merger and authorizes its execution by the Company;

  h. Linkwell prepares a proxy statement and other related documents and distributes them to its stockholders;

  i. Linkwell calls a special meeting to vote on the agreement and plan of merger;

  j. "At the stockholders meeting affirmative vote in excess of majority is cast to approve the merger;"

k.      Yinling files a certificate of merger with the Secretary of State of Florida and consummates the merger, Leading First becomes the parent of Linkwell and all existing shareholders are cashed out; and

l.      "Linkwell undergoes post-merger restructuring in preparation for a domestic IPO."

183.    On April 4, 2014, Likang Disinfectant retained Sidley as legal counsel in connection with the Acquisition.

184.    Pursuant to the Likang Engagement Letter, Sidley agreed to provide advice and assistance to Likang Disinfectant in: (a) the filings of relevant documents in relation to the going dark of Linkwell with the SEC and in response to any inquiry by FINRA; (b) the organization of an acquisition vehicle in Florida; (c) the structuring and execution of a going private proposal, including the preparation of an agreement and plan of merger; and (d) liaising with the transfer, depository and paying agents.

185.    The Likang Engagement Letter set forth a fee for legal services to be rendered in connection with the Acquisition of RMB 950,000.   The fee amount was based on the understanding that completion of the Acquisition did not involve any extraordinary circumstances that will cause the fee arrangement to become impracticable, there will not be any extraordinarily extensive negotiation which would require Sidley's attendance and all negotiations on the deal documents will take place in mainland China and reasonably permit Sidley's attendance by telephone.   The fee amount was further qualified by stated assumptions that:

a.      The Acquisition will take the form of a one-step merger after going dark;

b.      There will be *no review by or comment from the SEC*;

c.      The language for all legal documents shall be English and no need for translation;

d.      The negotiation on the agreement and plan of merger is *minimal*;

e.      There is *no third party "interloper"* during the course of the Acquisition; and

f.      There is *no litigation* during the course of the Acquisition.

186.    On April 11, 2014, the Notice of Termination was filed on behalf of the Company with the SEC which indicated that Linkwell would deregister its securities and cease publicly filing financial statements or periodic reports.

187.    On April 15, 2014, counsel for Plaintiff requested, through counsel for CD Int'l, China Direct and Capital Resource, an April 16, 2014 meet and confer with a representative of Linkwell to discuss Plaintiff's intention to move for an Order of Contempt in light of the Company's failure to comply with the Omnibus Order and the recent filing of the Notice of Termination.  Plaintiff sought to ascertain whether and when Linkwell would comply with the Omnibus Order.

188.    Counsel for Plaintiff received no response to the request for a meet and confer.

189.    Documents produced in discovery show that on April 17, 2014, Plaintiff's request for a meet and confer was sent to Jue Wang ("Jue") (the Corporate Secretary of Linkwell, Linkwell Tech and Likang Disinfectant), and that Jue forwarded the communication to Liyong and Calamus Huang, an attorney at Sidley's Singapore office.

190.    On April 18, 2014, Plaintiff moved for an Order of Contempt against Linkwell (ECF No. 142).

191.    On April 22, 2014, the Supplement was executed whereby Likang Disinfectant retained Sidley to provide legal advice and assistance to Linkwell, Xuelian and Wei in connection with the claims asserted only against Xuelian and Wei in the Derivative Action.

192.    Sidley did not obtain a waiver of conflicts from Linkwell for its simultaneous representation of Linkwell and adverse parties Xuelian and Wei in the Derivative Action.  Nor did Sidley request or obtain the consent or waiver of conflicts from the Company's public shareholders to simultaneously represent Linkwell, Xuelian and Wei in the Derivative Action.

193.    On July 9, 2014, Yinling retained Sidley as legal counsel in connection with the Acquisition.  On the same date, Liyong executed a letter acknowledging the conflict or potential conflict of interest arising from Sidley's representation of both Yinling and Likang Disinfectant in the Acquisition and consented to Sidley's representation of Likang Disinfectant.

194.    On July 16, 2014, Xuelian executed a similar letter acknowledging the conflict or potential conflict of interest arising from Sidley's representation of both Likang Disinfectant and Yinling in the Acquisition and consented to Sidley's representation of Yinling.

195.    On July 11, 2014, the Court entered an Order (ECF No. 173) in the Derivative Action that granted Plaintiff's September 17, 2013 motion for alternative service of process upon Xuelian and Wei.

196.    On July 15, 2014, Xuelian and Wei were served with the Second Amended Verified Shareholders Derivative Complaint.

197.    On August 7, 2014, Plaintiff filed the Third Amended Verified Shareholders Derivative Complaint (ECF No. 187) ("Third Amended Complaint") which, among other things, named Ecolab as a Defendant in the Derivative Action.  At that time, Plaintiff had no knowledge of the Acquisition, that Sidley had been engaged to represent both Likang and Yinling in the

Acquisition or that Sidley had been engaged to represent Linkwell, Xuelian and Wei in the Derivative Action.

198.    On August 12, 2014, the Board purportedly approved the Merger Agreement and authorized its execution.

### 1.    The Notice and Proxy Statement

199.    After the Board approved the execution of the Merger Agreement, Sidley drafted a notice for the Special Meeting on September 19, 2014 in Shanghai ("Notice") and the Proxy Statement.  Sidley, in concert with Xuelian and Wei, had the task of ensuring that, among other things, the Notice and Proxy Statement were disseminated to all Linkwell shareholders.   In violation of Florida law, Sidley, Xuelian and Wei determined not to mail these materials to Plaintiff and the other shareholders of Linkwell that held their stock in street name.

200.    Since Xuelian, Wei and parties that they control or with whom they are affiliated owned more than 60% of Linkwell stock, Sidley determined that it was not necessary to send the Notice and Proxy Statement to public shareholders holding approximately 37% of the equity or solicit their proxies to vote on the Merger Agreement.  Moreover, in light of the pendency of the Derivative Action, Sidley, in concert with Xuelian and Wei, determined not to disclose the Acquisition to Plaintiff and the other shareholders of Linkwell that held their stock in street name in order to prevent them from taking any action (i.e., seeking an injunction or other rights) until after the Acquisition was consummated.

201.    On August 19, 2014, Sidley attorney Calamus Huang ("Huang") emailed the stock transfer agent for Linkwell, Signature Stock Transfer, Inc. ("Signature") about mailing the Notice and Proxy Statement to Linkwell shareholders of record as of August 15, 2014 that were located in the United States.  The August 19 email copied Sidley partner Joseph Chan ("Chan") and Jue, and set forth, in relevant part, as follows:

According to Linkwell's bylaws, "If a notice is mailed at least *thirty days* before the date of the meeting, it may be done by a class of United States mail other than first class. If mailed such notice shall be deemed to be delivered when deposited in the United States mail, addressed to *the shareholder at his address as it appears on the stock transfer books* of the corporation, with postage thereon prepaid."

In this regard, would you please kindly answer our questions below:

Would it be fine with you that you handle the mailing of the proxy statement to those *shareholders on record* whose address is outside [C]hina and Linkwell itself will handle the mailing to those shareholders whose address is inside China?

Is it possible for you to post the proxy statement by US mail other than first class on August 20 (New York time)?

202. Signature responded to Sidley on the same date that it would mail the Notice and Proxy Statement to "all direct holders of record (outside of China) on 8-20-2014." Huang wrote back that: "We note that some record holder[s] such as Cede & Co. is holding Linkwell shares as nominee for hundreds of beneficial holders. Would you please … explain how such record holder will handle it after receiving the proxy statement from you according to your experience?" Signature addressed Sidley's inquiry as follows:

For all street named holders who hold stock through (a broker or through DTCC/CEDE & CO) we will do a search with Broadridge (who does the mailing for all brokerage houses *but please note the search will take at least a week and brokerage holders will not be mailed their items by Broadridge until at least 10 days*). I am sorry but *I cannot speed up the process.*

Also note *for brokerage house purposes we will have to create a current or future record date.* (Emphasis added.)

203. Additional emails circulated between Sidley and Signature on August 19 confirmed that the Notice and Proxy Statement would be mailed on August 20, 2014 to *only* direct holders of Linkwell stock. With respect to holders in street name, Sidley took the position

that "we only need to mail to the record holders.  We are fine with the arrangement in relation to these shareholders whose shares are held by nominees."

