UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 16-62506-CIV-MORENO**

FREDERICK SIEGMUND,

        Plaintiff,

vs.

XUELIAN BIAN, WEI GUAN, SIDLEY
AUSTIN LLP, SHANGHAI YINLING
ASSET MANAGEMENT, CO., LTD.,
LEADING FIRST CAPITAL LIMITED, and
LEADING WORLD CORPORATION,

        Defendants.

_____/

## ORDER GRANTING DEFENDANT SIDLEY AUSTIN LLP'S MOTION TO DISMISS CLASS ACTION COMPLAINT

This is a securities class action alleging violations of state and federal law in connection

with Linkwell Corporation's 2014 go-private[1] acquisition ("2014 Acquisition"). Frederick

Siegmund—the named Plaintiff—argues that Defendants deceived Linkwell's "street name"[2]

shareholders by failing to timely provide them with notice of the 2014 Acquisition in order to

---

[1] A "go-private" merger is a transaction that converts a publicly traded company into a private entity. Once the company goes private, shareholders can no longer trade their stocks on the open market.

[2] "The vast majority of publicly traded shares in the United States are registered on the companies' books not in the name of beneficial owners—*i.e.*, those investors who paid for, and have the right to vote and dispose of, the shares—but rather in the name of "Cede & Co.," the name used by The Depository Trust Company []. Shares registered in this manner are commonly referred to as being held in "street name." . . . [The Depository Trust Company] holds the shares on behalf of banks and brokers, which in turn hold on behalf of their clients (who are the underlying beneficial owners or other intermediaries)." *In re Appraisal of Dell Inc.*, 2015 WL 4313206, at *4 (Del. Ch. July 13, 2015) (quoting John C. Wilcox, John J. Purcell III, & Hye-Won Choi, *"Street Name" Registration & The Proxy Solicitation Process, in A Practical Guide to SEC Proxy and Compensation Rules* 10-3, 10-3 (Amy Goodman et al. eds., 4th ed. 2007 & 2008 Supp.)).

deprive them "of the opportunity to enjoin the acquisition or exercise other rights, including appraisal rights." Siegmund's Complaint names six Defendants and includes the following four counts: (I) violation of Section 10(b) of the Exchange Act and Rule 10b-5; (II) breach of fiduciary duty; (III) aiding and abetting breach of fiduciary duty; and (IV) civil conspiracy.

Defendant Sidley Austen LLP—named in Counts I, III, and IV—moves this Court to dismiss Siegmund's claims for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Sidley argues that Siegmund's Complaint does not satisfy the relevant pleading standards set forth in Federal Rules of Civil Procedure 8(a)(2) and 9(b), Section (b) of the Private Securities Litigation Reform Act.

THIS CAUSE came before the Court upon Defendant Sidley Austin LLP's Motion to Dismiss Class Action Complaint and Incorporated Memorandum of Law **(D.E. 29)**, filed on **December 15, 2016**.

THE COURT has considered the motion, the response, the reply, the sur-reply, and pertinent portions of the record, and being otherwise fully advised in the premises, it is

**ADJUDGED** that Defendant Sidley Austin LLP's Motion to Dismiss Class Action Complaint (D.E. 29) is **GRANTED**. Plaintiff is hereby granted leave to file an Amended Complaint by October 19, 2017. It is

**ADJUDGED** that Plaintiff's Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel (D.E. 32) is **DENIED** as moot with leave to refile as appropriate.

## I.  BACKGROUND

A.  **Plaintiff**

1.  **Frederick Siegmund (Class Representative)**

Frederick Siegmund is the named plaintiff bringing this suit individually and on behalf of all similarly situated "street-name" shareholders of Linkwell Corporation. He is a citizen of the

State of New York. According to the Complaint, Siegmund owned Linkwell shares throughout the relevant time period. Those shares were cancelled from his brokerage account on November 6, 2014 following the 2014 Acquisition. Siegmund claims that neither he nor his broker "were provided with any information concerning the Acquisition and were not furnished with a copy of the Merger agreement, Proxy Statement or notice of the Special Meeting." He also alleges that he did not receive notice of his statutory appraisal rights (or "other rights in connection with the acquisition").

B.   **Defendants**

   1.   **Sidley Austin LLP**

   Sidley Austin is an international law firm operating as a limited liability partnership. Sidley maintains its headquarters in Chicago, IL and has offices in 20 cities worldwide.

