UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-cv-62506 (FAM)

FREDERICK SIEGMUND, Individually and on
Behalf of All Others Similarly Situated,

                              Plaintiff,

        v.

XUELIAN BIAN, WEI GUAN,
SIDLEY AUSTIN LLP,
SHANGHAI YINLING ASSET
MANAGEMENT CO., LTD.
LEADING FIRST CAPITAL LIMITED and
LEADING WORLD CORPORATION,

                              Defendants.
_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Frederick Siegmund ("Plaintiff"), individually and on behalf of all similarly

situated public shareholders of Linkwell Corporation ("Linkwell" or the "Company"), asserts

claims for federal securities violations and state law breaches of fiduciary duty, aiding and

abetting breaches of fiduciary duty and civil conspiracy against defendants Xuelian Bian

("Xuelian"), Wei Guan ("Wei"), Sidley Austin LLP ("Sidley"), Shanghai Yinling Asset

Management Co., Ltd. ("Yinling"), Leading First Capital Limited ("Leading First") and Leading

World Corporation ("Leading World") (Yinling, Leading First and Leading World are

collectively referred to as "Yinling"), for their direct participation in a fraudulent scheme to

cause the forced sale of Linkwell public shareholders' stock without their knowledge or

approval, through the consummation of a covert freeze-out merger transaction ("Freeze-Out

Merger"). In support of the claims herein, Plaintiff, upon personal knowledge as to his own acts,

and as to all other matters based upon the investigation conducted by himself and his counsel,

which includes the review of filings with the Securities and Exchange Commission ("SEC") and Shanghai Administration of Industry and Commerce ("SAIC"), discovery obtained in a related derivative action and other publicly available information, alleges as follows:

**THE PARTIES**

**Plaintiff**

1.      Plaintiff is a citizen of New York and was a Linkwell stockholder throughout the time the misconduct complained of herein occurred.   On December 26, 2012, Plaintiff commenced a derivative action (*Siegmund v. Bian, et al*. No. 12-cv-62539 (S.D. Fla.)) ("Derivative Action") which alleged that Xuelian and Wei, the directors, officers and controlling shareholders of Linkwell, caused the Company to enter a reverse merger transaction and wrongfully issue 94% of its equity to certain related third parties for grossly inadequate consideration ("2012 Transaction").   Plaintiff alleged that Xuelian and Wei engaged in unlawful and/or fraudulent acts and breaches of fiduciary duty because the purpose of the 2012 Transaction was to enable Xuelian and Wei to transfer control of Linkwell to certain related third parties, while stripping the assets and operations of the subsidiary disinfectant business in China for themselves and for no consideration to the Company.   The allegations against Xuelian and Wei in connection with the 2012 Transaction, among others, are more fully set forth in the Proposed Fourth Amended Verified Shareholders Derivative and Class Action Complaint ("PFAC"), a copy of which is attached hereto and incorporated by reference herein.

2.      In the face of Plaintiff's complaint, Linkwell unwound the 2012 Transaction. Control of Linkwell's subsidiary disinfectant business, however, remained with Xuelian and Wei.   By January 2014, Plaintiff was on the verge of obtaining discovery to confirm that the stock certificates for the disinfectant business were not in Linkwell's possession, but were in the hands of Xuelian, Wei, their affiliates and/or designees – which would have led to an Order

2

directing their return to Linkwell.  Faced with this turn of events, Sidley rode to Xuelian and Wei's rescue and came up with a scheme to defraud Linkwell's public shareholders and permit Xuelian and Wei to retain control of the disinfectant business for negligible consideration.

3.     On November 6, 2014, Plaintiff's shares of Linkwell stock were unilaterally cancelled from his TD Ameritrade brokerage account through a one-step going-private merger transaction designed, implemented and consummated by Sidley to covertly freeze out Linkwell's public shareholders, divest Plaintiff of his Linkwell stock and standing to continue to prosecute the claims in the Derivative Action, and allow Xuelian and Wei to keep the disinfectant business while paying almost nothing for its valuable assets and  operations.

**Defendants**

4.     Defendant Sidley is an international law firm with its headquarters in Chicago, Illinois and has offices in Shanghai, New York and San Francisco, among other locations.  As counsel for Linkwell, Xuelian and Wei, Sidley was fully aware that Linkwell had no operations or personnel in the United States, and that its clients had no knowledge of the United States securities laws or Florida corporate law, no concept of what a "freeze-out" merger was or how to implement one without giving notice to public shareholders, or that such a transaction could be utilized to divest a shareholder of standing in a derivative action.  Sidley knew that, in order to achieve Xuelian and Wei's objectives, Sidley would not only have to do all of the legal work necessary to conclude the go-private merger, but also design and actively effectuate all aspects of the scheme to freeze out Plaintiff and the other public shareholders of Linkwell through the forced sale of their stock by, among other things, ensuring that they did not receive notice of the special shareholders meeting to approve the merger until the merger was consummated.

5.     Defendant Xuelian, at all relevant times, was a controlling shareholder of Linkwell.  Xuelian has served as the Chairman of the Board of Directors of Linkwell ("Board"),

Chief Executive Officer and President since May 2005. Xuelian has simultaneously served as Chief Executive Officer, President and a director of Linkwell Tech Group, Inc. ("Linkwell Tech") since its inception in June 2004, and as General Manager of Shanghai Likang Disinfectant High-Tech Co., Ltd. ("Likang Disinfectant") since 1993. Xuelian is the Executive Director of Zhongyou Pharmaceutical High-Tech Co., Ltd. ("Zhongyou Pharmaceutical"). Xuelian is also a co-owner of Linkwell International Capital Ltd. ("Linkwell Int'l") and owns 30% of the equity of Zhongyou (Shanghai) Technology Development Co. Ltd. ("Zhongyou Technology"). Xuelian is a citizen of China.

6.     Xuelian had no knowledge or understanding of the United States federal securities laws or Florida state law and relied exclusively upon Sidley to undertake all actions necessary to implement and consummate the Freeze-Out Merger, divest Plaintiff of his Linkwell stock and standing to continue to prosecute the claims in the Derivative Action, and eliminate Linkwell's challenge to the control which Xuelian exercised over the disinfectant business. In his capacity as General Manager of Likang Disinfectant and director, officer and a controlling shareholder of Linkwell, Xuelian retained Sidley as counsel for the Freeze-Out Merger and for securing the dismissal of the Derivative Action. Xuelian subsequently executed or caused others to execute all papers (which were in English and which Xuelian could not read or understand) as instructed by Sidley and attended or appeared to attend the sham meetings orchestrated by Sidley without any real concept of the actions undertaken other than to eliminate Linkwell's public shareholders.

7.     Defendant Wei, at all relevant times, was a controlling shareholder of Linkwell. Wei has served as a member of the Board and Vice President since May 2005. Wei has also served as the Vice President of Linkwell Tech since its inception in June 2004, and as Vice

General Manager of Likang Disinfectant since 2002.  Wei is a co-owner of Linkwell Int'l.  Wei owns 35% of the equity of Zhongyou Technology and serves as a supervisor for that company. Wei is a citizen of China.

8.     Wei had no knowledge or understanding of the United States federal securities laws or Florida state law and relied exclusively upon Sidley to undertake all actions necessary to implement and consummate the Freeze-Out Merger, divest Plaintiff of his Linkwell stock and standing to continue to prosecute the claims in the Derivative Action, and eliminate Linkwell's challenge to the control which Wei exercised over the disinfectant business.  In his capacity as Vice General Manager of Likang Disinfectant and director, officer and a controlling shareholder of Linkwell, Wei executed or caused others to execute all papers (which were in English and which Wei could not read or understand) as instructed by Sidley and attended or appeared to attend the sham meetings orchestrated by Sidley without any real concept of the actions undertaken other than to eliminate Linkwell's public shareholders.

9.     Defendant Yinling is a Chinese limited liability company with a principal place of business in Shanghai, China.  Yinling was formed on April 18, 2014 for the purpose of entering into and consummating the transaction contemplated by the Freeze-Out Merger and is the sole shareholder of Leading First.  Yinling currently owns 100% of the equity of Linkwell Tech and is a minority shareholder of Zhongyou Pharmaceutical.

10.    The remaining corporate Defendants were all created by Sidley to accomplish the Freeze-Out Merger.

11.    Defendant Leading First is a British Virgin Islands company with a business address in Shanghai, China.  Sidley formed Leading First on or about June 25, 2014 for the sole purpose of entering into and consummating transactions contemplated by the Freeze-Out Merger.

12.     Defendant Leading World is a Florida corporation with a business address in Shanghai, China, and is a wholly owned subsidiary of Leading First.  Sidley formed Leading World on or about August 5, 2014 for the sole purpose of entering into and consummating transactions contemplated by the Freeze-Out Merger.

**Relevant Non-Parties**

13.     Relevant Non-Party Linkwell was a publicly held Florida corporation with no presence in the United States and a sole place of business in Shanghai, China.  Linkwell was created on May 2, 2005 through a reverse merger transaction between Kirshner Entertainment & Technologies, Inc. and Linkwell Tech. Prior to the commencement of the Derivative Action, Linkwell operated as public holding company for direct operating subsidiaries Linkwell Tech, Likang Disinfectant, Shanghai Likang Biological High-Tech Co., Ltd. ("Likang Biological") and other affiliated entities, and shared the same registered business address and office space as Likang Disinfectant.  On or about August 16, 2016, both Linkwell and Linkwell Tech filed Articles of Dissolution with the Florida Department of State.

14.     Relevant Non-Party Liyong Sui ("Liyong") is a Vice President of Yinling and the sole director of Leading First.  Liyong is a chartered accountant in China.

15.     Relevant Non-Parties Song Qiang Chen ("Song"), Ling Li ("Ling"), Metamining, Inc. ("Metamining"), Metamining Nevada, Inc. ("Metamining Nevada"), CD International Enterprises, Inc. ("CD Int'l"), China Direct Investments, Inc. ("China Direct"), Capital Resource Management Co., Ltd. f/k/a Capital One Resource Management Co., Ltd. ("Capital Resource") and Ecolab Inc. (NYSE: ECL) ("Ecolab") are named as defendants in the Derivative Action.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over the claims asserted herein pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa,

and 28 U.S.C. §§ 1331 and 1337(a), as those claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.   The Court has supplemental jurisdiction, pursuant to 28 U.S.C.  § 1367(a) over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because many of the acts and omissions charged herein occurred in this District.

## INTRODUCTION

18.    In March 2014, when Xuelian and Wei were advised of the risk that the Derivative Action might force them to actually return the Disinfectant Businesses to Linkwell, Sidley came to the rescue and proposed a scheme to terminate the claims asserted in the Derivative Action and, thereby, cement Xuelian and Wei's unfettered ownership of Linkwell subsidiaries Linkwell Tech and Likang Disinfectant.

19.    After more than two years of litigation in the Derivative Action, the District Court had sustained Plaintiff's complaint and ordered defendants and nominal defendant Linkwell in the Discovery Orders (D.E. 116-18) to respond to Plaintiff's outstanding discovery seeking, among other things, information regarding the location of the stock certificates for Linkwell Tech and Likang Disinfectant.

20.    While Xuelian and Wei had refused to allow Linkwell to answer pleadings or comply with the Omnibus Order (D.E. 116) compelling discovery, it appeared that the other defendants would have to comply or suffer contempt citations.   The defendants would eventually produce documents: (a) confirming Plaintiff's allegations regarding the unlawful agreement to spin off Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei; and (b)

7

supporting Plaintiff's claim for relief seeking a constructive trust to hold the stock certificates until such time Linkwell obtained fair value for its assets.

21.     Sidley came to the rescue.  It proposed a transaction to freeze out Linkwell's public shareholders through a merger and, by depriving the public shareholders of notice of the proposed merger so they could not oppose it or seek appraisal, they allowed Xuelian and Wei to avoid having to pay Linkwell fair value for its unlawfully taken assets – including Likang Disinfectant, which generated in excess of 99% of the Company's revenues – and enabled insiders to profit from the sale of equity in the disinfectant business through a subsequently planned initial public offering in China.

22.     Sidley proposed to Xuelian and Wei that it would take all the steps necessary to take Linkwell private in a one-step merger.  Plaintiff's stock, as well as the stock of all other similarly situated Linkwell shareholders, would be cancelled for *de minimis* consideration.  The merger would, according to Sidley, divest Plaintiff of standing to continue to prosecute the Derivative Action.  Xuelian, Wei and their affiliates could retain total control of the disinfectant business without further public airing of their extreme misconduct in the 2012 Transaction *and* without having to pay fair value to Linkwell for those assets.  As the mastermind of the scheme and the agent for achieving its unlawful objectives, Sidley would be paid a fee for its services and assured a role as deal counsel for the restructured company in the intended public offering.

23.     Sidley has extensive mergers and acquisitions ("M&A") experience and touts itself as "a preeminent global M&A practice … engaged in the full spectrum of public and private mergers and acquisitions and private equity transactions of all sizes …."  Sidley, M&A, *available at* https://www.sidley.com/en/us/services/ma/?tab=deep.   According to the firm's website, Sidley has advised "over 100 public companies on securities transactions and ongoing

reporting and disclosure matters." Sidley, Capital Markets, *available at* https://www.sidley.com/en/us/services/capital-markets/?tab=deep. Thus, Sidley knew that the sole feasible path to consummate the Freeze-Out Merger and divest Plaintiff of his Linkwell stock during the pendency of the Derivative Action was through a forced sale without notice to Linkwell's public shareholders.

