UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-cv-62539 (DPG)(WCT)

FREDERICK SIEGMUND, Derivatively on
Behalf of LINKWELL CORPORATION,

Plaintiff,

v.

XUELIAN BIAN, WEI GUAN,
SONG QIANG CHEN, LING LI,
METAMINING, INC.,
METAMINING NEVADA, INC.,
CD INTERNATIONAL ENTERPRISES, INC.,
CHINA DIRECT INVESTMENTS, INC.,
CAPITAL RESOURCE MANAGEMENT CO., LTD.,
and ECOLAB INC.,

Defendants,

-and-

LINKWELL CORPORATION,

Nominal Defendant.

_____/

FREDERICK SIEGMUND, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

XUELIAN BIAN, WEI GUAN,
SIDLEY AUSTIN LLP,
SHANGHAI YINLING ASSET
MANAGEMENT CO., LTD.
LEADING FIRST CAPITAL LIMITED and
LEADING WORLD CORPORATION,

Defendants.

_____/

## [PROPOSED] FOURTH AMENDED VERIFIED SHAREHOLDERS DERIVATIVE AND CLASS ACTION COMPLAINT

Plaintiff Frederick Siegmund ("Plaintiff"), by his counsel, alleges upon personal knowledge as to his own acts, and as to all other matters based upon the investigation conducted by himself and his counsel, which includes the review of filings with the Securities and Exchange Commission ("SEC"), discovery had in this action to date and other publicly available information, as follows:

## I.    INTRODUCTION

1.    This action previously asserted derivative claims on behalf of nominal defendant Linkwell Corporation ("Linkwell" or the "Company"), against the members of the Company's Board of Directors (the "Board") and certain related and/or affiliated third parties for their misconduct in connection with an unfair, wrongfully accomplished reverse merger transaction (the "Transaction").[1]

2.    Plaintiff sought to recover damages and other relief for the benefit of Linkwell in connection with derivative claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, constructive fraud, civil conspiracy, unjust enrichment, imposition of a constructive trust against defendants Xuelian Bian ("Xuelian"), Wei Guan ("Wei"), Song Qiang Chen ("Song"), Ling Li ("Ling"), Metamining, Inc. ("Metamining"), Metamining Nevada, Inc.

_____

[1] On April 11, 2016, the Court issued an Order (ECF No. 369) ("April 11, 2016 Order") which dismissed, without prejudice, the derivative claims in this action for lack of standing as Plaintiff was no longer a shareholder of the Company – having been unlawfully and unfairly divested of his shares of Linkwell stock during the pendency of this action as a result of a squeeze out merger without statutory notice – and the Court declined to determine whether an equitable exception to the continuous ownership rule was applicable under the circumstances.  On June 8, 2016, the Court issued an Order (ECF No. 391) ("June 8, 2016 Order") denying Plaintiff's motion for reconsideration of the April 11, 2016 Order.  Plaintiff alternatively asserts direct claims in this amended pleading relating to the squeeze out merger.  Plaintiff asserts derivative claims here: (i) to preserve his rights of appeal with respect to the April 11 and June 8, 2016 Orders; and (ii) because the value of the derivative claims are a component of damages in connection with the direct claims.

("Metamining Nevada"), CD International Enterprises, Inc. ("CD Int'l"), China Direct Investments, Inc. ("China Direct"), Capital Resource Management Co., Ltd., f/k/a Capital One Resource Co., Ltd. ("Capital Resource") (CD Int'l, China Direct and Capital Resource are collectively referred to as "CD Defendants") and Ecolab Inc. ("Ecolab"), for their misconduct in connection with the Transaction, during the period commencing October 1, 2011 through the present (the "Relevant Period").

3.      Plaintiff, individually and on behalf of all similarly situated public shareholders of Linkwell, now asserts alternative class claims for federal securities violations and state law breach of fiduciary duty, aiding and abetting breach of fiduciary duty and civil conspiracy against Xuelian, Wei, Sidley Austin LLP ("Sidley"), Shanghai Yinling Asset Management Co., Ltd. ("Yinling"), Leading First Capital Limited ("Leading First" or "Parent") and Leading World Corporation ("Leading World" or "Merger Sub") (Yinling, Leading First and Leading World are collectively referred to as "Yinling") for their misconduct in connection with the design and implementation of a covert go-private merger transaction (the "Acquisition") which was consummated without providing statutory notice to Plaintiff (and other similarly situated shareholders) and resulted in the unilateral sale of the Company's sale of its stock at an unfair price.

4.      The Transaction was designed to conceal its principals' self-dealing with respect to the Company's assets and operations, to the detriment and expense of Linkwell.  After Plaintiff uncovered that the Transaction was a sham and moved for partial summary judgment, the Transaction was unwound.  Xuelian and Wei then retained Sidley as legal counsel to provide advice and assistance in the design, implementation and consummation of the Acquisition as a means to: (a) unlawfully and unfairly terminate the derivative claims in this action through the

2

secret sale of Plaintiff's shares of Linkwell stock and (b) directly acquire for themselves and their affiliates total control of the Company's disinfectant business in China.

5.      Linkwell began operations in China in the 1980s under the name Shanghai Likang Disinfectant High-Tech Co., Ltd. ("Likang Disinfectant").  Linkwell was subsequently formed to function as a public holding company and, through its direct operating subsidiaries Linkwell Tech Group, Inc. ("Linkwell Tech"), Likang Disinfectant and Shanghai Likang Biological High-Tech Co., Ltd. ("Likang Biological"), developed, manufactured, sold and distributed disinfectant healthcare products.

6.      In 2011, unable to achieve the growth desired as a U.S. publicly traded company, Xuelian and Wei began to discuss potential exit strategies for the disinfectant business with the Company's business consultant, Yuejian (James) Wang, Ph.D. ("Wang"), the Chairman and Chief Executive Officer of CD Int'l and China Direct.  The exit strategies discussed included the spin-off of the subsidiaries Linkwell Tech, Likang Disinfectant and Likang Biological from the public parent Linkwell.

7.      In January 2012, Linkwell, Linkwell Tech and Likang Disinfectant retained Shanghai Haimai Legal Firm ("Hamai Legal") to collectively represent them in a deal where the equity of Linkwell, Linkwell Tech and Likang Disinfectant would be acquired by Metamining and Ecolab.  The mechanics of the deal were largely described in two March 2012 consulting agreements executed by the parties.

8.      Pursuant to one of the consulting agreements between China Direct, Capital Resource and Metamining Nevada, Linkwell was to be delivered to Song and Ling as a "clean shell company" (a company with no debts or liabilities).  Under its terms: (a) Metamining Nevada was to become a wholly owned subsidiary of a U.S. public company (Linkwell) , with

3

the shareholders of Metamining Nevada as the controlling shareholders of the public company; (b) 9,581,973 shares of preferred stock would be issued to Song, Ling and CD Defendants; and (c) after Xuelian and Wei cancelled their 36 million shares of Linkwell common stock and a 200:1 reverse stock split took effect, Song, Ling and CD Defendants would own over 95% of the Company's equity.

9.      In the other consulting agreement between Capital Resource and Linkwell, Capital Resource was retained to handle the spin-off of Linkwell Tech from Linkwell.  As set forth in this agreement, Xuelian and Wei would acquire the Company's 90% equity interest in Linkwell Tech (and Linkwell Tech's 100% equity interest in Likang Disinfectant and Likang Biological) in exchange for the return or cancellation of 36 million shares of Linkwell stock owned by Xuelian and Wei, and the Linkwell stock held in the name of Linkwell International Capital Ltd. ("Linkwell Int'l").

10.     The Transaction was designed to enable the secret spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological from Linkwell to Xuelian and Wei in exchange for the transfer of control of the public shell to Song and Ling.  Linkwell would not receive any consideration for the spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei, or for the transfer of substantially all of the Company's equity to Song, Ling, CD Int'l and its affiliates.

11.     The Transaction was approved by Board members Xuelian and Wei, and then ratified by Song and Ling once they were appointed as directors of Linkwell.

12.     On April 2, 2012, Linkwell announced in an SEC filing that it had entered into a definitive share exchange agreement (the "Share Exchange Agreement") with Metamining, a

mining development company, to acquire its wholly owned subsidiary, Metamining Nevada, a private shell company with no assets, operations or employees.

13.     Pursuant to the publicly disclosed terms of the Transaction, Linkwell issued Metamining 9 million shares of convertible preferred stock (approximately 88% of the Company's equity) and 3 million warrants to purchase common stock for 100% of the capital stock of Metamining Nevada.  Linkwell also issued 581,973 shares of convertible preferred stock and 10 million shares of common stock (approximately 6% of the Company's equity) to China Direct and Capital Resource (together with CD Int'l, collectively referred to as "CD Defendants") for certain services provided to Linkwell, Metamining and Metamining Nevada as "consultants" in connection with the Transaction.

14.     The Board's approval of the Transaction did not constitute an appropriate exercise of business judgment.  The Company's SEC filings provided no discernable business purpose to justify giving away over 94% of the Company's equity and control of the valuable disinfectant business to acquire an inactive company with no meaningful assets, no operations, no employees and an $11.25 million financial obligation to pay for certain unconfirmed real property and mining rights in the State of Nevada.

15.     The same SEC filings also failed to disclose that the Transaction involved the sale or spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei for no consideration to the Company, and that Xuelian and Wei were engaged in negotiations with Ecolab for the near term sale of the assets, equity or operations of Linkwell Tech, Likang Disinfectant and Likang Biological.

16.     According to Ecolab's Annual Report on Form 10-K for fiscal year ended December 31, 2012 (filed with the SEC on February 26, 2013), Ecolab acquired Linkwell Tech,

Likang Disinfectant and Likang Biological as "significant majority-owned subsidiaries" sometime in 2012.  Linkwell did not disclose the sale or transfer of these subsidiaries in any of the Company's 2012 press releases or financial disclosures filed with the SEC.

17.     Immediately after the Transaction closed, and consistent with the disposition of the subsidiary disinfectant businesses, the results of the operations from Linkwell Tech, Likang Disinfectant and Likang Biological were eliminated from the Company's consolidated statements of operations and comprehensive income in its Form 10-Q filing for the quarter ended March 31, 2012.  The same Form 10-Q filing additionally disclosed in the notes to consolidated financial statements the elimination of a $2.4 million put option liability which was cancelled by the option holder, Ecolab, in March 2012.  Linkwell did not disclose that the holder of the put option was Ecolab or that a 2008 stockholders agreement between Linkwell, Linkwell Tech and Ecolab mandated that the put option be eliminated in the event that Ecolab acquired all of the outstanding equity interests of Linkwell Tech.

18.     Xuelian, Wei, Song and Ling (sometimes collectively referred to as "Director Defendants"), in breach of their fiduciary duties, caused Linkwell to issue almost all of its equity, assets and operations to themselves and Metamining, Metamining Nevada, CD Int'l, China Direct, Capital Resource and Ecolab for grossly inadequate consideration.   Metamining, Metamining Nevada, CD Int'l, China Direct, Capital Resource and Ecolab aided and abetted the breaches of fiduciary duty, rendered substantial assistance and acted with knowledge and awareness of their overall contribution to and furtherance of Director Defendants' wrongdoings.

19.     To conceal their plan to appropriate the Company's valuable assets for their own benefit, Xuelian, Wei, Song, and Ling caused Linkwell to file misleading financial reports,

information statements and press releases with the SEC that omitted to state material information with respect to the Transaction.

20.     On December 26, 2012, Plaintiff commenced this derivative action on behalf of Linkwell seeking, among other things, to recover damages equal to the fair value of 94% the Company's equity as of March 31, 2012, rescission of the Transaction and, if already disposed of, the fair value of the Company's 90% equity interest in Linkwell Tech and Linkwell Tech's 100% equity interest in Likang Disinfectant and Likang Biological.

21.     Plaintiff's prosecution of the derivative claims in this action resulted in significant portions of the Transaction being unwound at the end of 2013, to the benefit of the Linkwell.

22.     On October 17, 2013, Plaintiff moved for partial summary judgment on the derivative claim for unjust enrichment against Song, Ling, Metamining, Metamining Nevada, CD Int'l and China Direct.  Based on admissions made by Song in declarations submitted in another action before the United States District Court, Northern District of California, Plaintiff's motion asserted that there was no genuine issue of material fact as to whether Song, Ling, Metamining, Metamining Nevada, CD Int'l and China Direct were unjustly enriched as a result of the Transaction because Linkwell received no value when it agreed to acquire Metamining Nevada in exchange for substantially all of the Company's equity.

23.     Song's declarations confirmed that the consideration purportedly obtained by Linkwell in 2012 when it acquired Metamining Nevada from Metamining – the unconfirmed real estate and mining rights in the State of Nevada – was still owned by Metamining in 2013.  Given that Linkwell received no value for the transfer of 94% of the Company's equity, it was inequitable for Song, Ling, Metamining, Metamining Nevada, CD Int'l and China Direct to

retain their Linkwell shares and for Linkwell to be saddled with an $11.25 million debt for property and mining rights it did not own.

24.     On November 26, 2013, after papers were filed opposing Plaintiff's motion, Linkwell disclosed in a Form 8-K filing with the SEC that the Company sold Metamining Nevada back to Metamining in exchange for Metamining's agreement to cancel its Linkwell stock.  The stock certificates for the 9 million shares of Linkwell stock issued to the individual stockholders of Metamining, including Song, Ling and members of their respective families, were subsequently returned to the Company.  The shares of Linkwell stock issued to CD Defendants were also returned.  Plaintiff, however, was unable to obtain any confirmation that the stock certificates representing Company's 90% equity ownership of Linkwell Tech, and Linkwell Tech's 100% equity ownership of Likang Disinfectant and Likang Biological were returned to Linkwell.

25.     On January 16, 2014, the Court entered Orders compelling Linkwell, Song, Ling, Metamining, Metamining Nevada and CD Defendants to respond to Plaintiff's discovery concerning, among other things, the location of the stock certificates for Linkwell Tech, Likang Disinfectant and Likang Biological, by January 31, 2014.

26.     Xuelian and Wei prevented Linkwell from obeying the January 16, 2014 Omnibus Order (ECF No. 116) ("Omnibus Order") and failed to take appropriate action within their power as members of the Board to cause the Company to comply with discovery.  Further, Xuelian and Wei retained legal counsel to assist them in avoiding being compelled to produce documents or disclose facts establishing their self-dealing with respect to the Company's assets and being held to account for their misconduct.

27.     On or about March 28, 2014, Sidley presented a proposal to Xuelian, Wei and Liyong Sui ("Liyong") (a representative of the yet to be formed Yinling) to take Linkwell private in a one-step merger, and subsequent post-merger restructuring for an IPO outside of the U.S.

28.     On April 4, 2014, Likang Disinfectant retained Sidley as legal counsel to provide advice and assistance in all aspects of the Acquisition.   The April 4, 2012 legal counsel engagement letter ("Likang Engagement Letter") was signed by Xuelian for Likang Disinfectant and Joseph Chan, a partner in Sidley's Singapore office.   Pursuant to the Likang Engagement Letter, Sidley agreed to, among other things, assist in the preparation and filing of documents whereby Linkwell would "go dark" with the SEC, deregister its securities and cease filing financial statements or periodic reports.   Sidley also agreed to assist Linkwell with any regulatory inquiry from the Financial Industry Regulatory Authority ("FINRA").

29.     By going dark, Xuelian and Wei sought to avoid future public disclosures regarding the Acquisition, as well as any regulatory scrutiny of the same.

30.     Pursuant to the Likang Engagement Letter, Sidley additionally agreed to assist in: (a) the organization of an acquisition vehicle (Leading World); (b) the structuring and execution of a going private proposal and the necessary legal documentation to facilitate the same; and (c) liaising with the transfer, depository and paying agents.

31.     On April 11, 2014, Linkwell filed a Certificate and Notice of Termination of Registration on Form 15 ("Notice of Termination") with the SEC.

32.     On April 15, 2014, counsel for Plaintiff sent an email to counsel for CD Defendants, whose client China Direct served as the registered agent for Linkwell, regarding the Company's non-compliance with the Omnibus Order and the recent filing of the Notice of Termination.   The email advised that Plaintiff intended to move for an Order of Contempt and

requested a meet and confer on April 16, 2014 with a representative of Linkwell to discuss the Company's immediate efforts to comply with discovery it had been directed to produce. That communication was forwarded to Linkwell on April 17, 2014.

33.     On April 22, 2014, Likang Disinfectant, and Sidley executed a supplement to the Likang Engagement Letter ("Supplement"). Pursuant to the Supplement, Likang Disinfectant retained Sidley as legal counsel for Linkwell, Xuelian and Wei in connection with the claims asserted in this action (which asserted derivative claims against *only* Xuelian and Wei). Like the Likang Engagement Letter, the Supplement was signed by Xuelian for Likang Disinfectant and Sidley partner Joseph Chan.

34.     Sidley undertook the retention despite clear conflicts of interest posed by the representation of Linkwell, the Nominal Defendant in the action, and Xuelian and Wei, individuals alleged to have, among other things, caused substantial harm to Linkwell. Sidley obtained no waiver of conflicts from Linkwell and no consent from Linkwell's public shareholders with respect to the representation of Xuelian and Wei.

35.     On July 9, 2014, Yinling retained Sidley in connection with the Acquisition. The July 9, 2014 legal counsel engagement letter ("Yinling Engagement Letter") was signed by Liyong for Yinling and Sidley partner Joseph Chan.

36.     Likang and Yinling each subsequently executed waiver letters which: (a) acknowledged the disclosure by Sidley that its representation of both Likang and Yinling in connection with the Acquisition is an actual or potential conflict of interest; and (b) consented to Sidley's representation.

37.     On July 15, 2014, Xuelian and Wei were served with process in this action. Three days later, Xuelian and Wei purportedly resigned their positions as directors and officers of

Linkwell.  Xuelian and Wei did not disclose their resignations until November 2014, after they were confronted with a motion for an Order of Contempt relating to the Company's failure to comply with the Omnibus Order.

38.     On August 12, 2014, Linkwell entered an agreement and plan of merger (the "Merger Agreement") with Leading First and its wholly owned subsidiary Leading World, pursuant to which Leading First would acquire all of the equity of Linkwell at $0.88 per share.

39.     Sidley served as the sole counsel for the acquirer and target in the Acquisition, attended all meetings involving the Board and Yinling, and participated in all discussions of the material terms to the Merger Agreement, including the $0.88 per share merger consideration. Sidley formed and incorporated Leading First and Leading World for purposes of entering into and consummating the Acquisition.  Sidley was responsible for the preparation and drafting of all transaction documents relevant to the Acquisition, including the Merger Agreement which contained provisions to ensure that any costs or expenses incurred in connection with this action by, among others, Xuelian and Wei, as well as any costs or expenses incurred in connection with the Acquisition, would be borne by Linkwell.  Sidley also drafted the proxy statement ("Proxy Statement") and was responsible for ensuring that the mailing of the Proxy Statement and related materials to the Company's shareholders was timely and complied with Florida law.

40.     Sidley also served as counsel for Xuelian and Wei in connection with this action since April 22, 2014, yet failed to disclose any information about the Acquisition or the September 19, 2014 special meeting of Linkwell shareholders in Shanghai, China ("Special Meeting") to approve the same to the Court or Plaintiff.

41.     Xuelian, Wei and Sidley determined not to provide Plaintiff (or any other U.S. public shareholders of Linkwell that held their stock in street name) with notice of the

Acquisition, Special Meeting or their appraisal rights, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes, in order to prevent Plaintiff (and other similarly situated shareholders of Linkwell) from moving to enjoin the Acquisition or exercising appraisal rights.

42.     After the Merger Agreement was approved at the Special Meeting, Sidley caused amended and restated articles of incorporation ("Amended Articles of Incorporation") to be filed on behalf of Linkwell with the Florida Department of State.  Pursuant to the Amended Articles of Incorporation, Linkwell, for the first time, agreed to authorize the indemnification of its current and former officers and directors to the fullest extent provided by applicable law and including the advancement of legal expenses for all matters pending, existing or occurring at or prior to the approval of the Merger Agreement.

43.     Sidley also caused articles of merger for Linkwell ("Articles of Merger"), which attached a plan of merger ("Plan of Merger") and amended Bylaws, to be filed with the Florida Department of State, which set forth, among other things, that the Acquisition became effective on September 19, 2014, after the Plan of Merger and Merger Agreement were adopted by the Linkwell shareholders at the Special Meeting.

44.     Upon information and belief, neither the Amended Articles of Incorporation nor the Articles of Merger were publicly available until October 26, 2014.

45.     As a result of the failure by Xuelian, Wei and Sidley to comply with Florida's statutory notice requirements, Plaintiff did not discover the Acquisition until after its consummation.  The failure to provide Plaintiff with statutory notice unlawfully and unfairly deprived Plaintiff of the opportunity to: (a) evaluate whether the $0.88 per share merger consideration was fair; (b) vote to approve the Merger Agreement; (c) exercise appraisal rights; or (d) move to enjoin the Acquisition.  Plaintiff would have moved to enjoin the Acquisition in

this action if the legally required notice had been provided.  The failure to provide such notice rendered the approval of the Merger Agreement and consummation of the Acquisition a *fait accompli*.

46.     Documents produced in discovery after the Acquisition was consummated demonstrate that the Company's disclosures concerning the Acquisition are manifestly incomplete insofar as they omit material information.  For example, the Proxy Statement (which Plaintiff obtained through discovery) contains no current financial statements, either audited or unaudited, for Linkwell, or even a fairness opinion from a financial advisor to allow Linkwell shareholders to evaluate the $0.88 per share merger consideration.  The Proxy Statement does not disclose the pendency of this action, the nature of the claims pending against Xuelian and Wei, amongst others, for self-dealing and other breaches of fiduciary duty in connection with the Transaction; nor does it contain a valuation of those claims to the Company.

47.     The Merger Agreement appended to the Proxy Statement is also incomplete.  It is not executed by the parties.  It lacks the requisite schedules, including the Company Disclosure Schedules referenced therein which are described to contain "a correct and complete list of all of the Company's subsidiaries, ownership interest of the Company in each Company Subsidiary, and the ownership interest of each Person or Persons in each Company Subsidiary."

48.     As a result of the foregoing misconduct, Plaintiff and the other public shareholders of Linkwell suffered substantial damages as they did not receive fair value for their Linkwell stock in connection with the Acquisition.

49.     In 2008, Ecolab paid $2 million to acquire 10% of the equity of Linkwell Tech from Linkwell.  In 2013, Ecolab purportedly sold the 10% equity interest to Linkwell Tech (and not Linkwell) for $2.4 million.

50.     In connection with the Acquisition, Yinling purportedly paid only $483,120.00 ($0.88 x 549,000 outstanding shares of Linkwell stock) to obtain 100% of the equity of Linkwell. Excluding the shares of Linkwell stock owned by Xuelian, Wei and parties that they control or with whom they are affiliated, the cost to squeeze out the public shareholders of Linkwell was a mere $176,960.66 ($0.88 x 201,092 outstanding shares of Linkwell stock).

51.     Corporate filings with the Shanghai Administration of Industry and Commerce ("SAIC") indicate that Likang Disinfectant had: RMB 254,020,000 million (U.S. $40,926,924) (based on December 31, 2014 conversion rate of 0.1611169372) in total assets and RMB 28,920,000 (U.S. $4,659,502) in total liabilities for year-end 2014; RMB 189,710,000 (U.S. $31,336,466) (based on December 31, 2013 conversion rate of 0.1651808859) in total assets and RMB 22,177,000 (U.S. $3,663,217) in total liabilities for year-end 2013; and RMB 170,684,480 (U.S. $27,391,515) (based on December 31, 2012 conversion rate of 0.1604804074) in total assets and RMB 23,062,248 (U.S. $3,701,039) in total liabilities for year-end 2012.

52.     Likang Disinfectant recorded net profits of RMB 15,613,894 (U.S. $2,505,724), 20,180,000 (U.S. $3,333,350) and 6,050,000 (U.S. $974,757) for the years 2012, 2013 and 2014, respectively.

53.     The merger consideration paid to Linkwell's public shareholders of $0.88 per share is less than 1% of the net asset value of Linkwell subsidiary Likang Disinfectant that was reported to SAIC for 2014.

54.     The 2012, 2013 and 2014 financial information for Likang Disinfectant furnished to SAIC was *not* provided to the public shareholders of Linkwell in the Proxy Statement.

55.     Despite having been purportedly cashed out of Linkwell as a result of the consummation of the Acquisition, Xuelian is presently the controlling shareholder of Likang

14

Disinfectant which, according to the Company's SEC filings, was responsible for 99% of the revenues and earnings of Linkwell from its disinfectant business in China. Pursuant to corporate filings with SAIC, Xuelian is the majority shareholder of Shanghai Zhongyou Pharmaceutical High-Tech Co., Ltd. ("Zhongyou Pharmaceutical"), and owns in excess of 51% of that company. Yinling is now one of Zhongyou Pharmaceutical's *minority* shareholders. As of December 9, 2014, Zhongyou Pharmaceutical owned over 83% of the equity of Likang Disinfectant. The remainder of the equity of Likang Disinfectant is owned by Linkwell Tech.

## II.    **DERIVATIVE ALLEGATIONS**

56.    This action was brought by Plaintiff on December 26, 2012, in the right and for the benefit of Linkwell to redress the injuries suffered as a direct result of the misconduct alleged herein relating to the Transaction. It is not a collusive action to confer jurisdiction on this Court that it otherwise would not have.