204.     On August 28, 2014, Huang emailed Signature to inquire about the status of the search and to confirm that the Notice and Proxy Statement was mailed to Cede & Co. on August 20.  This communication copied Chan and Jue.  Signature responded by email on August 29, 2014 stating, in relevant part, as follows:

> Broadridge will do the mailing to all street holders the end of next week or the week later (note as I stated all I can do is operate in the time constraints they have).  CEDE was mailed 1 copy but that really doesn't matter as they cannot vote their position (as their position has to be voted through Broadridge by the direct holders). Note there is nothing I can do beyond what has already been done for the mailing/solicitation of prox[ies].

205.     On the same day, Huang wrote back to reconfirm that Sidley was not concerned whether holders in street name timely received the Notice and Proxy Statement, stating: "We are totally fine with the procedures that you have to take in relation to street holders and appreciate your efforts and cooperation very much."

206.     On September 9, 2014, Signature emailed Jue about the process of mailing the Notice and Proxy Statement to shareholders of Linkwell that held their stock in street name. Signature wrote:

> Note *all holders in street name need to be mailed by Broadridge if you are soliciting proxies … as they would also have to vote through Broadridge* (not directly your firm).
>
> Also *we are being told that there is not enough time for the mailing/vote for street named holders to respond* (usually a mailing/vote is done giving the shareholders *at least 30 days to respond after the items are mailed*).  Please advise if you wish to postpone the meeting or if you have the votes in house already if you wish to forego the proxy process with Broadridge and make this a mailing only.  (I will check to see if this is only a mailing if they can mail to all holders except those on the NOBO list in

China since there would be no proxy if you like).   (Emphasis added.)

207.   On September 10, 2014, Jue responded in an email stating, in relevant part, as follows:

> First of all *we won't postpone the meeting and we do have more than 60% votes in house already*.  Of course, *I will double check with our attorney in relation to the forgoing of the proxies*.
>
> Forgive my asking, will Broadridge refused [sic] [to] do the mailing/[v]ote if we might don't take those votes into account? (Emphasis added.)

208.   Signature responded that Broadridge would not refuse to do the mailing.

209.   On September 10, 2014, Huang emailed Signature regarding the concern expressed to Jue that the mailing of the Proxy Statement to holders in street name gave them insufficient time to respond.  The September 10, 2014 email copied Jue and Chan, and set forth, in relevant part, as follows:

> Has … Broadridge posted the proxy statement to the street named holders?  I understand from [Jue] that you are concerned that there may not be enough time for these holders to respond.  However, according to Linkwell's by-laws, if a notice of special meeting is mailed at least 30 days before the date of the meeting, it shall be deemed to be delivered when deposited in the US mail, addressed to the shareholder at his address as it appears on the stock transfer books.  Therefore, the notice has been delivered in compliance with Linkwell's by-laws.
>
> Also, the proxy statement clearly stated that if a shareholder abstains from voting, fails to cast his vote in person or by proxy or fails to give voting instructions to his broker, dealer, commercial bank, trust company or other nominee, it will have the same effect as a vote "AGAINST" the approval of the merger agreement. Therefore, Broadridge can simply mail the whole package of the notice of special meeting, the proxy statement and proxy card to those street named holders.
>
> Since the proxy statement has set out clear instructions, we don't think a separate cover letter is necessary.

210.    On September 12, 2014, Jue wrote Signature that the mailing to Linkwell shareholders that held their stock in street name should not include proxy solicitations.

211.    Even if the Proxy Statement was mailed by Broadridge to holders in street name without proxy solicitations on September 12, it was already too late as the Special Meeting was scheduled to be held in 7 days and Section 607.0705(a) of the Florida Statutes requires notice to be sent not fewer than 10 days before the meeting date.

212.    On September 17, 2014, Huang emailed Signature to confirm the status of the mailing of the Proxy Statement to holders in street name.  The September 17, 2014 email copied Jue and Chan, and set forth, in relevant part, as follows:

> Would you please let us know whether or not Broadridge has mailed the proxy statement?  …  If Broadridge hasn't done the mailing before September 19, this Friday, the day on which the special meeting is scheduled to be held, we *may* consider to adjourn the meeting if necessary.  Therefore, it is very important for us to know the status of the mailing as soon as possible. (Emphasis added.)

213.    On September 18, 2014, Huang again emailed Signature to inquire whether Broadridge had mailed the Proxy Statement to Linkwell shareholders in the U.S. holding their shares in street name and, if not, how much time Broadridge needed to complete the mailing.  However, the mailing had not been done as Xuelian, Wei and Sidley intended.   Sidley determined to not to send the Notice or Proxy Statement to street name holders at all and, in violation of Florida law, proceeded with the Special Meeting, thus preventing street name holders, including Plaintiff, from moving to enjoin the Acquisition before its consummation.

214.    On September 19, 2014, the very next day, the Special Meeting was held and the Acquisition was approved by Xuelian, Wei and parties controlled by or affiliated with them, and without the mailing of the Notice or Proxy Statement to Plaintiff and other Linkwell shareholders

that held their stock in street name. Sidley engineered this result by acting far beyond their capacity as lawyers, but rather as agents for Xuelian and Wei.

### 2.     The Proxy Statement is Materially Misleading

215.    The Proxy Statement prepared by Sidley is materially misleading because it falsely portrays the Acquisition as an arm's length transaction between Linkwell and a third party buyer, Yinling.

216.    According to the Proxy Statement, in February 2014, Yinling contacted Linkwell, Xuelian and/or Wei to express an interest in acquiring all of the outstanding shares of the Company.

217.    In March 2014, Xuelian and/or Wei, on behalf of Linkwell, purportedly executed a non-disclosure agreement with Yinling. Pursuant to the Proxy Statement, Yinling commenced its business, financial and legal due diligence following the execution of that agreement.

218.    On April 12, 2014, Yinling requested that negotiations with Linkwell be conducted on an exclusive basis for six months with no solicitation of other proposals or negotiations with other bidders, and Linkwell granted Yinling's request.

219.    Records filed with SAIC indicate, however, that Yinling was not even formed until April 18, 2014. Moreover, in response to Plaintiff's discovery requests concerning any due diligence sought by the parties to the Acquisition, Sidley represented that "after a reasonable search, no responsive documents exist."

220.    The Proxy Statement sets forth that, on July 25, 2014, Yinling submitted a preliminary non-binding proposal ("Proposal Letter") to Linkwell to acquire all of the Company's outstanding stock in a merger transaction for $0.18 per share. The Proxy Statement does not disclose that the Proposal Letter was prepared by Sidley, or the nature of Sidley relationship with Yinling in connection with the Acquisition. The Proxy Statement does not

disclose the Derivative Action or that a primary purpose of the Acquisition was to terminate the Derivative Action.   The Proxy Statement does not disclose that after the Acquisition was consummated, Xuelian and Wei intended to restructure Linkwell in preparation for a public offering in China.

221.   The Proxy Statement further sets forth that the Board, Yinling and Sidley held various meetings to discuss material issues arising from a draft merger agreement and to determine the positions of the Board with respect to those issues.   Sidley also held a number of conference calls with the Company to summarize and explain the key terms of the merger agreement and communicated the Board's positions on key issues to Yinling.   On August 10, 2014, the parties reached an agreement in principle on all major issues, including the $0.88 per share offer price and a non-solicitation provision pursuant to which Linkwell was prohibited from actively soliciting alternative transaction proposals.   On August 12, 2014, Linkwell, Leading First and Leading World purportedly executed the Merger Agreement.

222.   The Proxy Statement does not disclose, however, that Likang and Yinling reached an agreement to consummate the Acquisition in March/April 2014.   In fact, most of the events described in the Proxy Statement were planned and scheduled in a document titled "Timetable for the Merger and Acquisition of Linkwell Corporation," which was prepared by Sidley and circulated to Liyong and Jue on April 16, 2014.   The timetable sets forth tentative dates by which, among other things: (a) Linkwell accepts the Merger Agreement, prepares the Proxy Statement and convenes the Special Meeting; and (b) Yinling submits a certificate of merger to the Florida Department of State to complete the merger.   Absent from the timetable are action items involving the preparation of Linkwell financial results for the periods proximate to the

vote, projections of future performance, or financial analyses or fairness opinion with respect to the merger consideration.

### 3. Xuelian, Wei and their Affiliates Approve the Merger Agreement at the Special Meeting

223. According to the Notice, all Linkwell shareholders were invited to attend the Special Meeting in Shanghai on September 19, 2014.