   2.   **Xuelian Bian**

   Xuelian Bian was a controlling shareholder[3] of Linkwell. He became a controlling shareholder in May 2005 and remained a controlling shareholder of Linkwell at all relevant times. Siegmund alleges that "by reason of their positions at Linkwell, Xuelian and Wei each had the power and authority to control the contents of Linkwell's public statements to the financial marketplace," and that both "were aware of the wrongful conduct complained of [in the Complaint], had access to adverse non-public information and were required to disclose such facts promptly and accurately to the Company's shareholders and the financial markets." Siegmund alleges upon information and belief that Xuelian is a citizen of China.

   Xuelian also maintains the following positions:

---

[3] Although Siegmund alleges that Xuelian Bian and Wei Guan were controlling shareholders, their combined shares totaled 43% of all Linkwell shares as of the September 19, 2014 Special Meeting to approve the Plan of Merger and Merger agreement.

- Chief Executive Officer and Director of Linkwell Tech since its inception in 2004.

- General Manager of Likang Disinfectant since 1993.

- Executive Director and controlling shareholder of Zhongyou Pharmaceutical.

- Co-Owner of Linkwell International (with Wei).

- Owner of 30% of the equity of Zhongyou (Shanghai) technology Development Company Limited.

3.   **Wei Guan**

Wei Guan was a controlling shareholder[4] of Linkwell at all relevant times. He served as a Member of the Board and Vice President of the Company since May 2005. Siegmund alleges that "by reason of their positions at Linkwell, Xuelian and Wei each had the power and authority to control the contents of Linkwell's public statements to the financial marketplace," and that both "were aware of the wrongful conduct complained of [in the Complaint], had access to adverse non-public information and were required to disclose such facts promptly and accurately to the Company's shareholders and the financial markets." Siegmund alleges upon information and belief that Wei is a citizen of China.

Wei also maintains the following positions:

- Vice President of Linkwell Tech since its inception in June 2004.

- Vice General Manager of Likang Disinfectant since 2002.

- Co-Owner of Linkwell International (with Xuelian).

- Owner of 35% of the equity of Zhongyou Technology (he also serves as a supervisor).

4.   **Shanghai Yinling Asset Management Company, Limited**

---

[4] *See supra* text accompanying note 3.

Shanghai Yinling is a Chinese limited liability company formed on April 18, 2014. Yinling's operates primarily in Shanghai, China. Yinling is the sole shareholder of Leading First and is a minority shareholder of Zhongyou Pharmaceutical.

### 5.   Leading First Capital Limited

Leading First is a British Virgin Islands Company with a business address in Shanghai, China. Siegmund alleges that Sidley formed Leading First "on or about June 25, 2014 for the purpose of entering into and consummating transactions contemplated by the merger agreement."

### 6.   Leading World Corporation

Leading World is a Florida corporation with a business address in Shanghai, China. It is a wholly owned subsidiary of Leading First. Siegmund alleges that "Sidley formed Leading World on or about August 5, 2014 for the purpose of entering into and consummating transactions contemplated by the Merger Agreement."

## C.   Relevant Non-Parties

### 1.   Linkwell Corporation

Linkwell is a Florida corporation with its principal place of business in Shanghai, China. Before the 2012 Derivative Action (*see* discussion *infra*, "Background"), Linkwell operated as a public holding company for a number of affiliated entities, including the following direct operating subsidiaries: (i) Linkwell Tech; (ii) Likang Biological; and most notably (iii) Likang Disinfectant. Through these entities, Linkwell developed, manufactured, sold, and distributed disinfectant health care products in China.

Siegmund alleges that Linkwell and Likang Disinfectant share the same registered business address and office space. He also contends that Likang Disinfectant accounted for greater than 99% of Linkwell's total net revenues in 2011.

D.     **Summary of Facts**

This lawsuit stems from a 2014 convert, go-private merger transaction involving

Linkwell Corporation. According to Siegmund, the 2014 Acquisition was "undertaken on behalf

of and for the benefit of [Defendants] Xuelian and Wei to: (a) extinguish the valuable claims

asserted against them in a previously filed derivative action (*Siegmund v. Bian, et al.*, No 12-cv-

62539 (S.D. Fla.)); (b) and directly acquire for Xuelian, Wei, and their affiliates total control of

the Company's disinfectant business in China."