24.     Fully familiar with the claims asserted and procedural history of the case, Sidley knew that Plaintiff would challenge any management/controlling shareholder-led buyout of his Linkwell stock at less than fair value. The only way to avoid an anticipated motion from Plaintiff to enjoin the Freeze-Out Merger and prevent any other similarly situated shareholder from seeking an appraisal of their stock was to withhold notice of it from Linkwell's public shareholders, almost all of whom held their Linkwell stock in street name. Sidley, upon information and belief, assured Xuelian and Wei that Linkwell's minority shareholders who held their stock in street name would not be provided timely notice of the meeting to approve the merger, i.e. "there will be no interlopers" to gum up the works.

25.     Prior to the engagement of Sidley, Xuelian and Wei relied exclusively upon CD Int'l, China Direct and Capital Resource (collectively, "CD Group") and their agents to provide advice and SEC disclosure services for Linkwell because Xuelian and Wei did not speak English and possessed no knowledge or understanding of the laws governing the regulation of U.S. public companies, SEC disclosure and state corporate law. Xuelian and Wei did not know how to take Linkwell, a publicly-traded Florida company, private. They did not know that a forced sale of Plaintiff's Linkwell stock could serve as grounds to seek dismissal of the Derivative Action. Xuelian and Wei were thus entirely reliant upon Sidley's knowledge, experience and direct action to achieve the objectives of the proposed scheme.

26.     On April 4, 2014, Sidley was engaged to carry out the proposed scheme. It was agreed that Sidley would take all actions to cause Linkwell to "go dark" with the SEC and avoid the obligation to publicly disclose the merger between Linkwell and Yinling and any regulatory scrutiny of the same. Sidley would also form an acquisition vehicle, structure and draft a going private proposal and prepare the necessary legal documentation to facilitate the same, and liaise with the transfer, depository and paying agents.

27.     As for the next step in the proposed scheme, Sidley agreed to serve as legal counsel for Linkwell, Xuelian and Wei in the Derivative Action. Sidley was engaged to represent Linkwell, Xuelian and Wei in the Derivative Action after Plaintiff moved for an Order of Contempt against Linkwell for noncompliance with the Omnibus Order following its filing of a Certificate and Notice of Termination of Registration on Form 15 ("Notice of Termination") with the SEC.

28.     Sidley undertook the retention despite an obvious and impermissible conflict of interest clearly posed by the representation. Sidley also determined not to seek a waiver of conflict from Linkwell or consent from its public shareholders.

29.     On July 9, 2014, Sidley was engaged by Yinling, the final party involved in the proposed scheme, pursuant to a legal counsel engagement letter ("Yinling Engagement Letter") executed by Liyong, on behalf of Yinling, and Joseph Chan, a partner in Sidley's Shanghai office, wherein Sidley agreed to represent Yinling in the formation of a Florida company for the Freeze-Out Merger.

30.     On August 12, 2014, the Board purportedly met in China to approve the agreement and plan of merger ("Merger Agreement") whereby Yinling would acquire 100% of the equity of Linkwell at a merger consideration of $0.88 per share of Linkwell stock. The

purported meeting was a sham.  No minutes of the meeting exist and it is doubtful whether the meeting actually took place.  Plaintiff obtained documents through third-party discovery served upon Sidley that show that the Merger Agreement was approved by resolutions adopted by unanimous written consent of the Board; there is no reference to an actual meeting.  The resolutions contain no assessment by the Board as to the fairness of the $0.88 per share merger consideration offered to Linkwell shareholders.

31.     Sidley subsequently drafted a proxy statement ("Proxy Statement"), scheduled a September 19, 2014 Special Meeting of Linkwell shareholders ("Special Meeting") to vote on whether to approve the Merger Agreement in Shanghai, China, and prepared a notice for the Special Meeting ("Notice") that set an August 15 record date.

32.     Sidley, however, intentionally delayed providing the Notice and Proxy Statement to Linkwell's transfer agent, fully aware that such a delay would result in Plaintiff and other public shareholders that held their Linkwell stock in street name not receiving timely notice of the Special Meeting, which would consequently prevent them from exercising their legal rights.

33.     Sidley did not provide the Notice and Proxy Statement to Linkwell's transfer agent until late in the afternoon on August 19, 2014 and knew that they would not be mailed even to holders of record on the Linkwell shareholders list until August 20.  Based on its experience representing hundreds of public companies in merger transactions, Sidley knew that shareholders who, like Plaintiff, held their Linkwell stock in street name would not receive the Notice and Proxy Statement until well after the Special Meeting was concluded.

34.     As a consequence of Sidley's actions, the Notice and Proxy Statement were not delivered to street name record holders.  The Notice and Proxy Statement were not delivered to Plaintiff's broker, TD Ameritrade, and thus there was nothing for TD Ameritrade to distribute to

Plaintiff or any other client that held Linkwell stock.  Upon information and belief, the Notice and Proxy Statement were not provided to any shareholder that held their Linkwell stock in street name.

35.     As intended, Sidley's actions with respect to not providing notice to street name holders prevented Plaintiff from moving to enjoin the merger or exercising appraisal rights. Sidley's action rendered the consummation of the Freeze-Out Merger a *fait accompli*.

36.     The Freeze-Out Merger was consummated through an unfair process.  The $0.88 per share merger consideration paid to Linkwell shareholders was unfair.  The total merger consideration purportedly paid to all shareholders, including Xuelian and Wei, was $483,120.00 ($0.88 x 549,000 outstanding shares).

37.     In 2008, by comparison, Ecolab paid Linkwell $2 million to acquire 10% of the equity of Linkwell Tech which, at that time, held 100% of the equity of Likang Disinfectant and Likang Biological.

38.     The total merger consideration represented less than 1% of the net asset value Likang Disinfectant reported to SAIC for 2014.   No financial information about Likang Disinfectant was provided in the Proxy Statement.  The last financial report Linkwell filed with the SEC was for the quarter ended September 30, 2012.

39.     On November 15, 2016, Jiangsu Yuyue Medical Equipment & Supply Co., Ltd. ("Yuyue") announced the acquisition of a 61.62% equity interest in Zhongyou Pharmaceutical for RMB 862.7 million (US $125.97 million).

40.     As of the date of the announcement, Zhongyou Pharmaceutical had submitted a listing application with the National SME Share Transfer System Company, the sole over-the-counter market regulated by the China Securities Regulatory Commission.   Upon information

and belief, Sidley prepared the materials relevant to Zhongyou Pharmaceutical's listing application and intended domestic offering.

41.     At the time of the acquisition, Zhongyou Pharmaceutical owned 83.83% of the equity of Likang Disinfectant. Linkwell Tech owned the remaining 16.17% of the equity of Likang Disinfectant.   Prior to Yuyue's purchase, Xuelian was the majority shareholder of Zhongyou Pharmaceutical.   Yinling is currently a minority shareholder of Zhongyou Pharmaceutical and the sole shareholder of Linkwell Tech.

42.     Xuelian and Wei, like all other Linkwell shareholders, were cashed out of Linkwell as a result of the Freeze-Out Merger.  After the Freeze-Out Merger, however, Xuelian, Wei and their affiliates retained control of Likang Disinfectant.

<u>ALLEGATIONS APPLICABLE TO ALL CLAIMS</u>

**I.      THE 2012 TRANSACTION**

43.     Plaintiff incorporates by reference hereto, the allegations in the PFAC regarding the 2012 Transaction.  Those allegations are summarized below as follows:

44.     At all relevant times, Linkwell, through its direct subsidiaries Linkwell Tech, Likang Disinfectant and Likang Biological, engaged in the development, manufacture, sale and distribution of disinfectant health care products in China.  Products manufactured by Likang Disinfectant accounted for more than 99% of the Company's total net revenues for fiscal year ended December 31, 2011.  According to the Company's Annual Return on Form 10-K for fiscal year ended December 31, 2011 ("2011 Form 10-K"), Linkwell, through Likang Disinfectant, had more than 6,000 active and recurring customers in China, including hospitals, clinics, health centers, medical suppliers and distribution companies.

45.     Linkwell's financial performance and future prospects, however, were not reflected in its share price.  In the 2011 Form 10-K, Linkwell acknowledged that its common

stock did not have an established trading market in the United States and, as such, was traded on the OTCBB and the Pink Sheets.  Trading on these platforms made it more difficult for Linkwell to raise additional capital in the U.S. public markets.

46.    Sometime in 2011, Xuelian and Wei determined to spin off Linkwell Tech, Likang Disinfectant and Likang Biological from Linkwell.  On January 1, 2012, Linkwell, Linkwell Tech and Likang Disinfectant executed a legal counsel agreement with Shanghai Haimai Legal Firm ("Haimai Legal"), pursuant to which Haimai Legal agreed to provide legal services for Linkwell, Linkwell Tech and Likang Disinfectant in anticipation of the equity of those companies being acquired by certain third parties, Ecolab and Metamining.

47.    Documents produced by Metamining and CD Group after the Discovery Orders were issued confirm the agreement by the parties to the 2012 Transaction to transfer control of Linkwell to the principals of Metamining in exchange for the secret spin-off of Linkwell's subsidiary disinfectant business to Xuelian and Wei.  Linkwell was not paid anything for the transfer of the equity of the parent holding company, or for the spin-off of the assets and operations constituting the disinfectant business.

48.    For example, the documents show that on March 6, 2012, Metamining Nevada executed a reverse merger consulting agreement ("Reverse Merger Consulting Agreement") with China Direct and Capital Resource which served as a framework for the transfer of control of Linkwell as a clean public shell company to Song and Ling, and without the subsidiary disinfectant business.  On March 31, 2012 Capital Resource executed a consultant service agreement with Linkwell, pursuant to which it agreed, in exchange for 5 million shares of Linkwell common stock, to strip Linkwell of its 90% equity interest in Linkwell Tech and complete the divestiture by June 30, 2012.

49.     Other materials contemporaneously prepared by CD Int'l and Metamining for potential investors in a reorganized Linkwell also confirm the plan to spin off Linkwell Tech from Linkwell.

50.     On April 2, 2012, Linkwell announced in a press release that it had entered into a definitive share exchange agreement (the "Share Exchange Agreement") with Metamining to acquire Metamining Nevada as a wholly owned subsidiary, in exchange for 9 million shares of newly issued Series C convertible preferred stock and 3 million warrants to purchase common stock.  Linkwell had not previously disclosed that it was contemplating a business combination, let alone one with a start-up company involved in the exploration, mining and trading of iron ore in the United States.  There was no apparent business purpose to support the combination of the two companies.

51.     The determination by the Board (then comprised of only Xuelian and Wei) to acquire Metamining Nevada was entirely inconsistent with the disclosures made by Linkwell to its shareholders less than a month before that the Company would effect a reverse stock split of its common stock at a 30:1 ratio because the Board believed that Linkwell was undervalued and the reverse split would allow the common stock to trade in a "more realistic price range." Xuelian and Wei knew or should have known that the acquisition of Metamining Nevada in exchange for almost all of the equity of Linkwell would have a negative effect on its stock price. The 2012 Transaction did, in fact, have a negative impact on the Company's stock price.

52.     The issuance of new equity also impacted Xuelian and Wei who, at the time, purported to beneficially own 39,023,470 shares of Linkwell common stock, or almost 40% of the Company's equity, which would be reduced to less than 3%.  It made no business sense that Xuelian and Wei, who collectively devoted more than 57 years to building Linkwell into a

profitable business, would agree to such a substantial reduction in equity and give up control without anything in return.

53.     The only plausible explanation was that Xuelian and Wei extracted something of value in exchange for their agreement to execute the Share Exchange Agreement that did not devolve to the Company.  As Plaintiff subsequently learned, the benefit that Xuelian and Wei received was the Company's 90% equity interest in Linkwell Tech and Linkwell Tech's 100% equity interest in Likang Disinfectant and Likang Biological.  The spin-off of the disinfectant business to Xuelian and Wei for no consideration was not disclosed in any of the Company's public filings.

54.     Ecolab subsequently identified Linkwell Tech, Likang Disinfectant and Likang Biological as corporate subsidiaries in its Annual Return on Form 10-K for fiscal year ended December 31, 2012.

55.     Plaintiff commenced the Derivative Action on December 26, 2012.  Linkwell did not file an annual or quarterly financial report with the SEC after the commencement of the Derivative Action.  Upon information and belief, no reports were filed after the quarter ended September 30, 2012 to avoid Linkwell having to explain, among other things: (a) how Ecolab came to acquire Linkwell Tech, Likang Disinfectant and Likang Biological as significant majority-owned subsidiaries; (b) what consideration, if any, Linkwell received for these assets; and (c) if not, to whom such consideration was paid.

56.     On April 22, 2013, Linkwell, Linkwell Tech and Ecolab executed a redemption agreement which terminated the business relationship between and amongst the companies.  Linkwell Tech paid $2.4 million to repurchase the shares of its stock that Ecolab had acquired from Linkwell in 2008 for $2 million.

57. On October 17, 2013, Plaintiff moved for partial summary judgment in the Derivative Action on the unjust enrichment claim against Song, Ling, Metamining, Metamining Nevada, CD Int'l and China Direct. Plaintiff argued that, based on declarations submitted by Song in *Zhenhua Logistics (Hong Kong) Co., Ltd. v. Metamining, Inc., et al.,* No. 13-cv-2658 (N.D. Cal.) ("Zhenhua Action") stating that Metamining currently owned the assets which had allegedly been transferred to Linkwell under the Share Exchange Agreement, Linkwell received no value in exchange for the issuance of approximately 94% of its equity.