57.    Plaintiff continuously owned Linkwell stock through the Relevant Period until November 6, 2014. On November 6, 2014, almost 2 years *after* Plaintiff commenced this action, Plaintiff's shares of Linkwell stock in his TD Ameritrade account were cancelled without notice.

58.    The Acquisition was undertaken on behalf of and for the benefit of Xuelian and Wei with a primary purpose of divesting Plaintiff of his Linkwell shares and deprive him of standing to assert derivative claims on behalf of the Company.

59.    Plaintiff was not provided with any notice of the Special Meeting or his appraisal rights, and was not furnished with a copy of the Proxy Statement. As a consequence, Plaintiff was unlawfully and unfairly deprived of the opportunity to evaluate whether the merger consideration was fair, vote at the Special Meeting on the approval of the Merger Agreement, exercise his appraisal rights or seek to enjoin the Acquisition.

60.     A derivative action is equitable in nature.  Plaintiff was not provided the statutory notice required under Florida law and divested of his Linkwell shares without due process or the opportunity to seek appropriate redress.  Under the circumstances, enforcement of the continuous ownership rule is inequitable.

61.     At the time that this action was commenced, the members of the Board were Xuelian, Wei, Song and Ling.

62.     At all relevant times, the Board was grossly conflicted and rejected both a books and records demand and a follow up litigation demand made by Plaintiff.

63.     On July 24, 2012, Plaintiff caused a books and records demand to be made upon the Company in order to investigate potential breaches of fiduciary duty and/or aiding and abetting breaches of fiduciary duty involving the misconduct alleged herein (the "Books and Records Demand").  A true and correct copy of the Books and Records Demand is annexed hereto as Exhibit A.

64.     By letter dated July 31, 2012, and signed by Xuelian, Linkwell acknowledged receipt of the Books and Records Demand; however, it refused to provide Plaintiff with any of the requested materials.  A true and correct copy of the July 31, 2012 Letter is annexed hereto as Exhibit B.

65.     By letter dated August 16, 2012, Plaintiff, through counsel retained to make a litigation demand pursuant to Section 607.07401 of the Florida Statutes, made a written demand upon the Board to bring this action (the "Demand Letter").  A true and correct copy of the Demand Letter is annexed hereto as Exhibit C.

66.     By letter dated August 24, 2012, Linkwell acknowledged receipt of the Demand Letter, however, it refused to take any action to protect its meaningful assets from divestiture for

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 18 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 18 of
141

no or inadequate consideration.  A true and correct copy of the August 24, 2012 Letter (without attachment) is annexed hereto as Exhibit D.

67.     On January 29, 2013, Linkwell acknowledged service of the Complaint in a Form 8-K filing with the SEC, however, failed to appear, file or serve any responsive papers.

68.     On March 23, 2015, at the Court's instruction, Plaintiff moved for an entry of default against Linkwell as a result of the Company's failure to appear, file or serve any responsive papers or comply with discovery.  The motion was not opposed by Xuelian, Wei, or their counsel Sidley.  An entry of default was issued on March 24, 2015 (ECF No. 252).

### III.     JURISDICTION AND VENUE

69.     The Court has diversity jurisdiction over the derivative claims asserted herein under 28 U.S.C. § 1332(a)(2), because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

70.     Venue is proper in this District because Linkwell is a Florida corporation with a registered agent in this District.  Additionally, substantial acts in furtherance of the alleged wrongdoings and/or their effects occurred in this District.

71.     The Court has subject matter jurisdiction over the alternatively asserted class claims pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a), as those claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. §78j, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to the claims in the action within such original

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 19 of 141

jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

72.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. 1391(b) because many of the acts and omissions charged herein occurred in this District.

## IV.     THE PARTIES

### A.     Plaintiff

73.     Plaintiff was a Linkwell stockholder throughout the time the misconduct complained of herein occurred.  On November 6, 2014, Plaintiff's shares of Linkwell stock were unilaterally cancelled from his brokerage account in connection with the Acquisition.  Neither Plaintiff, nor his broker, were provided with any information concerning the Acquisition and were not furnished with a copy of the Merger Agreement, Proxy Statement or notice of the Special Meeting.  Plaintiff was not notified of his statutory appraisal or other rights in connection with the Acquisition.  Plaintiff is a citizen of the State of New York.

### B.     Nominal Corporate Defendant

74.     Nominal defendant Linkwell is a Florida corporation with a principal place of business in Shanghai, China.  Prior to the commencement of this action, Linkwell operated as public holding company for its direct operating subsidiaries Linkwell Tech, Likang Disinfectant, Likang Biological and other affiliated entities.  Linkwell shares the same registered business address and office space as Likang Disinfectant.

### C.     Defendants

75.     Defendant Xuelian, at all relevant times, was a controlling shareholder of Linkwell.  Xuelian has served as the Board Chairman, Chief Executive Officer and President of Linkwell since May 2005.  Xuelian has simultaneously served as Chief Executive Officer,

President and a director of Linkwell Tech since its inception in June 2004, and as General Manager of Likang Disinfectant since 1993. Xuelian is the Executive Director and controlling shareholder of Zhongyou Pharmaceutical. Xuelian is also a co-owner of Linkwell Int'l and owns 30% of the equity of Zhongyou (Shanghai) Technology Development Co. Ltd. ("Zhongyou Technology"). Upon information and belief, Xuelian is a citizen of China.

76.   Defendant Wei, at all relevant times, was a controlling shareholder of Linkwell. Wei has served as a member of the Board and Vice President of the Company since May 2005. Wei has also served as the Vice President of Linkwell Tech since its inception in June 2004, and as Vice General Manager of Likang Disinfectant since 2002. Wei is a co-owner of Linkwell Int'l with Xuelian. Wei owns 35% of the equity of Zhongyou Technology and serves as a supervisor for that company. Upon information and belief, Wei is a citizen of China.

77.   Defendant Song served as a member of the Board from March 30, 2012 to mid-2014. Song also served as the Chairman of Metamining and Metamining Nevada since co-founding those companies in 2008 and 2011, respectively. Song is a resident of the State of California.

78.   Defendant Ling served as a member of the Board from March 30, 2012 to mid-2014. Ling, also a co-founder of Metamining and Metamining Nevada, served as the President and a director of those companies since 2008 and 2011, respectively. Ling is a resident of the State of California.

79.   Defendant Metamining is a California corporation with a principal place of business in Foster City, California. Metamining is a privately held mining development company that manages mines in the United States and develops a portfolio of mineral assets, including metallurgical coal, iron ore, copper and manganese ore.

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 21 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 21 of
141

80.     Defendant Metamining Nevada is a Nevada corporation.  Prior to the Transaction, Metamining Nevada was a wholly owned subsidiary of Metamining.  Metamining Nevada was formed by Metamining on March 30, 2011 in connection with certain agreements to purchase mining and real property rights on approximately 4,500 acres in northern Nevada (the "Nevada Properties").   Since  its  inception,  Metamining  Nevada  has  had  no  assets,  operations  or employees.   It  shares  an  interlocking  management  structure  with  Metamining.   Prior  to December 30, 2012, all of the issued and outstanding shares of Metamining Nevada were owned by Song and Ling.

81.     Defendant CD Int'l is a Florida corporation with its principal place of business in Deerfield Beach, Florida.  CD Int'l's stock is quoted on the OTCQB Tier of the OTC Markets under the symbol CDII.  CD Int'l produces and distributes industrial commodities in China and the Americas.  CD Int'l also provides business and financial consulting services to public and private companies primarily operating in China.

82.     Defendant China Direct is a Florida corporation and a wholly owned subsidiary of CD Int'l.  China Direct provides specialized business consulting services primarily to Chinese companies seeking access to the U.S. capital markets.  China Direct shares an interlocking management structure with CD Int'l.  It also shares the same office space with CD Int'l in Deerfield Beach, Florida.  Since 2005, China Direct has been engaged as a consultant for Linkwell to advise management in areas related to marketing and operational support in the United States, media and public relations, mergers and acquisitions, financial advisory and SEC disclosure compliance.

83.     Defendant Capital Resource is a Brunei company with a principal place of business in China.  Capital Resource is a wholly owned subsidiary of CD International.  Capital

Resource provides specialized business consulting services primarily to Chinese companies seeking access to the U.S. capital markets.

84.     Defendant Ecolab is a Delaware corporation with headquarters located in St. Paul, Minnesota. Ecolab's stock trades on the New York Stock Exchange under ticker symbol ECL. Ecolab develops and markets products and services for the hospitality, foodservice, healthcare and industrial markets.

85.     Defendant Sidley is an international law firm with its headquarters in Chicago, Illinois.

86.     Defendant Yinling is a Chinese limited liability company with a principal business in Shanghai, China. Yinling was formed on April 18, 2014. Yinling is the sole shareholder of Leading First. Yinling is also a minority shareholder of Zhongyou Pharmaceutical.

87.     Defendant Leading First is a British Virgin Islands company with a business address in Shanghai, China. Sidley formed Leading First on or about June 25, 2014 for the purpose of entering into and consummating transactions contemplated by the Merger Agreement.

88.     Defendant Leading World is a Florida corporation with a business address in Shanghai, China, and a wholly owned subsidiary of Leading First. Sidley formed Leading World on or about August 5, 2014 for the purpose of entering into and consummating transactions of the type contemplated by the Merger Agreement.

89.     Because of their positions with the Company and substantial direct and indirect ownership of Linkwell stock, Xuelian, Wei, Song and Ling had the power and authority to cause and did cause Linkwell to engage in the misconduct complained of herein. Xuelian, Wei, Song and Ling had the power and authority to enter into and then ratify the Transaction, and control

the contents of the Company's public statements to the financial marketplace concerning the material terms of the Transaction and the materially misleading SEC filings discussed herein.

90.     Because of their positions with the Company and Likang Disinfectant, and their substantial direct and indirect ownership of Linkwell stock, Xuelian and Wei had the power and authority to cause and did cause Sidley to be retained as legal counsel for Likang in connection with the Acquisition, and for Linkwell and themselves in connection with this action.

91.     Because of their positions with the Company and Likang Disinfectant, and substantial direct and indirect ownership of Linkwell stock, Xuelian and Wei had the power and authority to cause and did cause Linkwell to consummate the Acquisition without providing statutory notice to, or seeking the approval of, the public shareholders of Linkwell.

## V.     RELEVANT NON-PARTIES

92.     Relevant Non-Party Wang is the Chairman and Chief Executive Officer of CD Int'l and China Direct.  Wang has served as Chairman and Chief Executive Officer of CD Int'l since August 2006.  He co-founded China Direct and has served as its Chairman and Chief Executive Officer since January 2005.  In his capacity as Chief Executive Officer of CD Int'l, Wang exercised voting and dispositive control over the shares of Linkwell stock held by China Direct and Capital Resource.

93.     Relevant Non-Party Liyong is a Vice President of Yinling and the sole director of Leading First and Leading World.  Liyong is a chartered accountant in China.

## VI.    DUTIES OF DIRECTOR DEFENDANTS

94.     Xuelian, Wei, Song and Ling each owed the Company and its shareholders the fiduciary duties loyalty, good faith, due care and disclosure.  The misconduct complained of herein involves culpable violations by the Company's directors of their fiduciary obligations. The misconduct includes authorizing the Transaction for no or inadequate consideration,

executing the Share Exchange Agreement and entering other undisclosed agreements for the secret sale or spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological for no consideration to the Company.

95.     By reason of their positions as directors and fiduciaries of Linkwell, and because of their ability to control the business and corporate affairs of the Company and its subsidiaries, Xuelian, Wei, Song and Ling each owed Linkwell and its public shareholders fiduciary duties and were required to use their ability to control and manage Linkwell in a fair, just, honorable and equitable manner, to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their own personal interests or benefits.  Furthermore, as officers, directors and fiduciaries of a publicly held company, Xuelian, Wei, Song and Ling each had a duty to refrain from utilizing their control over Linkwell to secretly divert assets to themselves or their designee(s).

96.     Each director of Linkwell named herein owed the Company and its public shareholders the fiduciary obligation to act in good faith, with due care, loyalty and diligence in the management and administration of the Company's affairs, as well as in the use and preservation of its property and assets, and the highest obligations of fair dealing.

97.     By reason of their positions at Linkwell, Xuelian, Wei, Song and Ling each had the power and authority to control the contents of the Company's public statements to the financial marketplace, including the Company's false Form 10-Qs, press releases, proxy statements and information statements (collectively, "public filings") discussed herein.

98.     Because of their positions at Linkwell, Xuelian, Wei, Song and Ling were each aware of the wrongful conduct complained of herein, had access to adverse non-public

information and were required to disclose such facts promptly and accurately to the Company's shareholders and the financial markets.

99.     Xuelian, Wei, Song and Ling, because of their advisory, executive, managerial and directorial positions with Linkwell, each had access to adverse, non-public information about the financial condition and operations of Linkwell, access to internal corporate documents, reports and other information, including adverse, non-public information about the business, financial condition and future prospects, and attended management and/or board of director meetings.  Xuelian, Wei, Song and Ling were each responsible for the truthfulness and accuracy of the Company's public filings.

100.    Xuelian, Wei, Song and Ling directly participated in the management, administration and/or oversight of Linkwell and were privy to confidential, proprietary information about its business operations and accounting practices.  They were involved or participated in drafting, producing, reviewing, approving and/or disseminating the false and misleading statements alleged herein and were thus aware that the statements were being made, and approved and ratified them in violation of the applicable laws, rules and regulations.

101.    To discharge their duties, Xuelian, Wei, Song and Ling were each required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company.  By virtue of such duties, Xuelian, Wei, Song and Ling were obligated to, among other things:

a.     Manage, conduct, supervise and direct the business affairs of Linkwell in accordance with all applicable laws (including federal and state laws, government rules and regulations);

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 26 of 141

b.      Neither engage in self-dealing, nor knowingly permit any officer, director or employee of Linkwell to engage in self-dealing;

c.      Neither violate, nor knowingly permit any officer director or employee of Linkwell to violate, applicable laws, rules and regulations;

d.      Prudently protect the Company's assets, and to ensure that the Company is paid an appropriate price for the disposition of its material assets and/or operations;

e.      Not permit Linkwell to issue approximately 94% of its equity in exchange for no consideration;

f.      Not conspire to secretly sell or spin-off Linkwell Tech, Likang Disinfectant and Likang Biological;

g.      Not permit the sale or spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological for no consideration to the Company;

h.      Exercise control and supervision over the public statements to the securities markets trading in Linkwell stock by the officers and employees of the Company; and

i.      Supervise the preparation and filing of all financial reports or other information required by law from Linkwell, examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning each of the subjects and duties set forth above.

102.    Xuelian, Wei, Song and Ling each failed to discharge their fiduciary obligations in connection with the Transaction.

103.    In connection with the Acquisition, Xuelian and Wei each stood in a fiduciary relationship with Linkwell, Plaintiff and the Company's other public shareholders and owed

them the highest fiduciary obligations of loyalty, good faith, fair dealing, due care and full and candid disclosure.

104.    To diligently comply with their fiduciary obligations, Xuelian and Wei were duty bound not take any action that:

        a.      Adversely affects the value provided to Linkwell or its stockholders;

        b.      Favor themselves;

        c.      Adversely affects their duty to search for and secure the best value available under the circumstances for Linkwell and its stockholders; and/or

        d.      Provide them with preferential treatment at the expense of Linkwell or its public shareholders.

105.    Xuelian and Wei, separately and together, in connection with the Acquisition, knowingly or recklessly violated their fiduciary duties as directors, officers and controlling shareholders of Linkwell, including their duties of loyalty, good faith, due care and disclosure owed to Linkwell, Plaintiff and the other shareholders of Linkwell.  Xuelian and Wei undertook and approved the Acquisition as a means to terminate the derivative claims in this action, avoid significant personal liability for their misconduct and, thus, deprive the Company of compensation for the damage they caused.  Xuelian and Wei stood on both sides of the Acquisition, engaged in self-dealing and obtained for themselves financial benefits not equally shared by Plaintiff and the public shareholders of Linkwell.  Xuelian, Wei and their legal counsel Sidley did not provide statutory notice of the Acquisition and shareholder appraisal rights to *all* of the Company's shareholders, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes, so as to prevent Plaintiff from moving to enjoin the Acquisition or exercise appraisal rights.

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 28 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 28 of
141

106.    Other reasons exist that challenge the fairness and propriety of the Acquisition. For example, Sidley, counsel for Linkwell, Xuelian and Wei in connection with this action, also served as counsel for Likang and Yinling in the Acquisition.  The Proxy Statement does not disclose this conflict of interest.  After the Acquisition was consummated, Xuelian continued to control Linkwell through his position of management at and as controlling shareholder of Likang Disinfectant.  The Proxy Statement does not disclose whether Xuelian or Wei would have any post-merger management role or equity interest in Linkwell, Linkwell Tech or Likang Disinfectant.

107.    As a result of the self-dealing and divided loyalties of Xuelian and Wei, Linkwell did not obtain value for its assets.  Moreover, Plaintiff and the public shareholders of Linkwell Company (unaffiliated with Xuelian and Wei) did not receive fair value for their shares of Linkwell stock.

108.    Because Xuelian and Wei knowingly or recklessly breached their fiduciary duties of loyalty, good faith, due care and disclosure in connection with the Acquisition, the burden of proving entire fairness, including all aspects of its negotiation, structure, price, terms and provision of statutory notice, is placed upon them as a matter of law.

VII.    **ALLEGATIONS APPLICABLE TO ALL CLAIMS**

A.      **Background**

1.      **Linkwell**

109.    At all relevant times, Linkwell, through its direct subsidiaries Linkwell Tech, Likang Disinfectant and Likang Biological, and certain other affiliated entities, engaged in the development, manufacture, sale and distribution of disinfectant health care products in China.

110.    Likang Disinfectant's products are sold on a wholesale and retail basis to the health care community in China.  It has 66 marketed products, 46 of which are certified by one

or more of the following Chinese government authorities: the Chinese Ministry of Health, the State Food and Drug Administration and the Ministry of Agriculture.  The Ministry of Health, the authority which approves products that require the highest level of licensing, has granted Likang Disinfectant 31 hygiene licenses.

111.    Products manufactured by Likang Disinfectant accounted for more than 99% of the Company's total net revenues for fiscal year ended December 31, 2011.

112.    According to the Company's Annual Return on Form 10-K for fiscal year ended December 31, 2011 ("2011 Form 10-K"), Linkwell, through Likang Disinfectant, has more than 6,000 active and recurring customers in China, including hospitals, clinics, health centers, medical suppliers and distribution companies.

113.    Bolstered by this strong customer base, Linkwell's total net sales for fiscal year ended December 31, 2011 were almost $17 million, more than a 25% increase over its prior year's performance.  Gross profits were $7,428,520 and net income was approximately $1.88 million, a 101.2% increase over 2010.

114.    As of December 31, 2011, the Company had cash and cash equivalents of $2,919,670, accounts receivable of $12,651,347, total assets of $27,446,588, total liabilities of $10,012,087, total stockholders' equity of $17,434,501, and working capital of $1,997,311 with no material commitments for capital expenditures.

### a)    Legal Counsel Agreement

115.    Linkwell's strong financial performance and future prospects, however, were not reflected in its share price.  In the 2011 Form 10-K, Linkwell acknowledged that its common stock did not have an established trading market in the U.S. and, as such, was traded on the OTCBB and the Pink Sheets.  Trading on these platforms made it more difficult for Linkwell to raise additional capital in the U.S. public markets.

116.    Sometime in 2011, after discussions with the Company business consultant Wang, Xuelian and Wei determined to spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological from Linkwell.

117.    On January 1, 2012, Linkwell, Linkwell Tech and Likang Disinfectant executed a legal counsel agreement ("Legal Counsel Agreement") with Haimai Legal, pursuant to which Haimai Legal agreed to provide certain legal services to Linkwell, Linkwell Tech and Likang Disinfectant in exchange for 6 million shares of Linkwell common stock.

118.    As set forth in the Legal Counsel Agreement, Linkwell, Linkwell Tech and Likang Disinfectant engaged Haimai Legal as counsel in anticipation of certain planned transactions with third parties for the sale of equity in Linkwell, Linkwell Tech and Likang Disinfectant.   The Legal Counsel Agreement sets forth, among other things, that "Party A [(Linkwell, Linkwell Tech and Likang Disinfectant)] planned to conduct private equity financing and carry out merger & acquisition (we called 'capital operation' as follows); meanwhile Ecolab, Inc. and another American company planned to acquire shares of Party A (we called 'acquisitions of equity')."

### 2.    Ecolab

119.    Before the Relevant Period, on February 15, 2008, Linkwell, Linkwell Tech and Ecolab entered into a stock purchase agreement ("Stock Purchase Agreement") whereby Ecolab agreed to purchase 10% of the issued and outstanding shares of Linkwell Tech (888,889 shares) from Linkwell for $2 million, or approximately $2.25 per share.

120.    On May 30, 2008, Linkwell, Linkwell Tech and Ecolab entered into a stockholders agreement ("Stockholders Agreement") whereby Linkwell and Ecolab agreed to be subject to certain pre-emptive rights, transfer restrictions and take along rights related to the shares of Linkwell Tech each entity held.

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 31 of 141

121.    The Stockholders Agreement provided Ecolab with a call right exercisable upon the entry of any change of control transaction by Linkwell.  The call right required the Company to sell Ecolab all of its equity interest in Linkwell Tech, and any of the affiliates owned by Linkwell, without a control premium.

122.    The Stockholders Agreement also provided Ecolab with an option to require Linkwell to buy back the 10% equity interest that Ecolab acquired for $2.4 million ("Put Option").  Pursuant to its the terms, the right to exercise the Put Option would terminate in the event that Ecolab acquired all of the outstanding equity of Linkwell Tech.  The Stockholders Agreement further provided that it could be terminated by written agreement of the parties.

123.    The Stock Purchase Agreement and Stockholders Agreement provided no terms for Ecolab to acquire any additional equity of Linkwell Tech.  Thus, the acquisition by Ecolab of Linkwell Tech equity in excess of the 10% equity interest Ecolab already owned would have to be governed by a separate agreement.

124.    Ecolab did not identify Linkwell Tech as a subsidiary company in its Annual Return on Form 10-K filings with the SEC for fiscal years ended December 31, 2008, December 31, 2009, December 31, 2010 and December 31, 2011.  Ecolab only included significant majority-owned subsidiaries in its consolidated financial statements.  During 2008 through 2011, the exhibit attached to Ecolab's Form 10-K filings identifying its subsidiary companies also listed the percentage of ownership.

125.    In late 2011 and early to mid-2012, Ecolab, Linkwell and others were engaged in negotiations regarding the acquisition by Ecolab of a controlling equity interest in Linkwell Tech, Likang Disinfectant and Likang Biological.

126.     During the negotiations, Xuelian, Wei and/or the Company's counsel at Haimai Legal disclosed the material terms of the Transaction to Ecolab, including the spin-off of Linkwell Tech from Linkwell.

### 3.     Metamining and Metamining Nevada

#### a)     The Purchase and Sale Agreements

127.     On April 15, 2011, Metamining entered into purchase and sale agreements (the "Purchase and Sale Agreements") with Little Valley Group, LLC, Greater Nevada Ranches, LLC and Western Resources Group, LLC (the "Sellers") to acquire rights to mining claims, together with certain real property rights on the Nevada Properties during a two-year period, for an aggregate purchase price of $14.25 million (the "Purchase Price").

128.     The Nevada Properties are also referred to in the Company's SEC filings as the "Iron Horse Project in Nevada," the "Iron Horse Project – Dodge Mine" and the "Iron Horse Project."

129.     Under the Purchase and Sale Agreements, the Purchase Price was payable in 3 installments payments.  The first installment payment included an initial down payment in the approximate amount of $3,000,003 payable in 3 partial payments.

130.     The Sellers acknowledged in the Purchase and Sale Agreements that they received a "review" payment in the amount of $234,567.53 on December 28, 2010.  A pre-payment in the amount of $500,000 was to be made to the Sellers within 10 days after execution of the Purchase and Sale Agreements, and the balance of the down payment ($2,265,435.60) was due 45 days after the pre-payment.  The second installment payment in the amount of $5.625 million was due on April 15, 2012.  The third installment in the amount of $5.625 million was due on April 23, 2013.

131.    Pursuant to the Purchase and Sale Agreements, the Sellers financed the payment of the Purchase Price by Metamining by carrying two of the $5.625 million notes payable on April 15, 2012 and April 15, 2013 (in the aggregate $11.25 million), free of interest.

132.    By March 2012, however, Metamining had not even completed payment on the first installment of the Purchase Price.

### b)        The Letters of Authorization

133.    On March 5 and 6, 2012, Metamining and Metamining Nevada executed letters of authorization ("Letters of Authorization") with China Direct and Capital Resource.  Both Letters of Authorization were executed by Song on behalf of Metamining and Metamining Nevada, and by Wang on behalf of both China Direct and Capital Resource.

134.    Pursuant to the Letter of Authorization, Metamining and Metamining Nevada authorized China Direct and Capital Resource to act on its behalf in connection with accessing the U.S. capital markets in order to provide financing, among other things, to fund the Purchase Price and development of the Nevada Properties.