224. The stated purpose of the Special Meeting was to approve the Merger Agreement, which provided for the merger of Leading World with and into Linkwell, with Linkwell surviving as a wholly owned subsidiary of Leading First. The Notice further set forth, among other things:

> Regardless of the number of shares of Company common stock you own, your vote is important. The failure to vote will have the same effect as a vote *against* the proposal to approve the merger agreement. Whether or not you plan to attend the special meeting, please take the time to submit a proxy by following the instructions on your proxy card as soon as possible. If your shares of the Company common stock are held in an account at a broker, dealer, commercial bank, trust company or other nominee, you should instruct your broker, dealer, commercial bank, trust company or other nominee to vote in accordance with the voting instruction form furnished by your broker, dealer, commercial bank, trust company or other nominee.
>
> …
>
> *Company common shareholders who do not vote in favor of approval of the merger agreement will have the right to seek appraisal and receive the fair value of their shares in lieu of receiving the per share merger consideration if the merger closes but only if they perfect their appraisal rights by complying with the required procedures under Florida law which are summarized in the accompanying proxy statement.* The procedure for dissent and appraisal is described in Sections 607.1301 to 607.1333 of the Florida Business Corporation Act, which are attached as Annex B to the proxy statement accompanying this notice. We are providing this notice and a copy of such sections pursuant to Section 607.1320 of the Florida Business Corporation Act. Florida law requires strict adherence to the procedures set forth therein,

and failure to do so may result in the loss of all dissenters' appraisal rights.  Accordingly, each shareholder who might desire to exercise dissenter's appraisal rights should carefully consider and comply with the provisions of those sections and consult with his or her legal advisor.  (Emphasis added.)

225.    According to the shareholder's attendance sheet, the following Linkwell shareholders were present at the Special Meeting:

      a.     Linkwell Int'l (represented by Xuelian and Wei) (170,118 shares);

      b.     Xuelian (50,000 shares) and Wei (11,000 shares);

      c.     Shanghai Likang Pharmaceutical Technology Co. Ltd ("Likang Pharmaceutical") (represented by Xuelian) (2,500 shares);

      d.     Haimai Legal (41,750 shares);

      e.     Honglin Li ("Honglin") (20,000 shares);

      f.     Wensheng Sun ("Wensheng") (5,000 shares);

      g.     Qiqing Zong ("Qiqing") (11,030 shares);

      h.     Jue (17,500 shares); and

      i.     Liumei Chen ("Liumei") (19,010 shares).

226.    According to the Company's 2011 Form 10-K, Xuelian and Wei own all of the equity of Linkwell Int'l.  Additionally, Xuelian and Wei respectively own 90% and 10% of Likang Pharmaceutical.

227.    Wensheng is Chief Operating Officer of Likang Disinfectant and serves as a member of that company's board of directors with Xuelian, its Chairman.  Wensheng is also President of Zhongyou Pharmaceutical.

228.    Shengyao a director and partner of Haimai Legal, exercises voting and investment power over the Linkwell shares owned by Haimai Legal.  Shengyao is also a member of the Likang Disinfectant board.

229.    Jue is the Secretary to the Board, the Corporate Secretary at Linkwell Tech and the Secretary and a supervisor at Likang Disinfectant.

230.    Honglin is the President of Inner Mongolia Likang Biological Co., Ltd., a Linkwell related party.

231.    Upon information and belief, Qiqing was a consultant to Linkwell and awarded 2 million shares of Linkwell stock in May 2011.

232.    Liumei is a supervisor at 2 Linkwell affiliated companies, Shanghai Yikang Environmental Technology, Co., Ltd. ("Yikang Environmental") and Shanghai Zhongyou Health Management Consulting Co., Ltd. ("Zhongyou Health Management").   Xuelian is the sole shareholder of Yikang Environmental and Zhongyou Health Management.

233.    Linkwell Int'l, Likang Pharmaceutical, Haimai Legal, Honglin, Wensheng, Qiqing, Jue and Liumei are entities or individuals controlled by or affiliated with Xuelian and Wei.

234.    Xuelian, Wei, Linkwell Int'l, Likang Pharmaceutical, Haimai Legal, Honglin, Wensheng, Qiqing, Jue and Liumei voted to approve the Plan of Merger and Merger Agreement at the Special Meeting.   The votes cast by these attendees at the Special Meeting represented 347,908 of the total 348,508 shares of Linkwell stock voted in favor of approving the Plan of Merger and Merger Agreement.

235.    Xuelian and Wei beneficially owned 233,618 of the total 348,508 Linkwell shares cast to approve the Plan of Merger and Merger Agreement.   These 233,618 shares represented 43% of all Linkwell shares and 67% of all Linkwell shares voted at the Special Meeting.

236.    The Plan of Merger and Merger Agreement could not have been approved, and the Acquisition could not have been consummated, without the shares of Xuelian and Wei being cast to approve the Plan of Merger and Merger Agreement.

237.    No votes were cast or counted against approval of the Plan of Merger or Merger Agreement.  Pursuant to the Notice, shares of Linkwell stock that were not voted at the Special Meeting were to have the same effect as a vote against the proposal to approve the Merger Agreement.  According to the summary of poll results ("Summary") for the Special Meeting, 200,492 out of the Company's total 549,000 shares of Linkwell stock were not voted.  Not 1 of the 200,492 shares was reflected in the Summary as being cast against the approval of the Plan of Merger or Merger Agreement.

238.    After the vote, the Amended Articles of Incorporation were filed with the Florida Department of State.  The Amended Articles of Incorporation were prepared and filed by Sidley.

239.    The Amended Articles of Incorporation contains a new Article VI which provides for the indemnification of the Company's officers and directors to the fullest extent of the law and specifically include "advancing expenses of officers and directors as provided in Section 6.10 of [the Merger Agreement]."   In pertinent part, this Section of the Merger Agreement provides:

> From and after the Effective Time, [Linkwell] shall indemnify and hold harmless, to the fullest extent required by the Company Articles of Incorporation and Company By-Laws … each present and former director and officer of the Company and each Company Subsidiary (collectively, the Indemnified Parties") against any costs of expenses (including attorneys' fees and expenses), judgments, fines, losses, claims, settlements, damages or liabilities incurred in connection with any Action, whether civil, criminal, administrative or investigative, arising out of or pertaining to such Indemnified Party's *service as a director or officer of the Company or Company Subsidiary or services performed by such Person and the request of the Company or Company Subsidiary*, including (i)

any and all matters pending, existing or occurring at or prior to the Effective Time, and (ii) any claim arising for the transactions contemplated herein, and any actions taken by [Leading First] and/or [Leading World] with respect thereto (including any disposition of assets of [Linkwell] or any of its Subsidiaries which is alleged to have rendered [Linkwell] and/or any of its Subsidiaries insolvent).  (Emphasis added.)

240.    No such indemnification provision existed in prior versions of the Company's Articles of Incorporation or amendments thereto.

241.    The Articles of Merger were subsequently filed by Sidley with the Florida Department of State.  Pursuant to the Articles of Merger, the Plan of Merger was adopted by the shareholders of Linkwell on September 19, 2014.

242.    As described in the Plan of Merger, the respective boards of directors of Linkwell and Leading World approved the merger with Linkwell as the surviving company, on the terms and conditions contained or referred to in the Merger Agreement and the shareholders of Linkwell approved and adopted the Merger Agreement and Plan of Merger.  It further provided that on the effective date of the merger (September 19, 2014), in accordance with the terms of the Merger Agreement, the issued and outstanding shares of Linkwell will be cancelled and the shareholders will have the right to receive merger consideration in the amount of $0.88 per share of Linkwell stock.

### 4.    Plaintiff and Other Linkwell Shareholders were not mailed the Notice or Proxy Statement

243.    On October 8, 2014, Sidley drafted a cover letter to Linkwell shareholders which was intended to be delivered with a letter of transmittal (for the surrendering of Linkwell shares to obtain the merger consideration of $0.88 per share).  The cover letter disclosed that the Merger Agreement was approved by the Company's shareholders at the Special Meeting on September 19, 2014, Articles of Merger were filed with Florida Department of State on the same day and, as

a result of the merger, Linkwell became a wholly owned subsidiary of Leading First.  The cover letter further disclosed that, as of October 8, no shareholders had exercised their appraisal rights.

244.   On October 15, 2014, Jue emailed Signature (and copied Chan and Huang) concerning the fact that Linkwell shareholders who held in street name did not receive notice of the Special Meeting and the Proxy Statement, writing:  "I am afraid that these street holders of Linkwell Corporation haven't received the Notice regarding the Merger, since there is still some trading of Linkwell stock recently.  Could you please relay the enclosed letter to the Broadridge and push it to inform all these brokers about the completion of the merger."