The Derivative Action referenced above ("Derivative Action")—also filed by

Siegmund—related to a 2012 reverse merger transaction ("2012 Reverse Merger") involving

Linkwell, Likang Disinfectant, and several third-party entities. In the 2012 Reverse Merger,

Linkwell issued 94% of its equity to two companies—Metamining, Inc. and China Direct

Investments Inc.—in exchange for 100% ownership of Metamining Nevada, Inc. According to

Siegmund, Metamining Nevada, Inc. had "no assets, operations, or employees." Siegmund also

alleges that, as part of the 2012 Reverse Merger, Linkwell secretly spun-off Likang Disinfectant

and transferred ownership to Xuelian and Wei for no consideration.

Siegmund calls the 2012 Reverse Merger a "sham." The Derivative Action—which he

brought on *behalf* of Linkwell and *against* Xuelian and Wei—challenged the Directors' alleged

"misconduct and self-dealing in connection with" that transaction. Notably, Siegmund alleges

that, beginning in April 2014, Sidley represented Linkwell, Xuelian, and Wei in connection with

the Derivative Action, despite the apparent conflict of interest. Also in April 2014, Sidley agreed

to "provide advice and assistance in all aspects of the [2014] Acquisition." Judge Gayles of the

District Court for the Southern District of Florida eventually dismissed the Derivative Action for

lack of standing when Siegmund's Linkwell shares were cancelled as a result of the 2014

Acquisition. *See Siegmund v. Xuelian*, No. 12-62539-CIV, 2016 WL 3186004, at *1 (S.D. Fla. June 8, 2016).

Siegmund alleges that Sidley, Xuelian, and Wei devised the 2014 Acquisition for the express purpose of terminating the Derivative Action.  He contends that Sidley proposed a plan for the 2014 Acquisition to Xulian and Wei in March 2014, adding that Sidley specifically designed it "to divest Plaintiff of his shareholdings in Linkwell and thereby divest Plaintiff of his standing to pursue derivative claims against Linkwell's former directors and other parties in a separate litigation."

On August 12, 2014, Linkwell's Board approved the Plan of Merger, which proposed that each share of Linkwell stock be converted into the right to receive $0.88 in cash. Following that approval, Sidley drafted a Notice for the Special Meeting in Shanghai on September 19, 2014. Linkwell scheduled the Special Meeting to allow Linkwell shareholders to vote on—and approve—the Merger Agreement. The Notice indicated that all Linkwell shareholders were invited to attend the Special Meeting.

The Plan of Merger was approved during the September 19th Special Meeting. Defendants Xuelian and Wei attended the Special Meeting and voted their Linkwell shares in favor of the merger. The same day, Sidley filed Linkwell's Articles of Merger and Amended Articles of Incorporation with the Florida Secretary of State.

Siegmund claims that he never received notice of the Special Meeting—"as mandated under Sections 607.0705 and 607.1103 of the Florida Statutes"—or the Plan of Merger, Proxy Statement, or merger agreement. He alleges that he discovered the Articles of Merger and accompanying documents on the Florida Department of State website on October 26, 2014 and that he had no knowledge of the 2014 Acquisition before that date.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions," instead plaintiffs must "allege some specific factual basis for those conclusions or face dismissal of their claims." *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004).  When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true.  *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir. 1986).  This tenet, however, does not apply to legal conclusions.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Moreover, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 1950.   Those "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  In short, the complaint must not merely allege a misconduct, but must demonstrate that the pleader is entitled to relief.  *See Iqbal*, 129 S. Ct. at 1950.

## III.    ANALYSIS

A.    **Motion to Dismiss for Failure to State a Claim Under Section 10(b) and Rule 10b-5**

1.    **Standards**

a.    ***Pleading Requirements Under Federal Rule of Civil Procedure 9(b)***

Securities fraud claims must meet the heightened pleading standards under Federal Rule of Civil Procedure 9(b), which requires a complaint to "state with particularity the circumstances constituting fraud." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). To satisfy the particularity requirement, a plaintiff must allege "facts as to time, place, and substance of the defendants' alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex. rel. Matheny v. Medco*

*Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (internal quotation marks and citations omitted). In other words, a plaintiff must "plead the who, what, when, where, and how of the allegedly false statements." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citations omitted).