58. In response to Plaintiff's motion, the portion of the 2012 Transaction in which Linkwell issued 94% of its equity to Metamining and CD Group was unwound. Linkwell disclosed in a November 26, 2013 Form 8-K filing that it sold Metamining Nevada to Metamining pursuant to an equity transfer agreement in exchange for the cancellation of the Linkwell stock and stock warrants issued to Metamining and its affiliates. Documents produced in discovery also show that the Linkwell stock CD Group obtained in the 2012 Transaction was returned to the Company for cancellation.

59. The November 26, 2013 Form 8-K filing did not disclose whether the stock certificates for Linkwell Tech, Likang Disinfectant and Likang Biological were either returned to Linkwell or were currently in the Company's possession.

## II.     THE FREEZE-OUT MERGER

### A.     Sidley Devises a Scheme to Force the Buyout of Linkwell's Shareholders and for the Dismissal of the Derivative Action

60. On January 16, 2014, the District Court entered Discovery Orders directing Linkwell, Song, Ling, Metamining, Metamining Nevada and CD Group to respond to Plaintiff's discovery.

61.    The Omnibus Order compelled Linkwell to answer interrogatories and produce documents to Plaintiff by January 31, 2014.  With particular respect to the discovery propounded upon Linkwell by Plaintiff, the Omnibus Order required Linkwell to produce documents sufficient to identify the current and prior locations and custody of the stock certificates for Linkwell Tech and Likang Disinfectant.

62.    Sidley, acting as counsel for Xuelian and Wei, recognized that if Linkwell complied with the Omnibus Order and disclosed that Linkwell no longer possessed the stock certificates and that Xuelian, Wei and their affiliates and/or designees had not paid any value for those assets, Sidley's ability to achieve its clients' objectives would evaporate.

63.    Sidley billing records produced in the Derivative Action indicate that Sidley M&A attorney Chan first met with the "Likang team" on March 7, 2014 to develop a "transaction structure" to accomplish the goals of eliminating Xuelian and Wei's exposure in the Derivative Action, avoiding payment of Linkwell fair value for its assets and enabling all parties involved in the scheme to profit from the planned sale of equity in the disinfectant business.

64.    On March 28, 2014, Sidley prepared a transaction structure and fee proposal for Likang Disinfectant ("Proposal") based on the objectives of Xuelian and Wei.  Pursuant to the Proposal, Sidley would deregister Linkwell's securities with the SEC, take Linkwell private in a secret one-step merger with Yinling, and then restructure the company in preparation for a subsequent public offering in China.  The Proposal described the action items to be undertaken in connection with the scheme:

   a.    Sidley would deregister Linkwell, cause it to "go dark" and terminate its filing obligations with the SEC by filing a Form 15;

b.    Sidley, on behalf of Liyong's organization (Yinling), would form two vehicles, a parent company in an offshore jurisdiction and a merger subsidiary in Florida;

c.    Sidley would prepare a merger proposal;

d.     The Board would rubber stamp the plan of merger;

e.    Sidley would prepare a proxy statement and other related documents for distribution to Linkwell's shareholders;

f.    Sidley would set a date for a special meeting of Linkwell shareholders to vote on the agreement and plan of merger, such date being too soon to notify street name shareholders of the proposed Freeze-Out;

g.    At the stockholders meeting, affirmative vote in excess of majority would be cast by Xuelian, Wei and their affiliates (representing more than 60% of the shares) to approve the merger;

h.    Sidley would file a certificate of merger with the Secretary of State of Florida and consummate the merger, Leading First would become the parent of Linkwell and all existing shareholders would be cashed out; and

i.    Linkwell would undergo a post-merger restructuring in preparation for a domestic IPO.

65.    Sidley billing records indicate that on April 3, 2014, Chan again met with the "Likang team" to discuss the structure for the Freeze-Out Merger, the actions Sidley would undertake to consummate it and the terms for Sidley's engagement.   On April 4, Likang Disinfectant retained Sidley, pursuant to a legal counsel engagement letter ("Likang Engagement Letter"), to accomplish Xuelian and Wei's goal.

66.     Since the Freeze-Out Merger was structured as a "friendly buyout," the Likang Engagement Letter set forth a fee for services of RMB 950,000.  The fee was based on, among other things, the understanding that there would not be any meaningful negotiation.  The fee was further qualified by express assumptions that:

        a.      The Freeze-Out Merger would be a one-step merger after Linkwell went dark;

        b.      There would be no review by or comment from the SEC;

        c.      The language for all legal documents should be English and there would be no need for translation;

        d.      The negotiation of the agreement and plan of merger would be a sham;

        e.      There would be no third party "interloper," i.e. the public shareholders who would get no notice; and

        f.      There would be no litigation during the course of the Freeze-Out Merger.

67.     In truth, all legal documents could be in English because Xuelian and Wei had no interest in the details of the deal, just the result; the negotiation of the agreement and plan of merger would be almost non-existent; there would be no third party interloper because none of Linkwell's public shareholders would be sent notice; and there would be no litigation with respect to the buyout because no one would know about it.

**B.**     **Sidley Actively Participated in the Scheme to Defraud**

68.     On April 9, 2014, Sidley drafted the Notice of Termination.  On April 11, 2014, Sidley filed the Notice of Termination with the SEC.

69.     On April 15, 2014, counsel for Plaintiff sent an email to counsel for CD Group requesting a meet and confer with a representative of Linkwell to discuss Plaintiff's intention to

move for an Order of Contempt in light of the Company's failure to comply with the Omnibus Order and its filing of the Notice of Termination.

70.     Plaintiff received no response from Linkwell to his request.  Documents produced by Sidley show, however, that Plaintiff's email was forwarded on April 17, 2014 to Jue Wang ("Jue") (the Corporate Secretary of Linkwell, Linkwell Tech and Likang Disinfectant), and that Jue provided the email to Liyong and Calamus Huang ("Huang"), an attorney at Sidley's Shanghai office, on the same day.

71.     On April 18, 2014, Plaintiff moved for an Order of Contempt against Linkwell in the Derivative Action (D.E. 142).

72.     Sidley billing records indicate that on April 21, 2014, Chan and Huang met with Xuelian, Liyong and Jue to discuss "litigation matters" related to Plaintiff's motion and the engagement of Sidley to represent Linkwell, Xuelian and Wei in the Derivative Action.  Chan also discussed the matter with Sara B. Brody ("Brody"), a partner at Sidley in San Francisco and co-leader of the firm's Securities and Shareholder Litigation practice group.

73.     On April 22, 2014, Sidley was engaged in the Derivative Action.  Sidley, however, did not obtain a waiver of conflicts from Linkwell for its simultaneous representation of Linkwell and adverse parties Xuelian and Wei in the Derivative Action.  Nor did Sidley request or obtain the consent or waiver of conflicts from the Company's public shareholders.

74.     Sidley billing records for the Derivative Action (referenced in the bills as the "Suit Matter") between April 22, 2014 and June 30, 2014 show that Sidley attorneys Chan, Brody, Tom A. Paskowitz ("Paskowitz") and Huang reviewed litigation files for the Derivative Action and met and corresponded with each other on litigation strategy and the status of the

21

"going private process."  Paskowitz, in addition, periodically communicated with counsel for CD Group to obtain updates regarding the status of the litigation.

75.     Sidley billing records for the Freeze-Out Merger (referenced in the bills as the "Buyout") show that, over the same period, Sidley formed Leading First, drafted bylaws for Leading World and drafted the Merger Agreement.

76.     On June 27, 2014, Paskowitz spoke with counsel for CD Group regarding the Derivative Action and a potential partial settlement between CD Group and Plaintiff.  On the same day, Paskowitz spoke with Plaintiff's counsel about the partial settlement.

77.     These calls were a consequence of the fact that Plaintiff and CD Group had negotiated and agreed upon terms for the purpose of executing a memorandum of understanding. Linkwell, the nominal defendant in the Derivative Action, however, was an essential component to any understanding reached and was necessary to represent and warrant in the memorandum of understanding that the 2012 Transaction had been completely unwound and that it currently held the stock certificates for Linkwell Tech, Likang Disinfectant and Likang Biological.

78.     During the June 27 call with Plaintiff's counsel, Paskowitz disclosed that Sidley represented Linkwell.  Paskowitz further said that he was authorized by Linkwell to participate in negotiations on the proposed partial settlement. Paskowitz did not disclose Sidley's involvement in the Freeze-Out Merger or its retention as counsel for Linkwell, Xuelian and Wei in the Derivative Action.  He, however, billed his time for this call and all subsequent calls with Plaintiff's counsel concerning the proposed partial settlement to the Suit Matter.

79.     On July 11, 2014, the Court entered an Order (D.E. 173) in the Derivative Action that granted Plaintiff's September 17, 2013 motion for alternative service of process upon Xuelian and Wei.  Xuelian and Wei were served with process on July 15, 2014.

80.     On July 28, 2014, Paskowitz again spoke to Plaintiff's counsel regarding the potential partial settlement of the Derivative Action.   At no time did Paskowitz disclose that Sidley represented Xuelian and Wei in the Derivative Action, nor did he disclose to Plaintiff's counsel that he was at the same time taking steps to effectuate the Freeze-Out Merger.

81.     On August 12, 2014, the Board, without meeting, approved by consent the terms of the Freeze-Out Merger as orchestrated by Sidley.

82.     After approval, Sidley drafted the Notice and Proxy Statement.   Sidley, upon information and belief, told Xuelian, Wei and Liyong that the Notice and Proxy Statement would not reach Plaintiff or other shareholders that held their Linkwell stock in street name in time for them to seek an injunction of the Freeze-Out Merger or exercise appraisal rights.   Plaintiff's belief is based upon the following:

a.     Sidley's engagement to handle all aspects of the Freeze-Out Merger specifically contemplated that there would be no interlopers or deal litigation;

b.     Since Xuelian, Wei and parties that they control or with whom they are affiliated owned more than 60% of Linkwell's stock, there was no need to obtain the votes of public shareholders, although there was a requirement that they get notice of the meeting;

c.     Based on its experience from other public merger transactions, Sidley knew that if the process to deliver notice to Linkwell's public shareholders was properly manipulated, notice of the Special Meeting would not be sent until after the meeting.

83.     Sidley took the necessary steps to prevent the Notice or Proxy Statement from being timely sent to Plaintiff and the other shareholders of Linkwell that held their stock in street name.

84.     On August 19, 2014, Sidley attorney Huang emailed the stock transfer agent for Linkwell, Signature Stock Transfer, Inc. ("Signature") about mailing the Notice and Proxy Statement to Linkwell shareholders of record as of August 15, 2014 that were located in the United States.  The August 19 email copied Chan and Jue, and set forth, in relevant part, as follows:

> According to Linkwell's bylaws, "If a notice is mailed at least thirty days before the date of the meeting, it may be done by a class of United States mail other than first class.  If mailed such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the shareholder at his address as it appears on the stock transfer books of the corporation, with postage thereon prepaid."

> In this regard, would you please kindly answer our questions below:

> Would it be fine with you that you handle the mailing of the proxy statement to those shareholders on record whose address is outside [C]hina and Linkwell itself will handle the mailing to those shareholders whose address is inside China?

> Is it possible for you to post the proxy statement by US mail other than first class on August 20 (New York time)?

85.     Signature responded on the same date that it would mail the Notice and Proxy Statement to "all direct holders of record (outside of China) on 8-20-2014."  Huang wrote back disingenuously that: "We note that some record holder[s] such as Cede & Co. is holding Linkwell shares as nominee for hundreds of beneficial holders.  Would you please … explain how such record holder will handle it after receiving the proxy statement from you according to your experience?"  Signature addressed the inquiry as follows:

> For all street named holders who hold stock through (a broker or through DTCC/CEDE & CO) we will do a search with Broadridge (who does the mailing for all brokerage houses but please note the search will take at least a week and brokerage holders will not be mailed their items by Broadridge until at least 10 days).  I am sorry but I cannot speed up the process.

24

> Also note for brokerage house purposes we will have to create a
> current or future record date.

86.     Given its experience representing public companies, Sidley knew exactly how

Cede & Co. would handle receipt of the Proxy Statement.  This communication, therefore, was

made for the purpose of creating a record upon which to pin the blame for the late delivery of the

Notice and Proxy Statement on Broadridge.

87.     Additional emails circulated between Sidley and Signature on August 19

confirmed that the Notice and Proxy Statement would be mailed on August 20, 2014 to *only*

direct holders of Linkwell stock.  Signature told Sidley that that the Notice and Proxy Statement

could not be mailed on August 20 to brokerage house holders because a future record date was

required (the Notice set forth an August 15, 2014 record date) and the search process with

Broadridge still needed to be done.  In a separate series of emails, Signature stated that "[f]or the

direct holders (holders who appear on the list I will email you (*not counting brokers and

depositories*) we will try to mail [the Notice and Proxy Statement] today [(August 19)] with the

remainder tomorrow."  Huang responded: "If the mail is stamped as of August 20, it is fine.  *You

are right that we only need to mail to the record holders.  We are fine with the arrangement in

relation to these shareholders whose shares are held by nominees.*" (Emphasis added.)