### c)        The Reverse Merger Consulting Agreement

135.    On March 6, 2012, Metamining Nevada executed a reverse merger consulting agreement ("Reverse Merger Consulting Agreement") with China Direct and Capital Resource. The Reverse Merger Consulting Agreement was executed by Song on behalf of Metamining Nevada, and by Wang on behalf of both China Direct and Capital Resource.

136.    Pursuant to the Reverse Merger Consulting Agreement, Metamining Nevada engaged China Direct and Capital Resource to help it raise capital and list on a U.S. stock market.  It sets forth that, through a reverse merger transaction, Metamining Nevada will become a wholly owned subsidiary of a U.S. public company and the shareholders of Metamining Nevada – Song and Ling – will become the controlling shareholders of the public company.

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 34 of 141

137.    The Reverse Merger Consulting Agreement describes the process by which Metamining Nevada will become a wholly owned subsidiary of a U.S. public company and raise capital as follows:

      a.    China Direct and Capital Resource shall provide a clean shell company for Metamining Nevada to merge into.

      b.    The shell company shall not have any debts or liabilities.

      c.    The total number of outstanding shares of the shell company shall be 10 million.

      d.    After listing on the OTCBB, Metamining Nevada will raise $15 million through a private placement and simultaneously issue 3 million shares of common stock to PIPE investors, which will increase the outstanding common stock to 13 million shares.

      e.    China Direct and Capital Resource will be paid a fee (referred to in a prior draft of the Reverse Merger Consulting Agreement obtained in discovery as a commission) of 8% of the amount raised through the private placement for providing consulting services to Metamining Nevada.

      f.    China Direct and Capital Resource will advance the legal expenses incurred on behalf of Metamining Nevada in connection with the listing on the OTCBB and the raising of capital, and the amounts advanced will be deducted from the sum raised through the private placement.

138.    The Reverse Merger Consulting Agreement sets forth that, after completion of the reverse merger transaction, the shareholders of Metamining Nevada will own 9 million shares and 90% of all equity and assets of the shell company, and China Direct and the "retailing [sic] shareholders of [the] shell company" owning 1 million shares.  In order for this to occur,

Linkwell "shall issue 9,581,973 shares of preferred stock at the reverse merger. Among, which, 9 million shares shall be issued to shareholders of Metamining [Nevada], and the other 581,973 shares shall be issued to [China Direct and Capital Resource]."

139.   The Reverse Merger Consulting Agreement provides that after it takes effect, "all of the verified assets and business of [Metamining Nevada] shall be acquired by the public company." The Reverse Merger Consulting Agreement took effect on March 6, 2012.

140.   The Reverse Merger Consulting Agreement further sets forth that, after completion of the reverse merger transaction, China Direct and Capital Resource will provide Metamining Nevada with "comprehensive consulting services for One year (April 1, 2012 to March 31, 2013), including preparation of 10Q/10K financial reports, periodic SEC filings, U.S. legal consultation, investor relations, website design and promotion, and press release."

141.   Finally, in a chart captioned "Current Outstanding Shares," the Reverse Merger Consulting Agreement specifically sets forth that Xuelian and Wei would cancel their 36 million shares of Linkwell stock to reduce the total number of outstanding shares of Linkwell stock from 119,605,475 to 83,605,475.

142.   After a reverse stock split at 200:1 ratio, Song and Ling would control 90% of the equity of the "new" public company, and Wang (on behalf of CD Defendants) would control 5.82% of the equity.

### 4.   CD Defendants

143.   At all relevant times, CD Int'l was engaged in a similar business to Metamining and, through its subsidiaries China Direct and Capital Resource, provided merger advice and SEC consulting and related services to many Chinese companies trading in the U.S. stock markets, including Linkwell, that were not familiar with the operations and regulations of U.S. public companies, SEC disclosure compliance and/or state corporate law.

144.    Wang and CD Defendants served as consultants in connection with the Transaction and the sale or spin-off of Linkwell Tech.

145.    At or about the same time that CD Defendants executed the Letter Authorization and Reverse Merger Consulting Agreement with Metamining and Metamining Nevada, CD Defendants also executed a service agreement ("Service Agreement") and a consulting service agreement ("Consulting Service Agreement") with Linkwell, as well as reviewed an agreement prepared by Ecolab which provided for the elimination of the Put Option under the Stockholders Agreement ("Amendment to Stockholders Agreement").

### a)    The Service Agreement

146.    On March 13, 2012 Capital Resource executed the Service Agreement with Linkwell.    The Service Agreement was signed by Xiaowen Zhuang (Wang's brother) ("Xiaowen") on behalf of Capital Resource, and Xuelian on behalf of Linkwell.    Pursuant to the Service Agreement, Capital Resource agreed, in exchange for 5 million shares of Linkwell common restricted stock, to provide certain services for Linkwell, including, but not limited to, maintaining the Company's U.S. representative offices, providing financial management and investor relation service, managing investor road show and investment conferences, coordinating the preparation of and filing of all public disclosures with the SEC and providing written instruction for future merger and consolidation.

147.    The Service Agreement also lists the Company's "Work Items."    Among other things, the Work Items require Linkwell to provide Capital Resource with the "background information of three companies for intended acquisition."    As described below, the three companies for intended acquisition referenced in the Service Agreement were Linkwell Tech, Likang Disinfectant and Likang Biological.

### b)   The Amendment to Stockholders Agreement

148.   On or about March 18, 2012, CD Int'l reviewed the Amendment to Stockholders Agreement on behalf of its client Linkwell.   As set forth in the Amendment to Stockholders Agreement, Linkwell, Linkwell Tech and Ecolab desired to terminate Ecolab's right to exercise the Put Option.   Pursuant to its terms, the Amendment to Stockholders Agreement terminated Section 4.1 of the Stockholders Agreement.

149.   Upon information and belief, the Amendment to Stockholders Agreement was sent to Linkwell, Linkwell Tech and Ecolab and subsequently executed by the parties.

150.   The Put Option was cancelled by its holder (Ecolab) in March 2012.

### c)   The Consultant Service Agreement

151.   On March 31, 2012 Capital Resource executed the Consultant Service Agreement with Linkwell.   The Consultant Service Agreement was signed by Xiaowen on behalf of Capital Resource, and Xuelian on behalf of Linkwell.

152.   Pursuant to the Consultant Service Agreement, Capital Resource agreed, in exchange for 5 million shares of Linkwell common stock, to strip Linkwell of its 90% equity interest in Linkwell Tech and provide related consulting services to Linkwell.

153.   According to the Consultant Service Agreement, Capital Resource was to complete the divestiture of Linkwell Tech from Linkwell before June 30, 2012.   Among other things, the Consultant Service Agreement acknowledged the terms of the Transaction between Linkwell and Metamining and that, as a result, the Board would be reorganized.   As set forth in the document:

> On March 30, 2012, [Capital Resource] shall complete Linkwell Corporation's reverse merger with the U.S. company Metamining Nevada, Inc.

> On April 1, 2012, [Linkwell]'s current board of directors shall be reorganized.   New shareholders shall designate the board chairperson, CEO, and chairperson's secretary; and Linkwell Tech Group, Inc. shall designate one director, with his/her term up till [sic] June 30, 2012.  During this period, the company name and stock symbol of Linkwell Corporation shall be changed, while the two parties work to separate the 90% equity of Linkwell Tech Group, Inc. from Linkwell Corporation, namely, the 36 million shares under the name of Linkwell International Capital Ltd. shall be returned to Linkwell Corporation in exchange for the 90% equity of Linkwell Tech Group, Inc.

154. The Consultant Service Agreement also sets forth additional rights and obligations of the parties.  For example, Linkwell agreed that the Linkwell Tech designated director of the reorganized board "shall cooperate with Linkwell Corporation's new board of directors in signing and issuing corresponding board of director documents."

155. The Consulting Service Agreement further provided that Capital Resource is responsible for, among other things:

a.   All legal, business and financial auditing documents related to the Transaction and separation/divestiture of Linkwell Tech;

b.   Introducing Metamining Nevada, Inc. and the extra costs of completing the quarterly report Form 10-Qs, annual report Form 10-K, major event Form 8-K and other disclosures required by the SEC starting from the fiscal quarter of April 1, 2012 to June 30, 2012; and

c.   Press releases, investor relations, road shows, audit coordination, legal consultation, translation, company registration, tax returns, documents management and other regular corporate matters of the public company after the divestiture of Linkwell Tech from Linkwell.

156.    Other materials contemporaneously prepared by CD Defendants and Metamining for potential investors in a reorganized Linkwell similarly describe the Transaction and the anticipated spin-off of Linkwell Tech from Linkwell as follows:

> Linkwell … is a U.S. company, who operates under a holding company structure and currently has one direct operating subsidiary, Linkwell Tech … of which we own 90%. On February 15, 2008, Linkwell Tech sold 10% of its issued and outstanding capital stock to Ecolab Inc., a Delaware corporation …. Linkwell Tech owns 100% of … LiKang [sic] Disinfectant …. LiKang [sic] Disinfectant's business is hospital disinfectant products which is our primary business. LiKang [sic] Disinfectant acquired 100% of LiKang [sic] Biological on March 5, 2009.
>
> The chart below shows the current structure of the company:



> …
>
> In March 2012, the shareholders of Metamining Nevada, Inc. developed a plan to expand and obtain the benefits of a U.S. public company (the "Reorganization").   A key element of the Reorganization was to enter into a transaction with a public shell company in the United States by which we, the public shell company would acquire operations based in the state of Nevada.
>
> To accomplish this plan, in [sic] March 6th 2012, Metamining Nevada … entered an agreement with China Direct … and Capital

[Resource] … in which [China Direct] and Capital [Resource] are both engaged to coordinate the capital raise and list in the U.S. stock market for Metamining Nevada, Inc. through a reverse merger transaction. [China Direct] will provide Linkwell … as the clean shell company, after the reverse merger, Metamining Nevada … will become a wholly owned subsidiary of [Linkwell], while the founding shareholders of Metamining Nevada … will become the controlling shareholders of the reorganized public company.

In addition, Linkwell … entered a consulting agreement with Capital [Resource], in which Capital [Resource] is engaged to spin off [Linkwell]'s 90% owned subsidiary, Linkwell Tech … by selling 90% equity interest in Linkwell Tech … in exchange for the return and cancelation of a total of 36 million shares of [Linkwell] common stock held by Linkwell International ….

After the reorganization [sic], the structure of the Company will be as the following chart:



**B.      The Transaction**

157.    On April 2, 2012, Linkwell announced in a press release filed in a Form 8-K with the SEC that the Company had entered into a definitive share exchange agreement (the "Share Exchange Agreement") with the Metamining to acquire Metamining Nevada as a wholly owned subsidiary, in exchange for 9 million shares of newly issued Series C convertible preferred stock and 3 million warrants to purchase common stock.

158.    The press release set forth that after the effective date there would be a reverse stock split of all of the outstanding shares of the Company's common stock at a 200:1 ratio so

that the Series C preferred is convertible into 9 million shares of common stock would give Metamining approximately 90% of the equity.

159.    Comments attributed to Xuelian in connection with the acquisition of Metamining Nevada were as follows:  "We are extremely pleased to have entered into this agreement to acquire Metamining Nevada and enter into a new era for our company.  We are confident that this acquisition will become a tremendous long term growth opportunity for our company and we intend to work diligently to unlock the vast potential of these mining properties for our shareholders."

160.    The announcement was greeted by shock and surprise by Plaintiff, one of the Company's public shareholders, for a number of reasons.

161.    First, Linkwell had not previously disclosed to its public shareholders that the Company was contemplating a business combination, let alone one with a start-up company in an entirely dissimilar line of business – the exploration, mining and trading of iron ore in the United States.  There was no apparent business purpose to support the merging of the two companies.

162.    Second, the determination by the Board (then comprised of Xuelian and Wei) to acquire Metamining Nevada was entirely inconsistent with the disclosures made by Linkwell to its shareholders less than a month before.  On March 9, 2012, Linkwell had informed shareholders in a Definitive Information Statement on Schedule 14C that it would effect a reverse stock split of its common stock at a 30:1 ratio.  According to the Information Statement, on February 13, 2012, the Board adopted and approved the reverse stock split in an amendment (the "Charter Amendment") to the Company's Articles of Incorporation, having determined this action to be in the Company's best interest because it believed that the common stock was

undervalued and the reverse split would allow the common stock to trade in a "more realistic price range."

163.     Xuelian and Wei knew or should have known that the acquisition of Metamining Nevada in exchange for almost all of the equity of Linkwell would have a negative effect on the Company's stock price.  The Transaction did in fact have a negative impact on the Company's stock price.

164.     Third, Linkwell did not obtain a fairness opinion in connection with the Transaction, so that shareholders could evaluate whether the purported acquisition of 100% of the equity of Metamining Nevada constituted adequate consideration for substantially all of the Company's equity.

165.     Fourth, the issuance of new equity in connection with the Transaction also affected Xuelian and Wei who, at the time, purported to beneficially own 39,023,470 shares of Linkwell common stock, or almost 40% of the Company's equity.   Under the terms of the Transaction, the number of shares of common stock Xuelian and Wei beneficially own would be reduced to less than 3% of the Company's equity.  It made no business sense that Xuelian and Wei, who collectively devoted more than 57 years to building Linkwell into a profitable business, would consent to such a substantial reduction in equity for essentially nothing in return.

166.     The only plausible explanation was that Xuelian and Wei obtained something of value in exchange for their agreement to execute the Share Exchange Agreement and substantially reduce or cancel their equity interest in Linkwell that did not devolve to the Company.   The benefit that Xuelian and Wei received, namely, the Company's 90% equity interest in Linkwell Tech and, as consequence, Linkwell Tech's 100% equity interest in Likang Disinfectant and Likang Biological, was not disclosed in any of the Company's public filings.

### 1.     The Terms of the Transaction

167.     On April 4, 2012, Linkwell announced in a Form 8-K filing with the SEC that it acquired Metamining Nevada from Metamining on March 30, 2012.   According to the filing, Linkwell acquired Metamining Nevada to exploit certain mining and real property rights on the Nevada Properties.

168.     Pursuant to the terms of the Share Exchange Agreement, Linkwell acquired 100% of the capital stock of Metamining Nevada in exchange for 9 million shares of the Company's Series C convertible preferred stock and 3 million Series C common stock purchase warrants issued to Metamining.   Linkwell was also required, among other things, to: (a) appoint 2 directors designated by Metamining; and (b) issue certificates representing 581,973 convertible preferred shares to China Direct.

169.     Metamining was limited to appointing only 2 new directors because CD Defendants recommended during pre-closing negotiations that an entirely new slate of members not be immediately appointed to the Board in order to avoid unwanted scrutiny of the Transaction by the SEC and other regulatory agencies.   CD Defendants explained that the appointment of 2 Metamining directors to the Board was just the first stage of a phase-by-phase appointment process, and that by June 30 the Board would contain only Metamining appointees.

170.     As set forth in March 27, 2012 email from individuals at CD Int'l to Metamining:

> To save at least two-week[s] work related to the SEC disclosure and potential comments on the transaction, our attorney suggests that the current board remain [in] control for the following 15 days after acquisition closing date (March 30).   *In this way, the public company remains an operating company in the deal rather than a shell company, which will avoid many potential questions related to a typical reverse merger with a shell.*
>
> 15 days later, one of the two current directors will resign so that the board will be controlled by MetaMining [sic] since then. MetaMining [sic] can appoint other directors on that day.

Another current director will remain on board until June 30, 2012 to ensure smooth transition of the board.  That director will resign on June 30, 2012.  Thus, from June 30, the whole board of the public company will all be from MetaMining [sic].

In all, *we are* not limiting the number of directors from MetaMining [sic], but *suggesting a phase-by-phase appointment process to save potential questioning from SEC and other regulatory agencies*.  (Emphasis added.)

171.   On March 29, 2012, the Company filed Articles of Amendment to its Articles of Incorporation wherein the Board (composed of Xuelian and Wei), by unanimous written consent, adopted a resolution providing for the issuance of 9,581,973 shares of Series C convertible preferred stock.

172.   On March 30, 2012, Song and Ling were appointed to the Board.  On the same date, Linkwell issued 581,973 shares of Series C convertible preferred stock to China Direct for services rendered on behalf of Metamining in connection with the Transaction.

### 2.   The Grossly Inadequate Consideration for the Transaction

173.   Linkwell received no consideration in exchange for the transfer of almost 90% of the Company's equity to Metamining.

174.   On May 11, 2012, Linkwell filed an amendment to its April 4, 2012 Form 8-K filing.  The amended filing provided the following financial statements and other information: (a) the audited financial statements of Metamining Nevada as of December 31, 2011 (the "Audited Financial Statements"); and (b) pro forma financial information for Linkwell for the fiscal year ended December 31, 2011.

175.   The Audited Financial Statements of Linkwell reflect an absence of assets on the balance sheet of Metamining Nevada and no revenues on the statement of income.

176.   Note 1 in the Audited Financial Statements nevertheless described Metamining Nevada as an active business operation, which currently owns mining rights on the Nevada Properties, and that the Nevada Properties hold promising future prospects.

177.   Metamining Nevada, however, did not purchase any real property or mining rights on the Nevada Properties.   It was not even a signatory to any of the Purchase and Sale Agreements.   Before the Purchase and Sale Agreements were executed, Metamining was required to form a Nevada incorporated operating company (Metamining Nevada) to receive title of the mineral and mining rights so as to secure the Sellers control over the transfer of the Nevada Properties until the full payment of the Purchase Price.

178.   Moreover, after this action was commenced, Song admitted in a declaration dated July 20, 2013, and filed with the United States District Court, Northern District of California, in *Zhenhua Logistics (Hong Kong) Co., Ltd. v. Metamining, Inc., et al.,* No. 13-cv-2658 (N.D. Cal.) ("Zhenhua Action"), that "Metamining holds a 100% ownership interest in the Iron Horse Project …."

179.   On May 15, 2012, Linkwell filed its quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC which failed to report any results from the operations of its subsidiary disinfectant business.

180.   In the notes to consolidated financial statements of the same Form 10-Q, Linkwell disclosed the elimination of the $2.4 million put option liability to Ecolab under the Stockholders Agreement – which was cancelled by Ecolab in March 2012.

181.   Materials contemporaneously prepared by CD Defendants (reproduced below) confirm the secret agreement to spin-off Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei for no consideration to the Company:

The 3 Steps to Consummate the LWLL – Metamining (Meta) Reverse Acquisition (With 3 million Warrants)

**Step 1. LWLL acquires Meta with preferred stock (PS) for Meta**

Required Disclosure

The exchange

9 mm preferred stock and 3 million warrants

Meta Inc. (CA)
100%
Meta (NV)

LWLL (FL)
90%

100% equity interest

Linkwell Tech (FL)
10% — Eco Lab (DE) — 10%
100%

Likang Disinfectant (PRC)
100%

Likang Bio (PRC)

After the exchange

Meta Inc. (CA)
91.1%

Other Shareholders (including Bian and Guan 1.8%)
8.9%

LWLL (FL)
90%               100%

Linkwell Tech (FL)          Meta (NV)
100%

Likang Disinfectant (PRC)
100%

Likang Bio (PRC)

8K, 4 business days after merger.

8K-A, 71 days after 8K.

Legal acquirer (accounting acquiree) = LWLL

Legal acquiree (accounting acquirer) = Meta

**Step 2. Meta to control the Board of Directors and execute reverse split of shares, conversion of preferred stock and name change**

Proxy

**Step 3. LWLL spins off Linkwell Tech**

The spin off

Cancel 180,000 shares

Bian and Guan (1.4% ownership)

Meta Inc. (CA)
91.1%

Other Shareholders
8.9%

LWLL (FL)
90%          100%
90% equity interest

Linkwell Tech (FL)          Eco Lab (DE)          Meta (NV)
100%                10%

Likang Disinfectant
100%

Likang Bio (PRC)

After spin-off

Meta Inc. (CA)
92.3%

Other Shareholdes
7.7%

LWLL (FL)
100%

Meta (NV)

Proxy

Proxy Issues

1. Reverse Split

2. Conversion of preferred into common @ 1:1

3. Spin-off of Linkwell Tech

4. Name change

Note: The 4 issues could be done in one proxy.



45

## Ownership With 3 Million Warrants

| Pre-merger and Pre-reverse-split Common Stock Ownership | | |
|---|---:|---:|
| CDII | 10,000,000 | 8.36% |
| Likang former owners (Bian and Guan) | 36,000,000 | 30.10% |
| Other LWLL Shareholders | 73,605,475 | 61.54% |
| LWLL Shares Outstanding as of 3/29/2012 | 119,605,475 | 100.00% |

| After Issuance of Shares of Preferred Stock on the Merger | | |
|---|---:|---:|
| CDII | 581,973 | 4.42% |
| Metamining Shareholders (with 3 million warrants) | 12,000,000 | 91.05% |
| After Reverse Stock Split (200:1) | | |
| CDII | 50,000 | 0.38% |
| Likang former owners (Bian and Guan) | 180,000 | 1.37% |
| Other LWLL Shareholders | 368,027 | 2.79% |
| LWLL Shareholders Subtotal | 598,027 | 4.54% |
| Total shares after the merger and reverse split | 13,180,000 | 100.00% |

| After Spin-off of Linkwell Tech | | |
|---|---:|---:|
| Cancellation of shares (Bian and Guan) | (180,000) | |
| CDII | 631,973 | 4.86% |
| LWLL shareholders | 368,027 | 2.83% |
| Metamining Shareholders (with 3 million warrants) | 12,000,000 | 92.31% |
| Total shares of after the merger, reverse split and spin-off | 13,000,000 | 100.00% |

| Breakout of Ownership Excluding Metaming | | |
|---|---:|---:|
| CDII | 631,973 | 4.79% |
| Likang former owners (Bian and Guan) | 180,000 | 1.37% |
| Other LWLL Shareholders | 368,027 | 2.79% |
| Total ownership excluding Metamining | 1,180,000 | 8.95% |



The 3 Steps to Consummate the LWLL – Metamining (Meta) Reverse Acquisition (Without Warrants)

**Step 1. LWLL acquires Meta with preferred stock (PS) for Meta**

Required Disclosure

The exchange

After the exchange

Meta Inc. (CA) — 100% — Meta (NV)

9 mm preferred stock

LWLL (FL) — 90% — Linkwell Tech (FL) — 10% — Eco Lab (DE) — 10% — 100% equity interest

Linkwell Tech (FL) — 100% — Likang Disinfectant (PRC) — 100% — Likang Bio (PRC)

Meta Inc. (CA) — 88.4% — LWLL (FL); Other Shareholders (including Bian and Guan 1.8%) — 11.6%

LWLL (FL) — 90% — Linkwell Tech (FL); 100% — Meta (NV)

Linkwell Tech (FL) — 100% — Likang Disinfectant (PRC) — 100% — Likang Bio (PRC)

8K, 4 business days after merger.

8K-A, 71 days after 8K.

Legal acquirer (accounting acquiree) = LWLL

Legal acquiree (accounting acquirer) = Meta

**Step 2. Meta to control the Board of Directors and execute reverse split of shares, conversion of preferred stock and name change**

Proxy

**Step 3. LWLL spins off Linkwell Tech**

The spin off

After spin-off

Bian and Guan (1.8% ownership)

Cancel 180,000 shares

Meta Inc. (CA) — 88.4% — LWLL (FL); Other Shareholder — 9.8%

90% equity interest

LWLL (FL) — 90% — Linkwell Tech (FL); 100% — Eco Lab (DE) — 10% — Meta (NV)

Linkwell Tech (FL) — 100% — Likang Disinfectant — 100% — Likang Bio (PRC)

Meta Inc. (CA) — 90% — LWLL (FL); Other Shareholdes — 10%

LWLL (FL) — 100% — Meta (NV)

Proxy

Proxy Issues

1. Reverse Split

2. Conversion of preferred into common @ 1:1

3. Spin-off of Linkwell Tech

4. Name change

Note: The 4 issues could be done in one proxy.

47

**Without Warrants**

| Pre-merger and Pre-reverse-split Common Stock Ownership | | |
|---|---:|---:|
| CDII | 10,000,000 | 8.36% |
| Likang former owners (Bian and Guan) | 36,000,000 | 30.10% |
| Other LWLL Shareholders | 73,605,475 | 61.54% |
| LWLL Shares Outstanding as of 3/29/2012 | 119,605,475 | 100.00% |

| After Issuance of Shares of Preferred Stock on the Merger | | |
|---|---:|---:|
| CDII | 581,973 | 5.72% |
| Metamining Shareholders | 9,000,000 | 88.41% |
| After Reverse Stock Split (200:1) | | |
| CDII | 50,000 | 0.49% |
| Likang former owners (Bian and Guan) | 180,000 | 1.77% |
| Other LWLL Shareholders | 368,027 | 3.62% |
| LWLL Shareholders Subtotal | 598,027 | 5.87% |
| Total shares after the merger and reverse split | 10,180,000 | 100.00% |

| After Spin-off of Linkwell Tech | | |
|---|---:|---:|
| Cancellation of shares (Bian and Guan) | (180,000) | |
| CDII | 631,973 | 6.32% |
| LWLL shareholders | 368,027 | 3.68% |
| Metamining Shareholders | 9,000,000 | 90.00% |
| Total shares of after the merger, reverse split and spin-off | 10,000,000 | 100.00% |

182.    On May 29, 2012, Linkwell filed a Preliminary Information Statement on Schedule 14C which disclosed that, on May 24, 2012, the Board, comprised of Xuelian, Wei, Song and Ling, adopted and approved the Articles of Amendment: (a) to effect a reverse stock split at a 200:1 ratio rather than the previously disclosed 30:1 ratio; and (b) to change the corporate name of the Company to Sun Sage Resources, Inc.