245.   The email attached a signed copy of the cover letter described above which disclosed that, among other things, as of October 15, 2014, no shareholders had exercised their appraisal rights.

246.   According to a certification provided by Securities Transfer Corporation, the paying agent for Linkwell in connection with the Acquisition, proxy materials were not mailed to Linkwell shareholders of record until October 29, 2014, more than a month *after* the Merger Agreement was purportedly approved at the Special Meeting and Articles of Merger were filed with the Florida Department of State.

247.   On November 6, 2014, Plaintiff's shares of Linkwell stock were unilaterally cancelled from his brokerage account at TD Ameritrade, contemporaneous with the receipt of $0.88 per share for his Linkwell stock.

248.   Plaintiff was not mailed the Notice or Proxy Statement, nor was his broker TD Ameritrade.  Other Linkwell shareholders with brokerage accounts at TD Ameritrade similarly did not receive the Notice or Proxy Statement.

249.    By letter dated December 22, 2014. Plaintiff's broker TD Ameritrade confirmed that it received no materials regarding the Acquisition to forward to TD Ameritrade clients that owned shares of Linkwell stock.

250.    Based on the foregoing, it is reasonable to infer that not one of the hundreds of Linkwell shareholders in the U.S. that held Linkwell stock in street name was sent the Notice or Proxy Statement.

### G.    The Acquisition was Unlawful and Unfair

251.    As described above, the consummation of the Acquisition was procured through the use of a manipulative and deceptive device, artifice to defraud or acts which operated or could act as a fraud of deceit, willful nondisclosure, unlawful conduct, unfair dealing and/or impermissible conflicts of interest.

252.    On October 26, 2014, Plaintiff discovered the Articles of Merger and the accompanying documents on the Florida Department of State website.

253.    Prior to October 26, 2014, Plaintiff had no knowledge of any actual or potential merger transaction between Linkwell, Leading First and Leading World.

254.    Plaintiff and other Linkwell shareholders that held their stock in street name were not provided with the statutory notice with respect to the Acquisition, as mandated under Sections 607.0705 and 607.1103 of the Florida Statutes.

255.    The complete failure to provide such notice unlawfully and unfairly deprived Plaintiff and other Linkwell shareholders of the right and opportunity to: (a) evaluate whether the material terms of the Merger Agreement, including the $0.88 per share merger consideration, were fair; (b) vote on whether to approve the Merger Agreement; (c) exercise appraisal rights; or (d) seek an injunction to enjoin the Acquisition.

256.    If Plaintiff had been provided with the requisite notice, he would have moved in the Derivative Action to enjoin the Special Meeting.  Such motion would have been meritorious because, as described below, the Proxy Statement was manifestly incomplete insofar as it lacks basic information relevant to a material transaction for the sale of 100% of the Company's equity.

257.    As described above, the failure to provide Plaintiff and other Linkwell shareholder that held their stock in street name with statutory notice was a strategic decision by Xuelian, Wei and Sidley.

258.    Because Plaintiff was not provided the requisite notice, he did not know there was a material transaction to acquire all of the shares of common stock of Linkwell, and did not discover the Acquisition until after it was consummated.

259.    The failure of Xuelian, Wei and Sidley to comply with Florida law and provide Plaintiff with statutory notice ensured that the Acquisition would be consummated and wrongfully prevented Plaintiff from obtaining an injunction and exercising other legal and statutory rights.

260.    A principal purpose of the Acquisition was to divest Plaintiff of standing to assert the claims in the Derivative Action and, thereby, insulate Xuelian and Wei from liability for their misconduct in connection with the Transaction.  Sidley designed and implemented the Acquisition to accomplish this objective.  The Acquisition was consummated by not providing Plaintiff or other Linkwell shareholders that held their stock in street name with statutory notice thereof.  Sidley knew that Sections 607.0705 and 607.1103 of the Florida Statues required that notice of the shareholders' meeting to vote on the Acquisition and notice of shareholder appraisal rights be timely furnished to *all* Linkwell shareholders.  Xuelian, Wei and Sidley did not comply

with Florida law and, as a result, Yinling was able to acquire 100% of the equity of Linkwell through an inherently unfair process and at a grossly inadequate price.

261.    Xuelian and Wei faced substantial liability for the claims asserted against them in connection with the Transaction for self-dealing and other breaches of fiduciary duty.  By undertaking the Acquisition, Xuelian and Wei intended to prevent further scrutiny of their misconduct by the Court in the Derivative Action.

262.    There is no legitimate business purpose to justify the Acquisition and none has been offered or provided.  Xuelian, Wei and Sidley knew that no legitimate business purpose existed when they planned the Acquisition with Liyong in March 2014.

263.    Prior to December 9, 2014, Linkwell Tech owned 100% of the equity of Likang Disinfectant.  According to company filings with SAIC, as of December 9, 2014, Linkwell Tech's equity ownership of Likang Disinfectant was reduced to 16.17%.  The other 83.83% of Likang Disinfectant was acquired by Zhongyou Pharmaceutical.  Xuelian is the controlling shareholder (51.17%) of Zhongyou Pharmaceutical.

264.    Xuelian, Wei and Sidley possessed direct knowledge of the pendency of the Derivative Action yet failed to provide any notice of the Special Meeting to the Court or Plaintiff.  After the Merger Agreement was approved at the Special Meeting, Xuelian, Wei and Sidley still failed to disclose this information to the Court or Plaintiff.

265.    Even if Plaintiff had been provided with statutory notice, the process employed in connection with the Acquisition would still have been unfair.

266.    The Proxy Statement does not contain any current financial statements (audited or unaudited) for Linkwell, Linkwell Tech, Likang Disinfectant or any other revenue generating subsidiary company.  The Proxy Statement also does not contain a fairness opinion from a

financial advisor to address the adequacy or inadequacy of the $0.88 per share merger consideration for Linkwell stock.

267.    The merger consideration paid to acquire Linkwell has no relation to the Company's net assets, enterprise value or the value of the derivative claims against Defendants. For example, for year-end 2014, Likang Disinfectant reported in excess of $40.9 million in total assets and just under $4.7 million in total liabilities.  A calculation of share price based on a valuation of net assets at approximately $36.2 million would yield a $65.94 price per share ($36.2 million ÷ 549,000 outstanding shares of Linkwell stock).

268.    The $0.88 merger consideration paid to Linkwell shareholders was arrived at based on advice received from Sidley as no other advisors, legal or financial, are identified in the Proxy Statement.  Moreover, Sidley served as legal counsel for both Likang Disinfectant and Yinling.

269.    The $0.88 merger consideration was accepted and approved by Xuelian, Wei and parties that they control or with whom they are affiliated without solicitation of other bids to acquire Linkwell.  No other bids were solicited because Xuelian and Wei stood on both sides of the Acquisition and, as described in paragraphs 38 and 263 above, Xuelian personally obtained a controlling interest in Likang Disinfectant, Linkwell's primary revenue generating asset, after the Acquisition was consummated.  This information was not disclosed in the Proxy Statement.

270.    In addition, the Proxy Statement does not disclose the existence of the Derivative Action or attempt to value the claims pending against Xuelian and Wei, amongst others, for their misconduct and self-dealing in connection with the Transaction, and other parties that participated in such misconduct.  The value of those claims are material as Xuelian and Wei sought to acquire for themselves Linkwell's revenue generating assets and operations (Linkwell

Tech, Likang Disinfectant and Likang Biological) for *zero* consideration to the Company. The $0.88 per share merger consideration did not include any value for the claims asserted in the Derivative Action.

271. The Merger Agreement annexed to the Proxy Statement is also incomplete insofar as it is not even signed by the parties and does not attach the referenced schedules.

272. The Proxy Statement also fails to disclose Sidley's debilitating conflicts of interest in violation of the Rules of Professional Conduct. Sidley did not disclose that it was engaged to provide legal advice and assistance to both Likang Disinfectant and Yinling in connection with the sale of Linkwell and a post-merger restructuring in preparation for an IPO. Sidley did not disclose that the real parties in interest in connection with the Acquisition were Xuelian, Wei and Yinling. Nor did Sidley disclose that at the same time that it was representing Likang and Yinling in connection with the Acquisition, it was also engaged to provide legal advice and assistance to adverse parties Linkwell and Xuelian and Wei in the Derivative Action.

273. Finally, the Proxy Statement does not disclose that the Amended Articles of Incorporation and the Merger Agreement were drafted and approved so that any legal fees and expenses incurred by and any judgments or liabilities obtained against Xuelian and Wei, among others, in connection with the claims asserted in the Derivative Action, or the claims arising out of the Acquisition, would be paid or advanced by Linkwell.