> b.      ***Pleading Requirements Under the Private Securities Litigation Reform Act***

In addition to Federal Rules of Civil Procedure 8(a)(2) and 9(b), plaintiffs alleging securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 must satisfy the Private Securities Litigation Reform Act's pleading standards. *See* 15 U.S.C. § 78u-4(b)(1)–(2). Most notably, the Private Securities Litigation Reform Act increased the minimum requirements for pleading scienter. "[F]or all private 10b-5 claims requiring proof of scienter, 'the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter].'" *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citing 15 U.S.C. § 78u-4(b)(2)). The complaint must establish this strong inference "for each defendant with respect to each violation." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). Lastly, for Rule 10b-5(b) claims based on false or misleading statements or omissions, the Private Securities Litigation Reform Act requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

> 2.      **Arguments**

Sidley's motion to dismiss for failure to state a claim under Section 10(b) relies primarily on the following two arguments. First, Sidley states that Siegmund fails to establish that Sidley had a duty to notify Siegmund of the 2014 Acquisition.[5] Second, Sidley contends that Siegmund's scheme liability theory fails because it conflicts with Supreme Court precedent abolishing 10b-5 liability for aiding and abetting.

The Court addresses each argument in turn.

3.    **Legal Analysis**

Section 10(b) of the Exchange Act makes it illegal "for any person . . . directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" that violates the Securities and Exchange Commission's rules protecting investors. Rule 10b-5—promulgated under Section 10(b)—makes it unlawful to:

a)    Employ any device, scheme, or artifice to defraud;

b)    Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)    Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

a.    *10b-5(b) – No Misleading Omissions or Duty to Notify*

---

[5] In response, Siegmund asserts that the Complaint does not allege an omissions claim under 10b-5(b). Rather, he argues that Sidley's intentional failure to provide notice of the 2014 Acquisition constitutes a deceptive act in violation of 10b-5(a) and (c)—*i.e.*, "scheme liability." This Order evaluates the allegations under all three subsections of Rule 10b-5.

Sidley argues that Siegmund's allegations form an omissions claim. It points to Siegmund's allegations that the law firm's failure to timely provide Linkwell's "street name" shareholders with notice of the 2014 Acquisition deprived Siegmund of certain remedies under Florida state law. (Opp. Br. at 5 ("Plaintiff was deprived of the opportunity to move to enjoin the merger, which he would have done had notice been furnished.").) Sidley contends that it had no obligation to notify Siegmund, so the Court cannot hold it liable for omitting information it had no duty to disclose. *See In re Infocure Sec. Litig.*, 210 F. Supp. 2d 1331, 1351 (N.D. Ga. 2002).

In *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, the Supreme Court articulated the following framework for assessing securities fraud claims alleging misleading statements or omissions under 10b-5(b):

> In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

552 U.S. 148, 157 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005)). For omissions, a plaintiff also must prove that the defendant had a duty to speak. *Basic Inc. v. Levinson*, 485 U.S. 242, 239, n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

Here, Siegmund must show that Sidley had a duty to disclose the 2014 Acquisition to Linkwell's "street name" shareholders. "[A] duty to disclose is triggered either because the omitted fact was necessary to render a preexisting statement not misleading, or because the securities law otherwise required its disclosure." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 681 (11th Cir. 2010). However, Siegmund never alleges that Sidley's failure to

provide notice of the 2014 Acquisition rendered a preexisting Sidley statement misleading.[6] He

therefore must show that the securities laws created Sidley's alleged disclosure duty.

Courts determine the existence of a disclosure duty on a case-by-case basis. Their

assessment involves consideration of the following factors: "(1) 'the relationship' between the

parties; (2) their 'relative access to the information' at issue; (3) 'the benefit derived by the

defendant' from the transaction; (4) the 'defendant's awareness of Plaintiffs' reliance' on

defendant in making its investment decision; (5) 'the extent of the defendant's knowledge', (6)

'the significance' of the omitted information; and (7) 'the extent of the defendant's participation

in the fraud.'" *In re Infocure*, 210 F. Supp. 2d at 1351 (quoting *Ziemba*, 256 F.3d at 1206).

As in *Ziemba*, the relationship between the parties presents the most relevant factor in

this case. *Ziemba*, 256 F.3d at 1206. Consideration of those relationships "leads to the conclusion

that [Sidley] had no duty to make any disclosures to [Siegmund] concerning its client." *Id.* First,

Sidley owed a fiduciary duty to its client. As such, it had privileges not to disclose the

information at issue. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir.

1986) ("Neither lawyers nor accountants are required to tattle on their clients in the absence of

some duty to disclose. To the contrary, attorneys have privileges not to disclose.") (internal

citations omitted).