88.     On August 28, 2014, Huang emailed Signature to inquire about the status of the

search and to confirm that the Notice and Proxy Statement was mailed to Cede & Co. on August

20.  This email copied Chan and Jue.  Signature responded on August 29, 2014 stating, in

relevant part, as follows:

> Broadridge will do the mailing to all street holders the end of next
> week or the week later (note as I stated all I can do is operate in the
> time constraints they have).  CEDE was mailed 1 copy but that
> really doesn't matter as they cannot vote their position (as their
> position has to be voted through Broadridge by the direct holders).

> Note there is nothing I can do beyond what has already been done
> for the mailing/solicitation of prox[ies].

89.    On the same day, Huang wrote back to reconfirm that Sidley was not concerned whether holders in street name timely received the Notice and Proxy Statement, stating: "*We are totally fine with the procedures that you have to take in relation to street holders and appreciate your efforts and cooperation very much.*" (Emphasis added.) Indeed, Sidley's intended that Linkwell shareholders who held in street name to not receive notice in time for them to act on their rights.

90.    On September 5, September 9, and September 11, Paskowitz spoke with Plaintiff's counsel regarding the potential partial settlement of the Derivative Action.  Paskowitz did not disclose that Linkwell had executed the Merger Agreement or that the Special Meeting was scheduled for September 19.   Paskowitz did not disclose that Sidley also represented Xuelian and Wei in the Derivative Action.

91.    On September 9, 2014, Signature emailed Jue about the process of mailing the Notice and Proxy Statement to shareholders of Linkwell that held their stock in street name.  As Sidley expected and planned from the beginning based on its experience, Signature wrote:

> Note all holders in street name need to be mailed by Broadridge if
> you are soliciting proxies … as they would also have to vote
> through Broadridge (not directly your firm).
>
> Also we are being told that there is not enough time for the
> mailing/vote for street named holders to respond (usually a
> mailing/vote is done giving the shareholders at least 30 days to
> respond after the items are mailed).  Please advise if you wish to
> postpone the meeting or if you have the votes in house already if
> you wish to forego the proxy process with Broadridge and make
> this a mailing only.  (I will check to see if this is only a mailing if
> they can mail to all holders except those on the NOBO list in
> China since there would be no proxy if you like).

92.     On September 10, 2014, Jue responded in an email stating, in relevant part, that the Special Meeting would not be postponed because Xuelian, Wei and their affiliates had more than 60% of the votes in-house already.

93.     On September 10, 2014, Huang emailed Signature regarding the concern expressed to Jue that the mailing of the Proxy Statement to holders in street name gave them insufficient time to respond.  The September 10, 2014 email copied Jue and Chan, and set forth, in relevant part, as follows:

> Has … Broadridge posted the proxy statement to the street named holders?  I understand from [Jue] that you are concerned that there may not be enough time for these holders to respond.  However, according to Linkwell's by-laws, if a notice of special meeting is mailed at least 30 days before the date of the meeting, it shall be deemed to be delivered when deposited in the US mail, addressed to the shareholder at his address as it appears on the stock transfer books.  Therefore, the notice has been delivered in compliance with Linkwell's by-laws.
>
> Also, the proxy statement clearly stated that if a shareholder abstains from voting, fails to cast his vote in person or by proxy or fails to give voting instructions to his broker, dealer, commercial bank, trust company or other nominee, it will have the same effect as a vote "AGAINST" the approval of the merger agreement.  Therefore, Broadridge can simply mail the whole package of the notice of special meeting, the proxy statement and proxy card to those street named holders.
>
> Since the proxy statement has set out clear instructions, we don't think a separate cover letter is necessary.

94.     On September 12, 2014, Jue wrote Signature that the mailing to Linkwell shareholders that held their stock in street name should not include proxy solicitations.

95.     Even if the Notice and Proxy Statement were mailed by Broadridge to holders in street name without proxy solicitations on September 12, it was already too late as the Special Meeting was scheduled to be held in 7 days and Section 607.0705(a) of the Florida Statutes requires notice to be sent not fewer than 10 days before the meeting date.

96.     On September 16, 2014, Jue sent an email to Signature to inquire whether Broadridge mailed the Notice and Proxy Statement to the street name holders of Linkwell stock and confirm that "[w]e will hold the meeting this Friday."  On the same date, Signature replied that it had not received a response from Broadridge on the mailing status.

97.     On September 17, 2014, Huang emailed Signature to confirm that the Proxy Statement *was not mailed* to holders in street name.  The September 17, 2014 email copied Jue and Chan, and set forth, in relevant part, as follows:

> Would you please let us know whether or not Broadridge has mailed the proxy statement?  …  If Broadridge hasn't done the mailing before September 19, this Friday, the day on which the special meeting is scheduled to be held, we may consider to adjourn the meeting if necessary.  Therefore, it is very important for us to know the status of the mailing as soon as possible.

98.     Sidley had no intention of adjourning the meeting.

99.     On September 18, 2014, Huang again emailed Signature to inquire whether Broadridge had mailed the Proxy Statement to Linkwell shareholders in the U.S. holding their shares in street name and, if not, how much time Broadridge needed to complete the mailing.

100.    Sidley already knew that Broadridge had not done the mailing, however, which is what Sidley had intended from the outset.  Sidley has handled hundreds of merger transactions where Broadridge has been involved in the provision of shareholder notice to brokers holding stock on behalf of their customers, and knew that the Notice and Proxy Statement would not be sent to shareholders, including Plaintiff, which held their Linkwell stock in street name, by or before the Special Meeting.  Sidley knew that Broadridge required the Notice and Proxy Statement to be mailed 30 calendar days prior to the meeting date.  Sidley not only knew that there was not enough time for Broadridge to do the mailing to the brokers on the Cede list, but Sidley also calculated that by the time the Notice and Proxy Statement were delivered, it would

be too late for Plaintiff to move for an injunction of the Freeze-Out Merger, and past time for shareholders to exercise appraisal rights.

101.    On September 18, 2014, shortly before the vote at the Special Meeting was to occur in China, Paskowitz called Plaintiff's counsel to advise that Sidley was no longer representing Linkwell in negotiating a memorandum of understanding because Linkwell was now controlled by another group and Xuelian and Wei were no longer directors of the Company. Paskowitz explained that Linkwell had entered a transaction and that Plaintiff should have or would receive a proxy statement.  Paskowitz further stated that he would be appearing as counsel for Xuelian and Wei in the Derivative Action.

102.    Sidley billing records indicate that before Paskowitz spoke with Plaintiff's counsel, he conducted a strategy call with Brody on communicating the message above.

103.    On September 19, 2014, the Special Meeting was held and the Merger Agreement was approved by Xuelian, Wei and parties controlled by or affiliated with them.

104.    After the Merger Agreement was approved, Sidley filed amended and restated articles of incorporation ("Amended Articles of Incorporation") on behalf of Linkwell with the Florida Department of State which authorized the indemnification of the Company's current and former officers and directors to the fullest extent provided by applicable law and included the advancement of legal expenses for all matters pending, existing or occurring at or prior to the approval of the Merger Agreement.

105.    Sidley also filed articles of merger for Linkwell ("Articles of Merger"), which attached a plan of merger ("Plan of Merger") and amended Bylaws with the Florida Department of State, which set forth, among other things, that the Freeze-Out Merger became effective on

September 19, 2014, after the Plan of Merger and Merger Agreement were adopted by the Linkwell shareholders at the Special Meeting.

106.    Upon information and belief, neither the Amended Articles of Incorporation nor the Articles of Merger were publicly available on the Florida Department of State website until October 26, 2014.

### C.    Sidley's Deception Results in the Notice and Proxy Statement not being Provided to Street Name Record Holders

107.    On September 25, 2014, Jue emailed Signature to inquire about the mailing of the Notice by Broadridge and to report that "[o]ur ([Likang Disinfectant's]) attorney said she hasn't received any feedback from you yet."  Signature subsequently responded that it would contact Broadridge to confirm whether mailing was completed with no solicitation of proxy.

108.    On October 6, 2014, Signature emailed Jue a copy of a subpoena for records from Plaintiff and requested that Jue advise Signature whether Linkwell had any objections to the subpoena by the close of business October 8.  On October 8, Signature sent another email to Jue, Chan and Wang requesting, in light of the failure to respond to the prior communication, whether Signature could comply with the subpoena.  Chan forwarded the email to Brody and Paskowitz, Sidley counsel purporting to simultaneously represent Linkwell, Xuelian and Wei in the Derivative Action, and, upon information and belief, inquired what response, if any, should Signature provide.

109.    On October 9, 2014, Paskowitz responded to Chan's email and carbon copied Brody and Huang.  Upon information and belief, the email stated Sidley's position on objections to the subpoena.  On the same date, Huang forwarded the email from Paskowitz to Jue.  Jue then created a new email to respond to Signature's request for approval to comply with the subpoena. The email, which carbon copied only the members of the Buyout team (Chan and Huang),

identified by number the subpoena requests to which Linkwell purportedly objected, and requested a Linkwell shareholders list dated as of September 19.

110.    In response, Signature sent an email that stated: "we need your attorney to object through the courts by filing a motion in Florida by next Tuesday October 14th if their [sic] is a objection of any part of their request …."  Signature did not receive a reply to this email.  On October 15, Signature sent another email to Jue, Chan and Huang stating that it was "left with no choice but to comply with the subpoena at this time."

111.    On October 15, 2014, Jue emailed Signature (and copied Chan and Huang) concerning the fact that Linkwell shareholders who held in street name did not receive notice of the Special Meeting and the Proxy Statement, writing:  "I am afraid that these street holders of Linkwell Corporation haven't received the Notice regarding the Merger, since there is still some trading of Linkwell stock recently.  Could you please relay the enclosed letter to the Broadridge and push it to inform all these brokers about the completion of the merger."

112.    The email attached a signed copy of a letter which disclosed that the Merger Agreement was approved by the Company's shareholders at the Special Meeting on September 19, 2014, that the Articles of Merger were filed with the Florida Department of State on the same day and, as a result of the merger, that Linkwell became a wholly owned subsidiary of Leading First.  The letter further disclosed that, as of October 15, no shareholders had exercised their appraisal rights.

113.    On October 23, 2014, Linkwell shareholder Van Mardirosian sent an email to Xuelian stating the following:

> Dear Mr. Bian,
>
> Hope all is well with you.

You have not responded to my previous e-mails. I would greatly appreciate is if you let me know if Linkwell is still in operation, still in business. If still in business why the decision was made not to have any SEC filings or issue and financial or quarterly results.

As a shareholder I think I have the right to know that so please inform me of what is going on with the company.

114.    According to a certification provided by Securities Transfer Corporation ("STC"), the paying agent for Linkwell in connection with the Freeze-Out Merger, the Notice and Proxy Statement were not emailed to *Linkwell shareholders of record until October 29, 2014*, more than a month after the Merger Agreement was purportedly approved at the Special Meeting and Articles of Merger were filed with the Florida Department of State.

115.    On November 6, 2014, Plaintiff's shares of Linkwell stock were unilaterally cancelled from his brokerage account at TD Ameritrade, contemporaneous with the receipt of $0.88 per share for his Linkwell stock.

116.    Plaintiff was not mailed the Notice or Proxy Statement, nor was his broker TD Ameritrade.   TD Ameritrade confirmed in a letter to Plaintiff that it received no materials regarding the Freeze-Out Merger to forward to clients that owned Linkwell stock.

117.    By November 2014, however, it was apparent that Sidley's manipulation of the delivery of the Notice and Proxy Statement to Broadridge did not just delay the mailing of the same to street name holders; it had caused Broadridge to not do the mailing at all.

118.    On November 6, 2014, Huang sent an email to Signature which complained that it has been long enough to confirm whether Broadridge completed the mailing to street name holders and inquired whether Signature had heard anything from Broadridge at all.

119.    On November 11, 2014, Huang sent an email to STC that carbon copied Chan and requested information regarding whether payment of the merger consideration was made to Cede & Co. and whether the shares held were cancelled.  Chan added in a separate email to STC that

32

"[t]he payment to Cede … needs to happen ASAP."  STC confirmed from FINRA that Cede & Co. received the merger consideration and allocated it to its client record holders (brokers and banks) on November 6, 2014.

120.    On February 1, 2015, Huang emailed STC requesting immediate confirmation whether distribution of the merger consideration was made to TD Ameritrade.

121.    On February 12, 2015, Chan emailed STC requesting an additional update on the distribution of the merger consideration.  The email further stated that Linkwell "would like to know where we stand with respect to nominee holders under Cede ….  In particular, have you received the stock certificate for a small shareholder by the name of Frederick Siegmund?"

## III.    THE FREEZE-OUT MERGER WAS CONSUMMATED THROUGH AN UNFAIR PROCESS AND AT AN UNFAIR PRICE

122.    The consummation of the Freeze-Out Merger was procured through the use of a manipulative and deceptive device, artifice to defraud or acts which operated or could act as a fraud of deceit, willful nondisclosure, unlawful conduct, unfair dealing and/or impermissible conflicts of interest.

123.    On October 26, 2014, Plaintiff discovered the Articles of Merger and the accompanying documents on the Florida Department of State website.

124.    Prior to October 26, 2014, Plaintiff had no knowledge of any actual or potential go-private merger transaction between Linkwell, Leading First and Leading World.

125.    Plaintiff and other similarly situated shareholders that held their Linkwell stock in street name were intentionally not provided statutory notice with respect to the Freeze-Out Merger by Sidley, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes.