183.     This Information Statement set forth that the Company's principal shareholders, holding "60.1% of our outstanding voting securities have approved these actions on June [7], 2012, by written consent in lieu of a special meeting of shareholders in accordance with the relevant provisions of the Florida Business Corporations Act."

184.     As of May 24, 2012, according to its Information Statement, Linkwell had 119,605,475 shares of common stock and 9,581,973 shares of Series C convertible preferred stock outstanding.   The Articles of Amendment were approved by the holders of 67,373,443 shares of the Company's common stock and 9,581,973 shares of the Series C convertible preferred stock.   The holders of the voting securities that were stated to have approved these actions by written consent in lieu of a special meeting include Xuelian, Wei, Metamining, CD Defendants and Haimai Legal.

185.     According to the Information Statement:

    a.     Xuelian exercised voting and investment power over 30,420,919 shares of Linkwell common stock, 20,420,919 shares of which as a co-owner of Linkwell Int'l;

    b.     Wei exercised voting and investment power over 15,602,551 shares of Linkwell common stock, 13,602,551 shares of which as a co-owner of Linkwell Int'l;

    c.     Song exercised voting and investment power over 9 million shares of Linkwell Series C convertible preferred stock owned by Metamining, and 3 million shares of Linkwell common stock issuable upon the exercise of outstanding Series C common stock purchase warrants exercisable anytime following the reverse stock split;

    d.     Shengayo Wu ("Shengayo") exercised voting and investment power over 8.35 million shares of Linkwell common stock owned by Haimai Legal; and

e.      Wang exercised voting and investment power over 581,973 shares of Linkwell Series C convertible preferred stock beneficially owned by CD Int'l through China Direct and 10 million shares of Linkwell common stock beneficially owned by CD Int'l through Capital Resource.

186.    On July 26, 2012, Linkwell filed an amendment to its quarterly report for the period ended March 31, 2012 on Form 10-Q/A with the SEC.  The amendment was filed in response to comments for the staff of the SEC and intended to address, among other things, certain risks faced by the Company as a result of the Transaction.

187.    The amended risk factors disclosed that the Metamining *never* commissioned or received feasibility studies or obtained operating permits to either explore or mine the mineral rights on the Nevada Properties.  Moreover, substantial feasibility work and capital were required just to demonstrate economic viability.  Even further, the filing disclosed that the Company may not be able to establish sufficient mineral reserves to ever justify commercial operations on the Nevada Properties.

188.    On the same day, Linkwell also filed a Form 8-K/A (amendment no. 2) amending the May 11, 2012 Form 8-K/A to provide a revised disclosure in Note 1 of the previously submitted Audited Financial Statements.  These curative disclosures confirmed that the representations Linkwell made about Metamining Nevada and its business in prior disclosures filed with the SEC were materially misleading.

189.    On August 20, 2012, Linkwell filed a quarterly report for the period ended June 30, 2012 on Form 10-Q with the SEC which contained the results of operations from the Company's subsidiary disinfectant business and reported revenue, profit and income for the 3 and 6 months ended June 30, 2012 in its consolidated statements of operations.  The Form 10-Q

filing disclosed that Metamining Nevada had no operations during the 6 months ended June 30, 2012.

190.    On September 11, 2012, Linkwell filed a Form 8-K/A (amendment no. 2) amending the May 11, 2012 Form 8-K/A to provide a revised disclosure in Note 1 of the previously submitted Audited Financial Statements.  These curative disclosures again confirmed that the representations Linkwell made about Metamining Nevada and its business in prior disclosures filed with the SEC were materially misleading.

191.    On October 25, 2012, Linkwell filed a Definitive Information Statement on Schedule 14C announcing the adoption and approval by the Board of the Articles of Amendment.  The Articles of Amendment, which are annexed to the Information Statement, set forth that the effective date for the reverse stock split is November 16, 2012.

192.    The Information Statement represented that "the holders of 60.1% of our outstanding voting securities have approved these actions on October 10, 2012, by written consent in lieu of a special meeting of shareholders in accordance with the relevant provisions of the Florida Business Corporations Act."  The holders of the voting securities that were stated to have approved these actions by written consent in lieu of a special meeting were Xuelian, Wei, Song, Metamining, CD Defendants and Haimai Legal.

193.    On November 15, 2012, Linkwell filed its quarterly report for the period ended September 30, 2012 on Form 10-Q with the SEC.  The Form 10-Q filing disclosed that Metamining Nevada Metamining Nevada still had no operations during the 9 months ended September 30, 2012.

194.    As a result of the business conducted by its operating subsidiaries in China, Linkwell had, as of December 31, 2011, cash and cash equivalents of $2,919,670, accounts

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 53 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 53 of
141

receivable of $12,651,347, total assets of $27,446,588, total liabilities of $10,012,087, total stockholders' equity of $17,434,501, and working capital of $1,997,311 with no material commitments for capital expenditures.

195.    As of the date of its last Form 10-Q filed with the SEC on November 15, 2012, none of the Company's liquidity or capital resources were utilized to make any of the payments due under the Purchase and Sale Agreements.

### C.    Ecolab Acquires Linkwell Tech, Likang Disinfectant and Likang Biological

196.    Ecolab identified Linkwell Tech, Likang Disinfectant and Likang Biological as corporate subsidiaries in its Annual Return on Form 10-K for fiscal year ended December 31, 2012. The "List of Subsidiaries," which is included as an exhibit to the Form 10-K filing, set forth the disclaimer that "[c]ertain additional subsidiaries, which are not significant in the aggregate, are not shown."

197.    Ecolab did not identify Linkwell Tech as a subsidiary in the 2008 Annual Return on Form 10-K that it filed with the SEC after the acquisition of 10% of the equity of the company in 2008.  In fact, Ecolab's historical practice has been to list as subsidiaries only those companies in which it maintains at least a majority ownership interest.  The List of Subsidiaries exhibit to Ecolab's 2011 Annual Return on Form 10-K defines subsidiaries as only those companies where Ecolab has equity interests of 50.1% and above.

198.    The disclosures in the 2012 Annual Return on Form 10-K represented that Linkwell Tech, Likang Disinfectant and Likang Biological are significant majority-owned subsidiary companies of Ecolab and that "[a]ll significant majority-owned subsidiaries are included in the filed consolidated financial statements."  Thus, the assets, liabilities and results of operations of Linkwell Tech, Likang Disinfectant and Likang Biological were included in Ecolab's consolidated financial statements for 2012.

199.   Linkwell did not file an Annual Return on Form 10-K for fiscal year ended December 31, 2012 with the SEC.  Linkwell did not file an annual or quarterly financial report with the SEC after Plaintiff commenced this action.  Upon information and belief, Linkwell did not file any financial reports with the SEC after the quarter ended September 30, 2012 to avoid having to disclose, among other things: (a) how Ecolab came to acquire Linkwell Tech, Likang Disinfectant and Likang Biological as significant majority-owned subsidiaries; and (b) what consideration, if any, was Linkwell paid for these assets.

200.   At all relevant times, Ecolab knew that Linkwell, as a publicly traded company, would be required to disclose to the SEC and its shareholders any material agreement to acquire all or substantially all of the Company's assets and operations.

### D.   Ecolab Discovers this Action and Distances Itself from Linkwell

201.   Plaintiff commenced this action on December 26, 2012.

202.   Upon information and belief, sometime prior to April 22, 2013, Ecolab obtained notice of the Complaint which identified it as a relevant non-party.  The basis for that belief is that on April 22, 2013, Linkwell, Linkwell Tech and Ecolab executed a redemption agreement ("Redemption Agreement") whereby: (a) Linkwell Tech agreed to repurchase the 10% equity interest expressly obtained by Ecolab pursuant to the Stock Purchase Agreement in 2008; and (b) the parties terminated *in their entirety* the agreements between and amongst themselves, including the Stock Purchase Agreement and the Stockholders Agreement.

203.   Under the terms of the Redemption Agreement, Linkwell Tech purchased the 888,889 shares of its stock that Ecolab had acquired from Linkwell for $2.4 million – the same price that would have been paid by Linkwell under the Put Option in the Stockholders Agreement had it not been terminated by Ecolab in March 2012.

204.    Ecolab returned the share certificate representing the 888,889 shares of Linkwell Tech stock to Linkwell Tech, not Linkwell.  According to the Company's Form 10-Q filing for the quarterly period ended September 30, 2012 (filed November 15, 2012), Linkwell Tech was a 90% owned subsidiary of Linkwell.

205.    Upon information and belief, Ecolab returned the shares to Linkwell Tech because Linkwell no longer possessed an equity interest in the subsidiary company.

**E.      The Transaction is Unwound**

206.    On October 17, 2013, Plaintiff moved for an Order granting partial summary judgment on the claim in the Complaint for unjust enrichment against Song, Ling, Metamining, Metamining Nevada, CD Int'l and China Direct.  Plaintiff asserted in the motion that, because of Song's admissions in the Zhenhua Action that Linkwell received no value in exchange for approximately 94% of its equity, there was no genuine issue of material fact that certain Defendants had been unjustly enriched.

207.    Song submitted two declarations under the penalties of perjury in the Zhenhua Action stating that Metamining was the present owner of the Nevada Properties (or the Iron Horse Project), *not* Linkwell or Metamining Nevada.

208.    On June 26, 2013, Song filed a declaration (ECF No. 85-26) opposing plaintiff's ex parte application for a writ of attachment, temporary restraining order and preliminary injunctive relief.  The declaration set forth that:  "*Metamining presently holds assets with significant value.  These assets are in the form of real property, mining rights and infrastructure, and equipment* of three mining operations: the Coal Creek (Spiro) Mine in Oklahoma, *the Iron Horse Project in Nevada*, and Barnett Energy LLC, which holds mining rights in Virginia." (Emphasis added.)

209.    On July 2, 2013, Song filed a supplemental declaration (ECF No. 106-2) which stated that "*Metamining holds a 100% ownership interest in the Iron Horse Project* …." (Emphasis added.)

210.    During his deposition in this action, Song confirmed that the statements made in his July 2, 2013 declaration are true and accurate.  Song's testimony objectively contradicts the November 12, 2013 declaration Song submitted in this action (ECF No. 101-1) in which he stated under the penalty of perjury that "Metamining indirectly owns 88% of the Iron Horse Project" and that "Metamining claims no direct ownership of the Iron Horse Project."

211.    In response to Plaintiff's motion, Xuelian, Wei, Song, Ling and Wang determined to unwind that portion of the Transaction whereby Linkwell acquired 100% of the equity in Metamining Nevada in exchange for the delivery of approximately 94% of the Company's equity to CD Defendants and the shareholders of Metamining.

212.    Linkwell disclosed in a Form 8-K filing with the SEC on November 26, 2013 that it sold 100% of its "interest" in Metamining Nevada back to Metamining pursuant to an equity transfer agreement.  The filing further disclosed that, under the terms of said agreement, Metamining cancelled the Linkwell shares and stock warrants it owned.

213.    Documents produced in discovery indicate that CD Defendants also returned the Linkwell stock obtained from the Company in connection with the Transaction.

214.    The prosecution of this action was the main reason for the unwinding of that portion of the Transaction in which Song, Ling and CD Defendants acquired substantially all of the Company's equity and Xuelian and Wei sought to spin-off Linkwell Tech, Likang Disinfectant and Likang Biological to themselves and/or to Ecolab for their own self benefit. Song confirmed as much at his July 20, 2015 deposition:

55

Case 0:12-cv-62539-DPG    Document 402-1    Entered on FLSD Docket 08/10/2016    Page 57 of 141

Q.    You mentioned that part of the reason that the transaction was unwound was because the capital that was sought was not able to be raised; is that correct?

A.    No, it's not entirely so.  The main reason I would say is because of the litigation.  We were sued.

Q.    And when you say "the litigation," do you mean this lawsuit filed by Frederick Siegmund?

A.    Yes.

Q.    Ultimately we saw in the documents that the reverse merger was unwound, Linkwell returned to the position it was premerger; is that correct?

A.    Yes.

Song Tr. (July 20, 2015) at 294:19 - 295:10.

## F.    The Acquisition

215.    On January 16, 2014, the Court entered Discovery Orders (ECF Nos. 116-18) that directed Linkwell, Song, Ling, Metamining, Metamining Nevada and CD Defendants to respond to Plaintiff's outstanding discovery requests.

216.    Xuelian and Wei, in their capacity as directors and officers of Linkwell, prevented the Company from complying with the Omnibus Order – which directed Linkwell to answer interrogatories and produce documents by January 31, 2014 – and/or failed to take action to cause the Company to comply.

217.    Xuelian and Wei then retained Sidley to structure a transaction to get rid of this action.  Sidley developed a scheme whereby Xuelian, Wei, Yinling and their affiliates would acquire the revenue generating assets in Linkwell's subsidiary companies at a fraction of their fair value to Linkwell's public shareholders.  Given the pendency of this action, the scheme could be accomplished only by depriving Plaintiff of notice of such transaction prior to its consummation.

56

218.   On March 28, 2014, Sidley prepared a proposed transaction structure and fee proposal to Likang Disinfectant ("Proposal") based on prior discussions conducted with Xuelian and Liyong.   According to documents produced in discovery, Sidley began working on the Proposal on March 7, 2014.

219.   Pursuant to the Proposal, Sidley would represent Likang Disinfectant in connection with the deregistration of Linkwell's securities with the SEC, followed by a one step merger between Linkwell and Yinling, and then post-merger restructuring of the private company in preparation for a subsequent public offering in China for a fee of RMB 950,000.  In relevant part, the Proposal described the proposed transaction structure as follows:

a.      Linkwell will 'go dark" and terminate its filing obligations with the SEC by filing a Form 15;

b.      Liyong's organization (Yinling) establishes two vehicles, a parent company in an offshore jurisdiction and a merger subsidiary in Florida;

c.      Yinling serves a merger proposal on the Board;

d.      The Board evaluates the terms of the merger proposal;

e.      "[Yinling] serves a first draft of the agreement and plan of merger on the [B]oard and the [B]oard, (if necessary, consider to engage its separate counsel), evaluates said agreement;"

f.      Yinling, the Board and their counsel negotiate the agreement and plan of merger;

g.      The Board accepts the agreement and plan of merger and authorizes its execution by the Company;

h.      Linkwell prepares a proxy statement and other related documents and distributes them to its stockholders;

i.      Linkwell calls a special meeting to vote on the agreement and plan of merger;

j.      "At the stockholders meeting affirmative vote in excess of majority is cast to approve the merger;"

k.      Yinling files a certificate of merger with the Secretary of State of Florida and consummates the merger, Leading First becomes the parent of Linkwell and all existing shareholders are cashed out; and

l.      "Linkwell undergoes post-merger restructuring in preparation for a domestic IPO."

220.    On April 4, 2014, Likang Disinfectant retained Sidley as legal counsel in connection with the Acquisition.

221.    Pursuant to the Likang Engagement Letter, Sidley agreed to provide advice and assistance to Likang Disinfectant in: (a) the filings of relevant documents in relation to the going dark of Linkwell with the SEC and in response to any inquiry by FINRA; (b) the organization of an acquisition vehicle in Florida; (c) the structuring and execution of a going private proposal, including the preparation of an agreement and plan of merger; and (d) liaising with the transfer, depository and paying agents.

222.    The Likang Engagement Letter set forth a fee for legal services to be rendered in connection with the Acquisition of RMB 950,000.   The fee amount was based on the understanding that completion of the Acquisition did not involve any extraordinary circumstances that will cause the fee arrangement to become impracticable, there will not be any

extraordinarily extensive negotiation which would require Sidley's attendance and all negotiations on the deal documents will take place in mainland China and reasonably permit Sidley's attendance by telephone.   The fee amount was further qualified by stated assumptions that:

      a.     The Acquisition will take the form of a one-step merger after going dark;

      b.     There will be *no review by or comment from the SEC*;

      c.     The language for all legal documents shall be English and no need for translation;

      d.     The negotiation on the agreement and plan of merger is *minimal*;

      e.     There is *no third party "interloper"* during the course of the Acquisition; and

      f.     There is *no litigation* during the course of the Acquisition.

223.   On April 11, 2014, in accordance with the plan to take Linkwell private, the Notice of Termination was filed on behalf of the Company with the SEC which indicated that Linkwell would deregister its securities and cease publicly filing financial statements or periodic reports.

224.   On April 15, 2014, counsel for Plaintiff requested, through counsel for CD Defendants, an April 16, 2014 meet and confer with a representative of Linkwell to discuss Plaintiff's intention to move for an Order of Contempt in light of the Company's failure to comply with the Omnibus Order and the recent filing of the Notice of Termination.   Plaintiff sought to ascertain whether and when Linkwell would comply with the Omnibus Order.   Counsel for Plaintiff received no response to the request for a meet and confer.

225.     Documents produced in discovery show that on April 17, 2014, Plaintiff's request for a meet and confer was sent to Jue Wang ("Jue") (the Corporate Secretary of Linkwell, Linkwell Tech and Likang Disinfectant), and that Jue forwarded the communication to Liyong and Calamus Huang, an attorney at Sidley's Singapore office.

226.     On April 18, 2014, Plaintiff moved for an Order of Contempt against Linkwell (ECF No. 142).

227.     On April 22, 2014, the Supplement was executed whereby Likang Disinfectant retained Sidley to provide legal advice and assistance to Linkwell, Xuelian and Wei in connection with the claims asserted only against Xuelian and Wei in this action.

228.     Sidley did not obtain a waiver of conflicts from Linkwell in connection with the simultaneous representation of Linkwell and adverse parties Xuelian and Wei in this action.  Nor did Sidley request or obtain the consent or waiver of conflicts from the Company's public shareholders to represent both Linkwell and Xuelian and Wei.

229.     On July 9, 2014, Yinling retained Sidley as legal counsel in connection with the Acquisition.  On the same date, Liyong executed a letter acknowledging the conflict or potential conflict of interest arising from Sidley's representation of both Yinling and Likang Disinfectant in the Acquisition and consented to Sidley's representation of Likang Disinfectant.  On July 16, 2014, Xuelian executed a similar letter acknowledging the conflict or potential conflict of interest arising from Sidley's representation of both Likang Disinfectant and Yinling in the Acquisition and consented to Sidley's representation of Yinling.

230.     On July 11, 2014, the Court entered an Order (ECF No. 173) granting Plaintiff's September 17, 2013 motion for alternative service of process upon Xuelian and Wei.

231.    On July 15, 2014, Xuelian and Wei were served with the Second Amended Verified Shareholders Derivative Complaint.

232.    On August 7, 2014, Plaintiff filed the Third Amended Verified Shareholders Derivative Complaint (ECF No. 187) ("Third Amended Complaint") which, among other things, named Ecolab as a Defendant in the action.    At that time, Plaintiff had no knowledge with respect to the Acquisition, that Sidley had been engaged to represent both Likang and Yinling in connection with the Acquisition or that Sidley had been engaged to represent Linkwell, Xuelian and Wei in connection with this action.

233.    On August 12, 2014, the Board purportedly approved the Merger Agreement and authorized its execution.

### 1.    The Notice and Proxy Statement

234.    After the Board approved the execution of the Merger Agreement, Sidley drafted a notice for the Special Meeting on September 19, 2014 in Shanghai ("Notice") and the Proxy Statement.  Sidley, in concert with Xuelian and Wei, had the task of ensuring that, among other things, the Notice and Proxy Statement were disseminated to all Linkwell shareholders.   In violation of Florida law, Sidley, Xuelian and Wei determined not to mail these materials to Plaintiff and the other shareholders of Linkwell that held their stock in street name.

235.    Since Xuelian, Wei and parties that they control or with whom they are affiliated owned more than 60% of Linkwell stock, Sidley determined that it was not necessary to send the Notice and Proxy Statement to public shareholders holding approximately 37% of the equity or solicit their proxies to vote on the Merger Agreement.  Moreover, in light of the pendency of this action, Sidley, in concert with Xuelian and Wei, determined not to disclose the Acquisition to Plaintiff and the other shareholders of Linkwell that held their stock in street name in order to

prevent them from taking any action (i.e., seeking an injunction or other rights) until after the Acquisition was consummated.

236.    On August 19, 2014, Sidley attorney Calamus Huang ("Huang") emailed the stock transfer agent for Linkwell, Signature Stock Transfer, Inc. ("Signature") about mailing the Notice and Proxy Statement to Linkwell shareholders of record as of August 15, 2014 that were, located in the United States.  The August 19 communication copied Sidley partner Joseph Chan ("Chan") and Jue, and set forth, in relevant part, as follows:

> According to Linkwell's bylaws, "If a notice is mailed at least *thirty days* before the date of the meeting, it may be done by a class of United States mail other than first class.  If mailed such notice shall be deemed to be delivered when deposited in the United States mail, addressed to *the shareholder at his address as it appears on the stock transfer books* of the corporation, with postage thereon prepaid."

> In this regard, would you please kindly answer our questions below:

> Would it be fine with you that you handle the mailing of the proxy statement to those *shareholders on record* whose address is outside [C]hina and Linkwell itself will handle the mailing to those shareholders whose address is inside China?

> Is it possible for you to post the proxy statement by US mail other than first class on August 20 (New York time)?

237.    Signature responded to Sidley on the same date that it would mail the Notice and Proxy Statement to "all direct holders of record (outside of China) on 8-20-2014."  Huang wrote back that: "We note that some record holder[s] such as Cede & Co. is holding Linkwell shares as nominee for hundreds of beneficial holders.  Would you please … explain how such record holder will handle it after receiving the proxy statement from you according to your experience?" Signature addressed Sidley's inquiry as follows:

> For all street named holders who hold stock through (a broker or through DTCC/CEDE & CO) we will do a search with Broadridge

> (who does the mailing for all brokerage houses *but please note the search will take at least a week and brokerage holders will not be mailed their items by Broadridge until at least 10 days*. I am sorry but *I cannot speed up the process*.
>
> Also note *for brokerage house purposes we will have to create a current or future record date*. (Emphasis added.)

238.    Additional emails circulated between Sidley and Signature on August 19 confirmed that the Notice and Proxy Statement would be mailed on August 20, 2014 to *only* direct holders of Linkwell stock. With respect to holders in street name, Sidley took the position that "we only need to mail to the record holders. We are fine with the arrangement in relation to these shareholders whose shares are held by nominees."

239.    On August 28, 2014, Huang emailed Signature to inquire about the status of the search and to confirm that the Notice and Proxy Statement was mailed to Cede & Co. on August 20. This communication copied Chan and Jue. Signature responded by email on August 29, 2014 stating, in relevant part, as follows:

> Broadridge will do the mailing to all street holders the end of next week or the week later (note as I stated all I can do is operate in the time constraints they have). CEDE was mailed 1 copy but that really doesn't matter as they cannot vote their position (as their position has to be voted through Broadridge by the direct holders). Note there is nothing I can do beyond what has already been done for the mailing/solicitation of prox[ies].

240.    On the same day, Huang wrote back to reconfirm that Sidley was not concerned whether holders in street name timely received the Notice and Proxy Statement, stating: "We are totally fine with the procedures that you have to take in relation to street holders and appreciate your efforts and cooperation very much."

241.    On September 9, 2014, Signature emailed Jue about the process of mailing the Notice and Proxy Statement to shareholders of Linkwell that held their stock in street name. Signature wrote:

> Note *all holders in street name need to be mailed by Broadridge if you are soliciting proxies … as they would also have to vote through Broadridge* (not directly your firm).
>
> Also *we are being told that there is not enough time for the mailing/vote for street named holders to respond* (usually a mailing/vote is done giving the shareholders *at least 30 days to respond after the items are mailed*).  Please advise if you wish to postpone the meeting or if you have the votes in house already if you wish to forego the proxy process with Broadridge and make this a mailing only.  (I will check to see if this is only a mailing if they can mail to all holders except those on the NOBO list in China since there would be no proxy if you like).   (Emphasis added.)

242.   On September 10, 2014, Jue responded in an email stating, in relevant part, as follows:

> First of all *we won't postpone the meeting and we do have more than 60% votes in house already*.  Of course, *I will double check with our attorney in relation to the forgoing of the proxies*.
>
> Forgive my asking, will Broadridge refused [sic] [to] do the mailing/[v]ote if we might don't take those votes into account? (Emphasis added.)

243.   Signature responded that Broadridge would not refuse to do the mailing.

244.   On September 10, 2014, Huang emailed Signature regarding the concern expressed to Jue that the mailing of the Proxy Statement to holders in street name gave them insufficient time to respond.  The September 10, 2014 email copied Jue and Chan, and set forth, in relevant part, as follows:

> Has … Broadridge posted the proxy statement to the street named holders?  I understand from [Jue] that you are concerned that there may not be enough time for these holders to respond.  However, according to Linkwell's by-laws, if a notice of special meeting is mailed at least 30 days before the date of the meeting, it shall be deemed to be delivered when deposited in the US mail, addressed to the shareholder at his address as it appears on the stock transfer books.  Therefore, the notice has been delivered in compliance with Linkwell's by-laws.

Also, the proxy statement clearly stated that if a shareholder abstains from voting, fails to cast his vote in person or by proxy or fails to give voting instructions to his broker, dealer, commercial bank, trust company or other nominee, it will have the same effect as a vote "AGAINST" the approval of the merger agreement. Therefore, Broadridge can simply mail the whole package of the notice of special meeting, the proxy statement and proxy card to those street named holders.