### H.   Xuelian, Wei and Sidley Take Actions to Evade Discovery, Avoid Compliance with Court Orders and Terminate the Derivative Action

274. As described above, on January 16, 2014, the Court in the Derivative Action entered the Omnibus Order compelling Linkwell, among others, to answer interrogatories and produce documents responsive to Plaintiff's discovery requests. Xuelian and Wei did not take any action to cause the Company to comply with the Omnibus Order.

275.     On April 18, 2014, Plaintiff moved for an Order of Contempt against Linkwell as a result of the failure to comply.  Plaintiff's motion was unopposed.  An Order of Contempt for failure to comply with the Omnibus Order was issued against Linkwell on April 1, 2015 (ECF No. 258).

276.     On October 31, 2014, while the motion for an Order of Contempt was pending, Plaintiff filed a second motion for an Order of Contempt (ECF No. 216) after the discovery of the Acquisition.

277.     On November 17, 2014, Xuelian and Wei filed papers opposing Plaintiff's Second Motion for an Order of Contempt against Linkwell (ECF Nos. 219, 219-1, 219-2). Those opposition papers included declarations from Xuelian and Wei, which were prepared with the advice and assistance of Sidley.  The declarations affirmed under the penalty of perjury that, effective July 18, 2014, Xuelian and Wei resigned their positions as directors and officers of Linkwell and no longer hold any position with the Company.

278.     Sidley knew at the time the declarations were prepared and executed, that the statements therein were false.  Sidley possessed contemporaneously executed Statements on Lost Share Certificates, each of which was signed by Xuelian on behalf of Linkwell.  The Statements on Lost Share Certificates are respectively dated November 5, 2014 and November 10, 2014, and post-date the claimed resignation by Xuelian by almost 4 months.  Sidley knew that Xuelian nor Wei had not resigned from their positions at Likang Disinfectant – the company responsible for almost all of Linkwell's revenues and profits and paying Sidley's legal fees to represent Linkwell, Xuelian and Wei in the Derivative Action.  Sidley knew that Xuelian and Wei controlled Linkwell through their management and control of Likang Disinfectant.  Sidley also knew that Linkwell shares the same registered address and office space as Likang Disinfectant.

Sidley nonetheless permitted Xuelian and Wei to declare under the penalty of perjury that they resigned in July and were no longer affiliated with the Company.

279.    In January 2015, Huang emailed the Statements on Lost Share Certificates to the Company's paying agent, Stock Transfer Corporation, so that the Linkwell stock certificates could be cancelled.  Jue, Liyong and Chan were copied on the email.

280.    On April 1, 2015, the Court entered an Order (ECF No. 258) denying Plaintiff's second motion on grounds that the relief requested against Xuelian and Wei is inappropriate at this time.  Objections to the Order were subsequently filed.  On September 29, 2015, the Court ruled on the objections and entered an Endorsed Order (ECF No. 322) finding, among other things, that an Order of Contempt could not be enforced as against Xuelian and Wei because "they are no longer directors of the corporation."

281.    Neither Xuelian, nor Wei clarified to the Court or Plaintiff whether the Statements on Lost Share Certificates, which were signed by Xuelian on behalf of Linkwell, require the withdrawal of the declarations submitted by Xuelian and Wei in November 2014.

282.    On January 8, 2015, Plaintiff served requests for production of documents ("Requests") upon Xuelian and Wei.

283.    On March 11, 2015, Plaintiff filed a motion to compel in connection with the Requests.

284.    On April 10, 2015, the Court issued an Order (ECF No. 265) granting the motion to compel consistent with its oral rulings of April 9, 2015 (ECF No. 285) ("April 9, 2015 Hearing Tr.").

285.    On April 14, 2015, in accordance with the Order, Buchanan Ingersoll & Rooney PC ("Buchanan") (counsel appearing for Xuelian and Wei in the Derivative Action) delivered a

letter to Sidley, in its capacity as counsel for Linkwell, and requested on behalf of Xuelian and Wei copies of all documents responsive to the Requests in the Company's possession, custody or control.

286.    On April 28, 2015, Xuelian and Wei produced limited documents purportedly obtained from Linkwell and Sidley.  As a result of material gaps in the production, Plaintiff served Sidley with a subpoena on October 20, 2015 ("Subpoena").

287.    On October 8, 2015, Xuelian and Wei moved to dismiss the Derivative Action for lack of standing.

288.    On December 4, 2015, Xuelian and Wei moved to quash the Subpoena ("Motion to Quash") in the United States District Court of the Southern District of New York (*In re Subpoena to Sidley Austin LLP*, No. 15-Misc-375) ("MC Case").

289.    In support of the Motion to Quash, counsel for Xuelian and Wei submitted a declaration which asserted, among other things, that Xuelian and Wei "shared a common interest in the outcome of the Lawsuit with each other and with … Linkwell" and that Xuelian, Wei and Linkwell have a "common cause of securing dismissal of the Lawsuit."

290.    On December 21, 2015, in apparent response to Plaintiff's argument in opposition that the interests of Linkwell, on one hand, and Xuelian and Wei, on the other, were adverse, Tom Paskowitz, a partner in Sidley's New York office, filed a declaration in support of the Motion to Quash which, in relevant part, stated:

> On April 4, 2014, Sidley entered into an engagement letter with [Likang Disinfectant] to assist with a going-private transaction of Linkwell … that was then under consideration.

> On April 22, 2014, Sidley and [Likang Disinfectant] entered into a supplement of the April 4, 2014 engagement letter, pursuant to which Sidley agreed to represent Linkwell, [Xuelian] and [Wei] in connection with the [Derivative] Action.

> After service of process was effected on [Xuelian] and [Wei] in the [Derivative] Action, and each resigned as a director of Linkwell, I negotiated an extension of time for [Xuelian] and [Wei] to answer, move, or otherwise respond to the complaint.  That stipulation, however, was signed by Buchanan Ingersoll & Rooney PC ("Buchanan") on behalf of [Xuelian] and [Wei], and Sidley has not appeared on behalf of [Xuelian] and [Wei] in the [Derivative] Action.
>
> However, Sidley has continued to work with [Xuelian] and [Wei] in connection with the [Derivative] Action, including to facilitate communications between [Xuelian], [Wei], and Buchanan.
>
> Sidley has not terminated its representation of [Xuelian] and [Wei] in connection with the [Derivative] Action.

(MC Case, ECF No. 19-1).

291.   At no prior time had Sidley disclosed that it simultaneously represented Linkwell, Xuelian and Wei in the Derivative Action.

292.   Notably, on March 23, 2015, Plaintiff moved for an entry of default against Linkwell at the Court's instruction as a result of the Company's failure to appear, file or serve any responsive papers or comply with discovery.  Even though Sidley served as counsel to Linkwell at the time the motion was filed, Sidley did not appear on the Company's behalf to oppose it.  An entry of default (ECF No. 252) was issued by the Clerk of the Court against Linkwell in the Derivative Action on March 24, 2015.

293.   At no prior time did Buchanan disclose to Plaintiff or the Court that their clients, Xuelian and Wei, and Linkwell were being jointly represented by Sidley in the Derivative Action.  To the contrary, Buchanan represented to the Court that Xuelian and Wei had no relation to the Company:

> THE COURT: So you are representing to me, as an officer of the court, that they have cut their ties and they no longer officially belong to the company, right?
>
> MR. VILLENEUVE: Absolutely, Your Honor. …

April 9, 2015 Hearing Tr. at 12:18-21.