Second, Sidley had no attorney-client relationship with Siegmund. Thus, it had no

fiduciary duty to provide him with notice. *See Ziemba,* 256 F.3d at 1206; *see also Chiarella v.

United States*, 445 U.S. 222, 230 (1980) (noting that "silence in connection with the purchase or

sale of securities may operate as a fraud actionable under § 10(b) . . . [,b]ut such liability is

---

[6] In fact, the Complaint does not reference *any* statement publicly attributable to Sidley. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001) (no 10b-5 liability unless the alleged omission was "publicly attributable to the defendant") (citation omitted).

premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction"). Indeed, the Complaint states that Xuelian and Wei—*not* Sidley—had fiduciary obligations to notify Siegmund of the 2014 Acquisition.

Finally, the Florida Statutes did not obligate Sidley to provide Siegmund with notice of the 2014 Acquisition.[7] The Florida Statute detailing the requirements for notifying shareholders of a plan of merger states that "[t]he corporation . . . shall notify each shareholder." Fla. Stat. Ann. § 607.1103.  Notably, a "shareholder" is defined as "one who is a holder of record of shares in a corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation." Fla. Stat. Ann. § 607.01401.

Siegmund held his shares in "street name," so he was not the holder of record. *See Nu Med Home Health Care, Inc. v. Hosp. Staffing Services, Inc.*, 664 So. 2d 353, 354 (Fla. 4th DCA 1995) (explaining that (i) a holder in "street name" is the beneficial owner of the shares, (ii) the holder of record is the nominee, and (iii) "stock is held frequently in a street name and is reflected in the corporate records only by the name of the nominee"). And he does not allege that he had a nominee certificate on file with Linkwell entitling him to notice. Thus, Siegmund is not a "shareholder" for purposes of the Statutes discussed above. Regardless, the Statute states that the *corporation* is responsible for notifying each shareholder. So even if Siegmund had a right to

---

[7] Siegmund argues in his reply brief—but not in his Complaint—that federal law provided the applicable notice requirements. (Opp. Br. at 18.) This argument lacks merit. To be sure, the Court in *In re Appraisal of Dell Inc.* discussed whether federal law governed notice procedures, but only because the securities at issue in that case were registered with the Securities and Exchange Commission in accordance with Section 12 of the Exchange Act. *In re Appraisal of Dell Inc.*, 2015 WL 4313206, at *3 (Del. Ch. July 13, 2015). Here, the Complaint states that Linkwell deregistered its securities with the SEC months before the 2014 Acquisition. (Compl. ¶ 14, 186.) Once Linkwell deregistered its securities, its shares were no longer registered pursuant to Section 12 of the Exchange Act and federal law did not apply.

receive notice of the 2014 Acquisition, Linkwell—not Sidley—would be at fault for failing to notify him.

### b.   *10b-5(a) & (c) – No Scheme Liability*

Siegmund alleges that Sidley violated Section 10(b) through its general commission of deceptive acts in connection with the 2014 Acquisition. Specifically, Siegmund alleges that as the "architect of the [2014] Acquisition," (Compl. ¶ 311), Sidley "carried out a deliberate scheme to deceive or defraud Plaintiff and the Class" in violation of Section 10(b) and Rule 10b-5(a) and (c). (Compl. ¶ 316.) A securities fraud claim under Section 10(b) based on a deceptive scheme must allege: "(1) that the defendant committed a deceptive . . . act, (2) in furtherance of a scheme to defraud, (3) with scienter, and (4) reliance." *See In re Altisource Portfolio Solutions, S.A. Sec. Litig.*, 2015 U.S. Dist. LEXIS 180850, at *16 (S.D. Fla. Dec. 22, 2015).

Siegmund correctly notes that claims under 10b-5(a) and (c) are distinct from 10b-5(b) actions. *See In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) ("Claims for engaging in a fraudulent scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct elements."). Subsections (a) and (c) provide separate causes of action "for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant." *Id.* at 335 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152–53 (1972); *S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002)).

Sidley argues that Siegmund's scheme liability theory conflicts with the Supreme Court's holding in *Central Bank*, 511 U.S. at 176. In *Central Bank*, the Supreme Court held that Section 10(b) does not provide a cause of action against aiders and abettors of securities fraud. *Id.* "The statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act"—that "proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id.* at 177.

Indeed, even "substantial participation" in the deception is not enough. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.1998). "Allegations that a party assisted, participated, or was complicit in a fraudulent 'device, scheme, or artifice' are insufficient to impose liability under Section 10(b) and Rule 10b-5." *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 275–76 (S.D.N.Y. 2009).