126.    The wrongful withholding of statutory notice was intended to and did in fact unfairly deprive Plaintiff and other Linkwell shareholders of the opportunity to: (a) evaluate

whether the material terms of the Merger Agreement, including the $0.88 per share merger consideration, were fair; (b) exercise appraisal rights; or (c) move to enjoin the Freeze-Out Merger.

127.    If Plaintiff had been provided with the requisite notice, he would have moved in the Derivative Action to enjoin at the Special Meeting.   Such motion would have been meritorious because the Proxy Statement is materially, manifestly incomplete and lacked basic information relevant to a material transaction for the sale of 100% of Linkwell's equity.

128.    The Proxy Statement prepared solely by Sidley, while not distributed to Plaintiff or other similarly situated shareholders, nonetheless falsely portrays the Freeze-Out Merger as an arm's length transaction between Linkwell and a third party buyer.  It was not.  It was a sham transaction orchestrated by Sidley from beginning to end with all the other parties playing passive roles.

129.    According to the Proxy Statement prepared by Sidley, in February 2014 Yinling contacted Linkwell, Xuelian and/or Wei to express an interest in acquiring all of the outstanding shares of the Company.  In March 2014, Xuelian and/or Wei, on behalf of Linkwell, purportedly executed a non-disclosure agreement with Yinling which commenced its business, financial and legal due diligence following the execution of that agreement.   On April 12, 2014, Yinling requested that negotiations with Linkwell be conducted on an exclusive basis for six months with no solicitation of other proposals or negotiations with other bidders, and Linkwell granted Yinling's request.

130.    Records filed with SAIC show that Yinling was not even formed until April 18, 2014.  Moreover, in response to Plaintiff's discovery requests concerning any due diligence or

valuation sought by the parties to the Freeze-Out Merger, Sidley represented that "after a reasonable search, no responsive documents exist."

131.    The Proxy Statement sets forth that in early April 2014 Linkwell engaged Sidley as its counsel in a possible transaction with Yinling.   This statement is contradicted by the Likang Engagement Letter which identifies Likang Disinfectant as Sidley's only client therein. It further states that:

> The Client does not include any subsidiary or affiliate of such entity, nor any of its or their respective shareholders, directors, officers or employees.   Accordingly, our representation of the Client in the Matter will not give rise to any conflict of interest if any of our other clients are adverse to any subsidiary or affiliate of the Client.

132.    On July 9, 2014, Yinling also engaged Sidley for the purpose of consummating the Freeze-Out Merger.   The fact that Sidley acted as counsel for both Likang Disinfectant and Yinling is not disclosed in the Proxy Statement.

133.    The Proxy Statement sets forth that, on July 25, 2014, Yinling submitted a preliminary non-binding proposal ("Proposal Letter") to Linkwell to acquire all of the Company's outstanding stock in a merger transaction for $0.18 per share.   The Proxy Statement does not disclose that the Proposal Letter was prepared by Sidley.

134.    The Proxy Statement does not disclose any facts about the Derivative Action, the value of the claims asserted by Plaintiff on behalf of Linkwell or disclose the value of those claims to the Company.

135.    The Proxy Statement further sets forth that the Board, Yinling and Sidley held various meetings, of which there are no record, to discuss material issues arising from a draft merger agreement and to determine the positions of the Board with respect to those issues. Sidley also purportedly held a number of conference calls with the Company to summarize and

explain the key terms of the merger agreement and communicated the Board's position on key issues to Yinling.  According to the Proxy Statement, on August 10, 2014, the parties reached an agreement in principle on all major issues, including the $0.88 per share offer price and a non-solicitation provision pursuant to which Linkwell was prohibited from actively soliciting alternative transaction proposals.  It would appear there was no meeting on August 10 and no record of such alleged meeting exists.  Sidley billing records do not show time billed by any of its attorneys on the Buyout matter from August 8 to August 10, 2014.

136.   Most of the events described in the Proxy Statement never occurred and were simply referred to in the "Timetable for the Merger and Acquisition of Linkwell Corporation," which Sidley prepared and circulated on April 16, 2014.  The timetable sets forth tentative dates by which events orchestrated by Sidley were to be completed but never formally took place.  Notably absent from the timetable are action items relevant to any material transaction for the sale of all or substantially all of a company's equity: *e.g.,*  the preparation of Linkwell's financial results for the periods proximate to the vote at the Special Meeting, projections of future performance, financial analyses, fairness opinion with respect to the merger consideration, etc.

137.   The Merger Agreement annexed to the Proxy Statement was also incomplete insofar as it does not attach the referenced schedules.

138.   The Proxy Statement prepared by Sidley also fails to disclose Sidley's debilitating conflicts of interest that violated the Rules of Professional Conduct.  Sidley did not disclose that it was engaged to provide legal advice and assistance to both Likang Disinfectant and Yinling in connection with the sale of Linkwell and a post-merger restructuring of the disinfectant business in preparation for a domestic public offering.  Sidley did not disclose that the real parties in interest in the Freeze-Out Merger were Xuelian and Wei.  Nor did Sidley disclose that at the

same time that it was engaged to simultaneously represent Likang and Yinling in the Freeze-Out Merger, it was also engaged to represent adverse parties Linkwell and Xuelian and Wei in the Derivative Action for the purpose of securing its dismissal.

139.    The Proxy Statement does not disclose that the Amended Articles of Incorporation and the Merger Agreement were drafted and approved so that any legal fees and expenses incurred by and any judgments or liabilities obtained against Xuelian and Wei, among others, in connection with the claims asserted in the Derivative Action, or the claims arising out of the Freeze-Out Merger, would be paid or advanced by Linkwell.

140.    The intentional withholding of statutory notice from shareholders that held their Linkwell stock in street name was a strategic decision made by Sidley.

141.    Because Plaintiff was not provided statutory notice, he did not know there was a material transaction to acquire 100% of the equity of Linkwell, and did not discover the Freeze-Out Merger until after it was consummated.

142.    The failure to provide Plaintiff and other Linkwell shareholders with timely notice was inherently unfair and ensured that the assets of Linkwell could be obtained by Xuelian, Wei and Yinling at a grossly inadequate price.

143.    As indicated above, the principal purpose of the Freeze-Out Merger was to divest Plaintiff of standing to continue to prosecute the claims in the Derivative Action.  Xuelian and Wei faced substantial exposure for their fraud, self-dealing and breaches of fiduciary duty in connection with the 2012 Transaction.  By undertaking the Freeze-Out Merger, Sidley intended to cause the forced sale of Plaintiff's Linkwell stock so that Xuelian and Wei could avoid further scrutiny of their unlawful and/or fraudulent acts, self-dealing and other breaches of fiduciary duty by the District Court.

144.     There was no legitimate business purpose to justify the Freeze-Out Merger and none has been offered or provided.

145.     Even if Plaintiff had been provided with statutory notice, the process employed in connection with the Freeze-Out Merger would still have been unfair.

146.     Additionally, the Proxy Statement does not contain any current financial statements (audited or unaudited) for Linkwell, Linkwell Tech, Likang Disinfectant or any other revenue generating subsidiary company.  The Proxy Statement also does not contain a fairness opinion from a financial advisor to address the adequacy or inadequacy of the $0.88 per share merger consideration for Linkwell stock.

147.     Corporate filings by Likang Disinfectant with SAIC reflect that it had: RMB 254,020,000 million (U.S. $40,926,924) (based on December 31, 2014 conversion rate of 0.1611169372) in total assets and RMB 28,920,000 (U.S. $4,659,502) in total liabilities for year-end 2014; RMB 189,710,000 (U.S. $31,336,466) (based on December 31, 2013 conversion rate of 0.1651808859) in total assets and RMB 22,177,000 (U.S. $3,663,217) in total liabilities for year-end 2013; and RMB 170,684,480 (U.S. $27,391,515) (based on December 31, 2012 conversion rate of 0.1604804074) in total assets and RMB 23,062,248 (U.S. $3,701,039) in total liabilities for year-end 2012.  The same filings also reflected net profits of RMB 15,613,894 (U.S. $2,505,724), 20,180,000 (U.S. $3,333,350) and 6,050,000 (U.S. $974,757) for the years 2012, 2013 and 2014, respectively.  This information, while available, was not disclosed in the Proxy Statement.

148.     The merger consideration paid to acquire Linkwell has no relation to the Company's net assets, enterprise value or the value of the derivative claims.  For year-end 2014, Likang Disinfectant reported in excess of $40.9 million in total assets and just under $4.7 million

in total liabilities.   A calculation of share price based on a valuation of net assets at approximately $36.2 million would yield a $65.94 price per share ($36.2 million ÷ 549,000 outstanding shares of Linkwell stock).

149.   The $0.88 merger consideration paid to Linkwell shareholders, like everything else done in the Freeze-Out Merger, was determined by Sidley.   No other advisors, legal or financial, are identified in the Proxy Statement.

150.   The $0.88 merger consideration was approved by Xuelian and Wei, the controlling shareholders of Linkwell, and parties that they control or with whom they are affiliated without solicitation of other bids.   No other bids were solicited because Xuelian, Wei, their affiliates and, most importantly, Sidley, stood on both sides of the deal and because Xuelian maintained a controlling interest in Likang Disinfectant after the Freeze-Out Merger was concluded.   This information was also not disclosed in the Proxy Statement.

151.   As indicated above, the Proxy Statement does not disclose the existence of the Derivative Action or attempt to value the claims pending against Xuelian and Wei, among others, for their unlawful acts and/or fraud and breaches of fiduciary duty in connection with the 2012 Transaction.   The value of those claims is material because Xuelian and Wei sought to acquire Linkwell's subsidiary disinfectant business for themselves without paying *any* consideration to the Company for its assets.   The $0.88 per share merger consideration did not include any value for those claims.

152.   Corporate filings with SAIC for Likang Disinfectant indicate that, prior to December 9, 2014, Linkwell Tech owned 100% of its equity.   Corporate filings for Likang Disinfectant as of December 9, 2014 show that Zhongyou Pharmaceutical owned 83.83% of the equity, and that Linkwell Tech's equity ownership was reduced to 16.17%.   Xuelian, whose

Linkwell shares were acquired by Yinling in the Freeze-Out Merger, was, until recently, the majority shareholder (51.17%) of Zhongyou Pharmaceutical and owned 51.17% of its equity.

153.    On November 15, 2016, Yuyue acquired a 61.62% equity interest in Zhongyou Pharmaceutical for approximately $126 million.   As a majority shareholder of Zhongyou Pharmaceutical, a substantial portion the proceeds from the equity purchase by Yuyue was paid Xuelian.

## IV.    SIDLEY'S ACTS IN FURTHERANCE OF THE SCHEME TO DEFRAUD AFTER CONSUMMATION OF THE FREEZE-OUT MERGER

### A.    Sidley Misrepresents to the District Court that Xuelian and Wei are no longer Directors or Officers of Linkwell

154.    As described above, on January 16, 2014, the District Court issued the Omnibus Order compelling Linkwell, among others, to answer interrogatories and produce documents responsive to Plaintiff's discovery requests.

155.    On April 18, 2014, Plaintiff moved for an Order of Contempt against Linkwell as a result of the willful non-compliance with the Omnibus Order.   Plaintiff's motion was unopposed.   An Order of Contempt for failure to comply with the Omnibus Order was issued against Linkwell on April 1, 2015 (D.E. 258).

156.    On October 31, 2014, while the motion for an Order of Contempt was pending, Plaintiff filed a second motion for an Order of Contempt (D.E. 216) after the discovery of the Freeze-Out Merger.

157.    On November 17, 2014, Xuelian and Wei filed papers opposing Plaintiff's motion (D.E. 219, 219-1, 219-2).   Those opposition papers included declarations from Xuelian and Wei, which were prepared by Sidley attorneys.   The declarations affirmed under the penalty of perjury that, effective July 18, 2014, Xuelian and Wei resigned their positions as directors and officers of Linkwell and no longer held any position with the Company.

158.    Sidley billing records reflect that the declarations for Xuelian and Wei were prepared and approved for filing by Sidley attorneys Brody, Chan, Paskowitz, Huang and E. Young between November 11 and November 17, 2014.

159.    Sidley knew at the time the declarations were executed that the statements therein were false.   Sidley possessed contemporaneously executed Statements on Lost Share Certificates, each of which was signed by Xuelian on behalf of Linkwell.   The Statements on Lost Share Certificates are respectively dated November 5, 2014 and November 10, 2014, and post-date the claimed resignation by Xuelian by almost 4 months.   Sidley knew that Xuelian and Wei had not resigned from their positions at Likang Disinfectant.   Sidley knew that Xuelian and Wei managed the day-to-day affairs of Linkwell at Likang Disinfectant's offices.   Sidley also knew that Linkwell operated out of the same registered address and office space as Likang Disinfectant. Sidley thus filed or caused to be filed with the District Court declarations which it knew to be false.

160.    In January 2015, Huang emailed the Statements on Lost Share Certificates, executed by Xuelian on behalf of Linkwell, to the Company's paying agent, so that the Linkwell stock certificates could be cancelled.   Jue, Liyong and Chan were copied on the email.

161.    To date, Sidley has not disclosed to the District Court the misstatements in the declarations submitted by Xuelian and Wei.