Since the proxy statement has set out clear instructions, we don't think a separate cover letter is necessary.

245.    On September 12, 2014, Jue wrote Signature that the mailing to Linkwell shareholders that held their stock in street name should not include proxy solicitations.

246.    Even if the Proxy Statement was mailed by Broadridge to holders in street name without proxy solicitations on September 12, it was already too late as the Special Meeting was scheduled to be held in 7 days and Section 607.0705(a) of the Florida Statutes requires notice to be sent not fewer than 10 days before the meeting date.

247.    On September 17, 2014, Huang emailed Signature to confirm the status of the mailing of the Proxy Statement to holders in street name.  The September 17, 2014 email copied Jue and Chan, and set forth, in relevant part, as follows:

Would you please let us know whether or not Broadridge has mailed the proxy statement?  …  If Broadridge hasn't done the mailing before September 19, this Friday, the day on which the special meeting is scheduled to be held, we *may* consider to adjourn the meeting if necessary.  Therefore, it is very important for us to know the status of the mailing as soon as possible. (Emphasis added.)

248.    On September 18, 2014, Huang again emailed Signature to inquire whether Broadridge had mailed the Proxy Statement to Linkwell shareholders in the U.S. holding their shares in street name and, if not, how much time Broadridge needed to complete the mailing. However, the mailing had not been done as Xuelian, Wei and Sidley intended.  Sidley then determined to not to send the Notice or Proxy Statement to street name holders at all and, in

violation of Florida law, proceeded with the Special Meeting, thus preventing street name holders, including Plaintiff, from stopping the Acquisition before its consummation.

249.    On September 19, 2014, the very next day, the Special Meeting was held and the Acquisition was approved by Xuelian, Wei and parties controlled by or affiliated with them, and without the mailing of the Notice or Proxy Statement to Plaintiff and other Linkwell shareholders that held their stock in street name.  Sidley engineered this result by acting far beyond their capacity as lawyers, but rather as agents for Xuelian and Wei.

### 2.      The Proxy Statement is Materially Misleading

250.    The Proxy Statement prepared by Sidley is materially misleading because it falsely portrays the Acquisition as an arm's length transaction between Linkwell and a third party buyer, Yinling.

251.    According to the Proxy Statement, in February 2014, Yinling contacted Linkwell, Xuelian and/or Wei to express an interest in acquiring all of the outstanding shares of the Company.

252.    In March 2014, Xuelian and/or Wei, on behalf of Linkwell, purportedly executed a non-disclosure agreement with Yinling.  Pursuant to the Proxy Statement, Yinling commenced its business, financial and legal due diligence following the execution of that agreement.

253.    On April 12, 2014, Yinling requested that negotiations with Linkwell be conducted on an exclusive basis for six months with no solicitation of other proposals or negotiations with other bidders, and Linkwell granted Yinling's request.

254.    Records filed with SAIC indicate, however, that Yinling was not even formed until April 18, 2014.  Moreover, in response to Plaintiff's discovery requests concerning any due diligence sought by the parties to the Acquisition, Sidley represented that "after a reasonable search, no responsive documents exist."

255.     The Proxy Statement sets forth that, on July 25, 2014, Yinling submitted a preliminary non-binding proposal ("Proposal Letter") to Linkwell to acquire all of the Company's outstanding stock in a merger transaction for $0.18 per share.  The Proxy Statement does not disclose that the Proposal Letter was prepared by Sidley, or the nature of Sidley relationship with Yinling in connection with the Acquisition.  The Proxy Statement does not disclose this action or that a primary purpose of the Acquisition was to terminate this action.  The Proxy Statement does not disclose that after the Acquisition was consummated, Xuelian and Wei intended to restructure Linkwell in preparation for a public offering in China.

256.     The Proxy Statement further sets forth that the Board, Yinling and Sidley held various meetings to discuss material issues arising from a draft merger agreement and to determine the positions of the Board with respect to those issues.  Sidley also held a number of conference calls with the Company to summarize and explain the key terms of the merger agreement and communicated the Board's positions on key issues to Yinling.  On August 10, 2014, the parties reached an agreement in principle on all major issues, including the $0.88 per share offer price and a non-solicitation provision pursuant to which Linkwell was prohibited to actively solicit alternative transaction proposals.  On August 12, 2014, Linkwell, Leading First and Leading World purportedly executed the Merger Agreement.

257.     The Proxy Statement does not disclose, however, that Likang and Yinling reached an agreement to consummate the Acquisition in March/April 2014.  In fact, most of the events described in the Proxy Statement were planned and scheduled in a document titled "Timetable for the Merger and Acquisition of Linkwell Corporation," which was prepared by Sidley and circulated to Liyong and Jue on April 16, 2014.  The timetable sets forth tentative dates by which, among other things: (a) Linkwell accepts the Merger Agreement, prepares the Proxy

Statement and convenes the Special Meeting; and (b) Yinling submits a certificate of merger to the Florida Department of State to complete the merger.  Absent from the timetable are action items involving the preparation of Linkwell financial results for the periods proximate to the vote, projections of future performance, or financial analyses or fairness opinion with respect to the merger consideration.

### 3.    Xuelian, Wei and their Affiliates Approve the Merger Agreement at the Special Meeting

258.    According to the Notice, all Linkwell shareholders were invited to attend the Special Meeting in Shanghai on September 19, 2014.

259.    The stated purpose of the Special Meeting was to approve the Merger Agreement, which provided for the merger of Leading World with and into Linkwell, with Linkwell surviving as a wholly owned subsidiary of Leading First.  The Notice further set forth, among other things:

> Regardless of the number of shares of Company common stock you own, your vote is important.  The failure to vote will have the same effect as a vote *against* the proposal to approve the merger agreement.  Whether or not you plan to attend the special meeting, please take the time to submit a proxy by following the instructions on your proxy card as soon as possible.  If your shares of the Company common stock are held in an account at a broker, dealer, commercial bank, trust company or other nominee, you should instruct your broker, dealer, commercial bank, trust company or other nominee to vote in accordance with the voting instruction form furnished by your broker, dealer, commercial bank, trust company or other nominee.
>
> …
>
> *Company common shareholders who do not vote in favor of approval of the merger agreement will have the right to seek appraisal and receive the fair value of their shares in lieu of receiving the per share merger consideration if the merger closes but only if they perfect their appraisal rights by complying with the required procedures under Florida law which are summarized in the accompanying proxy statement.  The procedure for dissent and*

appraisal is described in Sections 607.1301 to 607.1333 of the Florida Business Corporation Act, which are attached as Annex B to the proxy statement accompanying this notice. We are providing this notice and a copy of such sections pursuant to Section 607.1320 of the Florida Business Corporation Act. Florida law requires strict adherence to the procedures set forth therein, and failure to do so may result in the loss of all dissenters' appraisal rights. Accordingly, each shareholder who might desire to exercise dissenter's appraisal rights should carefully consider and comply with the provisions of those sections and consult with his or her legal advisor. (Emphasis added.)

260. According to the shareholder's attendance sheet, the following Linkwell shareholders were present at the Special Meeting:

     a.     Linkwell Int'l (represented by Xuelian and Wei) (170,118 shares);

     b.     Xuelian (50,000 shares) and Wei (11,000 shares);

     c.     Shanghai Likang Pharmaceutical Technology Co. Ltd ("Likang Pharmaceutical") (represented by Xuelian) (2,500 shares);

     d.     Haimai Legal (41,750 shares);

     e.     Honglin Li ("Honglin") (20,000 shares);

     f.     Wensheng Sun ("Wensheng") (5,000 shares);

     g.     Qiqing Zong ("Qiqing") (11,030 shares);

     h.     Jue (17,500 shares); and

     i.     Liumei Chen ("Liumei") (19,010 shares).

261. According to the Company's 2011 Form 10-K, Xuelian and Wei own all of the equity of Linkwell Int'l. Additionally, Xuelian and Wei respectively own 90% and 10% of Likang Pharmaceutical.

262. Wensheng is Chief Operating Officer of Likang Disinfectant and serves as a member of that company's board of directors with Xuelian, its Chairman. Wensheng is also President of Zhongyou Pharmaceutical.

69

263.    Shengyao a director and partner of Haimai Legal, exercises voting and investment power over the Linkwell shares owned by Haimai Legal.  Shengyao is also a member of the Likang Disinfectant board.

264.    Jue is the Secretary to the Board, the Corporate Secretary at Linkwell Tech and the Secretary and a supervisor at Likang Disinfectant.

265.    Honglin is the President of Inner Mongolia Likang Biological Co., Ltd., a Linkwell related party.

266.    Upon information and belief, Qiqing was a consultant to Linkwell and awarded 2 million shares of Linkwell stock in May 2011.

267.    Liumei is a supervisor at 2 Linkwell affiliated companies, Shanghai Yikang Environmental Technology, Co., Ltd. ("Yikang Environmental") and Shanghai Zhongyou Health Management Consulting Co., Ltd. ("Zhongyou Health Management").  Xuelian is the sole shareholder of Yikang Environmental and Zhongyou Health Management.

268.    Linkwell Int'l, Likang Pharmaceutical, Haimai Legal, Honglin, Wensheng, Qiqing, Jue and Liumei are entities or individuals controlled by or affiliated with Xuelian and Wei.

269.    Xuelian, Wei, Linkwell Int'l, Likang Pharmaceutical, Haimai Legal, Honglin, Wensheng, Qiqing, Jue and Liumei voted to approve the Plan of Merger and Merger Agreement at the Special Meeting.  The votes cast by these attendees at the Special Meeting represented 347,908 of the total 348,508 shares of Linkwell stock voted in favor of approving the Plan of Merger and Merger Agreement.

270.   Xuelian and Wei beneficially owned 233,618 of the total 348,508 Linkwell shares cast to approve the Plan of Merger and Merger Agreement.   These 233,618 shares represented 43% of all Linkwell shares and 67% of all Linkwell shares voted at the Special Meeting.

271.   The Plan of Merger and Merger Agreement could not have been approved, and the Acquisition could not have been consummated, without the shares of Xuelian and Wei being cast to approve the Plan of Merger and Merger Agreement.

272.   No votes were cast or counted against approval of the Plan of Merger or Merger Agreement.   Pursuant to the Notice, shares of Linkwell stock that were not voted at the Special Meeting were to have the same effect as a vote against the proposal to approve the Merger Agreement.   According to the summary of poll results ("Summary") for the Special Meeting, 200,492 out of the Company's total 549,000 shares of Linkwell stock were not voted.   Not 1 of the 200,492 shares was reflected in the Summary as being cast against the approval of the Plan of Merger or Merger Agreement.

273.   After the vote, the Amended Articles of Incorporation were filed with the Florida Department of State.   The Amended Articles of Incorporation were prepared and filed by Sidley.

274.   The Amended Articles of Incorporation contains a new Article VI which provides for the indemnification of the Company's officers and directors to the fullest extent of the law and specifically include "advancing expenses of officers and directors as provided in Section 6.10 of [the Merger Agreement]."   In pertinent part, this Section of the Merger Agreement provides:

> From and after the Effective Time, [Linkwell] shall indemnify and hold harmless, to the fullest extent required by the Company Articles of Incorporation and Company By-Laws … each present and former director and officer of the Company and each Company Subsidiary (collectively, the <u>Indemnified Parties</u>") against any costs of expenses (including attorneys' fees and expenses),

judgments, fines, losses, claims, settlements, damages or liabilities incurred in connection with any Action, whether civil, criminal, administrative or investigative, arising out of or pertaining to such Indemnified Party's *service as a director or officer of the Company or Company Subsidiary or services performed by such Person and the request of the Company or Company Subsidiary*, including (i) any and all matters pending, existing or occurring at or prior to the Effective Time, and (ii) any claim arising for the transactions contemplated herein, and any actions taken by [Leading First] and/or [Leading World] with respect thereto (including any disposition of assets of [Linkwell] or any of its Subsidiaries which is alleged to have rendered [Linkwell] and/or any of its Subsidiaries insolvent). (Emphasis added.)

275.    No such indemnification provision existed in prior versions of the Company's Articles of Incorporation or amendments thereto.

276.    The Articles of Merger were subsequently filed by Sidley with the Florida Department of State. Pursuant to the Articles of Merger, the Plan of Merger was adopted by the shareholders of Linkwell on September 19, 2014.

277.    As described in the Plan of Merger, the respective boards of directors of Linkwell and Leading World approved the merger with Linkwell as the surviving company, on the terms and conditions contained or referred to in the Merger Agreement and the shareholders of Linkwell approved and adopted the Merger Agreement and Plan of Merger. It further provided that on the effective date of the merger (September 19, 2014), in accordance with the terms of the Merger Agreement, the issued and outstanding shares of Linkwell will be cancelled and the shareholders will have the right to receive merger consideration in the amount of $0.88 per share of Linkwell stock.

### 4.    Plaintiff and Other Linkwell Shareholders were not mailed the Notice or Proxy Statement

278.    On October 8, 2014, Sidley drafted a cover letter to Linkwell shareholders which was intended to be delivered with a letter of transmittal (for the surrendering of Linkwell shares

to obtain the merger consideration of $0.88 per share).  The cover letter disclosed that the Merger Agreement was approved by the Company's shareholders at the Special Meeting on September 19, 2014, Articles of Merger were filed with Florida Department of State on the same day and, as a result of the merger, Linkwell became a wholly owned subsidiary of Leading First.  The cover letter further disclosed that, as of October 8, no shareholders had exercised their appraisal rights.

279.   On October 15, 2014, Jue emailed Signature (and copied Chan and Huang) concerning the fact that Linkwell shareholders who held in street name did not receive notice of the Special Meeting and the Proxy Statement, writing:  "I am afraid that these street holders of Linkwell Corporation haven't received the Notice regarding the Merger, since there is still some trading of Linkwell stock recently.  Could you please relay the enclosed letter to the Broadridge and push it to inform all these brokers about the completion of the merger."

280.   The email attached a signed copy of the cover letter described above which disclosed that, among other things, as of October 15, 2014, no shareholders had exercised their appraisal rights.

281.   According to a certification provided by Securities Transfer Corporation, the paying agent for Linkwell in connection with the Acquisition, proxy materials were not mailed to Linkwell shareholders of record until October 29, 2014, more than a month *after* the Merger Agreement was purportedly approved at the Special Meeting and Articles of Merger were filed with the Florida Department of State.

282.   On November 6, 2014, Plaintiff's shares of Linkwell stock were unilaterally cancelled from his brokerage account at TD Ameritrade, contemporaneous with the receipt of $0.88 per share for his Linkwell stock.

283.    Plaintiff was not mailed the Notice and Proxy Statement, nor was his broker TD Ameritrade.  Other Linkwell shareholders with brokerage accounts at TD Ameritrade similarly did not receive the Notice and Proxy Statement.

284.    By letter dated December 22, 2014. Plaintiff's broker TD Ameritrade confirmed that it received no materials regarding the Acquisition to forward to TD Ameritrade clients that owned shares of Linkwell stock.

285.    Based on the foregoing, it is reasonable to infer that not one of the hundreds of Linkwell shareholders in the U.S. that held Linkwell stock in street name was sent the Notice and Proxy Statement.

**G.      The Acquisition was Unlawful and Unfair**

286.    As described above, the consummation of the Acquisition was procured through the use of a manipulative and deceptive device, artifice to defraud or acts which operated or could act as a fraud of deceit, willful nondisclosure, unlawful conduct, unfair dealing and/or impermissible conflicts of interest.

287.    On October 26, 2014, Plaintiff discovered the Articles of Merger and the accompanying documents on the Florida Department of State website.

288.    Prior to October 26, 2014, Plaintiff had no knowledge of any actual or potential merger transaction between Linkwell, Leading First and Leading World.

289.    Plaintiff and other Linkwell shareholders that held their stock in street name were not provided with the statutory notice with respect to the Acquisition, as mandated under Sections 607.0705 and 607.1103 of the Florida Statutes.

290.    The complete failure to provide such notice unlawfully and unfairly deprived Plaintiff and other Linkwell shareholders of the right and opportunity to: (a) evaluate whether the material terms of the Merger Agreement, including the $0.88 per share merger consideration,

were fair; (b) vote on whether to approve the Merger Agreement; (c) exercise appraisal rights; or (d) seek an injunction to enjoin the Acquisition.

291.    If Plaintiff had been provided with the requisite notice, he would have moved in this action to enjoin the Special Meeting.  Such motion would have been meritorious because, as described below, the Proxy Statement was manifestly incomplete insofar as it lacks basic information relevant to a material transaction for the sale of 100% of the Company's equity.

292.    As described above, the failure to provide Plaintiff and other Linkwell shareholder that held their stock in street name with statutory notice was a strategic decision by Xuelian, Wei and Sidley.

293.    Because Plaintiff was not provided the requisite notice, he did not know there was a material transaction to acquire all of the shares of common stock of Linkwell, and did not discover the Acquisition until after it was consummated.

294.    The failure of Xuelian, Wei and Sidley to comply with Florida law and provide Plaintiff with statutory notice ensured that the Acquisition would be consummated and wrongfully prevented Plaintiff from obtaining an injunction and exercising other legal and statutory rights.

295.    A principal purpose of the Acquisition was to divest Plaintiff of standing to assert the derivative claims in this action and, thereby, insulate Xuelian and Wei from liability for their misconduct in connection with the Transaction.  Sidley designed and implemented the Acquisition to accomplish this objective.  The Acquisition was consummated by not providing Plaintiff or other Linkwell shareholders that held their stock in street name with notice thereof, in violation of Florida law.  Sidley knew that Sections 607.0705 and 607.1103 of the Florida Statues required that notice of the Acquisition and appraisal rights be timely furnished to *all*

Linkwell shareholders. Xuelian, Wei and Sidley did not comply with Florida law and, as a result, Yinling was able to acquire 100% of the equity of Linkwell through an inherently unfair process and at a grossly inadequate price.

296.   Xuelian and Wei faced substantial liability for the claims asserted against them in connection with the Transaction for self-dealing and other breaches of fiduciary duty. By undertaking the Acquisition, Xuelian and Wei intended to prevent further scrutiny of their misconduct by the Court.

297.   There is no legitimate business purpose to justify the Acquisition and none has been offered or provided. Xuelian, Wei and Sidley knew that no legitimate business purpose existed when they planned the Acquisition with Liyong in March 2014.

298.   Prior to December 9, 2014, Linkwell Tech owned 100% of the equity of Likang Disinfectant. According to company filings with SAIC, as of December 9, 2014, Linkwell Tech's equity ownership of Likang Disinfectant was reduced to 16.17%. The other 83.83% of Likang Disinfectant was acquired by Zhongyou Pharmaceutical. Xuelian is the controlling shareholder (51.17%) of Zhongyou Pharmaceutical.

299.   Xuelian, Wei and Sidley possessed direct knowledge of the pendency of this action yet failed to provide any notice of the Special Meeting to the Court or Plaintiff. After the Merger Agreement was approved at the Special Meeting, Xuelian, Wei and Sidley still failed to disclose this information to the Court or Plaintiff.

300.   Even if Plaintiff had been provided with statutory notice, the process employed in connection with the Acquisition would still have been unfair.

301.   The Proxy Statement does not contain any current financial statements (audited or unaudited) for Linkwell, Linkwell Tech, Likang Disinfectant or any other revenue generating

subsidiary company.   The Proxy Statement also does not contain a fairness opinion from a financial advisor to address the adequacy or inadequacy of the $0.88 per share merger consideration for Linkwell stock.

302.   The merger consideration paid to acquire Linkwell has no relation to the Company's net assets, enterprise value or the value of the derivative claims against Defendants. For example, for year-end 2014, Likang Disinfectant reported in excess of $40.9 million in total assets and just under $4.7 million in total liabilities.   A calculation of share price based on a valuation of net assets at approximately $36.2 million would yield a $65.94 price per share ($36.2 million ÷ 549,000 outstanding shares of Linkwell stock).

303.   The $0.88 merger consideration paid to Linkwell shareholders was arrived at based on advice received from Sidley as no other advisors, legal or financial, are identified in the Proxy Statement.   Moreover, Sidley served as legal counsel for both Likang Disinfectant and Yinling.

304.   The $0.88 merger consideration was accepted and approved by Xuelian, Wei and parties that they control or with whom they are affiliated without solicitation of other bids to acquire Linkwell.   No other bids were solicited because Xuelian and Wei stood on both sides of the Acquisition and, as described in paragraphs 55 and 298 above, Xuelian personally obtained a controlling interest in Likang Disinfectant, Linkwell's primary revenue generating asset, after the Acquisition was consummated.   This information was not disclosed in the Proxy Statement.

305.   In addition, the Proxy Statement does not disclose the existence of this action or attempt to value the claims pending against Xuelian, Wei, Song and Ling for breaches of fiduciary duty in connection with the Transaction, as well as other parties that aided and abetted

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 79 of 141

such breaches of fiduciary duty. The $0.88 per share merger consideration did not include any value for the derivative claims previously asserted in this action.

306.    The Merger Agreement annexed to the Proxy Statement is also incomplete insofar as it is not even signed by the parties and does not attach the referenced schedules.

307.    The Proxy Statement also fails to disclose Sidley's debilitating conflicts of interest in violation of the Rules of Professional Conduct. Sidley did not disclose that it was engaged to provide legal advice and assistance to both Likang Disinfectant and Yinling in connection with the sale of Linkwell and a post-merger restructuring in preparation for an IPO. Sidley did not disclose that the real parties in interest in connection with the Acquisition were Xuelian, Wei and Yinling. Nor did Sidley disclose that at the same time that it was representing Likang and Yinling in connection with the Acquisition, it was also engaged to provide legal advice and assistance to adverse parties Linkwell and Xuelian and Wei in this action.

308.    Finally, the Proxy Statement does not disclose that the Amended Articles of Incorporation and the Merger Agreement were drafted and approved so that any legal fees and expenses incurred by and any judgments or liabilities obtained against Xuelian and Wei, among others, in connection with the claims asserted in this action related to the Transaction or the claims arising out of the Acquisition would be paid or advanced by Linkwell.

### H.    Xuelian, Wei and Sidley Take Actions to Evade Discovery and Avoid Compliance with Court Orders

309.    As described above, on January 16, 2014, the Court entered the Omnibus Order compelling Linkwell, among others, to answer interrogatories and produce documents responsive to Plaintiff's discovery requests. Xuelian and Wei did not take any action to cause the Company to comply with the Omnibus Order.

310.     On April 18, 2014, Plaintiff moved for an Order of Contempt against Linkwell as a result of the failure to comply.  Plaintiff's motion was unopposed.  An Order of Contempt for failure to comply with the Omnibus Order was issued against Linkwell on April 1, 2015 (ECF No. 258).

311.     On October 31, 2014, while the motion for an Order of Contempt was pending, Plaintiff filed a second motion for an Order of Contempt (ECF No. 216) after the discovery of the Acquisition.

312.     On November 17, 2014, Xuelian and Wei filed papers opposing Plaintiff's Second Motion for an Order of Contempt against Linkwell (ECF Nos. 219, 219-1, 219-2). Those opposition papers included declarations from Xuelian and Wei, which were prepared with the advice and assistance of Sidley.  The declarations affirmed under the penalty of perjury that, effective July 18, 2014, Xuelian and Wei resigned their positions as directors and officers of Linkwell and no longer hold any position with the Company.

313.     Sidley knew at the time the declarations were prepared and executed, that the statements therein were false.  Sidley possessed contemporaneously executed Statements on Lost Share Certificates, each of which was signed by Xuelian on behalf of Linkwell.  The Statements on Lost Share Certificates are respectively dated November 5, 2014 and November 10, 2014, and post-date the claimed resignation by Xuelian by almost 4 months.  Sidley knew that Xuelian nor Wei had not resigned from their positions at Likang Disinfectant – the company responsible for almost all of Linkwell's revenues and profits and paying Sidley's legal fees to represent Linkwell, Xuelian and Wei in connection with this action.  Sidley knew that Xuelian and Wei controlled Linkwell through their management and control of Likang Disinfectant.  Sidley also knew that Linkwell shares the same registered address and office space as Likang Disinfectant.

Sidley nonetheless permitted Xuelian and Wei to declare under the penalty of perjury that they resigned in July and were no longer affiliated with the Company.

314.    In January 2015, Huang sent the Statements on Lost Share Certificates to the Company's paying agent, Stock Transfer Corporation, so that the Linkwell stock certificates could be cancelled.  Jue, Liyong and Chan were copied on the email.

315.    On April 1, 2015, the Court entered an Order (ECF No. 258) denying Plaintiff's second motion on grounds that the relief requested against Xuelian and Wei is inappropriate at this time.  Objections to the Order were subsequently filed.  On September 29, 2015, the Court ruled on the objections and entered an Endorsed Order (ECF No. 322) finding, among other things, that an Order of Contempt could not be enforced as against Xuelian and Wei because "they are no longer directors of the corporation."

316.    Neither Xuelian, nor Wei have clarified to the Court or Plaintiff whether the Statements on Lost Share Certificates, which were signed by Xuelian on behalf of Linkwell, require the withdrawal of the declarations submitted by Xuelian and Wei in November 2014.

317.    On January 8, 2015, Plaintiff served requests for production of documents ("Requests") upon Xuelian and Wei.

318.    On March 11, 2015, Plaintiff filed a motion to compel in connection with the Requests.

319.    On April 10, 2015, the Court issued an Order (ECF No. 265) granting the motion to compel consistent with its oral rulings of April 9, 2015 (ECF No. 285) (April 9, 2015 Hearing Tr.").