294.    During the February 8, 2016 argument on the Motion to Quash and the Motion to

Compel Sidley, the Court noted the vast change in Buchanan's position:

> THE COURT: And also, counsel for defendants, okay, my recollection, and I have a couple thousand cases, but I remember repeatedly Xuelian and Wei saying, we can't get ahold of these records because we are not officers anymore of Linkwell.
>
> Counsel for plaintiff, am I off on a deserted island here?
>
> MR. HECHT: No, you're not.
>
> THE COURT: Now, without dancing around, let's address that. You were here, you argued that … they can't comply because they are no longer officers of Linkwell. Do you follow me that was your main argument as a matter of fact? Address that directly.
>
> MR. VILLENEUVE: Okay. Your Honor, I believe our position is that because they were not officers of Linkwell, they did not have legal custody and control of those documents and thus they were not required or able to produce them.
>
> THE COURT: Well, I just had -- you are here on this case, you know, and it's represented by Sidley's pleadings that they represent these fellows personally. They represent Linkwell. Am I missing something here? You could be Fred Astaire and you won't be able to dance out of that one.
>
> MR. VILLENEUVE: Your Honor, I'm not trying to dance. The fact that Sidley represents Linkwell and represents our clients doesn't mean that our clients have custody and control and possession of Linkwell documents. There was never a case presented and I don't know of any case that says, because your law firm represents another defendant, you have custody and control of that defendant's documents.
>
> THE COURT: They represent Linkwell. They represent Xuelian and Wei. Do you follow me? Xuelian and Wei say we are not officers of Linkwell, repeatedly saying that in federal court, and now Sidley enters an appearance on behalf of Wei and Xuelian and Linkwell.
>
> MR. VILLENEUVE: Your Honor, I don't think Sidley has entered an appearance on behalf of them. What we have said is we are co-

counsel and so our communications with Sidley should not be discoverable and --

THE COURT: Wait. Who is co-counsel?

MR. VILLENEUVE: The law firm of Buchanan, Ingersoll & Rooney which represents Xuelian Bian and Wei Guan is co-counsel with the law firm of Sidley Austin which --

THE COURT: Who represents Xuelian and Wei and Linkwell?

MR. VILLENEUVE: Yes, Your Honor.

THE COURT: I'll just leave that speak for itself.

…

MR. UNGER: In August or in July, I believe, Mr. Bian and Guan, they resigned as officers and directors of Linkwell, but the attorney-client relationship did not end just because they resigned at that point. We had been retained to represent them in regard to the derivative action. And then what happened was we assisted … those two individuals --

THE COURT: Derivative action?

MR. UNGER: This action, Your Honor.

…

THE COURT: Now, you heard counsel for plaintiff saying, and he was quite correct, I have addressed all those things, I have repeatedly addressed all those things. Do you follow me.

MR. UNGER: And as I understand, Your Honor, you are suggesting --

THE COURT: You are saying this is a new argument. The firm itself is coming in and asserting, to simplify things, the same – it's for a different reason. Before they said, well, we don't have the power because we are no longer officers. But when they first came into your office, correct, they were still officers, were they not?

MR. UNGER: Yes, Your Honor.

THE COURT: Okay.

MR. UNGER: I am not addressing --

THE COURT: So there's something the matter here because if they came in and they were still officers and their first visit to you was after the derivative action was filed and they were in my court claiming that they were not officers and they no longer had the ability to produce records, tell me what I am missing here.

MR. UNGER: They did not make that claim prior to the time they resigned, Your Honor. When they --

THE COURT: They made that claim here in court.

MR. UNGER: When they made that claim, they were no longer officers and directors, that's correct. There's nothing inaccurate about that claim. At the time that they were before you and said they were no longer officers and directors, that was true. And as a result --

THE COURT: Because after they came in and they were represented by you, during that time, they resigned. Is that what you are saying?

MR. UNGER: They resigned in July of 2014. We had -- yes, we had been representing them --

THE COURT: Okay.

Feb. 8, 2016 Hearing Tr. (ECF No. 355) at 10:22 - 12:17, 44:4-11, 45:9 - 46:18.

295.     On February 10, 2016, an Order (ECF No. 354) was issued denying the Motion to Quash and granting the Motion to Compel Sidley consistent with the oral rulings made on February 8.

296.     Sidley subsequently produced certain documents responsive to the Subpoena (including the Statements on Lost Share Certificates described in paragraphs 278-79 above) which confirm that Xuelian and/or Wei, at all relevant times, exercised control over Linkwell, either directly or through their management and control of Likang Disinfectant, and possessed the practical ability to obtain the documents sought in the Requests insofar as those documents reside in the shared office space of Likang Disinfectant and Linkwell in China.

297.     Xuelian, Wei and Sidley engaged in a pattern of obfuscation and deceit to frustrate Plaintiff's efforts in the Derivative Action to obtain relevant discovery regarding the Transaction and Acquisition.

298.     On April 11, 2016, the Court issued an Order (ECF No. 369) ("April 11, 2016 Order") which dismissed, without prejudice, the Derivative Action for lack of standing as Plaintiff was no longer a shareholder of the Company, and declined to determine whether an equitable exception to the continuous ownership rule was applicable under the circumstances. On June 8, 2016, the Court issued an Order (ECF No. 391) ("June 8, 2016 Order") denying Plaintiff's motion for reconsideration of the April 11, 2016 Order.

## VII.   CLASS ACTION ALLEGATIONS

299.     Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of all Linkwell common shareholders (the "Class") whose shares of Linkwell stock were sold in connection with the Acquisition, and were damaged thereby.

300.     Excluded from the Class are Xuelian and Wei, Sidley and its employees or agents, Yinling, Leading First and Leading World ("Class Defendants") and their subsidiaries and affiliates, all persons that voted in to approve the Merger Agreement and all persons who make a timely request to be excluded from the Class.  Plaintiff reserves the right to revise the Class definition based upon information obtained through discovery.

301.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

302.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

303.    The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiff believes that there are more than 300 members of the Class that reside in the United States.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

304.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.    Whether the federal securities laws were violated by Class Defendants' acts as alleged herein;

b.    Whether Class Defendants, by their design, implementation and consummation of the Acquisition without the provision of any notice of the same to Plaintiff and the Class, employed a scheme or artifice to defraud, or engaged in acts, practices or a course of conduct which operated as a fraud on deceit in connection with sale of Class members' Linkwell stock;

c.    Whether Class Defendants breached their fiduciary duties and/or aided and abetted breaches of fiduciary duties to Plaintiff and the Class as alleged herein;

d.    Whether Class Defendants conspired to acquire 100% of the equity of Linkwell through an unlawful and unfair process; and

e.    Whether $0.88 per share was fair value for the Linkwell stock owned by Plaintiff and the other members of the Class.

305.    Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants as described above.

306.    Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other member of the Class he seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation.  The interests of the Class will be fairly and adequately protected by Plaintiff, who intends to prosecute this action vigorously.

307.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The injury or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants.  It would be impracticable for Plaintiff and the members of the Class to individually seek redress for Class Defendants' wrongful conduct.

308.    Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   CAUSES OF ACTION

## COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER
**(Against Xuelian, Wei and Sidley)**

309.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-308 above, as though fully set forth herein.

310.    By their acts, transactions and courses of conduct, as alleged in paragraphs 67-72, 180-86, 191-94, 199-214, 243-64 and 267-70 above, Xuelian, Wei and Sidley knowingly and/or recklessly deceived the Class, including Plaintiff, in connection with the sale of the shares of their Linkwell stock by the failure to provide the Class with statutory notice concerning the Acquisition, as required by Sections 607.0705 and 607.1103 of the Florida Statutes.

311.    Xuelian, Wei and Sidley each violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) by covertly engineering the Acquisition and refusing to disclose any material fact regarding the same to Plaintiff and the Class, which operated as fraud and deceit upon Plaintiff and the Class by: (a) divesting Plaintiff and Class members of their equity in Linkwell through the unilateral sale of their shares of Linkwell stock – without paying them fair value therefor; and (b) preventing Plaintiff and Class members from moving to enjoin the Acquisition prior to its consummation.   Sidley was the architect of the Acquisition and represented all parties thereto.

312.    As directors, officers and controlling shareholders of Linkwell at the time they determined to undertake the Acquisition, Xuelian and Wei had a fiduciary obligation to disclose truthful information that would be material to Linkwell shareholders in compliance with applicable laws and regulations.   Xuelian and Wei had a fiduciary obligation to Plaintiff and the Class to disclose that the Company had entered into a material transaction for the sale of 100%

82

of its equity to Yinling.  As legal counsel in connection with the Acquisition, Sidley was responsible for ensuring that the Acquisition complied with applicable laws and regulations. Sidley knew that Xuelian and Wei had a fiduciary obligation to disclose all material facts relating to the Acquisition to Plaintiff and the Class.  Sidley also knew that Xuelian and Wei had not discharged their fiduciary obligation because no notice or other information regarding the Acquisition was furnished to Plaintiff or the Class.  Sidley made the decision to not provide any notice regarding the Acquisition, or other information in connection with the same, to Plaintiff or the Class.

313.    Pursuant to Sections 607.0705 and 607.1103 of the Florida Statutes, Xuelian, Wei and Sidley were obligated to timely furnish notice regarding the Acquisition and shareholder appraisal rights to all Linkwell shareholders at least 10 days in advance of the Special Meeting. Sidley, acting in concert with Xuelian and Wei, did not provide Plaintiff (or his broker) or other Class members (or their brokers) with the requisite notice.