Siegmund distinguishes *Central Bank* and its progeny on the grounds that these cases involved 10b-5(b) claims—not 10b-5(a) or (c) claims. He notes that even after *Central Bank*, Courts have imposed liability under Section 10(b) where defendants engage in deceptive schemes. (Opp. Br. at 6–7 ("Where lawyers or accountants designed and helped perpetrate transactions for clients that were intended to defraud shareholders, courts have sustained 10b-5(a) and (c) claims." *See In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 625 (S.D.N.Y. 2005); *In re Global Crossing*, 322 F. Supp. 2d at 336).).

However, in both cases cited by Siegmund, the Court held that scheme liability was appropriate where the defendants intentionally and artificially manipulated stock prices. The same cannot be said for Sidley. Although Siegmund alleges that Xuelian and Wei caused Linkwell to engage in a sham transaction in 2012 that involved the transfer of Linkwell shares for less than fair value, Sidley did not advise on that transaction. And with respect to the 2014 Acquisition, Siegmund does not accuse Sidley of engaging in a deceptive act to manipulate the price of Linkwell's stock. To be sure, Siegmund alleges that Xeulian and Wei had already deflated Linkwell's stock price, and that Sidley's guidance on the 2014 Acquisition indirectly helped them acquire Siegmund's shares at an artificially low price. But that is not enough—"a law firm may not be held liable for securities fraud merely because it played a substantial role in the transaction at issue." *In re Infocure Sec. Litig.*, 210 F. Supp. 2d at 1351; *see also In re Refco*

*Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 316 (S.D.N.Y. 2009) (a plaintiff must show that "it was the defendant *itself* that 'employ[ed]' the scheme to defraud or 'engage[d] in the deceitful practice, and not merely that the defendants assisted another party in its fraudulent practices").

Siegmund's allegations suggest that Sidley only *assisted* with or *participated* in the 2014 Acquisition. He contends that Sidley was retained "as legal counsel to *provide advice and assistance* in all aspects of the Acquisition," (Compl. ¶ 11 (emphasis added)), and that "Sidley was an *active participant* in the scheme to prevent the disclosure of the Acquisition to Plaintiff and the Class." (Compl. ¶ 316 (emphasis added).) Even if true, Sidley comprised only 1/3 of the parties involved. Unlike the other two parties—Xuelian and Wei—who stood to acquire 100% of Linkwell's shares, Sidley had no financial incentive to consummate the deal—it would make only its fees. Siegmund alleges as much; he states that that the 2014 Acquisition was "undertaken on behalf of and for the benefit of Xuelian and Wei." (Compl. ¶ 2.) Thus, the most reasonable conclusion is that Sidley *assisted* with or *participated* in an allegedly fraudulent scheme. That conduct constitutes aiding and abetting and does not give rise to cognizable 10b-5 claim. *See Cent. Bank*, 511 U.S. at 191–92.

Even if Sidley's conduct constituted an actionable deceptive scheme, Siegmund fails to allege specific facts showing Sidley acted with the requisite scienter—*i.e.*, the "intent to deceive, manipulate, or defraud" or "severe recklessness." *Mizzaro*, 544 F.3d at 1238 (internal quotations omitted). Despite allegations that Sidley "knowingly and/or recklessly deceived the class," the Complaint quotes discussions between Sidley and the transfer agent about how to provide all "shareholders on record" with notice. (Compl. ¶ 201 (email from Sidley attorney to transfer agent reciting a provision from Linkwell's bylaws regarding how to provide notice, and asking the transfer agent to "handle the mailing of the proxy statement to those shareholders on record

whose address is outside [C]hina . . . ?").) A Sidley attorney even emailed the transfer agent about notifying "street name" shareholders, and the agent explained that "Broadridge will do the mailing to all street holders [at] the end of next week or the week later (note as I stated all I can do is operate in the time constraints they have.)" (Compl. ¶ 204.) Contrary to Siegmund's assertion that Sidley intentionally withheld notice, the more cogent and compelling inference is that Sidley actually attempted to notify all shareholders—including "street name" shareholders— but simply ran out of time. *Tellabs*, 551 U.S. at 323–24 (holding that a complaint gives rise to a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged").

Based on the analysis above, Siegmund has failed to state an actionable claim against Sidley under either 10b-5(b) for a misleading omission or 10b-5(a) and (c) for a deceptive scheme.