**B.    Sidley Misrepresents that it is Counsel for Linkwell, Xuelian and Wei in the Derivative Action**

162.    On January 8, 2015, Plaintiff served requests for production of documents ("Requests") upon Xuelian and Wei.

163.    On March 11, 2015, Plaintiff filed a motion to compel in connection with the Requests.

164.    On April 10, 2015, the District Court issued an Order (D.E. 265) granting the motion to compel consistent with its oral rulings of April 9, 2015 (D.E. 285) ("April 9, 2015 Hearing Tr.").

165.    On April 14, 2015, in accordance with the Order, Buchanan Ingersoll & Rooney P.C. ("Buchanan") (counsel appearing for Xuelian and Wei in the Derivative Action) delivered a letter to Sidley, in its capacity as counsel for Linkwell in the Freeze-Out Merger (as set forth in the Proxy Statement), and requested copies of all documents responsive to the Requests in the Company's possession, custody or control.

166.    Sidley billing records between April 14 and April 28, 2015 show that Buchanan and Sidley coordinated on a strategy as to how Xuelian and Wei would respond to the Order.

167.    On April 28, 2015, Paskowitz delivered a letter to Buchanan that was signed by Chan and stated, in relevant part, the following:

> We ([Sidley]) have only been retained by Linkwell … on specific matters and are not general counsel to the Company. We have, however, consulted with our client and have consent to produce non-privileged documents that are responsive to the requests for production of documents that you attached to your letter. We have searched our files to compile such documents. Enclosed hereto are the documents.

168.    Sidley's production of Linkwell documents in response to the Order was extremely limited and provided no indication of Sidley's role as counsel for Linkwell, Xuelian and Wei in the Derivative Action.  As a result of what appeared to be material gaps in the production, Plaintiff served Sidley with a subpoena on October 20, 2015 ("Subpoena").

169.    On October 8, 2015, Xuelian and Wei moved to dismiss the Derivative Action for lack of standing.

170.    On December 4, 2015, Xuelian and Wei moved to quash the Subpoena ("Motion to Quash") in the United States District Court of the Southern District of New York (*In re Subpoena to Sidley Austin LLP*, No. 15-Misc-375) ("MC Case").

171.    In support of the Motion to Quash, counsel for Xuelian and Wei submitted a declaration which asserted, among other things, that Xuelian and Wei "shared a common interest in the outcome of the Lawsuit with each other and with … Linkwell" and that Xuelian, Wei and Linkwell have a "common cause of securing dismissal of the Lawsuit."

172.    On December 21, 2015, in apparent response to Plaintiff's argument in opposition that the interests of Linkwell, on one hand, and Xuelian and Wei, on the other, were adverse, Paskowitz filed a declaration in support of the Motion to Quash which, in relevant part, stated:

> On April 4, 2014, Sidley entered into an engagement letter with [Likang Disinfectant] to assist with a going-private transaction of Linkwell … that was then under consideration.
>
> On April 22, 2014, Sidley and [Likang Disinfectant] entered into a supplement of the April 4, 2014 engagement letter, pursuant to which Sidley agreed to represent Linkwell, [Xuelian] and [Wei] in connection with the [Derivative] Action.
>
> After service of process was effected on [Xuelian] and [Wei] in the [Derivative] Action, and each resigned as a director of Linkwell, I negotiated an extension of time for [Xuelian] and [Wei] to answer, move, or otherwise respond to the complaint.  That stipulation, however, was signed by Buchanan Ingersoll & Rooney PC ("Buchanan") on behalf of [Xuelian] and [Wei], and Sidley has not appeared on behalf of [Xuelian] and [Wei] in the [Derivative] Action.
>
> However, Sidley has continued to work with [Xuelian] and [Wei] in connection with the [Derivative] Action, including to facilitate communications between [Xuelian], [Wei], and Buchanan.
>
> Sidley has not terminated its representation of [Xuelian] and [Wei] in connection with the [Derivative] Action.

(MC Case, D.E. 19-1).

173.    At no prior time had Sidley disclosed that it simultaneously represented Linkwell, Xuelian and Wei in the Derivative Action.  On March 23, 2015, Plaintiff moved for an entry of default against Linkwell at the Court's instruction as a result of the Company's failure to appear, file or serve any responsive papers or comply with discovery.   Even though Sidley was Linkwell's counsel in the Derivative Action at the time the motion was filed, Sidley did not appear in order to oppose it.  An entry of default (D.E. 252) was issued by the Clerk of the Court against Linkwell in the Derivative Action on March 24, 2015.

174.    At no prior time did Buchanan disclose to Plaintiff or the District Court that their clients, Xuelian and Wei, and Linkwell were being jointly represented by Sidley in the Derivative Action.  To the contrary, Buchanan represented that Xuelian and Wei had no relation to the Company:

> THE COURT: So you are representing to me, as an officer of the court, that they have cut their ties and they no longer officially belong to the company, right?
>
> MR. VILLENEUVE: Absolutely, Your Honor. …

April 9, 2015 Hearing Tr. at 12:18-21.

175.    By the time of the February 8, 2016 argument on the Motion to Quash and the Motion to Compel Sidley, however, Buchanan had significantly changed its position, which the District Court duly noted:

> THE COURT: And also, counsel for defendants, okay, my recollection, and I have a couple thousand cases, but I remember repeatedly Xuelian and Wei saying, we can't get ahold of these records because we are not officers anymore of Linkwell.
>
> Counsel for plaintiff, am I off on a deserted island here?
>
> MR. HECHT: No, you're not.
>
> THE COURT: Now, without dancing around, let's address that. You were here, you argued that … they can't comply because they

44

are no longer officers of Linkwell. Do you follow me that was your main argument as a matter of fact? Address that directly.

MR. VILLENEUVE: Okay. Your Honor, I believe our position is that because they were not officers of Linkwell, they did not have legal custody and control of those documents and thus they were not required or able to produce them.

THE COURT: Well, I just had -- you are here on this case, you know, and it's represented by Sidley's pleadings that they represent these fellows personally. They represent Linkwell. Am I missing something here? You could be Fred Astaire and you won't be able to dance out of that one.

MR. VILLENEUVE: Your Honor, I'm not trying to dance. The fact that Sidley represents Linkwell and represents our clients doesn't mean that our clients have custody and control and possession of Linkwell documents. There was never a case presented and I don't know of any case that says, because your law firm represents another defendant, you have custody and control of that defendant's documents.

THE COURT: They represent Linkwell. They represent Xuelian and Wei. Do you follow me? Xuelian and Wei say we are not officers of Linkwell, repeatedly saying that in federal court, and now Sidley enters an appearance on behalf of Wei and Xuelian and Linkwell.

MR. VILLENEUVE: Your Honor, I don't think Sidley has entered an appearance on behalf of them. What we have said is we are co-counsel and so our communications with Sidley should not be discoverable and --

THE COURT: Wait. Who is co-counsel?

MR. VILLENEUVE: The law firm of Buchanan, Ingersoll & Rooney which represents Xuelian Bian and Wei Guan is co-counsel with the law firm of Sidley Austin which --

THE COURT: Who represents Xuelian and Wei and Linkwell?

MR. VILLENEUVE: Yes, Your Honor.

THE COURT: I'll just leave that speak for itself.

…

45

MR. UNGER: In August or in July, I believe, Mr. Bian and Guan, they resigned as officers and directors of Linkwell, but the attorney-client relationship did not end just because they resigned at that point. We had been retained to represent them in regard to the derivative action. And then what happened was we assisted … those two individuals --

THE COURT: Derivative action?

MR. UNGER: This action, Your Honor.

…

THE COURT: Now, you heard counsel for plaintiff saying, and he was quite correct, I have addressed all those things, I have repeatedly addressed all those things. Do you follow me.

MR. UNGER: And as I understand, Your Honor, you are suggesting --

THE COURT: You are saying this is a new argument. The firm itself is coming in and asserting, to simplify things, the same – it's for a different reason. Before they said, well, we don't have the power because we are no longer officers. But when they first came into your office, correct, they were still officers, were they not?

MR. UNGER: Yes, Your Honor.

THE COURT: Okay.

MR. UNGER: I am not addressing --

THE COURT: So there's something the matter here because if they came in and they were still officers and their first visit to you was after the derivative action was filed and they were in my court claiming that they were not officers and they no longer had the ability to produce records, tell me what I am missing here.

MR. UNGER: They did not make that claim prior to the time they resigned, Your Honor. When they --

THE COURT: They made that claim here in court.

MR. UNGER: When they made that claim, they were no longer officers and directors, that's correct. There's nothing inaccurate about that claim. At the time that they were before you and said they were no longer officers and directors, that was true. And as a result --

46

> THE COURT: Because after they came in and they were represented by you, during that time, they resigned. Is that what you are saying?
>
> MR. UNGER: They resigned in July of 2014. We had -- yes, we had been representing them --
>
> THE COURT: Okay.

Feb. 8, 2016 Hearing Tr. (D.E. 355) at 10:22 - 12:17, 44:4-11, 45:9 - 46:18.

176.    On February 10, 2016, an Order (D.E. 354) was issued denying the Motion to Quash and granting the Motion to Compel Sidley consistent with the oral rulings made on February 8.

177.    Sidley subsequently produced certain documents responsive to the Subpoena (including the Statements on Lost Share Certificates described in paragraphs 159-60 above) which confirm that Xuelian and/or Wei, at all relevant times, exercised control over Linkwell, either directly or through their management and control of Likang Disinfectant, and possessed the practical ability to obtain the documents sought in the Requests insofar as those documents reside in the shared office space of Likang Disinfectant and Linkwell in China.

178.    On April 11, 2016, the Court issued an Order (D.E. 369) ("April 11, 2016 Order") which dismissed, without prejudice, the Derivative Action for lack of standing as Plaintiff was no longer a shareholder of the Company.  On June 8, 2016, the Court issued an Order (D.E. 391) ("June 8, 2016 Order") denying Plaintiff's motion for reconsideration of the April 11, 2016 Order.  Those Orders and others have been appealed.

## DUTIES OF XUELIAN AND WEI

179.    As directors, officers and controlling shareholders of Linkwell, Xuelian and Wei each owed the Company and its shareholders the fiduciary duties of loyalty, good faith, due care

and disclosure.  The misconduct complained of herein involves culpable violations of their fiduciary obligations.

180.    By reason of their positions as fiduciaries of Linkwell, and because of their ability to control the business and corporate affairs of the Company and its subsidiaries, Xuelian and Wei each owed Linkwell and its public shareholders fiduciary duties and were required to use their ability to control and manage Linkwell in a fair, just, honorable and equitable manner, to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their own personal interests or benefits. Furthermore, as fiduciaries of a publicly held company, Xuelian and Wei each had a duty to refrain from utilizing their control over Linkwell to secrete its assets to themselves, their designees or affiliates.

181.    Xuelian and Wei each owed Linkwell and its shareholders the fiduciary obligation to act in good faith, with due care, loyalty and diligence in the management and administration of the Company's affairs, as well as in the use and preservation of its property and assets, and the highest obligations of fair dealing.

182.    Because of their positions at Linkwell, Xuelian and Wei were each aware of the wrongful conduct complained of herein, had access to adverse non-public information and were required to disclose such facts promptly and accurately to the Company's shareholders and the financial markets.

183.    Xuelian and Wei each had access to non-public information about the financial condition and operations of Linkwell, access to internal corporate documents, reports and other information, including non-public information about the business, financial condition and future

prospects, and attended management and/or board of director meetings. Xuelian and Wei were each responsible for the truthfulness and accuracy of Linkwell's public filings.

184.   To discharge their duties, Xuelian and Wei were each required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Linkwell. Thus, Xuelian and Wei were obligated to, among other things:

      a.   Manage, conduct, supervise and direct the business affairs of Linkwell in accordance with all applicable laws (including federal and state laws, government rules and regulations);

      b.   Neither engage in self-dealing, nor knowingly permit any officer, director or employee of Linkwell to engage in self-dealing;

      c.   Neither violate, nor knowingly permit any officer, director or employee of Linkwell to violate applicable laws, rules and regulations;

      d.   Prudently protect the Company's assets and ensure that Linkwell is paid an appropriate price for the disposition of its material assets and/or operations;

      e.   Exercise control and supervision over the public statements to the securities markets trading in Linkwell stock by the officers and employees of the Company; and

      f.   Supervise the preparation and filing of all financial reports or other information required by law from Linkwell, examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning each of the subjects and duties set forth above.

185.    In connection with the Freeze-Out Merger, Xuelian and Wei each stood in a fiduciary relationship with Linkwell, Plaintiff and the Company's other shareholders and owed them the highest fiduciary obligations of loyalty, good faith, fair dealing, due care and full and candid disclosure.

186.    To diligently comply with their fiduciary obligations, Xuelian and Wei were duty bound not take any action that:

        a.      Adversely affected the value provided to Linkwell or its shareholders;

        b.      Favored themselves;

        c.      Adversely affected their duty to search for and secure the best value available under the circumstances for Linkwell and its shareholders; and/or

        d.      Provided preferential treatment at the expense of Linkwell or its shareholders.

187.    Xuelian and Wei, separately and together, knowingly or recklessly violated their fiduciary duties as directors, officers and controlling shareholders, including their duties of loyalty, good faith, due care and disclosure owed to Linkwell and its public shareholders. Xuelian and Wei undertook the Freeze-Out Merger as a means to terminate the Derivative Action, avoid significant personal liability for their misconduct and deprive Linkwell of fair value for its disinfectant business that they fraudulently transferred to themselves.