320.    On April 14, 2015, in accordance with the Order, Buchanan Ingersoll & Rooney PC ("Buchanan") (counsel appearing for Xuelian and Wei in this action) delivered a letter to

Sidley, in its capacity as counsel for Linkwell, and requested on behalf of Xuelian and Wei copies of all documents responsive to the Requests in the Company's possession, custody or control.

321.    On April 28, 2015, Xuelian and Wei produced limited documents purportedly obtained from Linkwell and Sidley.  As a result of material gaps in the production, Plaintiff served Sidley with a subpoena on October 20, 2015 ("Subpoena").

322.    On December 4, 2015, Xuelian and Wei moved to quash the Subpoena in the United States District Court of the Southern District of New York ("Motion to Quash").

323.    In support of the Motion to Quash, counsel for Xuelian and Wei submitted a declaration which asserted, among other things, that Xuelian and Wei "shared a common interest in the outcome of the Lawsuit with each other and with … Linkwell" and that Xuelian, Wei and Linkwell have a "common cause of securing dismissal of the Lawsuit."

324.    On December 21, 2015, in apparent response to Plaintiff's argument in opposition that the interests of Linkwell, on one hand, and Xuelian and Wei, on the other, were adverse, Tom Paskowitz, a partner in Sidley's New York office, filed a declaration in support of the Motion to Quash which, in relevant part, stated:

> On April 4, 2014, Sidley entered into an engagement letter with [Likang Disinfectant] to assist with a going-private transaction of Linkwell … that was then under consideration.
>
> On April 22, 2014, Sidley and [Likang Disinfectant] entered into a supplement of the April 4, 2014 engagement letter, pursuant to which Sidley agreed to represent Linkwell, [Xuelian] and [Wei] in connection with the Action.
>
> After service of process was effected on [Xuelian] and [Wei] in the Action, and each resigned as a director of Linkwell, I negotiated an extension of time for [Xuelian] and [Wei] to answer, move, or otherwise respond to the complaint.  That stipulation, however, was signed by Buchanan Ingersoll & Rooney PC ("Buchanan") on

> behalf of [Xuelian] and [Wei], and Sidley has not appeared on behalf of [Xuelian] and [Wei] in the Action.
>
> However, Sidley has continued to work with [Xuelian] and [Wei] in connection with the Action, including to facilitate communications between [Xuelian], [Wei], and Buchanan.
>
> Sidley has not terminated its representation of [Xuelian] and [Wei] in connection with the Action.

(MC Case, ECF No. 19-1).

325.    At no prior time did Sidley disclose that it simultaneously represented Linkwell, Xuelian and Wei in connection with this action.   At no prior time did Buchanan disclose to Plaintiff or the Court that Linkwell and their clients were represented by Sidley in this action.

326.    To the contrary, Buchanan had represented to the Court that Xuelian and Wei had no relation to the Company:

> THE COURT: So you are representing to me, as an officer of the court, that they have cut their ties and they no longer officially belong to the company, right?
>
> MR. VILLENEUVE: Absolutely, Your Honor. …

April 9, 2015 Hearing Tr. at 12:18-21.

327.    During the February 8, 2016 argument on the Motion to Quash and the Motion to Compel Sidley, the Court noted the vast change in position:

> THE COURT: And also, counsel for defendants, okay, my recollection, and I have a couple thousand cases, but I remember repeatedly Xuelian and Wei saying, we can't get ahold of these records because we are not officers anymore of Linkwell.
>
> Counsel for plaintiff, am I off on a deserted island here?
>
> MR. HECHT: No, you're not.
>
> THE COURT: Now, without dancing around, let's address that. You were here, you argued that … they can't comply because they are no longer officers of Linkwell. Do you follow me that was your main argument as a matter of fact? Address that directly.

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 84 of 141

MR. VILLENEUVE: Okay. Your Honor, I believe our position is that because they were not officers of Linkwell, they did not have legal custody and control of those documents and thus they were not required or able to produce them.

THE COURT: Well, I just had -- you are here on this case, you know, and it's represented by Sidley's pleadings that they represent these fellows personally. They represent Linkwell. Am I missing something here? You could be Fred Astaire and you won't be able to dance out of that One.

MR. VILLENEUVE: Your Honor, I'm not trying to dance. The fact that Sidley represents Linkwell and represents our clients doesn't mean that our clients have custody and control and possession of Linkwell documents. There was never a case presented and I don't know of any case that says, because your law firm represents another defendant, you have custody and control of that defendant's documents.

THE COURT: They represent Linkwell. They represent Xuelian and Wei. Do you follow me? Xuelian and Wei say we are not officers of Linkwell, repeatedly saying that in federal court, and now Sidley enters an appearance on behalf of Wei and Xuelian and Linkwell.

MR. VILLENEUVE: Your Honor, I don't think Sidley has entered an appearance on behalf of them. What we have said is we are co-counsel and so our communications with Sidley should not be discoverable and --

THE COURT: Wait. Who is co-counsel?

MR. VILLENEUVE: The law firm of Buchanan, Ingersoll & Rooney which represents Xuelian Bian and Wei Guan is co-counsel with the law firm of Sidley Austin which --

THE COURT: Who represents Xuelian and Wei and Linkwell?

MR. VILLENEUVE: Yes, Your Honor.

THE COURT: I'll just leave that speak for itself.

…

MR. UNGER: In August or in July, I believe, Mr. Bian and Guan, they resigned as officers and directors of Linkwell, but the attorney-client relationship did not end just because they resigned at that point. We had been retained to represent them in regard to

the derivative action. And then what happened was we assisted … those two individuals --

THE COURT: Derivative action?

MR. UNGER: This action, Your Honor.

…

THE COURT: Now, you heard counsel for plaintiff saying, and he was quite correct, I have addressed all those things, I have repeatedly addressed all those things. Do you follow me.

MR. UNGER: And as I understand, Your Honor, you are suggesting --

THE COURT: You are saying this is a new argument. The firm itself is coming in and asserting, to simplify things, the same – it's for a different reason. Before they said, well, we don't have the power because we are no longer officers. But when they first came into your office, correct, they were still officers, were they not?

MR. UNGER: Yes, Your Honor.

THE COURT: Okay.

MR. UNGER: I am not addressing --

THE COURT: So there's something the matter here because if they came in and they were still officers and their first visit to you was after the derivative action was filed and they were in my court claiming that they were not officers and they no longer had the ability to produce records, tell me what I am missing here.

MR. UNGER: They did not make that claim prior to the time they resigned, Your Honor. When they --

THE COURT: They made that claim here in court.

MR. UNGER: When they made that claim, they were no longer officers and directors, that's correct. There's nothing inaccurate about that claim. At the time that they were before you and said they were no longer officers and directors, that was true. And as a result --

THE COURT: Because after they came in and they were represented by you, during that time, they resigned. Is that what you are saying?

84

MR. UNGER: They resigned in July of 2014. We had -- yes, we had been representing them --

THE COURT: Okay.

Feb. 8, 2016 Hearing Tr. (ECF No. 355) at 10:22 - 12:17, 44:4-11, 45:9 - 46:18.

328.    On February 10, 2016, an Order (ECF No. 354) was issued denying the Motion to Quash and granting the Motion to Compel Sidley consistent with the oral rulings made on February 8.

329.    Sidley subsequently produced certain documents responsive to the Subpoena (including the Statements on Lost Share Certificates described in paragraphs 313-14 above) which confirm that Xuelian and/or Wei, at all relevant times, exercised control over Linkwell, either directly or through their management and control of Likang Disinfectant, and possessed the practical ability to obtain the documents sought in the Requests insofar as those documents reside in the shared office space of Likang Disinfectant and Linkwell in China.

330.    Xuelian, Wei and Sidley have engaged in a pattern of obfuscation and deceit to frustrate Plaintiff's efforts in this action to obtain relevant discovery regarding the Transaction and Acquisition.

## VIII.    CLASS ACTION ALLEGATIONS

331.    Plaintiff alternatively brings this action on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of all Linkwell common shareholders (the "Class") whose shares of Linkwell stock were sold in connection with the Acquisition.

332.    Excluded from the Class are Xuelian and Wei, Sidley and its employees or agents, Yinling, Leading First and Leading World ("Class Defendants") and their subsidiaries and affiliates, all persons that voted in to approve the Merger Agreement and all persons who make a

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 87 of
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 87 of
141

timely request to be excluded from the Class.  Plaintiff reserves the right to revise the Class
definition based upon information obtained through discovery.

333.    Certification of Plaintiff's claims for class-wide treatment is appropriate because
Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as
would be used to prove those elements in individual actions alleging the same claim.

334.    This action has been brought and may be properly maintained on behalf of the
Class proposed herein under Federal Rule of Civil Procedure 23.

335.    The members of the Class are so numerous and geographically dispersed that
individual joinder of all Class members is impracticable.  Plaintiff believes that there are more
than 300 members of the Class that reside in the United States.  Class members may be notified
of the pendency of this action by recognized, Court-approved notice dissemination methods,
which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

336.    This action involves common questions of law and fact, which predominate over
any questions affecting individual Class members, including, without limitation:

a.      Whether the federal securities laws were violated by Class Defendants'
acts as alleged herein;

b.      Whether Class Defendants, by their design, implementation and
consummation of the Acquisition without the provision of any notice of the same to Plaintiff and
the Class, employed a scheme or artifice to defraud, or engaged in acts, practices or a course of
conduct which operated as a fraud on deceit in connection with sale of Class members' Linkwell
stock;

c.      Whether Class Defendants breached their fiduciary duties and/or aided
and abetted breaches of fiduciary duties to Plaintiff and the Class as alleged herein;

    d.      Whether Class Defendants conspired to acquire 100% of the equity of Linkwell through an unlawful and unfair process; and

    e.      Whether $0.88 per share was fair value for the Linkwell stock owned by Plaintiff and the other members of the Class.

337.    Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants as described above.

338.    Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other member of the Class he seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation. The interests of the Class will be fairly and adequately protected by Plaintiff, who intends to prosecute this action vigorously.

339.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The injury or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants. It would be impracticable for Plaintiff and the members of the Class to individually seek redress for Class Defendants' wrongful conduct.

340.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system. By contrast, the class

action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## IX.    CAUSES OF ACTION - DERIVATIVE CLAIMS[2]

### COUNT I (DISMISSED)

#### BREACH OF FIDUCIARY DUTY
#### (Against Xuelian, Wei, Song and Ling)

341.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-214 above, as though fully set forth herein.

342.    Xuelian, Wei Song and Ling owed Linkwell certain fiduciary obligations.  By reason of their fiduciary relationships, Xuelian, Wei Song and Ling owed Linkwell the highest obligations of loyalty, good faith, fair dealing and due care.

343.    As described in paragraphs 94, 97-102, 116-18, 125-26, 151-56, 164, 166-93, 199 and 206-14 above, Xuelian and Wei violated their fiduciary duties of loyalty, good faith, fair dealing, due care and disclosure in the management and administration of the Company's affairs, and in the use and preservation of its property and assets.

344.    During the Relevant Period, Xuelian and Wei caused Linkwell to enter the Transaction with Metamining.  The Share Exchange Agreement was executed by Xuelian, in his capacity as Chief Executive Officer of Linkwell.  The Share Exchange Agreement and collateral side agreements executed in connection with the Transaction were ratified by the Board, then composed solely of Xuelian and Wei.

345.    Xuelian and Wei breached their fiduciary obligations to Linkwell by failing to obtain a fairness opinion in connection with the Transaction, which would have confirmed that

---

[2] Plaintiff's derivative action was dismissed without prejudice pursuant to the April 11, 2016 Order. Plaintiff includes the derivative claims in this amended pleading to preserve the record, his rights on appeal of the dismissal for lack of standing and for valuation purposes in connection with the newly asserted class claims.

the deal to exchange 100% of the equity of Metamining Nevada for approximately 88% of the equity in Linkwell was entirely inadequate consideration and not in the Company's interest.

346.    Xuelian and Wei breached their fiduciary obligations to Linkwell by undertaking a secret side agreement with Song, Ling, Metamining, Metamining Nevada and CD Defendants to approve and authorize the Transaction in exchange for the undisclosed transfer of Linkwell Tech, Likang Disinfectant and Likang Biological to themselves, entities they control or with whom they are affiliated and/or Ecolab.

347.    Xuelian and Wei also breached their fiduciary obligations to Linkwell by failing to obtain a fairness opinion in connection with the disposition of the assets or operations of these businesses to or for the benefit of themselves, entities they control or with whom they are affiliated and/or Ecolab, at the expense and detriment of the Company.

348.    The Transaction was subsequently ratified by Song and Ling, who joined the Board on March 30, 2012, and with Xuelian and Wei, unanimously adopted and approved the 1 for 200 reverse stock split.  In ratifying the Transaction, Song and Ling (who simultaneously served as directors of Metamining) breached their fiduciary duties to Linkwell by confirming the issuance of approximately 88% of the Company's equity to Metamining for no consideration and without obtaining a fairness opinion and agreeing to the disposal of all of the meaningful assets and operations of Linkwell for no consideration.

349.    Xuelian, Wei, Song and Ling each had a duty to ensure that Linkwell disseminated accurate, truthful and complete information to its shareholders.

350.    Xuelian, Wei, Song and Ling each violated their fiduciary duties of good faith, due care and disclosure by causing the Company to disseminate to Linkwell shareholders

materially misleading information in the Company's public filings. These actions could not have been a good faith exercise of prudent business judgment.

351. During the Relevant Period, Xuelian, Wei, Song and Ling approved the issuance by Linkwell of preliminary and definitive Information Statements filed on SEC Schedules 14C on May 29, 2012 and October 25, 2012 (collectively, the "2012 Information Statements"), that were materially inaccurate because they failed to disclose highly material facts and circumstances concerning the Transaction. Each of the 2012 Information Statements was intended to provide the Company's public shareholders with notice of the adoption of the Articles of Amendment by written consent of the Board and the majority shareholders of Linkwell in lieu of a special meeting of shareholders. Each member of the Board was duty-bound to disclose all information material to the corporate actions.

352. Xuelian, Wei, Song and Ling each caused Linkwell to file and disseminate the 2012 Information Statements which failed to disclose material information to the Company's public shareholders. The 2012 Information Statements were materially inaccurate and incomplete because, among other things, they omitted to disclose that:

a. The Board failed to obtain written consents from the majority holders of the Company's outstanding voting securities to adopt and approve the Articles of Amendment without a special meeting of shareholders, despite representing otherwise in the Preliminary Information Statement filed with the SEC on May 29, 2012 (no shareholder consent was executed, nor did Linkwell obtain the written consent of the majority shareholders until immediately prior to the filing of the Definitive Information Statement);

b. The purpose of the Transaction was to provide Metamining, Metamining Nevada and CD Defendants with a clean public shell company to raise money to fund the

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 92 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 92 of
141

operations of their mining business, and, at the same time, permit Xuelian and Wei to dispossess Linkwell of its historical disinfectant business either through a transfer to themselves or other parties that they control or with whom they are affiliated, or a sale to Ecolab;

        c.      The purpose of the 1 for 200 reverse stock split was to reduce the number of total outstanding shares of Linkwell to 10,000,000 so that Metamining and CD Defendants would own substantially all of the equity of Linkwell and subsequently raise money for their nascent mining business through a private placement and issuance of stock to PIPE investors; and

        d.      Wholly owned subsidiaries of CD Int'l simultaneously served as consultants for Linkwell, Metamining and Metamining Nevada during the negotiations of the Transaction and were compensated with Linkwell equity for services provided.

353.    By reason of their positions as fiduciaries of Linkwell, Xuelian, Wei, Song and Ling each owed the Company and its public shareholders duties of good faith, due care and disclosure.  Xuelian, Wei, Song and Ling consciously violated and breached these duties by approving the Company's submission of materially misleading financial statements and press releases to the SEC in connection with the Transaction.  As detailed above, these public filings were materially misleading insofar as they:

        a.      Misrepresented or omitted material facts describing the business and prospects of Metamining Nevada in press releases and filings with the SEC;

        b.      Misrepresented that Linkwell acquired 100% of the equity interest in Metamining Nevada as a result of the Transaction;

      c.      Omitted to disclose that one of the goals of the Transaction was to divest the Company of the Linkwell Tech stock certificate(s) representing its 90% interests in Linkwell operating subsidiaries with substantial assets, sales and earnings;

      d.      Omitted to disclose the interests of Xuelian and Wei in the Transaction; and

      e.      Omitted to disclose Ecolab's acquisition of the business or operations of Linkwell Tech, Likang Disinfectant and Likang Biological.

354.     Xuelian, Wei, Song and Ling each engaged in *ultra vires* and/or fraudulent acts and breached their fiduciary obligations to Linkwell by:

      a.      Wrongfully divesting the Company of its 90% interest in Linkwell Tech, Likang Disinfectant and Likang Biological without ensuring that the Company received fair value for those assets;

      b.      Using their status as the shareholders in control of Linkwell:

      i.      To approve, for no consideration, the transfer of approximately 94% of the equity of the Company to Metamining and CD Defendants; and

      ii.      To approve the secret sale or transfer of the substantial assets and operations of Linkwell Tech, Likang Disinfectant and Likang Biological to themselves or parties that they control or with whom they are affiliated or Ecolab, without any consideration to Linkwell; and

      c.      As both directors and shareholders, in actively engaging in efforts to cover up their misconduct by submitting materially misleading filings with the SEC.

355.     The conduct of Xuelian, Wei, Song and Ling constitutes actual omissions involving breach of duty and/or breach of trust.

356.    Xuelian, Wei, Song and Ling each has violated fiduciary duties owed to Linkwell, engaged in unlawful self-dealing and acted to place their personal interests and/or their co-conspirators' interests ahead of the interests of Linkwell and its public shareholders.

357.    Xuelian, Wei, Song and Ling each failed to exercise the care required, and made material misrepresentations or omitted to disclose material information in filings with the SEC regarding the Transaction.

358.    The breaches of fiduciary duty Xuelian, Wei, Song and Ling constitute an abuse of their ability to control and influence Linkwell, for which they are legally responsible.

359.    Xuelian, Wei, Song and Ling each had a fiduciary duty to Linkwell and its shareholders not to issue approximately 94% of its equity for no consideration.

360.    Xuelian, Wei, Song and Ling each had a duty to Linkwell and its shareholders to prudently supervise, manage and control the assets, business and operations at Linkwell.

361.    By their actions, Xuelian, Wei, Song and Ling abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the duties imposed upon them by Florida law.  By engaging in the misconduct alleged herein, Xuelian, Wei, Song and Ling breached their duties of loyalty, good faith, fair dealing, due care and candor in the management and administration of the affairs of Linkwell and in the use and preservation of the Company's assets.

362.    As a direct and proximate cause of the breaches of fiduciary duty by Xuelian, Wei, Song and Ling, Linkwell suffered significant damages.

363.    Xuelian, Wei, Song and Ling are liable to the Company in an amount to be proven at trial.

Case 0:16-cv-62506-FAM Document 60-1 Entered on FLSD Docket 10/19/2017 Page 95 of
141
Case 0:12-cv-62539-DPG Document 402-1 Entered on FLSD Docket 08/10/2016 Page 95 of
141

**COUNT II (DISMISSED)**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Metamining, Metamining Nevada, CD Defendants and Ecolab)**

364.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-214 above, as though fully set forth herein.

365.    Metamining, Metamining Nevada, CD Defendants and Ecolab aided and abetted and rendered substantial assistance in the wrongful conduct complained of in paragraphs 342-63 above.   In taking such actions to substantially assist the commission of the wrongdoing complained of, Metamining, Metamining Nevada, CD Defendants and Ecolab acted with knowledge of the primary wrongdoing, and were aware of their overall contribution to and furtherance of the wrongdoing.

366.    Metamining, Metamining Nevada, CD Defendants and Ecolab provided material support to Xuelian, Wei, Song and Ling in connection with the Transaction.

367.    Metamining, Metamining Nevada, CD Defendants and Ecolab each knew that Xuelian, Wei, Song and Ling, as members of the Board, owed fiduciary duties to Linkwell and were acting in breach of those duties when they ratified the Transaction, issued shares of the Company for no or inadequate consideration without ever obtaining a fairness opinion and agreed to and permitted the disposal of all of the meaningful assets and operations of Linkwell for no consideration.

368.    As described in paragraphs 117-18, 135-41, 156-58, 167-78, 181, 186-88 and 206-10 above, Metamining provided substantial assistance to Xuelian, Wei, Song and Ling by, *inter alia*:

a.       Agreeing, through Song and Ling, to be a party to the Share Exchange Agreement;

b.      Agreeing to the secret sale or transfer of the substantial assets and operations of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei, parties that they control or with whom they are affiliated or Ecolab;

c.      Appointing Song and Ling to the Board to ratify the Transaction;

d.      Agreeing to a phase-by-phase appointment process for "new" Linkwell directors after the Transaction was consummated to avoid undesired scrutiny of the Transaction by the SEC or other regulatory agencies; and

e.      Directly providing or affirming materially misleading information to Linkwell concerning its ownership of Metamining Nevada and Metamining Nevada's assets and operations for inclusion in the Company's public filings.

369.    As described in paragraphs 135-41, 156-58, 167-68, 177 and 186-88 above, Metamining Nevada provided substantial assistance to Xuelian, Wei, Song and Ling by, *inter alia*:

a.      Agreeing, through Song and Ling, to be a party to the Reverse Merger Consulting Agreement and the Share Exchange Agreement;

b.      Operating as the agent or intermediary of Metamining to transfer the $11,250,000 financial obligation incurred by Metamining under the Notes to Linkwell; and

c.      Directly providing or affirming materially misleading information to Linkwell concerning its purported ownership of the Nevada Properties.

370.    As described in paragraphs 133-41, 143-56, 169-70, 172, 181-88, 190 and 206-10 above, CD Defendants provided substantial assistance to Xuelian, Wei, Song and Ling by, *inter alia*:

a.      Agreeing, pursuant to the Reverse Merger Consulting Agreement, to deliver Linkwell as a clean shell company to Metamining for the purposes of effecting the Transaction;

b.      Agreeing, pursuant to the Service Agreement, to provide certain services for Linkwell in connection with the transfer of control of the Company to Metamining, and the preparation and filing of all public disclosures for Linkwell with the SEC after the consummation of the Transaction;

c.      Agreeing, pursuant to the Consultant Service Agreement, to assist Xuelian and Wei in the secret divestiture of Linkwell Tech, Likang Disinfectant and Likang Biological from Linkwell;

d.      Agreeing to the secret sale or transfer of the substantial assets and operations of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei, parties that they control or with whom they are affiliated or Ecolab;

e.      Providing consulting and advisory services to Linkwell, Metamining and Metamining Nevada in connection with structuring the Transaction, despite the existence of a clear conflict of interest;

f.      Providing consulting and advisory services to Linkwell and Metamining to avoid undesired scrutiny of the Transaction by the SEC or other regulatory agencies; and

g.      Preparing and reviewing the Company's public filings for submission to the SEC which they knew, or should have known, were materially false and misleading.

371.   CD Defendants were highly compensated for their substantial assistance. CD Defendants served as consultants and advisors to Linkwell, Metamining and Metamining Nevada in connection with the Transaction. Linkwell, however, was solely responsible for paying China

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 98 of
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 98 of
141
141

Direct and Capital Resource for the services rendered in connection with the Transaction. Capital Resource was paid 10,000,000 shares of the Company's common stock (or 50,000 shares after the 1 for 200 reverse stock split). China Direct was paid substantially more. It received 581,973 shares of the Company's Series C convertible preferred stock. After the 1 for 200 reverse stock split, CD Defendants held 631,973 shares of Linkwell common stock while the Company's public shareholders (exclusive of Metamining and CD Defendants) held just 368,027 shares.

372.   As described in paragraphs 124-26, 148-50 and 196-200 above, Ecolab provided substantial assistance to Xuelian Wei, Song and Ling by, *inter alia*:

a.   Engaging in negotiations with Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada, CD Int'l, China Direct and/or Capital Resource regarding the secret sale or transfer of Linkwell Tech, Likang Disinfectant and Likang Biological;

b.   Agreeing to amend the Stockholders Agreement to terminated Section 4.1 thereof and cancel the Put Option in order to facilitate the secret sale or transfer of the substantial assets and operations of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei, or parties that they control or with whom they are affiliated;

c.   Agreeing to enter into a transaction with Xuelian and Wei, or their designees, for the secret sale or transfer of Linkwell Tech, Likang Disinfectant and Likang Biological, with the knowledge that:

i.   Linkwell, as a public company, would be required to publicly disclose a transaction to dispose of all or substantially all of its assets; and

ii.   Linkwell, to discharge its fiduciary obligations, would be required to obtain a fairness opinion and maximize value with respect to the proceeds payable to

97

Linkwell, either in accordance with the Stockholders Agreement with Ecolab or pursuant to other appropriate business valuation methods; and

       d.     Failing to confirm, under the circumstances, that the proceeds attributable to the disposition of the subsidiary disinfectant businesses were paid to and for the benefit of Linkwell, rather than Xuelian, Wei or their designees.

373.    As a counterparty to the transaction to acquire the equity of Linkwell Tech, Likang Disinfectant and Likang Biological, Ecolab knew about the Board's plan (then composed of Xuelian and Wei) to strip the assets and operations of the subsidiary disinfectant business for no meaningful consideration to the Company and were familiar with all material terms of the Transaction.