314.    The knowing and/or grossly reckless nondisclosure of any facts regarding the Acquisition (including the existence of the Acquisition itself) by Xuelian, Wei and Sidley operated as a fraud and deceit upon Plaintiff and the other members of the Class.

315.    The facts alleged herein give rise to a strong inference that Xuelian, Wei and Sidley acted with scienter.  Xuelian, Wei and Sidley each knew or with extreme recklessness disregarded their fiduciary obligation and/or legal duty to provide all shareholders of Linkwell with statutory notice regarding the Acquisition and shareholder appraisal rights and that their complete failure to do so would operate as a fraud and deceit upon Plaintiff and the Class. Xuelian, Wei and Sidley each knew that the purpose of the Acquisition was to terminate the

claims asserted against Xuelian and Wei in the Derivative Action and obtain control of Linkwell's disinfectant business for themselves.

316.    Xuelian, Wei and Sidley carried out a deliberate scheme to deceive or defraud Plaintiff and the Class by the nondisclosure of the Acquisition with the intent to prevent any litigation brought by Plaintiff or any member of the Class with respect to the Acquisition prior to its consummation.  As described in paragraphs 180-209 above, Sidley was an active participant in the scheme to prevent the disclosure of the Acquisition to Plaintiff and the Class.  Moreover, as described in paragraphs 180-89, 191-94, 199-203, 205-07, 209, 213-14, 257-60, 264 and 272-73 above, Sidley was the architect of the design, implementation and consummation of the Acquisition.

317.    Xuelian, Wei and Sidley, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, made or substantially participated in the unlawful and/or fraudulent conduct described above.

318.    If Xuelian, Wei and/or Sidley had complied with Florida law and provided statutory notice in connection with the Acquisition, Plaintiff would have moved for an injunction in this action.  As a result of their knowing or grossly reckless disregard of Florida law, and their fiduciary obligation and/or legal duty to provide notice to all Linkwell shareholders in connection with the Acquisition, Plaintiff was wrongfully deprived of the opportunity to enjoin the Acquisition or exercise other rights, including appraisal rights.

319.    As a direct and proximate result of the wrongful conduct of Xuelian, Wei and Sidley, Plaintiff and the other Class member suffered damages in connection with the sale of their Linkwell stock for substantially less than fair value.

320.     Xuelian, Wei and Sidley are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT II

**BREACH OF FIDUCIARY DUTY**
**(Against Xuelian and Wei)**

321.     Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-308 above, as though fully set forth herein.

322.     As directors, officers and controlling shareholders of Linkwell at the time they determined to undertake the Acquisition, Xuelian and Wei owed Plaintiff and the Class fiduciary obligations of loyalty, good faith, due care and disclosure.

323.     Xuelian and Wei violated their fiduciary obligations by determining to covertly enter and consummate the Acquisition: (a) for the purpose of terminating the claims asserted against them in the Derivative Action; and (b) without regard to the fairness of the Acquisition to Plaintiff and the Class.

324.     By their acts, transactions and courses of conduct, as described in paragraphs 67-72, 179-86, 191, 194, 199-200, 206-07, 214-22, 233-36, 239-40, 243-51, 254-57 and 259-78 above, Xuelian and Wei, individually and acting as part of a common plan, advanced their interests at the expense of Plaintiff and the Class.

325.     The Acquisition was implemented by and for the benefit of Xuelian and Wei, who stood on both sides of the transaction.  As such, Xuelian and Wei must establish the entire fairness of the transaction.

326.     Xuelian and Wei breached their fiduciary duties to Plaintiff and the Class by, among other things:

a.       Unlawfully and unfairly depriving Plaintiff and other public shareholders of Linkwell that held their stock in street name statutory notice of the Acquisition and their appraisal rights, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes;

b.       Failing to properly value Linkwell for purposes of the Acquisition, including the value of the claims asserted in the Derivative Action;

c.       Failing to properly maximize the value of Linkwell to its public shareholders;

d.       Agreeing to consummate the Acquisition at a price that does not adequately reflect Linkwell's true value;

e.       Failing to ensure a fair process;

f.       Failing to disclose all material information that would allow Linkwell public shareholders to cast a fully informed vote on the Acquisition;

g.       Failing to disclose all material information about the Special Meeting so as to allow Linkwell public shareholders to vote on whether to approve the Merger Agreement;

h.       Causing Linkwell to retroactively and prospectively indemnify them for all costs and expenses incurred in the Derivative Action and in connection with the Acquisition; and

i.       Failing and/or refusing to disclose that after the Acquisition was consummated, Xuelian would own the controlling equity interest in Likang Disinfectant.

327.     As directors, officers and/or controlling shareholders of Linkwell and Likang Disinfectant, Xuelian and Wei dominated and controlled the Company's business and corporate affairs and were in possession of non-public information concerning the assets, business and future prospects of Linkwell, Linkwell Tech, Likang Disinfectant and Likang Biological.  Thus,

there was an imbalance and disparity of information between Xuelian and Wei, on one hand, and the public shareholders of Linkwell, on the other, that made it inherently unfair for Xuelian and Wei to pursue any transaction where they obtained disproportionate benefits from the Acquisition, to the detriment of the Company's public shareholders.

328.    By reason of the foregoing acts, practices and course of conduct, Xuelian and Wei failed to exercise ordinary care and diligence in discharging their fiduciary obligations to Plaintiff and the Class.

329.    Xuelian and Wei engaged in self-dealing, did not act in good faith towards Plaintiff and the Class and failed to disclose material facts regarding the Acquisition in breach of their fiduciary obligations to Plaintiff and Class members.

330.    As a direct and proximate result of the foregoing breaches of fiduciary duty by Xuelian and Wei, Plaintiff and Class members suffered significant damages.

331.    Xuelian and Wei are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT III

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Sidley, Yinling, Leading First and Leading World)**

332.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-308 above, as though fully set forth herein.

333.    Sidley, Yinling, Leading First and Leading World aided and abetted and rendered substantial assistance in the wrongful conduct complained of in paragraphs 321-30.  In taking such actions to substantially assist the commission of wrongdoing complained of, Sidley Yinling, Leading First and Leading World acted with knowledge of the primary wrongdoing, and were aware of their overall contribution to and furtherance of the wrongdoing.

334.     Sidley, Yinling, Leading First and Leading World provided material support to Xuelian and Wei in connection with the Acquisition.

335.     Sidley, Yinling, Leading First and Leading World knew that Xuelian and Wei were Defendants in the Derivative Action and that the claims against them involved serious charges of wrongdoing in breach of their fiduciary duties to Linkwell and its public shareholders.

336.     Sidley, Yinling, Leading First and Leading World knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary duties to Plaintiff and the Class when they determined to undertake a going-private merger transaction to terminate the then pending claims in the Derivative Action without providing notice to all of the Company's shareholders, including Plaintiff.

337.     Sidley, Yinling, Leading First and Leading World knew that the Acquisition was not an arm's length transaction as all parties to the Acquisition were represented by the same legal counsel and Xuelian and Wei stood on both sides of the transaction.

338.     Sidley, Yinling, Leading First and Leading World knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary duties to Plaintiff and the Class when they approved and recommended approval of Acquisition for grossly inadequate consideration (less than $500,000).

339.     Sidley, Yinling, Leading First and Leading World also knew that Plaintiff and the Class were not provided with statutory notice of the Special Meeting or their appraisal rights under Florida law.