The Court **GRANTS** Sidley's Motion to Dismiss Siegmund's claim under Section 10(b) and Rule 10b-5 (Count I) for failure to state a claim upon which relief can be granted. The Court grants Siegmund leave to amend the Section 10(b) claim by October 19, 2017.

B.   <u>**Motion to Dismiss for Lack of Personal Jurisdiction**</u>

   1.   **Standard**

   On a motion to dismiss for lack of personal jurisdiction, the Court accepts as true all allegations in the complaint and decides whether the plaintiff has met its burden of establishing a prima facie case of personal jurisdiction. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). "[W]here the defendant challenges the court's exercise of jurisdiction over its person, the plaintiff bears the ultimate burden of establishing personal jurisdiction is present." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217

(11th Cir. 2009). A plaintiff establishes a prima facie case by putting forth enough evidence to withstand a motion for a directed verdict. *Stubbs*, 447 F.3d at 1360.

When determining whether personal jurisdiction exists over a defendant, courts generally partake in a two-step analysis. *Verizon Trademark Servs., LLC v. Producers, Inc.*, 810 F. Supp. 2d 1321, 1324–25 (M.D. Fla. 2011). A court may exercise personal jurisdiction over a nonresident if: (i) the forum state's long-arm statute confers jurisdiction; and (ii) jurisdiction would not "offend traditional notions of fair play and substantial justice." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.,* 598 F.3d 802, 807 (11th Cir. 2010) (citation and internal quotation marks omitted). Courts proceed to the second step only if the long-arm statute provides for jurisdiction. *Id.* A court must strictly construe the long-arm statute in assessing whether a plaintiff has satisfied its burden of producing affidavits, documents, or testimony that overcome a defendant's evidence challenging personal jurisdiction. *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 627 (11th Cir. 1996) (citations omitted).

2.     **Arguments**

Sidley contends that Siegmund's allegations do not satisfy any provision of Florida's long-arm statute, thus precluding this Court from exercising personal jurisdiction over Sidley with respect to Siegmund's Florida law claims.[8]

3.     **Legal Analysis**

Sidley contends that section 1(a)(1) of Florida's long-arm statute governs personal jurisdiction in this case. *See* Fla. Stat. Ann. § 48.193 (1)(a)(1). That section provides for jurisdiction over a nonresident who operates, conducts, engages in, or carries on a business or business venture in Florida or has an office in Florida. *Id.* "In order to establish that a defendant

---

[8] Sidley does not challenge this Court's jurisdiction over it with respect to Plaintiff's claim under Section 10(b), which provides for nationwide service of process.

is carrying on business for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005) (citation and internal quotation marks omitted). "Factors relevant, but not dispositive, to this analysis include the presence and operation of an office in Florida, the possession and maintenance of a license to do business in Florida, the number of Florida clients served, and the percentage of overall revenue gleaned from Florida clients." *Id.* (citations omitted).

In *Horizon,* the Eleventh Circuit held that section 1(a) of Florida's long-arm statute did not provide for jurisdiction over an out-of-state professional who had six Florida clients. *Horizon*, 421 F.3d at 1167. Although the *Horizon* defendant directed communications into Florida across state lines, he did not have a Florida office, was not licensed to conduct business in Florida, performed all of his work for the plaintiff in California, and generated less than five percent of his gross revenue from his Florida clients. *Id.* The Court held that rendering out-of-state professional services for the benefit of a Florida citizen "was insufficient by itself to trigger the provisions of the Florida Long–Arm statute." *Id.*

The Court in *Am. Torch Tip Co. v. Dykema Gossett PLLC* came to the same conclusion, holding that it lacked personal jurisdiction over a Chicago lawyer with respect to malpractice claims alleged by his former client. 2011 WL 3171811, at *7 (M.D. Fla. July 8, 2011), *report and recommendation adopted*, 2011 WL 3170282 (M.D. Fla. July 27, 2011). Although the lawyer had at least four clients registered in Florida or with offices in Florida, he did not maintain an office in Florida, was not licensed to practice law in Florida, and performed all of his work for these clients outside of Florida (with the exception of two visits to Florida to meet with

the plaintiff). *Id.* As such, the Court held that the lawyer did not "conduct, engage in, or operate a business in Florida as required for jurisdiction under section 1(a)." *Id.*