188.    Xuelian and Wei stood on both sides of the Freeze-Out Merger, engaged in an unlawful fraudulent scheme, designed and enacted by their agent Sidley, to obtain for themselves and their affiliates financial benefits not equally shared by Linkwell's minority shareholders. To accomplish their unlawful objective, Sidley, Xuelian and Wei wrongfully and recklessly

deprived Linkwell's public shareholders of statutory notice, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes.

189.    Other reasons exist that challenge the fairness and propriety of the Freeze-Out Merger.  Sidley, counsel for Likang Disinfectant and Yinling in the Freeze-Out Merger, also served as counsel for Linkwell, Xuelian and Wei in the Derivative Action for the purpose of securing the dismissal of the Derivative Action.  The Proxy Statement does not disclose these disabling conflicts of interest.  It does not disclose whether Xuelian, Wei or their affiliates would have any post-merger management role or equity interest in any Linkwell related or affiliated company, such as Likang Disinfectant.  It also does not disclose that Xuelian, Wei and Yinling intended to restructure the disinfectant business upon conclusion of the merger in preparation for a domestic offering and that Sidley would serve as deal counsel for the subsequent transaction.

190.    As a result of the self-dealing and divided loyalties of Xuelian and Wei, Linkwell did not obtain any value for its assets.  Plaintiff and other similarly situated shareholders (unaffiliated with Xuelian and Wei), therefore, did not receive fair value for their Linkwell stock.

191.    Because Xuelian and Wei knowingly or recklessly breached their fiduciary duties of loyalty, good faith, due care and disclosure in connection with the Freeze-Out Merger, the burden of proving entire fairness, including all aspects of its negotiation, structure, price, terms and provision of statutory notice, is placed upon them as a matter of law.

## CLASS ACTION ALLEGATIONS

192.    Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of all Linkwell common shareholders (the "Class") whose shares of Linkwell stock were sold in connection with the Freeze-Out Merger without notice, and who were damaged thereby.

193.     Excluded from the Class are Xuelian and Wei, Sidley and its employees or agents, Yinling, Leading First and Leading World ("Class Defendants") and their subsidiaries and affiliates, all persons that voted in to approve the Merger Agreement and all persons who make a timely request to be excluded from the Class.  Plaintiff reserves the right to revise the Class definition based upon information obtained through discovery.

194.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

195.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

196.     The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiff believes that there are more than 300 members of the Class that reside in the United States.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

197.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.      Whether the federal securities laws were violated by Class Defendants' acts as alleged herein;

b.      Whether Class Defendants, by their direct involvement and participation in a scheme to cause the forced sale of stock owned by Plaintiff and the Class without any notice, employed a scheme or artifice to defraud, or engaged in acts, practices or a course of conduct

which operated as a fraud or deceit in connection with the sale of Class members' Linkwell stock;

        c.     Whether Class Defendants breached their fiduciary duties and/or aided and abetted breaches of fiduciary duties to Plaintiff and the Class as alleged herein;

        d.     Whether Class Defendants conspired to acquire 100% of the equity of Linkwell through an unlawful and unfair process; and

        e.     Whether $0.88 per share was fair value for the Linkwell stock owned by Plaintiff and the other members of the Class.

198.   Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants as described above.

199.   Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other member of the Class he seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation.  The interests of the Class will be fairly and adequately protected by Plaintiff, who intends to prosecute this action vigorously.

200.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The injury or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants.  It would be impracticable for Plaintiff and the members of the Class to individually seek redress for Class Defendants' wrongful conduct.

201.    Even if Class members could afford individual litigation, the court system could

not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and

increases the delay and expense to all parties and to the court system.  By contrast, the class

action device presents far fewer management difficulties, and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court.

### CAUSES OF ACTION

### COUNT I

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND
RULE 10B-5 PROMULGATED THEREUNDER
(Against Sidley, Xuelian and Wei)**

202.    Plaintiff incorporates by reference and realleges each and every allegation in

paragraphs 1-201 above, as though fully set forth herein.

203.    By their acts, transactions and courses of conduct, as alleged in paragraphs 22-24,

26-35, 63-68, 72-78, 80-102, 111-15, 117, 125-27, 149, 157-61, 165-68, 171-73, 177 and 185-91

above, Sidley, Xuelian and Wei knowingly and/or recklessly deceived the Class, including

Plaintiff, in connection with the forced sale of their Linkwell stock by the failure to provide the

Class with statutory notice concerning the Freeze-Out Merger, with the intention of depriving

them of the right and opportunity to seek an injunction or exercise their other legal rights.

204.    Sidley, Xuelian, and Wei each violated Section 10(b) of the Exchange Act and

Rule 10b-5(a) and (c) by covertly engineering the Freeze-Out and refusing to disclose any

material fact regarding the same to Plaintiff and the Class, which operated as fraud and deceit

upon Plaintiff and the Class, which resulted in the unlawful divestiture of their Linkwell stock –

through the unilateral sale of their shares and without payment of fair value therefor, and

improperly prevented Plaintiff and Class members from moving to enjoin the Freeze-Out Merger

prior to its consummation.  Sidley was the mastermind and architect of the Freeze-Out Merger

and directly participated in the fraudulent activity as the principal actor on behalf of all parties involved.

205.    As directors, officers and controlling shareholders of Linkwell, Xuelian and Wei had a fiduciary obligation to disclose truthful information that would be material to Linkwell shareholders in compliance with applicable laws and regulations.  In connection with the Freeze-Out Merger, Xuelian and Wei had a fiduciary duty to Plaintiff and the Class to disclose that the Company had entered into a material transaction for the sale of 100% of its equity to Yinling.  Xuelian and Wei breached that duty to Plaintiff and the Class.  Sidley, as their agent, knowingly violated these obligations.

206.    As counsel for Linkwell in the Freeze-Out Merger, Sidley had a fiduciary duty to represent the interests of the Company and its shareholders.  Sidley breached that duty when it stood on both sides of the Freeze-Out Merger when it represented both the seller and purchaser.

207.    As the sole legal counsel acting as the principal in the Freeze-Out Merger and retained to take all action necessary to consummate the same, Sidley had the duty to ensure that it complied with all applicable laws and regulations.  Sidley, acting on behalf of Xuelian and Wei, knew it had a duty to disclose all material facts to Plaintiff and the Class, and that, if it did, there was a serious risk that the Freeze-Out Merger would have been enjoined.  In direct disregard of that known duty, Sidley advised Xuelian and Wei that by not giving notice they would avoid an injunction motion by not providing notice to Plaintiff and the Class.   In furtherance of the scheme to prevent disclosure of the Freeze-Out Merger, Sidley misrepresented and/or omitted to state facts with the intention to deceive Plaintiff about the nature and scope of its representation of Linkwell, Xuelian and/or Wei.  Plaintiff was in fact deceived by Sidley's misrepresentations and/or omissions.

208.     Pursuant to Sections 607.0705 and 607.1103 of the Florida Statutes, Xuelian, Wei and Sidley were obligated to timely furnish notice regarding the Freeze-Out Merger and shareholder appraisal rights to all Linkwell shareholders at least 10 days in advance of the Special Meeting.   Through its involvement in the process to furnish statutory notice through Broadridge, Sidley wrongfully intended that notice be received by Plaintiff and the Class sometime after the Freeze-Out Merger concluded.   Sidley's deception in connection with a regulated process resulted in statutory notice not being furnished at all.   Notice of the Freeze-Out Merger was not provided timely to any public shareholders in street name, including Plaintiff.

209.     The knowing and/or grossly reckless nondisclosure of any facts regarding the Freeze-Out Merger by Sidley, Xuelian and Wei operated as a fraud and deceit upon Plaintiff and the other members of the Class.

210.     The facts alleged herein give rise to a strong inference that Sidley acted with scienter.   Sidley knew, or with extreme recklessness, disregarded its duty to provide all Linkwell shareholders with notice regarding the Freeze-Out Merger and that their affirmative acts to cause the forced sale of Linkwell stock and deprive Plaintiff and members of the Class of any opportunity to move to enjoin the Freeze-Out Merger or seek other appropriate legal remedies would operate as a fraud and deceit upon Plaintiff and the Class.   Sidley knew that the purpose of the Freeze-Out Merger was to divest Plaintiff of his Linkwell stock and standing to continue to prosecute the claims asserted in the Derivative Action against Xuelian and Wei, among others. Sidley knew, or recklessly disregarded, that its representation of Linkwell, Xuelian and Wei in the Derivative Action constituted an impermissible conflict of interest; however, it accepted the retention to ensure that there would be no interloper or deal litigation to frustrate consummation

of the Freeze-Out Merger.  Sidley never made a formal appearance in the Derivative Action, and only disclosed its representation of Linkwell, Xuelian and Wei when it had no other alternative.

211.   Xuelian and Wei also acted with scienter.  They each knew, or with extreme recklessness, disregarded their duty to provide all Linkwell shareholders with notice regarding the Freeze-Out Merger and that they specifically retained Sidley to cause the forced sale of Linkwell stock and deprive Plaintiff and members of the Class of any opportunity to move to enjoin the Freeze-Out Merger or seek other appropriate legal remedies, and that Sidley's affirmative actions would operate as a fraud and deceit upon Plaintiff and the Class.  Xuelian and Wei knew that the purpose of the Freeze-Out Merger was to divest Plaintiff of his Linkwell stock and standing to continue to prosecute the claims asserted in the Derivative Action.  Xuelian and Wei knew that Plaintiff's continued prosecution of the Derivative Action jeopardized their ability to exercise unfettered control over Linkwell Tech, Likang Disinfectant and Likang Biological.

212.   Sidley, Xuelian and Wei carried out a deliberate scheme to deceive or defraud Plaintiff and the Class.  Sidley was involved in every aspect of the scheme and acted as the agent of Xuelian and Wei to achieve its fraudulent objectives.

213.   Sidley, directly, and as agent and the engineer for Xuelian and Wei, by the use, means or instrumentalities of interstate commerce and/or the mails, made or substantially participated in the unlawful and/or fraudulent conduct described above.

214.   As a direct and proximate result of the wrongful conduct of Sidley, Xuelian and Wei, Plaintiff and the other Class members suffered damages in connection with the sale of their Linkwell stock for substantially less than fair value.

215.   Sidley, Xuelian and Wei are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT II

**BREACH OF FIDUCIARY DUTY**
**(Against Xuelian and Wei)**

216.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-201 above, as though fully set forth herein.

217.    As directors, officers and controlling shareholders of Linkwell at the time they determined to undertake the Freeze-Out Merger, Xuelian and Wei owed Plaintiff and the Class fiduciary obligations of loyalty, good faith, due care and disclosure.

218.    Xuelian and Wei violated their fiduciary obligations by determining to covertly enter and consummate the Freeze-Out Merger for the purpose of: (a) terminating the claims asserted against them in the Derivative Action; (b) retaining their interest in Linkwell Tech and Likang Disinfectant without paying Linkwell fair value therefor; and (c) without regard to the fairness of the Freeze-Out Merger to Plaintiff and the Class.

219.    By their acts, transactions and courses of conduct, as described in paragraphs 18, 20-22, 62-63, 65, 68, 81-82, 87, 91-92, 103-05, 111, 115, 125-27, 140-47, 149-51, 157, 159-60, 177 and 185-91 above, Xuelian and Wei, individually and acting as part of a common plan, advanced their interests at the expense of Plaintiff and the Class.

220.    The Freeze-Out Merger was implemented by and for the benefit of Xuelian and Wei, who stood on both sides of the transaction.  As such, Xuelian and Wei must establish the entire fairness of the transaction.

221.    Xuelian and Wei breached their fiduciary duties to Plaintiff and the Class by, among other things:

a.       Unlawfully and unfairly depriving Plaintiff and other public shareholders of Linkwell that held their stock in street name statutory notice of the Freeze-Out Merger and their appraisal rights, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes;

b.       Failing to properly value Linkwell for purposes of the Freeze-Out Merger, including the value of the claims asserted in the Derivative Action;

c.       Standing on both sides of the Freeze-Out Merger and thus failing to properly maximize the value of Linkwell to its public shareholders;

d.       Agreeing to consummate the Freeze-Out Merger at a price that does not adequately reflect Linkwell's true value;

e.       Failing to ensure a fair process;

f.       Failing to disclose all material information that would allow Linkwell public shareholders to cast a fully informed vote on the Freeze-Out Merger;

g.       Failing to disclose all material information about the Special Meeting so as to allow Linkwell public shareholders to vote on whether to approve the Merger Agreement;

h.       Causing Linkwell to retroactively and prospectively indemnify them for all costs and expenses incurred in the Derivative Action and in connection with the Freeze-Out Merger; and

i.       Failing and/or refusing to disclose that after the Freeze-Out Merger was consummated, Xuelian would retain the controlling equity interest in Likang Disinfectant.

222.   As directors, officers and/or controlling shareholders of Linkwell, Xuelian and Wei dominated and controlled the Company's business and corporate affairs and were in possession of non-public information concerning the assets, business and future prospects of Linkwell, Linkwell Tech, Likang Disinfectant and Likang Biological.   Thus, there was an

imbalance and disparity of information between Xuelian and Wei, on one hand, and the public shareholders of Linkwell, on the other, that made it inherently unfair for Xuelian and Wei to pursue any transaction where they obtained disproportionate benefits at the expense of the Company's public shareholders.

223.    By reason of the foregoing acts, practices and course of conduct, Xuelian and Wei failed to exercise ordinary care and diligence in discharging their fiduciary obligations to Plaintiff and the Class.