374.    Ecolab knew that Linkwell was undertaking a reverse merger to acquire 100% of the equity of Metamining Nevada in exchange for over 90% of the Company's equity. Ecolab knew that the fundamental conditions to the Transaction required, *inter alia*, that Metamining Nevada merge into a clean shell company and that Metamining Nevada's shareholders (Song and Ling) become the controlling shareholders of Linkwell. Ecolab knew that CD Defendants were providing consulting services to Linkwell, Metamining and Metamining Nevada. Ecolab also knew that Linkwell Tech, Likang Disinfectant and Likang Biological were to be spun-off from Linkwell to Xuelian and Wei in connection with the Transaction, in exchange for the cancellation of their Linkwell shares.

375.    As a direct and proximate result of the aiding and abetting breaches of fiduciary duty by Metamining, Metamining Nevada, CD Defendants and Ecolab, Linkwell suffered significant damages.

376.    Metamining, Metamining Nevada, CD Defendants and Ecolab are liable to the Company in an amount to be proven at trial.

## COUNT III (DISMISSED)

### CONSTRUCTIVE FRAUD
### (Against Xuelian, Wei, Song and Ling)

377.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-220 above, as though fully set forth herein.

378.    Xuelian, Wei, Song and Ling, as officers and/or director of Linkwell, owe fiduciary duties to the Company and its public shareholders and have a fiduciary relationship relative to the Company.

379.    As described in paragraphs 94, 97-102, 116-18, 125-26, 151-56, 164, 166-93, 199 and 206-14 above, Xuelian, Wei, Song and Ling abused their fiduciary relationship with Linkwell such that an unconscionable advantage was taken to the detriment of the Company. Xuelian, Wei, Song and Ling abused their fiduciary relationship with Linkwell by:

a.    Approving and ratifying the Transaction for no consideration;

b.    Authorizing the undisclosed transfer of Linkwell's operating assets and business to Xuelian and Wei, or entities controlled by Xuelian for no consideration; and

c.    Causing Linkwell to submit materially misleading financial statements, information statements and press releases concerning the Transaction with the SEC.

380.    Xuelian, Wei, Song and Ling were each a participant in a scheme to defraud Linkwell by wrongfully issuing approximately 94% of the Company's equity to Metamining and CD Defendants for no consideration.

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 101 of 141

381.   Xuelian, Wei, Song and Ling approved and/or ratified the Transaction, including the issuance of shares of common and Series C convertible preferred stock to Metamining and CD Defendants in connection therewith.

382.   Xuelian, Wei, Song and Ling, through the abuse of the fiduciary relationship, took improper advantage of Linkwell by entering an agreement to transfer substantially all of the Company's equity to Metamining and CD Defendants for no consideration.  In exchange for the transfer of 94% of the Company's equity, Linkwell Tech, Likang Disinfectant and Likang Biological would be secretly spun-off to Xuelian and Wei or their affiliates.

383.   As a direct and proximate result of such misconduct, the Company suffered significant damages.

384.   Xuelian, Wei, Song and Ling are liable to the Company in an amount to be proven at trial.

## COUNT IV (DISMISSED)

### CIVIL CONSPIRACY
**(Against Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada, CD Defendants and Ecolab)**

385.   Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-214 above, as though fully set forth herein.

386.   As described in paragraphs 116-18, 125-26, 133-56, 164, 167-78, 180-81, 186-88, 190, 196-200 and 206-14 above Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada, CD Defendants and Ecolab conspired with one another to defraud Linkwell by agreeing to the issuance of approximately 94% of the Company's equity in exchange for a shell company with no meaningful assets and a $11,250,000 financial obligation for no or grossly inadequate consideration; as the *quid pro quo*, authorized the secret transfer of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei, parties that they control or with whom

they are affiliated, or sale to Ecolab, for no consideration; and disguised their misconduct by submitting materially misleading public filings with the SEC concerning the Transaction.

387.   Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada and CD Defendants agreed to perpetrate the constructive fraud upon Linkwell.   Upon information and belief, Xuelian, Wei and CD Defendants solicited and/or advised Metamining and Metamining Nevada to undertake the Transaction on terms designed solely to benefit themselves.

388.   In furtherance of the conspiracy, the following actions were undertaken:

a.   Song, on behalf of Metamining Nevada, executed the Reverse Merger Consulting Agreement with China Direct and Capital Resource;

b.   Xuelian, on behalf of Linkwell, executed the Service and Consultant Service Agreement with Capital Resource;

c.   Ecolab cancelled the Put Option in the Stockholders Agreement;

d.   Xuelian, Wei, Song and Ling executed the Share Exchange Agreement;

e.   CD Defendants received 10,000,000 shares of the Company's common stock and 581,973 shares of Series C convertible preferred stock as compensation for services rendered in connection with the Transaction;

f.   CD Defendants prepared and/or reviewed public filings for submission to the SEC in connection with the Transaction, which were materially false and misleading;

g.   Metamining transferred an $11,250,000 financial obligation off its books to Metamining Nevada, and then on to the balance sheet of Linkwell;

h.   Xuelian, Wei, Song and Ling approved of the submission of materially misleading public filings to the SEC concerning the Transaction;

      i.     The results of operations from the Company's subsidiary disinfectant business was removed from the consolidated statements of operations and comprehensive income of Linkwell, and only reappeared after the receipt of Plaintiff's Demand Letter and/or the SEC staff comments to the Company's filings, accompanied and followed by subsequent disclosures indicating that Linkwell would again dispose of these assets; and

      j.     Linkwell did not file with the SEC its Form 10-K for fiscal year ended December 31, 2012, and has not filed a Form 10-Q or Form 10-K financial disclosure for any subsequent period.

389.    As a direct and proximate result of the foregoing misconduct, the Company suffered significant damages.

390.    Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada, CD Defendants and Ecolab are liable to the Company in an amount to be proven at trial.

## COUNT V (DISMISSED)

### UNJUST ENRICHMENT
**(Against Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada and CD Defendants)**

391.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-214 above, as though fully set forth herein.

392.    By their wrongful acts and omissions, as described in paragraphs 135-41, 144-47, 151-56, 168, 171-78, 181, 186-88, 190 and 206-10 above, Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada and CD Defendants were unjustly enriched at the expense of and to the detriment of the Company. By approving the Transaction, Xuelian, Wei, Song and Ling agreed to give away approximately 94% of the equity of Linkwell at no cost to Metamining, while at the same time saddling the Company with an $11.25 million obligation for an asset (the Nevada Properties) which it did not own. Moreover, they also agreed to secretly

spin-off of Linkwell Tech, Likang Disinfectant and Likang Biological to Xuelian and Wei or their affiliates with no consideration to the Company.

393.    Plaintiff, as a shareholder and representative of Linkwell, seeks rescission of the Transaction, an Order disgorging all profits, benefits and other compensation obtained by Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada and CD Defendants from their wrongful conduct, and other relief for the Company, in an amount to be proven at trial.  While the portion of the Transaction by which 94% of the equity of Linkwell has apparently been unwound as a result of the prosecution of this action, as described in paragraphs 211-14 above, the fair value of the Company's 90% equity interest in Linkwell Tech, and Linkwell Tech's 100% equity interest in Likang Disinfectant and Likang Biological has not been accounted for.

394.    Plaintiff, as a shareholder representative of Linkwell, also seeks an award of damages equal to the value of the Company's equity interest in Linkwell Tech, Likang Disinfectant and Likang Biological at the time immediately prior to the execution of the Share Exchange Agreement on March 30, 2012.

## COUNT VI (DISMISSED)

### CONSTRUCTIVE TRUST
### (Against Xuelian, Wei, Song and Ling)

395.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-214 above, as though fully set forth herein.

396.    In the alternative and/or in conjunction with the relief requested above, Plaintiff seeks the establishment and imposition of a constructive trust on the stock certificates Linkwell Tech and Likang Disinfectant that belong to Linkwell.

397.    Xuelian, Wei, Song and Ling owed fiduciary duties to Linkwell and its shareholders.

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 105 of
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 105 of
141

398.    By agreeing to provide a clean public shell company to accomplish the Transaction and approving the secret sale or transfer of Linkwell Tech, Likang Disinfectant and Likang Biological, Xuelian, Wei, Song and Ling took advantage of their fiduciary relationship with the Company.

399.    Permitting Xuelian, Wei, Song and Ling to secretly transfer the Company's equity interests in Linkwell Tech, Likang Disinfectant and Likang Biological without adequate consideration to the Company constitutes an abuse of their fiduciary relationship with Linkwell.

400.    Equity demands that a constructive trust should be imposed to hold the stock certificates of Linkwell Tech, Likang Disinfectant and Likang Biological until such time as Linkwell obtains fair value for those assets.

### COUNT VII (DISMISSED)

**ATTORNEYS' FEES AND EXPENSES**
**(Against Xuelian, Wei, Song, Ling, Metamining, Metamining Nevada, CD Defendants and Ecolab)**

401.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-214 above, as though fully set forth herein.

402.    This is a shareholders derivative action brought pursuant to Section 607.07401 of the Florida Statutes.

403.    Plaintiff has had to retain counsel to bring this action because the Board is grossly conflicted and refused to take any action in response to the Demand Letter to recover the substantial damages sustained by Linkwell.

404.    Pursuant to Subsection (6) of Section 607.07401, the Court "may award reasonable expenses for maintaining the proceeding, including reasonable attorney's fees, to a successful plaintiff or to the person commencing the proceeding who receives *any* relief …."

405.   As described in paragraphs 206-14 above, Plaintiff's prosecution of the derivative claims in this action resulted in the Transaction being unwound.

406.   The Transaction was unwound prior to the unilateral sale of Plaintiff's shares of Linkwell stock.[3]

407.   Plaintiff requests a statutory award of attorney's fees and expenses incurred in connection with the relief obtained on behalf of Linkwell in connection with this action.

## X.   CAUSES OF ACTION - CLASS CLAIMS

### COUNT VIII

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER
(Against Xuelian, Wei and Sidley)

408.   Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-340 above, as though fully set forth herein.

409.   By their acts, transactions and courses of conduct, as alleged in paragraphs 103-08, 217-23, 227-29, 234-49, 278-99 and 302-04 above, Xuelian, Wei and Sidley knowingly and/or recklessly deceived the Class, including Plaintiff, in connection with the sale of the shares of their Linkwell stock by the failure to provide the Class with statutory notice concerning the Acquisition, as required by Sections 607.0705 and 607.1103 of the Florida Statutes.

410.   Xuelian, Wei and Sidley each violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) by covertly engineering the Acquisition and refusing to disclose any material fact regarding the same to Plaintiff and the Class, which operated as fraud and deceit upon Plaintiff and the Class by: (a) divesting them of their equity in Linkwell through the

---

[3] Plaintiff reserves his right to make an application under Section 607.07401(6) of the Florida Statutes to recover reasonable expenses, including attorney's fees, for the benefit that was conferred upon the Company prior to the dismissal of the derivative claims in this action.

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 107 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 107 of
141

unilateral sale of their shares of Linkwell stock – without paying them fair value therefor; and (b) preventing them from moving to enjoin the Acquisition prior to its consummation.  Sidley was the architect of the Acquisition and represented all parties thereto.

411.    As directors, officers and controlling shareholders of Linkwell at the time they determined to undertake the Acquisition, Xuelian and Wei had a fiduciary obligation to disclose truthful information that would be material to Linkwell shareholders in compliance with applicable laws and regulations.  Xuelian and Wei had a fiduciary obligation to Plaintiff and the Class to disclose that the Company had entered into a material transaction for the sale of 100% of its equity to Yinling.  As legal counsel in connection with the Acquisition, Sidley was responsible for ensuring that the Acquisition complied with applicable laws and regulations. Sidley knew that Xuelian and Wei had a fiduciary obligation to disclose all material facts relating to the Acquisition to Plaintiff and the Class.  Sidley also knew that Xuelian and Wei had not discharged their fiduciary obligation because no notice or other information in connection with the Acquisition was furnished to Plaintiff or the Class.  Sidley made the decision to not provide any notice regarding the Acquisition, or other information in connection with the same, to Plaintiff or the Class.

412.    Pursuant to Sections 607.0705 and 607.1103 of the Florida Statutes, Xuelian, Wei and Sidley were obligated to timely furnish notice of the Acquisition and shareholder appraisal rights to all Linkwell shareholders at least 10 days in advance of the Special Meeting.  Sidley, acting in concert with Xuelian and Wei, did not provide Plaintiff or other members of the Class with the requisite notice.

413.   The knowing and/or grossly reckless nondisclosure of any facts regarding the Acquisition (including the existence of the Acquisition itself) by Xuelian, Wei and Sidley operated as a fraud and deceit upon Plaintiff and the other members of the Class.

414.   The facts alleged herein give rise to a strong inference that Xuelian, Wei and Sidley acted with scienter.   Xuelian, Wei and Sidley each knew or with extreme recklessness disregarded their fiduciary obligation and/or legal duty to provide all shareholders of Linkwell with statutory notice in connection with the Acquisition and that their complete failure to do so would operate as a fraud and deceit upon Plaintiff and the Class.

415.   Xuelian, Wei and Sidley carried out a deliberate scheme to deceive or defraud Plaintiff and the Class by the nondisclosure of the Acquisition with the intent to prevent any litigation brought by Plaintiff or any member of the Class with respect to the Acquisition prior to its consummation.  As described in paragraphs 217-44 above, Sidley was an active participant in the scheme to prevent the disclosure of the Acquisition to Plaintiff and the Class.  As described in paragraphs 217-23, 227-29, 235-38, 240, 242-44, 294-95, 299 and 307-08 above, Sidley was the architect of the design, implementation and consummation of the Acquisition.

416.   Xuelian, Wei and Sidley, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, made or substantially participated in the unlawful and/or fraudulent conduct described above.

417.   If Xuelian, Wei and/or Sidley had complied with Florida law and provided statutory notice in connection with the Acquisition, Plaintiff would have moved for an injunction in this action.  As a result of their knowing or grossly reckless disregard of Florida law, and their fiduciary obligation and/or legal duty to provide notice to all Linkwell shareholders in

107

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 109 of 141

connection with the Acquisition, Plaintiff was wrongfully deprived of the opportunity to enjoin the Acquisition or exercise other rights, including appraisal rights.

418.    As a direct and proximate result of the wrongful conduct of Xuelian, Wei and Sidley, Plaintiff and the other members of the Class suffered damages in connection with the sale of their Linkwell stock for substantially less than fair value.

419.    Xuelian, Wei and Sidley are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT IX

### BREACH OF FIDUCIARY DUTY
### (Against Xuelian and Wei)

420.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-340 above, as though fully set forth herein.

421.    As directors, officers and controlling shareholders of Linkwell at the time they determined to undertake the Acquisition, Xuelian and Wei owed Plaintiff and the Class fiduciary obligations of loyalty, good faith, due care and disclosure.

422.    Xuelian and Wei violated their fiduciary obligations by determining to covertly enter and consummate the Acquisition for the purpose of: (a) terminating the derivative claims asserted against them; and (b) without regard to the fairness of the Acquisition to Plaintiff and the Class.

423.    By their acts, transactions and courses of conduct, as described in paragraphs 103-08, 216-23, 227-28, 234-35, 241-42, 249-57, 269-71, 274-75, 278-86, 289-92 and 294-313 above, Xuelian and Wei, individually and acting as part of a common plan, advanced their interests at the expense of Plaintiff and the Class.

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 110 of 141

424.    The Acquisition was implemented by and for the benefit of Xuelian and Wei, who stood on both sides of the transaction.  As such, Xuelian and Wei must establish the entire fairness of the transaction.

425.    Xuelian and Wei breached their fiduciary duties to Plaintiff and the Class by, among other things:

a.    Unlawfully and unfairly depriving Plaintiff and other public shareholders of Linkwell that held their stock in street name statutory notice of the Acquisition and their appraisal rights, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes;

b.    Failing to properly value Linkwell for purposes of the Acquisition, including the value of the derivative claims asserted in this action;

c.    Failing to properly maximize the value of Linkwell to its public shareholders;

d.    Agreeing to consummate the Acquisition at a price that does not adequately reflect Linkwell's true value

e.    Failing to ensure a fair process;

f.    Failing to disclose all material information that would allow Linkwell public shareholders to cast a fully informed vote on the Acquisition;

g.    Failing to disclose all material information about the Special Meeting so as to allow Linkwell public shareholders to vote on whether to approve the Merger Agreement;

h.    Causing Linkwell to retroactively and prospectively indemnify them for all costs and expenses incurred in this action and in connection with the Acquisition; and

i.    Failing and/or refusing to disclose that after the Acquisition was consummated, Xuelian would own the controlling equity interest in Likang Disinfectant.

426.   As directors, officers and/or controlling shareholders of Linkwell and Likang Disinfectant, Xuelian and Wei dominated and controlled the Company's business and corporate affairs and were in possession of non-public information concerning the assets, business and future prospects of Linkwell, Linkwell Tech, Likang Disinfectant and Likang Biological.  Thus, there was an imbalance and disparity of information between Xuelian and Wei, on one hand, and the public shareholders of Linkwell, on the other, that made it inherently unfair for Xuelian and Wei to pursue any transaction where they obtained disproportionate benefits from the Acquisition, to the detriment of the Company's public shareholders.

427.   By reason of the foregoing acts, practices and course of conduct, Xuelian and Wei failed to exercise ordinary care and diligence in discharging their fiduciary obligations to Plaintiff and the Class.

428.   Xuelian and Wei engaged in self-dealing, did not act in good faith towards Plaintiff and the Class and failed to disclose material facts regarding the Acquisition in breach of their fiduciary obligations to Plaintiff and members of the Class.

429.   As a direct and proximate result of the foregoing breaches of fiduciary duty by Xuelian and Wei, Plaintiff and the Class suffered significant damages.

430.   Xuelian and Wei are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT X

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Sidley, Yinling, Leading First and Leading World)

431.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-340 above, as though fully set forth herein.

432.    Sidley, Yinling, Leading First and Leading World aided and abetted and rendered substantial assistance in the wrongful conduct complained of in paragraphs 420-29.  In taking such actions to substantially assist the commission of wrongdoing complained of, Sidley and Yinling acted with knowledge of the primary wrongdoing, and were aware of their overall contribution to and furtherance of the wrongdoing.

433.    Sidley and Yinling provided material support to Xuelian and Wei in connection with the Acquisition.

434.    Sidley and Yinling knew that Xuelian and Wei were Defendants in this action and that the claims against them involved serious charges of wrongdoing in breach of their fiduciary duties to Linkwell and its public shareholders.

435.    Sidley and Yinling knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary duties to Plaintiff and the Class when they determined to undertake a going-private merger transaction to terminate the then pending derivative claims without providing notice to all of the Company's shareholders.

436.    Sidley and Yinling knew that the Acquisition was not an arm's-length transaction as all parties to the Acquisition were represented by the same legal counsel and Xuelian and Wei stood on both sides of the transaction.

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 113 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 113 of
141

437.    Sidley and Yinling knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary duties to Plaintiff and the Class when they approved and recommended approval of Acquisition for grossly inadequate consideration (less than $500,000).

438.    Sidley and Yinling also knew that Plaintiff and the Class were not provided with statutory notice of the Special Meeting or their appraisal rights under Florida law.

439.    As described in paragraphs 216-23, 227-29, 234-57, 273-83, 286, 289-92, 294-308, 312-16, 321-25 and 329-30 above, Sidley provided substantial assistance to Xuelian and Wei by, among other things:

a.      Undertaking the representation of Likang Disinfectant and Yinling in the Acquisition despite knowledge that the interests of Likang Disinfectant and Yinling were adverse and that such representation violated the Rules of Professional Conduct (ABA Model Rules of Professional Conduct 1.7 and 1.13; New York Rules of Professional Conduct 1.7 and 1.13) irrespective of the waivers obtained;

b.      Undertaking the representation of Linkwell, Xuelian and Wei in this action despite knowledge that the interests of Linkwell were adverse to the interests of Xuelian and Wei and that such representation violated the Rules of Professional Conduct (ABA Model Rules of Professional Conduct 1.7 and 1.13; New York Rules of Professional Conduct 1.7 and 1.13);

c.      Condoning, acquiescing, assisting, acting in concert and/or participating in the actions of Xuelian and Wei to procure through fraud, material misrepresentation or omission and/or unfair dealing the consummation of the Acquisition for the purpose of terminating the derivative claims in this action and obtaining control of Likang Disinfectant;

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 114 of
141
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 114 of
141

d.      Providing legal advice and assistance to Xuelian, Wei and Yinling for the purpose of entering and consummating the Acquisition;

e.      Omitting to disclose the following material information in the Proxy Statement:

i.      The pendency of this action;

ii.      That a primary purpose of the Acquisition was to terminate this action;

iii.      That Sidley served as legal counsel for both Likang Disinfectant and Yinling in the Acquisition whereby Leading First, a wholly owned subsidiary of Yinling acquired 100% of the equity of Linkwell for $0.88 per share; and

iv.      That Sidley served as legal counsel for Linkwell, Xuelian and Wei in connection with the derivative claims asserted only against Xuelian and Wei in this action and had not requested or obtained the consent or a waiver of conflicts from anyone, including the Company's public shareholders, with respect to such representation;

f.      Failing to provide any financial statements of Linkwell (audited or unaudited) or financial projections for Linkwell in the Proxy Statement;

g.      Failing to include a fairness opinion or other financial analysis of the merger consideration in the Proxy Statement;

h.      Failing to provide a valuation of the derivative claims asserted in this action in the Proxy Statement;

i.      Failing to ensure that Plaintiff and members of the Class were provided with notice in connection with the Acquisition or notice of their appraisal and other rights, as mandated by Sections 607.0705 and 607.1103 of the Florida Statutes;

113

j.      Drafting the Amended Articles of Incorporation to shield Xuelian and Wei from personal liability arising as a result of this action, including claims arising from the Acquisition, and legitimize fees and expenses previously incurred and to be incurred by Xuelian, Wei and their affiliates in connection with the defense of this action;

k.      Failing  to timely disclose information regarding the Acquisition to the Court and Plaintiff during the pendency of this action;

l.      Failing to timely disclose to the Court and Plaintiff that it represented Linkwell, Xuelian and Wei in this action;

m.      Acting in concert and complicity with Xuelian and Wei by, *inter alia*, causing the Company to not comply with the Orders of the Court and its obligations under the Federal Rules of Civil Procedure;

n.      Failing to inform the Court and Plaintiff that Xuelian presently exercises control over Linkwell and its corporate documents which are located at the same address as Likang Disinfectant;

o.      Participating in the preparation, review and filing of declarations by Xuelian and Wei, which declarations Sidley knew to be false and/or misleading; and

p.      Failing to inform the Court and Plaintiff regarding the falsity in the declarations of Xuelian and Wei, filed with the Court on November 17, 2014.

440.    As described in paragraphs 218-19, 229, 234 and 250-57 above, Yinling provided substantial assistance to Xuelian and Wei by, among other things:

a.      Agreeing, through Leading First and Leading World, to be a party to the Merger Agreement;

       b.      Agreeing to the implementation of the Acquisition and the vote to approve the Merger Agreement at the Special Meeting without the provision of notice to all of the Company's shareholders; and

       c.      Operating as the agent or intermediary of Xuelian, Wei and/or Sidley in order to divest Plaintiff of his shares of Linkwell stock and thereby terminate the derivative claims asserted in this action.

441.    As a direct and proximate result of the aiding and abetting breaches of fiduciary duty by Sidley, Yinling, Leading First and Leading World, Plaintiff and the Class suffered significant damages.

442.    Sidley, Yinling, Leading First and Leading World are liable to Plaintiff and the Class in an amount to be proven at trial.

## COUNT XI

### CIVIL CONSPIRACY
### (Against Xuelian, Wei, Sidley and Yinling)

443.    Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1-340 above, as though fully set forth herein.

444.    As described in paragraphs 103-08, 216-23, 226-29, 234-57, 269-71, 273-86 and 289-308 above Xuelian, Wei, Sidley and Yinling conspired with one another to covertly enter and consummate the Acquisition without notice to Plaintiff or the Class, in violation of Sections 607.0705 and 607.1103 of the Florida Statutes, whereby the Class members' Linkwell stock was acquired through an unlawful and unfair process and at a grossly inadequate price.

445.    Xuelian, Wei, Sidley and Yinling agreed to covertly enter the Acquisition in order to ensure that the same was consummated before Plaintiff or any other member of the Class had the opportunity to: (a) evaluate whether the $0.88 per share merger consideration was fair; (b)

vote for or against the approval of the Merger Agreement; (c) exercise appraisal rights; or (d) move to enjoin the Acquisition.

446.   Xuelian and Wei violated their fiduciary obligations to Plaintiff and the Class by determining to enter and consummate the Acquisition without the provision of notice and without regard to the fairness of the Acquisition to Plaintiff and the Class.

447.   Sidley and Yinling knew that the Acquisition was not an arm's-length transaction since all parties to the Acquisition had agreed to be represented by the same legal counsel (Sidley) and Xuelian and Wei stood on both sides of the transaction.

448.   Sidley and Yinling each knew that Xuelian and Wei, as directors, officers and/or controlling shareholders of Linkwell, were acting in breach of their fiduciary obligations to Plaintiff and the Class when they approved and recommended approval of Acquisition without notice and for grossly inadequate consideration.

449.   Sidley and Yinling also knew that Plaintiff and the Class did not receive statutory notice of the Special Meeting or their appraisal rights.