340.     As described in paragraphs 179-86, 191-94, 199-222, 238-41, 243-48, 251, 254-73, 277-81, 284-91, 293-94 and 296-97 above, Sidley provided substantial assistance to Xuelian and Wei by, among other things:

a.      Undertaking the representation of Likang Disinfectant and Yinling in the Acquisition despite knowledge that the interests of Likang Disinfectant and Yinling were adverse and that such representation violated the Rules of Professional Conduct (ABA Model Rules of Professional Conduct 1.7 and 1.13; New York Rules of Professional Conduct 1.7 and 1.13) irrespective of the waivers obtained;

b.      Undertaking the representation of Linkwell, Xuelian and Wei in the Derivative Action despite knowledge that the interests of Linkwell were adverse to the interests of Xuelian and Wei and that such representation violated the Rules of Professional Conduct (ABA Model Rules of Professional Conduct 1.7 and 1.13; New York Rules of Professional Conduct 1.7 and 1.13);

c.      Condoning, acquiescing, assisting, acting in concert and/or participating in the actions of Xuelian and Wei to procure through fraud, deceit and/or unfair dealing the consummation of the Acquisition for the purpose of terminating the claims in the Derivative Action and obtaining control of Likang Disinfectant;

d.      Providing legal advice and assistance to Xuelian, Wei, Yinling, Leading First and Leading World for the purpose of entering and consummating the Acquisition;

e.      Omitting to disclose the following material information in the Proxy Statement:

i.      The pendency of the Derivative Action;

ii.     That a primary purpose of the Acquisition was to terminate the Derivative Action;

iii.     That Sidley served as legal counsel for both Likang Disinfectant and Yinling in the Acquisition whereby Leading First, a wholly owned subsidiary of Yinling acquired 100% of the equity of Linkwell for $0.88 per share; and

iv.     That Sidley served as legal counsel for Linkwell, Xuelian and Wei in connection with the claims asserted only against Xuelian and Wei in the Derivative Action and had not requested or obtained the consent or a waiver of conflicts from anyone, including the Company's public shareholders, with respect to such representation;

f.     Failing to provide any financial statements of Linkwell (audited or unaudited) or financial projections for Linkwell in the Proxy Statement;

g.     Failing to include a fairness opinion or other financial analysis of the merger consideration in the Proxy Statement;

h.     Failing to provide a valuation of the claims asserted in the Derivative Action in the Proxy Statement;

i.     Failing to ensure that Plaintiff and members of the Class were provided with notice in connection with the Acquisition or notice of their appraisal and other rights, as mandated by Sections 607.0705 and 607.1103 of the Florida Statutes;

j.     Drafting the Amended Articles of Incorporation to shield Xuelian and Wei from personal liability arising as a result of the Derivative Action and the Acquisition, and to indemnify Xuelian and Wei, amongst others, for fees and expenses previously incurred and to be incurred by in connection with the defense of the same;

k.     Failing  to timely disclose information regarding the Acquisition to the Court and Plaintiff;

l.      Failing to timely disclose to the Court and Plaintiff that it represented Linkwell, Xuelian and Wei in the Derivative Action;

m.      Acting in concert and complicity with Xuelian and Wei by, *inter alia*, causing the Company to not comply with the Orders of the Court and its obligations under the Federal Rules of Civil Procedure;

n.      Failing to inform the Court and Plaintiff that Xuelian presently exercises control over Linkwell and its corporate documents which are located at the same address as Likang Disinfectant;

o.      Participating in the preparation, review and filing of declarations by Xuelian and Wei, which declarations Sidley knew to be false and/or misleading; and

p.      Failing to inform the Court and Plaintiff regarding the falsity in the declarations of Xuelian and Wei, filed with the Court on November 17, 2014.

341.    As described in paragraphs 181-82, 193 and 215-22 above, Yinling provided substantial assistance to Xuelian and Wei by, among other things:

a.      Agreeing, through Leading First and Leading World, to be a party to the Merger Agreement;

b.      Agreeing to the implementation of the Acquisition and the vote to approve the Merger Agreement at the Special Meeting without the provision of notice to all of the Company's shareholders; and

c.      Operating as the agent or intermediary of Xuelian, Wei and/or Sidley in order to divest Plaintiff of his shares of Linkwell stock and thereby terminate the derivative claims asserted in this action.

342.     As a direct and proximate result of the aiding and abetting breaches of fiduciary duty by Sidley, Yinling, Leading First and Leading World, Plaintiff and Class members suffered significant damages.

343.     Sidley, Yinling, Leading First and Leading World are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT IV

### CIVIL CONSPIRACY
### (Against Xuelian, Wei, Sidley and Yinling)

344.     Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-308 above, as though fully set forth herein.

345.     As described in paragraphs 67-72, 180-86, 190-94, 199-222, 233-41, 243-51 and 254-73 above Xuelian, Wei, Sidley and Yinling conspired with one another to covertly enter and consummate the Acquisition without notice to Plaintiff or the Class, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes, whereby the Class members' Linkwell stock was acquired through an unlawful and unfair process and at a grossly inadequate price.

346.     Xuelian, Wei, Sidley and Yinling agreed to covertly enter the Acquisition in order to ensure that the same was consummated before Plaintiff or any other Class member had the opportunity to: (a) evaluate whether the $0.88 per share merger consideration was fair; (b) vote for or against the approval of the Merger Agreement; (c) exercise appraisal rights; or (d) move to enjoin the Acquisition.

347.     Xuelian and Wei violated their fiduciary obligations to Plaintiff and the Class by determining to enter and consummate the Acquisition without the provision of notice and without regard to the fairness of the Acquisition to Plaintiff and the Class.

348.     Sidley and Yinling knew that the Acquisition was not an arm's-length transaction since all parties to the Acquisition had agreed to be represented by the same legal counsel (Sidley) and Xuelian and Wei stood on both sides of the transaction.

349.     Sidley and Yinling each knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary obligations to Plaintiff and the Class when they approved and recommended approval of Acquisition without notice and for grossly inadequate consideration.

350.     Sidley and Yinling also knew that Plaintiff and Class members did not receive statutory notice of the Special Meeting or their appraisal rights.

351.     In furtherance of the conspiracy, the following actions were undertaken:

a.      Sidley prepared the Proposal at the behest of Xuelian and Liyong;

b.      Xuelian and Sidley executed the Likang Engagement Letter whereby Sidley was retained as legal counsel for Likang Disinfectant in connection with the Acquisition;

c.      Sidley filed the Notice of Termination on behalf of Linkwell with the SEC to avoid the SEC proxy rules;

d.      Xuelian and Sidley executed the Supplement whereby Sidley: (i) was retained as legal counsel for Linkwell, Xuelian and Wei for the claims asserted against Xuelian and Wei asserted in the Derivative Action; and (ii) undertook the representation with full knowledge that the interests of Linkwell were adverse to the interests of Xuelian and Wei and that such representation violated the Rules of Professional Conduct;

e.      Yinling and Sidley executed an engagement letter whereby Sidley: (i) was retained as legal counsel for Yinling in connection with the Acquisition; and (ii) undertook the representation of Yinling with full knowledge that the interests of Yinling and Likang

Disinfectant in connection with the Acquisition were adverse and that such representation violated the Rules of Professional Conduct;

       f.     Sidley provided legal advice to Xuelian and Wei for the purpose of terminating their liability to Linkwell;

       g.     Xuelian, Wei, Sidley and Yinling agreed not to provide Plaintiff or the Class with the Notice, Proxy Statement or notice of their appraisal rights;

       h.     Sidley prepared the Amended Articles of Incorporation;

       i.     Xuelian and Wei caused Linkwell to consummate the Acquisition with Yinling (through Leading First and Leading World); and

       j.     Plaintiff and Class members were divested of their shares of Linkwell stock without ant notice and for grossly inadequate value.

352.    As a direct and proximate result of the foregoing misconduct, Plaintiff and the Class suffered significant damages.

353.    Xuelian, Wei, Sidley and Yinling are liable to Plaintiff and the Class in an amount to be proven at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

       a.     Declaring that the claims in connection with the Acquisition are properly maintainable as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative and appointing Wolf Haldenstein Adler Freeman & Herz LLP and Fischler & Friedman, P.A. as class counsel pursuant to Rule 23(g);

       b.     Determining that Xuelian, Wei and Sidley violated the Exchange Act by reason of the fraudulent and deceitful acts and nondisclosures alleged herein;

c.      Determining that Xuelian and Wei breached their fiduciary duties to the Class;

d.      Determining that Sidley, Yinling, Leading First and Leading World aided and abetted the breaches of fiduciary duties by Xuelian and Wei;

e.      Determining that Xuelian, Wei, Sidley and Yinling conspired with one another the covertly enter and consummate the Acquisition;

f.      Awarding Plaintiff and the Class compensatory damages against all Defendants in connection with Counts I through IV above, jointly and severally, in an amount to be determined at trial, together with prejudgment interest thereon;

g.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' and experts' fees, costs and expenses; and

h.      Granting Plaintiff and the Class such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury of all issues so triable.

Dated: October 24, 2016

**FISCHLER & FRIEDMAN, P.A.**


By:      /s/ Michael A. Fischler
Michael A. Fischler
Attorney Bar Number: 255531
1000 South Andrews Avenue
Fort Lauderdale, FL 33316
(954) 763-5778

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
Charles J. Hecht
Malcolm T. Brown
270 Madison Avenue
New York, NY 10016
(212) 545-4600

*Attorneys for Plaintiff*

/789778