The allegations in Siegmund's Complaint suggest that Sidley has even fewer Florida contacts than the defendants in *Horizon* and *Am. Torch Tip. Co.* Although Siegmund alleges that "many of the acts and omissions charged [in the Complaint] occurred in this District," (Compl. ¶ 40), the Complaint pleads no such activities related to the 2014 Acquisition. To be sure, Siegmund alleges that Sidley filed Linkwell's Amended Articles of Incorporation and Articles of Merger with the Florida Secretary of State. But Siegmund does not allege that either filing contributed to the harm he alleges in his state law claims. Furthermore, the Complaint suggests Sidley performed all work on the 2014 Acquisition outside Florida. Siegmund never alleges that a Sidley lawyer travelled to Florida during the representation or even directed communications into Florida. Therefore, Florida's long-arm statute does not provide the Court with personal jurisdiction over Sidley on Siegmund's state law claims.

Siegmund disputes Sidley's analysis, but in doing so conflates personal jurisdiction with subject-matter jurisdiction. He contends that the Section 10(b) claims and the state law claims "arise out of the same transaction or series of transactions" and that this provides "an appropriate basis for the Court to exercise supplemental jurisdiction." (Opp. Br. at 14.)  However, "supplemental jurisdiction is a doctrine of *subject matter jurisdiction*"—not personal jurisdiction. 13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3567 (3d ed.) (emphasis added). Thus, Siegmund's argument does not respond to the relevant jurisdictional issue.

However, if Siegmund had stated an actionable claim under Section 10(b) of the Exchange Act, the Court could exercise personal jurisdiction over Sidley on the state law claims

pursuant to the common-law doctrine of pendent personal jurisdiction. "Pendent personal jurisdiction permits a court to entertain a claim against a defendant over whom it lacks personal jurisdiction . . . if that claim arises from a common nucleus of operative fact with a claim in the same suit for which the court does have personal jurisdiction over the defendant." 13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3567 (3d ed.). In other words, pendent personal jurisdiction and supplementary jurisdiction involve the same analysis despite being "wholly unrelated." *Id.*

Although the Eleventh Circuit has not addressed the issue of pendent personal jurisdiction, every circuit to consider the doctrine has adopted it. *See Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1176 (9th Cir. 2004) (adopting pendent personal jurisdiction and noting that "every circuit court of appeals to address the question [has] upheld the application of [the doctrine]"). And at least one court in this district has employed it to resolve a similar personal jurisdiction issue. *See Exhibit Icons, LLC v. XP Companies, LLC*, 609 F. Supp. 2d 1282, 1299 (S.D. Fla. 2009). In *Exhibit Icons, LLC*, the plaintiff asserted a number of claims arising out of a common nucleus of operative facts. *Id.* The Court had personal jurisdiction over the defendant for one claim, but lacked personal jurisdiction over him for five related claims. *Id.* The Court held that because it had personal jurisdiction over the defendant for one claim, it had pendent personal jurisdiction over him for the other five claims. *Id.*

Here, Sidley does not challenge this Court's personal jurisdiction over it with respect to Siegmund's Section 10(b) claim. Nor does Sidley object to Siegmund's assertion that the Section 10(b) claim and the state law claims arise out of a common nucleus of operative facts. Therefore, if Siegmund files an Amended Complaint in this Court stating an actionable Rule 10b-5 claim against Sidley, this Court would have pendent personal jurisdiction over Sidley for the remaining

state law claims. *Id.* Because the Court is *granting* Sidley's Motion to Dismiss Siegmund's Rule 10b-5 claim (Count I), this Court presently does not have the requisite personal jurisdiction over Sidley to invoke pendant personal jurisdiction over Sidley with respect to Siegmund's state law claims.

The Court **GRANTS** Sidley's Motion to Dismiss Siegmund's state law claims (Counts III & IV) for lack of personal jurisdiction.[9]

## IV.   CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** as follows:

1)   Defendant Sidley Austin LLP's Motion to Dismiss Class Action Complaint (D.E. 29) is **GRANTED**. Plaintiff is hereby granted leave to file an Amended Complaint by October 19, 2017.

2)   Plaintiff's Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel (D.E. 32) is **DENIED** as moot with leave to refile as appropriate.

**DONE AND ORDERED** in Chambers at Miami, Florida, this _29th_ of September 2017.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[9] Of course, in granting leave to amend the Complaint, Siegmund may reassert his state law claims. If the Court determines that the Amended Complaint states a cause of action under Rule 10b-5, the Court may exercise pendent personal jurisdiction and examine the merits of Siegmund's state law claims.