224.    Xuelian and Wei engaged in fraud, self-dealing, did not act in good faith towards Plaintiff and the Class and failed to disclose material facts regarding the Freeze-Out Merger in breach of their fiduciary obligations to Plaintiff and Class members.

225.    As a direct and proximate result of the foregoing breaches of fiduciary duty by Xuelian and Wei, Plaintiff and Class members suffered significant damages.

226.    Xuelian and Wei are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT III

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Sidley, Yinling, Leading First and Leading World)

227.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-201 above, as though fully set forth herein.

228.    Sidley, Yinling, Leading First and Leading World aided and abetted and rendered substantial assistance in the wrongful conduct complained of in paragraphs 217-26.  In taking such actions to substantially assist the commission of wrongdoing complained of, Sidley Yinling, Leading First and Leading World acted with knowledge of the primary wrongdoing, and were aware of their overall contribution to and furtherance of the wrongdoing.

229.    Sidley, Yinling, Leading First and Leading World provided material support to Xuelian and Wei in the Freeze-Out Merger.

230.    Sidley, Yinling, Leading First and Leading World knew that Xuelian and Wei were Defendants in the Derivative Action and that the claims against them involved serious charges of wrongdoing in breach of their fiduciary duties to Linkwell and its public shareholders.

231.    Sidley, Yinling, Leading First and Leading World knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary duties to Plaintiff and the Class when they determined to undertake a going-private merger transaction to terminate the then pending claims in the Derivative Action without providing notice to all of the Company's shareholders, including Plaintiff.

232.    Sidley, Yinling, Leading First and Leading World knew that the Freeze-Out Merger was not an arm's length transaction as all parties thereto were represented by the same legal counsel and that Xuelian and Wei stood on both sides of the transaction.

233.    Sidley, Yinling, Leading First and Leading World knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary duties to Plaintiff and the Class when they approved and recommended approval of the Freeze-Out Merger for grossly inadequate consideration (less than $500,000).

234.    Sidley, Yinling, Leading First and Leading World also knew that Plaintiff and the Class were not provided with statutory notice with respect to the Freeze-Out Merger, in violation of Florida law.

235.    As described in paragraphs 10-12, 18, 21-22, 24-29, 31-35, 40, 60-65, 68, 73, 78, 80-90, 97-105,  117-21, 128-36, 138-43, 146-49, 151, 156-61, 162-73 and 177 above, Sidley provided substantial assistance to Xuelian and Wei by, among other things:

a.    Undertaking the representation of Likang Disinfectant and Yinling in the Freeze-Out Merger despite knowledge that the interests of Likang Disinfectant and Yinling were adverse and that such representation violated the Rules of Professional Conduct (ABA Model Rules of Professional Conduct 1.7 and 1.13; New York Rules of Professional Conduct 1.7 and 1.13) irrespective of the waivers obtained;

b.    Undertaking the representation of Linkwell, Xuelian and Wei in the Derivative Action despite knowledge that the interests of Linkwell were adverse to the interests of Xuelian and Wei and that such representation violated the Rules of Professional Conduct (ABA Model Rules of Professional Conduct 1.7 and 1.13; New York Rules of Professional Conduct 1.7 and 1.13);

c.    Condoning, acquiescing, assisting, acting in concert and/or participating in the actions of Xuelian and Wei to procure through fraud, deceit and/or unfair dealing the consummation of the Freeze-Out Merger for the purpose of terminating the claims in the Derivative Action and obtaining control of Likang Disinfectant;

d.    Providing legal advice and assistance to Xuelian, Wei, Yinling, Leading First and Leading World for the purpose of entering into and consummating the Freeze-Out Merger;

e.    Omitting to disclose the following material information in the Proxy Statement:

i.    The pendency of the Derivative Action;

ii.    That a primary purpose of the Freeze-Out Merger was to terminate the Derivative Action;

iii.     That Sidley served as legal counsel for both Likang Disinfectant and Yinling in the Freeze-Out Merger whereby Leading First, a wholly owned subsidiary of Yinling, acquired 100% of the equity of Linkwell for $0.88 per share; and

iv.     That Sidley served as legal counsel for Linkwell, Xuelian and Wei in connection with the claims asserted only against Xuelian and Wei in the Derivative Action and had not requested or obtained the consent or a waiver of conflicts from anyone, including the Company's public shareholders, with respect to such representation;

f.     Failing to provide any financial statements of Linkwell (audited or unaudited) or financial projections for Linkwell in the Proxy Statement;

g.     Failing to include a fairness opinion or other financial analysis of the merger consideration in the Proxy Statement;

h.     Failing to provide a valuation of the claims asserted in the Derivative Action in the Proxy Statement;

i.     Failing to ensure that Plaintiff and members of the Class were provided with notice in connection with the Freeze-Out Merger or notice of their appraisal and other rights, as mandated by the letter and spirit of Sections 607.0705 and 607.1103 of the Florida Statutes;

j.     Drafting the Amended Articles of Incorporation to shield Xuelian and Wei from personal liability arising as a result of the Derivative Action and the Freeze-Out Merger, and to indemnify Xuelian and Wei, amongst others, for fees and expenses previously incurred and to be incurred by in connection with the defense of the same;

k.     Failing to timely disclose information regarding the Freeze-Out Merger to the Court and Plaintiff;

l.      Failing to timely disclose to the Court and Plaintiff that it represented Linkwell, Xuelian and Wei in the Derivative Action;

m.      Acting in concert and complicity with Xuelian and Wei by, *inter alia*, causing Linkwell to not comply with the Orders of the Court and its obligations under the Federal Rules of Civil Procedure;

n.      Failing to inform the Court and Plaintiff that Xuelian presently exercises control over Linkwell and its corporate documents which are located at the same address as Likang Disinfectant;

o.      Participating in the preparation, review and filing of declarations by Xuelian and Wei, which declarations Sidley knew to be false and/or misleading; and

p.      Failing to inform the Court and Plaintiff regarding the falsity in the declarations of Xuelian and Wei, filed with the Court on November 17, 2014.

236.    As described in paragraphs 9-12, 29-30, 41, 129-30, 132 and 135-36 above, Yinling provided substantial assistance to Xuelian and Wei by, among other things:

a.      Agreeing, through Leading First and Leading World, to be a party to the Merger Agreement;

b.      Agreeing to the implementation of the Freeze-Out Merger and the vote to approve the Merger Agreement at the Special Meeting without the provision of notice to all of the Company's shareholders; and

c.      Providing substantial assistance to Xuelian and/or Wei in order to divest Plaintiff of his shares of Linkwell stock and thereby terminate the derivative claims asserted in this action.

237.   As a direct and proximate result of the aiding and abetting breaches of fiduciary duty by Sidley, Yinling, Leading First and Leading World, Plaintiff and Class members suffered significant damages.

238.   Sidley, Yinling, Leading First and Leading World are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT IV

### CIVIL CONSPIRACY
### (Against Sidley, Xuelian, Wei and Yinling)

239.   Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-201 above, as though fully set forth herein.

240.   As described in paragraphs 18, 21-22, 24-29, 31-35, 62-65, 68, 72-78, 82-83, 101-05, 140-42, 149-51, 157-61, 166-68, 170-73 and 177 above Sidley, Xuelian, Wei and Yinling conspired with one another to covertly enter into and consummate the Freeze-Out Merger without notice to Plaintiff or the Class, whereby the Class members' Linkwell stock was acquired through an unlawful and unfair process and at a grossly inadequate price.

241.   Sidley, Xuelian, Wei and Yinling agreed to covertly enter into the Freeze-Out Merger in order to ensure that the same was consummated before Plaintiff or any other Class member had the opportunity to: (a) evaluate whether the $0.88 per share merger consideration was fair; (b) seek an injunction; or (c) exercise appraisal rights.

242.   Xuelian and Wei violated their fiduciary obligations to Plaintiff and the Class by determining to enter into and consummate the Freeze-Out Merger without the provision of notice and without regard to its fairness to Plaintiff and the Class.

243.   Sidley Xuelian, Wei and Yinling knew that the Freeze-Out Merger was not an arm's-length transaction when all parties thereto agreed to be represented by and act singularly through Sidley.

244.   Sidley knew that Xuelian and Wei stood on both sides of the transaction.

245.   Sidley knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary obligations to Plaintiff and the Class when the Freeze-Out Merger was approved without notice to Plaintiff and the Class, and for grossly inadequate consideration.

246.   Sidley, Xuelian, Wei and Yinling knew that Plaintiff and Class members did not receive notice of the Freeze-Out Merger prior to the Special Meeting as that was Sidley's plan from the outset.

247.   In furtherance of the conspiracy, the following actions were undertaken:

a.   Sidley prepared the Proposal;

b.   Sidley was engaged by Xuelian, Wei and Yinling to take all actions necessary to consummate the Freeze-Out Merger and secure the dismissal of the Derivative Action;

c.   Sidley was retained as legal counsel for Linkwell, Xuelian and Wei for the claims asserted against Xuelian and Wei in the Derivative Action and undertook the representation with full knowledge that the interests of Linkwell were adverse to the interests of Xuelian and Wei and that such representation violated the Rules of Professional Conduct;

d.   Sidley was retained as legal counsel for Likang Disinfectant and Yinling in the Freeze-Out Merger  and undertook the representation of both with full knowledge that the interests were adverse and that such representation violated the Rules of Professional Conduct;

e.      Sidley acted on behalf of Xuelian, Wei and Yinling on all aspects of the Freeze-Out Merger in order to cause the forced sale of the stock of Linkwell's public shareholders without notice.

f.      Sidley prepared all necessary documents in connection with the Freeze-Out Merger, which were executed by Xuelian, Wei, Yinling and their affiliates, agents and/or designees;

g.      Sidley prepared and filed the Notice of Termination on behalf of Linkwell with the SEC to avoid the SEC proxy rules;

h.      Sidley prepared the Merger Agreement, Proxy Statement and Notice;

i.      Sidley scheduled the Special Meeting;

j.      Sidley, Xuelian, Wei and Yinling agreed not to provide Plaintiff or members of the Class with the Notice or Proxy Statement;

k.      Sidley manipulated the timing in which the Notice and Proxy Statement was furnished to the transfer agent to ensure that those documents were not delivered to Plaintiff and members of the Class in advance of the Special Meeting;

l.      Sidley prepared and filed the Articles of Merger, Plan of Merger and Amended Articles of Incorporation with the Florida Department of State;

m.      Xuelian and Wei caused Linkwell to consummate the Freeze-Out Merger with Yinling (through Leading First and Leading World);

n.      Sidley provided legal advice to Xuelian and Wei for the purpose of terminating their liability to Linkwell in the Derivative Action;

o.      Sidley prepared and caused declarations of Xuelian and Wei, which it knew were false, to be filed in the Derivative Action;

p.      Sidley misrepresented its status as counsel to Linkwell, Xuelian and Wei, to the District Court and Plaintiff; and

q.      Plaintiff and Class members were divested of their shares of Linkwell stock without any notice and for grossly inadequate value.

248.    As a direct and proximate result of the foregoing misconduct, Plaintiff and the Class suffered significant damages.

249.    Xuelian, Wei, Sidley and Yinling are liable to Plaintiff and the Class in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.      Declaring that the claims in connection with the Acquisition are properly maintainable as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative and appointing Wolf Haldenstein Adler Freeman & Herz LLP and Fischler & Friedman, P.A. as class counsel pursuant to Rule 23(g);

b.      Determining that Xuelian, Wei and Sidley violated the Exchange Act by reason of the fraudulent and deceitful acts, misrepresentations and nondisclosures alleged herein;

c.      Determining that Xuelian and Wei breached their fiduciary duties to the Class;

d.      Determining that Sidley, Yinling, Leading First and Leading World aided and abetted the breaches of fiduciary duties by Xuelian and Wei;

e.      Determining that Xuelian, Wei, Sidley and Yinling conspired with one another to covertly enter and consummate the Freeze-Out Merger;

f.      Awarding Plaintiff and the Class compensatory damages against all Defendants in connection with Counts I through IV above, jointly and severally, in an amount to be determined at trial, together with prejudgment interest thereon;

g.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' and experts' fees, costs and expenses; and

h.      Granting Plaintiff and the Class such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury of all issues so triable.

Dated: October 19, 2017

**FISCHLER & FRIEDMAN, P.A.**

By:      ___/s/ Michael A. Fischler___
Michael A. Fischler
Attorney Bar Number: 255531
1000 South Andrews Avenue
Fort Lauderdale, FL 33316
(954) 763-5778

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
Charles J. Hecht
Malcolm T. Brown
270 Madison Avenue
New York, NY 10016
(212) 545-4600

*Attorneys for Plaintiff*

/795718

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2017, I electronically filed a true and correct copy of

the foregoing document with the Clerk of the Court using the CM/ECF system.  The CM/ECF

system will deliver notification of filing of the above-referenced document(s) to the following

counsel of record:

Tracy A. Nicholls, Esq.
Louise McAlpin, Esq.
Holland & Knight
701 Brickell Avenue, Suite 3300
Miami, FL 33131
(305) 374-8500
tracy.nichols@hklaw.com
louise.mcalpin@hklaw.com

Counsel for Defendant:
Sidley Austin LLP

/s/ Michael A. Fischler, Esq.
Michael A. Fischler
Attorney Bar Number: 255531