450.   In furtherance of the conspiracy, the following actions were undertaken:

a.   Sidley prepared the Proposal at the behest of Xuelian and Liyong;

b.   Xuelian and Sidley executed the Likang Engagement Letter whereby Sidley was retained as legal counsel for Likang Disinfectant in connection with the Acquisition;

c.   Sidley filed the Notice of Termination on behalf of Linkwell with the SEC to avoid the SEC proxy rules;

d.   Xuelian and Sidley executed the Supplement whereby Sidley: (i) was retained as legal counsel for Linkwell, Xuelian and Wei for the claims asserted against Xuelian and Wei asserted in this action; and (ii) undertook the representation with full knowledge that the

interests of Linkwell were adverse to the interests of Xuelian and Wei and that such representation violated the Rules of Professional Conduct;

   e.  Yinling and Sidley executed an engagement letter whereby Sidley: (i) was retained as legal counsel for Yinling in connection with the Acquisition, in addition to serving as legal counsel for Likang in connection with the Acquisition; and (ii) undertook the representation of both Yinling and Likang Disinfectant with full knowledge that the interests of the two entities were adverse and that such representation violated the Rules of Professional Conduct;

   f.  Sidley provided legal advice to Xuelian and Wei for the purpose of terminating their liability to Linkwell;

   g.  Xuelian, Wei, Sidley and Yinling agreed not to provide Plaintiff or the Class with the Notice, Proxy Statement or notice of their appraisal rights;

   h.  Sidley prepared the Amended Articles of Incorporation;

   i.  Xuelian and Wei caused Linkwell to consummate the Acquisition with Yinling (through Leading First and Leading World); and

   j.  Plaintiff and the Class were divested of their shares of Linkwell stock without notice and for grossly inadequate value.

451. As a direct and proximate result of the foregoing misconduct, Plaintiff and the Class suffered significant damages.

452. Xuelian, Wei, Sidley and Yinling are liable to Plaintiff and the Class in an amount to be proven at trial.

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.      Determining that, under the circumstance, equity requires that Plaintiff is entitled to pursue derivative claims on behalf of the Company, that this suit is properly brought as a derivative action and designating Plaintiff as an appropriate representative of Linkwell for said action;

b.      Awarding damages, as specified in Counts I through VII above, in favor of Linkwell for the injuries sustained as a result of Defendants' breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty constructive fraud, civil conspiracy and unjust enrichment and reserving the right to seek punitive damages against the appropriate Defendants upon an appropriate showing in the record;

c.      Disgorging all profits and benefits obtained by Defendants by reason of the wrongs alleged herein and requiring them to reimburse all losses and expenses incurred by the Company as a result of their wrongdoing;

d.      Requiring Xuelian, Wei, Song and Ling to return to the Company all fees, monies and property received by them in their capacities as directors of Linkwell during the Relevant Period, including all legal fees and disbursements paid to them and their affiliates in connection with this action;

e.      Directing each of the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of their culpable conduct;

f.      Imposing a constructive trust to hold the share certificates of Linkwell Tech, Likang Disinfectant and Likang Biological until such time as a determination is made to award Linkwell fair value for those assets;

g.        Awarding to Plaintiff, pursuant to Section 607.07401(6) of the Florida Statutes, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses.

In light of the dismissal of the derivative claims, Plaintiff alternatively prays for judgment as follows:

a.        Declaring that the claims in connection with the Acquisition are properly maintainable as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative and appointing Wolf Haldenstein Adler Freeman & Herz LLP and Fischler & Friedman, P.A. as class counsel pursuant to Rule 23(g);

b.        Declaring and determining that Defendants violated the Exchange Act by reason of the acts, omissions and nondisclosures alleged herein;

c.        Awarding Plaintiff and the Class compensatory damages against all Defendants in connection with Counts VIII through XI above, jointly and severally, in an amount to be determined at trial, together with prejudgment interest thereon;

d.        Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' and experts' fees, costs and expenses; and

e.        Granting Plaintiff and the Class such other and further relief as the Court deems just and proper.

Case 0:16-cv-62506-FAM   Document 60-1   Entered on FLSD Docket 10/19/2017   Page 121 of
Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 121 of
141
141

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury of all issues so triable.

Dated: August 10, 2016

**FISCHLER & FRIEDMAN, P.A.**

By:      /s/ Michael A. Fischler

Michael A. Fischler
Attorney Bar Number: 255531
1000 South Andrews Avenue
Fort Lauderdale, FL 33316
(954) 763-5778

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
Charles J. Hecht
Malcolm T. Brown
270 Madison Avenue
New York, NY 10016
(212) 545-4600

*Attorneys for Plaintiff*

/788567

120

## **VERIFICATION**

STATE OF NEW YORK     :
                                : ss.:

COUNTY OF NEW YORK   :

        Frederick Siegmund, being duly sworn, deposes and says:

        I am the plaintiff in the action captioned above and have authorized the filing of the Fourth Amended Verified Shareholders Derivative and Class Action Complaint (the "Amended Complaint").

        I have reviewed the allegations made in the Amended Complaint, and to those allegations to which I have personal knowledge, I declare that those allegations are true and correct.  As to the allegations to which I do not have personal knowledge, I rely on the investigation conducted by my counsel, and for that reason believe those allegations to be true to the best of my knowledge, information and belief.

        I was a shareholder of nominal defendant Linkwell Corporation ("Linkwell"), an owner of Linkwell common stock and was an owner of such stock during the time period in which the wrongful conduct alleged in connection with the derivative claims in the Amended Complaint.  I did not sell, transfer or redeem my shares of Linkwell stock.  On November 6, 2014, my shares of Linkwell stock were unilaterally cancelled from my brokerage account without notice.

        This verification is made subject to the penalty of perjury under the laws of the United States.

FREDERICK SIEGMUND

Sworn to and subscribed before
me this 10th day of August 2016

_____
Notary Public

/788264

APRIL V TAGLIARINO
Notary Public, State of New York
No. 01TA6165968
Qualified in Bronx County
Commission Expires May 14, 2019

## CERTIFICATION

Frederick Siegmund ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in Linkwell Corporation ("Linkwell") securities and the unilateral sale of his Linkwell stock in connection with the Acquisition, as specified in the [Proposed] Fourth Amended Complaint, are as follows:

| Date | Shares Acquired | Shares Sold | Price |
|------|-----------------|-------------|-------|
| 04/18/2008 | 10,000 | | $2,100.00 |
| 11/18/2009 | 2,500 | | $  415.00 |
| 11/1802009 | 7,500 | | $1,275.00 |
| 12/16/2009 | 1,600 | | $  208.00 |
| 12/18/2009 | 8,400 | | $1,092.00 |
| 12/28/2009 | 9,500 | | $1,339.50 |
| 12/29/2009 | 10,500 | | $1,480.50 |
| 01/27/2011 | 7,500 | | $  645.00 |
| 02/16/2011 | 5,000 | | $  430.00 |
| 02/22/2011 | 6,000 | | $  516.00 |
| 02/25/2011 | 1,500 | | $  127.50 |
| 02/25/2011 | 10,000 | | $  810.00 |
| 03/15/2011 | 2,800 | | $  218.40 |
| 03/17/2011 | 7,200 | | $  561.60 |
| 07/01/2011 | 10,000 | | $  300.00 |
| 11/06/2014 | | 500 | $  440.00 |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of August, 2016.

FREDERICK SIEGMUND

/788617

# EXHIBIT A

*FREDERICK SIEGMUND*
*580 WEST END AVENUE – APT. 14*
*NEW YORK, NEW YORK 10024*

JULY 24, 2012

VIA FEDERAL EXPRESS

Xuelian Bian
Chief Executive Officer and Chairman of the Board of Directors
Linkwell Corporation
1104 Jiatong Road, Jiading District
Shanghai 201807
China

VIA FEDERAL EXPRESS

Xuelian Bian
Chief Executive Officer and Chairman of the Board of Directors
Linkwell Corporation
502 N. Division Street
Carson City, NV 89703

Re:     Books and Records Demand

Dear Mr. Bian:

I am a stockholder of Linkwell Corporation (the "Company") as evidenced by my annexed account statement. Pursuant to Section 670.1602 of Florida Statutes, I hereby request the right to inspect the books and records of the Company.

The purpose of this request is to investigate potential breaches of fiduciary duty and/or the aiding and abetting of breaches of fiduciary duty committed by Linkwell's current and former officers and members of its Board of Directors with respect to the following:

1.     The reasons why the Company authorized a 1 for 30 reverse stock split in or about 2011;

2.     The reasons why the Company elected instead to do a 1 for 200 reverse stock split prior to March 30, 2012;

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 127 of 141

Xuelian Bian
Page 2
July 24, 2012

3.    The reasons why the Company did not deliver to the shareholders a written appraisal notice and form at the time of either the initially proposed or subsequent reverse stock split;

4.    The reasons why the Company elected to enter into a transaction with Metamining Nevada Inc.;

5.    The basis on which the Company valued Metamining Nevada, Inc., as being worth approximately 9.5 million shares of Linkwell Capital Series C Convertible Preferred Stock and 3 million shares of Series C Common Stock Purchase Warrants;

6.    The circumstances surrounding the reasons why the Company issued the Shanghai Haimai Law Firm 8,350,000 shares, including 6 million shares of Company stock as compensation for future legal services valued at $160,000;

7.    The circumstances surrounding the Company's issuance in March 2012 of 10 million Company shares to CD International Enterprises, Inc. for unidentified consulting services valued at $250,000; and

8.    The reasons why the Company no longer reports the assets and liabilities and the results of operations of its 90% equity interest in Linkwell Tech Group, Inc. which wholly owns Shanghai LiKang Disinfectant High-Tech Company, Limited and Shanghai LiKang Biological High-Tech Co., Ltd. (collectively referred to as the "Linkwell Tech Group").

To conduct this inspection, I request copies of all applicable board minutes, by-laws, amendments, thereto and the Company's Certificate of Incorporation, and any amendments thereto. For the purpose of this demand, I will limit, without prejudice to the right to expand the demand if circumstances warrant, the timeframe concerning board minutes for the period of January 1, 2010 to the present.

Also, given the issues raised about the purchase of Metamining and the Company's 90% interest in Linkwell Tech Group, I request copies of any investment or other banker's presentations, valuations and/or appraisals concerning the value of Metamining and Linkwell's 90% interest in Linkwell Tech Group, Inc. and its two wholly-owned subsidiaries. I also request the books and records that demonstrate what consulting services Cap One Resource Co., Ltd. and its related entities provided to the Company and the services performed by Shanghai Haimai Law firm, to the extent, not privileged.

Xuelian Bian
Page 3
July 24, 2012

I request that this information be furnished to me within 14 business days or I will be compelled to avail myself to appropriate remedies under both Florida law and the federal securities laws.

Frederick Siegmund

Sworn to before me this
26 day of July, 2012

Notary Public

MITCHELL J FLACHNER
Notary Public, State of New York
Nassau County
Lic. #02FL5039193
Comm. Exp. March 27, 20_14_

Bcc:   Charles J. Hecht, Esq.
        Gregory M. Nespole, Esq.

CJH/cnm/693702



**TD Ameritrade**

**Statement Reporting Period:**
06/01/12 – 06/30/12

800-669-3900
TD AMERITRADE
DIVISION OF TD AMERITRADE INC
PO BOX 2209
OMAHA, NE 68103-2209

**Statement for Account #** 
FREDERICK SIEGMUND IRA ROLLOVER
TD AMERITRADE CLEARING CUSTODIAN
580 W END AVE
NEW YORK, NY 10024-1723

**Announcements:**
ON OR ABOUT SEPTEMBER 1, THE FEE
FOR A VOLUNTARY OR MANDATORY
REORGANIZATION WILL BE 38 DOLLARS.
FOR MORE INFORMATION, GO TO
TDAMERITRADE.COM/RATESFEES.

## Portfolio Summary

| Investment | Current Value | Prior Value | Period Change | % Change | Estimated Income | Estimated Yield | Portfolio Allocation |
|---|---|---|---|---|---|---|---|
| Cash | | | | | | | |
| Insrd Dep Acct | | | | | | | |
| Money Market | | | | | | | |
| Short Balance | | | | | | | |
| Stocks | | | | | | | |
| Short Stocks | | | | | | | |
| Fixed Income | | | | | | | |
| Options | | | | | | | |
| Short Options | | | | | | | |
| Mutual Funds | | | | | | | |
| Other | | | | | | | |
| Total | | | | | | | |



| | |
|---|---|
| Opening Balance | |
| Securities Purchased | |
| Securities Sold | |
| Contributions | |
| Distributions | |
| Income | |
| Expense | |
| Other | |
| Closing Balance | |

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 130 of 141

**Statement for Account #** ▓▓▓▓▓
06/01/12 – 06/30/12

## Account Positions

| Investment Description | Symbol/ CUSIP | Quantity | Current Price | Market Value | Purchase Date | Cost Basis | Average Cost | Unrealized Gain(Loss) | Estimated Income | Yiel |
|---|---|---|---|---|---|---|---|---|---|---|
| Stocks – Cash | | | | | | | | | | |
| LINKWELL CORP COM | LWLL | 100,000 | 0.024 | 2,400.00 | 04/18/08 | 11,598.38 | 0.12 | (9,198.38) | | |

Statement for Account #█████████
06/01/12 - 06/30/12

**Income Summary Detail**

| Description | Year to Da |
|---|---|
| Interest Income – Securities | |
| Ordinary Dividends | |
| Qualified Dividends | |
| IDA Interest | |

*This section displays current and year to date taxation values for this account. The current totals may not equ
can include changes made to previous payments and removal of payments reportable in a previous tax year (t

| Investment Description | Symbol/ CUSIP | Quantity | Current Price | Ac |
|---|---|---|---|---|
| Stocks – Cash | | | | |

# EXHIBIT B

Xuelian Bian
CEO and Chairman of the Board of Directors
Linkwell Corporation
1104 Jiatong Road, Jiading District
Shanghai 201807 China

July 31, 2012

Mr. Frederick Siegmund
580 West End Avenue, Apt. 14
New York, New York   10024

Dear Mr. Siegmund:

We are always pleased to hear from our shareholders.  Regarding your request, please be advised of the following:

1.  We have submitted most of the required materials and disclosures in our filings with the SEC, including periodic reports such as annual reports on Form 10-K, quarterly reports on Form 10-Q and other reports, such as current reports on Form 8-K.

2.  The disclosures you are seeking can be found on the SEC official website at www.sec.gov, including the various corporate documents.

3.  As you likely appreciate, under the U.S. securities laws and SEC staff positions, we are limited to the information we can provide to shareholders and other parties if those disclosures would involve selective disclosures.

We appreciate your interest.

Sincerely,

Xuelian Bian
CEO and Chairman of the Board of Directors
Linkwell Corporation

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 134 of 141

EXHIBIT C

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

FOUNDED 1888

270 MADISON AVENUE
NEW YORK, NY 10016
212-545-4600

GREGORY M. NESPOLE
212-545-4667
FAX 212-545-4758
NESPOLE@WHAFH.COM

SYMPHONY TOWERS
750 B STREET · SUITE 2770
SAN DIEGO, CA 92101

625 NORTH FLAGLER DRIVE ·
WEST PALM BEACH, FL 33401

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
55 WEST MONROE STREET, SUITE 1111
CHICAGO, IL 60603

August 16, 2012

**CONFIDENTIAL**

**VIA FEDERAL EXPRESS**

Board of Directors
c/o Xuelian Bian, CEO and Chairman
Linkwell Corporation
1104 Jiatong Road, Jiading District
Shanghai 201807 China

Re:    Demand for Legal Action

Dear Mr. Bian:

    This letter is written on behalf of Mr. Frederick Siegmund ("Siegmund"), an owner of the common stock of Linkwell Corporation ("Linkwell" or the "Company"). For the reasons set forth below, Mr. Siegmund demands, pursuant to Florida Statute §607.07401 concerning shareholders' derivative actions, that the Company take immediate legal action to redress all harm inflicted upon it and its shareholders. The Company and its shareholders were damaged by the conduct of certain officers, directors and employees of the Company due to their breaches of fiduciary duties and their commission of and/or acquiescence to the commission of fraud by certain members of the Company's most senior management.

**Status of Frederick Siegmund**

    Mr. Siegmund is a current owner of the common stock of Linkwell Corporation. Mr. Siegmund acquired his shares on April 18, 2008, acquired additional shares thereafter, and continuously held shares in the Company since that time. Mr. Siegmund previously documented his stock ownership in correspondence and materials provided to the Company on July 24, 2012, in connection with his demand to inspect certain books and records of the Company pursuant to Florida Statute §607.1602, concerning inspection of records by shareholders (the "Books and Records Demand").

WO﹍ HALDENSTEIN ADLER FREEMAN & HERZ LLP

Board of Directors                                            CONFIDENTIAL
Linkwell Corporation
August 16, 2012
Page 2

## Basis of Demand For Books and Records

The purpose of the demand for books and records was to investigate breaches of fiduciary duty committed by Linkwell's officers and members of its Board of Directors, in connection with the Company's transaction with Metamining, Inc. ("Metamining").

On April 2, Linkwell announced it had entered into a definitive share exchange agreement with Metamining to acquire the newly formed Metamining Nevada, Inc., ("Metamining Nevada") as a wholly owned subsidiary, in exchange for nine million shares of its newly issued Series C convertible preferred stock and three million warrants to purchase common stock. After giving effect to a 1 for 200 reverse stock split, the Series C preferred would be convertible into nine million shares of common stock, and the three million common stock purchase warrants would be exercisable for a period of five years from the date of issuance at $5.00 per share (the "Metamining Transaction").

As a result of the transaction, Linkwell common stock would be diluted dramatically and subsequently, shareholders would only own approximately 5% of the Company. Of further concern to Mr. Siegmund was that Metamining Nevada was purportedly a company engaged in the exploration, mining, and trading of iron ore. There did not seem to be any logical explanation as to why a growing company specializing in disinfectants would give away most of its shareholder equity to a speculative mining concern.

In conjunction with the acquisition of Metamining Nevada, Mr. Song Qiang Chen, co-founder and Executive Chairman and Mr. Ling Li, co-founder and Director of Metamining Nevada, were appointed as members of Linkwell's Board of Directors. Commenting on the acquisition, Mr. Xuelian Bian, CEO of Linkwell, stated, "We are extremely pleased to have entered into this agreement to acquire Metamining Nevada and enter into a new era for our company. We are confident that this acquisition will become a tremendous long term growth opportunity for our company and we intend to work diligently to unlock the vast potential of these mining properties for our shareholders."

As a result of the transaction with Metamining, the Company suffered and will continue to suffer material harm. Premised on these facts, Mr. Siegmund made the Books and Records Demand on the Board, pursuant to §607.1602.

## The §607.1602 Demand

By letter dated July 24, 2012[1], Mr. Siegmund made a §607.1602 Demand on Linkwell to inspect certain books and records of the Company. Generally, the requests pertained to the Company's reverse stock split, its transaction with Metamining, the whereabouts and reporting

---

[1] Attached hereto with accompanying list of documents demanded as Exhibit A.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

Board of Directors                                         CONFIDENTIAL
Linkwell Corporation
August 16, 2012
Page 3

of company assets and liabilities, and the Board's communications and investigation of these subjects. Additionally, the requests sought to explore any Board Members' conflicts of interest.

On July 31, 2012, CEO and Chairman Xuelian Bian ("Bian") sent Mr. Siegmund a letter in response to the §607.1602 Demand, stating that the Company was "limited" with regard to information it could provide and, in fact, provided no documents or information. Mr. Siegmund now makes the instant demand for corrective and legal action by the current Board of Directors.

**The Available Information Strongly Indicates that
Company Officials Were Acting in a Self-Interested Manner
and Failed to Fulfill Their Fiduciary Obligations to the Company**

On February 13, 2012, the Company's Board of Directors adopted and approved an amendment to the Company's Articles of Incorporation to effect a reverse stock split of the Company's common stock, of 1 share for every 30 outstanding shares. On April 2, 2012, the Company announced the Metamining Transaction, in which the previously adopted and approved 1 for 30 reverse stock split had apparently been changed to a 1 for 200 reverse stock split.

At the time of the announcement of the Metamining Transaction there were approximately 120 million shares of Linkwell common stock outstanding and after the 1 for 200 reverse stock split there would be approximately 600,000 shares outstanding. Under the terms of the definitive share exchange agreement with Metamining, the Company would be giving Metamining 9 million shares of post-reverse-stock-split stock to acquire Metamining Nevada. Shareholders would now only own approximately 5% of the Company.

No explanation was ever given as to how it was in the shareholders' best interests to dilute their holdings in order to purchase Metamining Nevada. No explanation was ever given as to why a growing disinfectant company would want to enter a completely unrelated and speculative mining business. In fact, Linkwell's 2011 revenue was approximately $17 million, a 20% year-over-year increase from 2010. Notwithstanding the Company's significant growth and prospects, the Board chose to enter into the Metamining Transaction and shareholder value has disappeared; shares of Linkwell have been rendered virtually worthless.

**Demand for Legal and Corporate Action
Pursuant to Florida Statute §607.07401**

Based on the above, as well as information from available public sources, it appears that the officers and directors of the Company knowingly engaged in, approved of and/or acquiesced to a pattern of self-dealing, gross mismanagement, and reckless disregard for their fiduciary duties. As a result, the Company and its shareholders have been injured and exposed to potential civil and regulatory liability.

Case 0:12-cv-62539-DPG   Document 402-1   Entered on FLSD Docket 08/10/2016   Page 138 of 141

Wo͡  ͡Haldenstein Adler Freeman & Herz LLP

Board of Directors                                                          CONFIDENTIAL
Linkwell Corporation
August 16, 2012
Page 4

There was a powerful motive to engage in or approve such conduct. While Company assets and revenues have disappeared, the Company has suffered and will continue to suffer material harm as a result of these wrongful actions and breaches of fiduciary duty.

While the Company chose not to provide Mr. Siegmund with the relevant internal documents to which he is entitled as a shareholder, through an investigation of publicly available information, Siegmund believes that there are strong grounds for the Company to immediately initiate legal action against individuals who participated in the conduct, which has substantially harmed the Company:

- Xuelian Bian ("Bian") has been a member of the Board of Directors and the President and CEO of Linkwell since June 2004. Bian has been Chairman since August 2005.

- Wei Guan ("Guan") has been a member of the Board of Directors and Vice President of the Company since August of 2005.

- Song Qiang Chen ("Chen") is the Chairman and Co-Founder of Metamining Nevada and has been a member of the Linkwell Board of Directors since April 2012.

- Ling Li ("Li") is a Co-Founder of Metamining Nevada and has been a member of the Linkwell Board of Directors since April 2012.

The claims to be brought should include all or some of the following:

- Claim for breach of the fiduciary duties of care, loyalty and good faith against all or some of the above-named individuals for permitting the Metamining Transaction on behalf of the Company without performing proper conflict checks.

- Claim for breach of the fiduciary duties of care, loyalty and good faith against all or some of the above-named individuals for abdicating their fiduciary duties to the Company and causing substantial harm to the Company by essentially giving the Company to Metamining and thereby securing terms beneficial to themselves and detrimental to the Company.

- Claim for breach of the fiduciary duties of care, loyalty and good faith against all or some of the above-named individuals for allowing the Company to discuss, participate in and agree to the Metamining Transaction.

- Claim for breach of fiduciary duty against all or some of the above-named individuals, for failing to properly manage and oversee the Company and to

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

Board of Directors                                          CONFIDENTIAL
Linkwell Corporation
August 16, 2012
Page 5

ensure that the Company was adequately protected from any conflicts of interest and that it was in compliance with all regulations and laws, including the securities laws.

- Claim for contribution and indemnification against all or some of the above-named individuals to the extent that the Company has been found liable and could be found liable in pending securities and derivative actions, stemming from the conflicts of and/or the lack of oversight from the Board of Directors. The Company's liability in those actions will arise in whole or part from the actions of all or some of the above-named individuals.

In addition to an action to recover the substantial losses suffered by the Company, the legal action should direct Linkwell to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from any repeat of the damaging events described herein.

Mr. Siegmund requests that the Company, within 15 business days from the date of receipt hereof, advise Gregory M. Nespole, Esq., Wolf Haldenstein Adler Freeman & Herz LLP, 270 Madison Avenue, New York, NY 10016, as to what action the Company intends to take in response to this demand.

Very truly yours,

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

Gregory M. Nespole
270 Madison Avenue
New York, New York 10016
(212) 545-4600 (phone)
(212) 545-4653 (fax)

GMN:mns/695959

EXHIBIT D

Linkwell Corporation
1104 Jiatong Road, Jiading District
Shanghai 201807 China

August 24, 2012

Mr. Frederick Siegmund
580 West End Avenue, Apt. 14
New York, New York 10024

Dear Mr. Siegmund:

We have received the recent letter from your attorney. We deny all of his various claims. We have always tried to act in the best interests of Linkwell.

Our books and records are at our offices in Shanghai, and you are welcome to come and visit Linkwell's offices to review the records and see our operations. These records are maintained in Chinese as they have always been. Please contact our Secretary Mr. Wang Jue (email:rick.wangl@gmail.com) to make arrangements.

I am also sending you Linkwell's Annual Report which should have most of the information you have asked for.

Sincerely,

Wang Jue
Board Secretary
Linkwell Corporation

Cc: Mr. Gregory M. Nespole